JOHN W. BERRY (bar admission pending, L.R. 83-2.4.1)
Email: berryj@sec.gov
DONALD W. SEARLES, Cal. Bar No. 135705
Email: searlesd@sec.gov
GARY Y. LEUNG (bar admission pending, L.R. 83-2.4.1)
Email: leungg@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>MANOUCHEHR MOSHAYEDI,<br><br>          Defendant. | Case No.  12-CV-01179-JVS-ANx<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF MUKESH BAJAJ UNDER RULES 403 AND 702 OF THE FEDERAL RULES OF EVIDENCE**<br><br>Date:      October 21, 2013<br>Time:     1:30 p.m.<br>Ctrm:    10C<br>Judge:   Hon. James V. Selna |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................... 1

II.   DR. BAJAJ AND HIS PROFFERED OPINIONS ................................... 3

    A.   Dr. Bajaj's Qualifications And Materials Considered ................... 3

    B.   Dr. Bajaj's Five "Principal" Opinions ........................................ 4

III.  ARGUMENT ........................................................................................... 5

    A.   Legal Standards ........................................................................... 5

        1.   An expert must be qualified ................................................. 6

        2.   Expert opinions must be both reliable and relevant ............. 7

        3.   Expert testimony is not helpful when it involves matters within the common knowledge of the fact finder or matters that can be addressed through cross-examination or argument ........................................ 8

        4.   Rule 403 also governs expert testimony ............................ 10

    B.   Dr. Bajaj's Opinion No. 1 About sTec's Stock Price Increase Before The Alleged Fraud Is Irrelevant And Unreliable ............. 10

        1.   His opinions about "crossing the chasm" are baseless ....... 11

        2.   Baja's other opinions about sTec's stock price increase in the first half of 2009 are equally flawed and irrelevant ................. 12

    C.   Dr. Bajaj's Opinion No. 2 About The EMC Price Discounts Is Irrelevant And Unreliable .......................................................... 14

    D.   Dr. Bajaj's Opinion No. 3 Regarding The "One-Off" Nature Of The Volume Commitment Is Just His View Of The Record .... 17

    E.   Baja's Opinion No. 4 About sTec's Inflated Q309 Guidance Is Also Just His View Of The Record ........................................ 18

    F.   Dr. Bajaj's Opinion No. 5 About sTec's Stock Price Decline Between August And November Is Irrelevant And Cumulative ... 20

    G.   Dr. Bajaj's Rebuttal Opinions Are Also Inadmissible ............... 22

IV.   CONCLUSION ...................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

*Arbol Media Inc. v. Hartford Casualty Ins. Co.*, No. SAXCV 02-0244-JVS (MLGx),
  2003 U.S. Dist. LEXIS 28465 (C.D. Cal. July 7, 2003) ...............................10

*AstraZeneca v. Tap Pharm. Prods. Inc.*,
  444 F. Supp. 2d 278 (D. Del. 2006) ............................................................10

*Bank of America, N.A. v. Bears Sterns Asset Management*, No. 08 Civ. 9265 (AJN),
  2013 U.S. Dist. LEXIS 125700 (S.D.N.Y. Sept. 3, 2013) .............................1

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit*,
  853 F. Supp. 2d 181 (D. Mass. 2012 )........................................................24

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit*,
  853 F. Supp. 2d 181 (D. Mass. 2012).........................................................24

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) .................................................................6, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..............................................................................6, 10

*Diaz v. Johnson Matthey, Inc.*,
  893 F. Supp. 358 (D.N.J. 1995)....................................................................6

*Domingo ex rel. Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ........................................................................7

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)......................................................................................9

*Haflich v. McLeod*, No. CV 09-161-M-DWM-JCL,
  2011 U.S. Dist. LEXIS 1943 (D. Mont. Jan. 10, 2011) ................................8

*Highland Capital Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) ......................................................8, 9

*Hinkle v. LaRoche*, No. CV-07-155-LRS,
  2008 U.S. Dist. LEXIS 106433 (E.D. Wash. Aug. 1, 2008).........................8

*In re Computer Sciences Corp. Set. Litig.*,
  288 F.R.D. 112 (E.D. Va. 2012)..................................................................21

*In re Credit Suisse First Boston Corp. Analyst Sec. Litig.*,
  250 F.R.D. 137 (S.D.N.Y. 2008)................................................................24

*In re Novatel Wireless Sec. Litig.*, No. 08cv1689 AJB (RBB),
  2011 U.S. Dist. LEXIS 133105 (S.D. Cal. Nov. 17, 2011)...........................8

*In re Oracle Corp. Sec. Litig.*, No. C 01-00988 SI,
  2009 U.S. Dist. LEXIS 50995 (N.D. Cal. June 16, 2009)..............................8

*In re Rezulin Prods. Liability Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................................10

*In re Safety-Kleen Corp.,*
   2004 U.S. Dist. LEXIS 30768 (D.S.C. Aug. 30, 2004)..............................10

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litig.,*
   284 F.R.D. 485 (C.D. Cal. 2012) (Selna, J.) ...................................7

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)........................................................................7

*Link Co. Inc. v. Fujitsu Ltd.,* Case No. 00 Civ. 7242 (SAS),
   2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. July 16, 2002)...........................9

*Malletier v. Dooney & Bourke, Inc.,*
   525 F. Supp. 2d 558 (S.D.N.Y) .....................................................6

*Marx & Co. v. Diners' Club, Inc.,*
   550 F.2d 505 (2d Cir. 1977) ..........................................................8

*Media Sport & Arts v. Kinney Shoe Corp.,* Case No. Civ. 3901 (PKL),
   1999 U.S. Dist. LEXIS 16035 (S.D.N.Y. Oct. 18, 1999).........................9

*Miller v. Thane International, Inc.,* No. SAVC 03-1031-JVS (SGLx),
   2005 W.L. 5957833 (C.D. Cal. Mar. 3, 2005) ....................................9

*Mukhtar v. California State Univ.,*
   299 F. 3d 1053 (9th Cir. 2002) ......................................................8

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.,* No. SACV 07-1306 JVS (RNBx),
   2008 U.S. Dist. LEXIS 95083 (C.D. Cal. Nov. 13, 2008) ..........................7

*Rosen v. Ciba-Geigy Corp.,*
   78 F.3d 316 (7th Cir. 1996) ..........................................................9

*SEC v. Johnson,*
   525 F. Supp. 2d 70 (D.D.C. 2007)....................................................10

*SEC v. Tourre,* No. Civ. 3229 (KBF),
   2013 U.S. Dist. LEXIS 87211 (S.D.N.Y. June 18, 2013) .............. 1, 8, 10, 17

*Snyder v. Wells Fargo Bank, N.A.,* Case No. Civ. 4496 (SAS),
   2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012)......................................8

*U.S. v. Chang,*
   207 F.3d 1169 (9th Cir. 2000) .......................................................6

*U.S. v. Christophe,*
   833 F.2d 1296 (9th Cir. 1987) ....................................................8, 9

*U.S. v. Duncan,*
   42 F.3d 97 (2d Cir. 1994) ............................................................8

*U.S. v. Ferguson*,
    584 F. Supp. 2d 447 (D. Conn. 2008) ...................................................20

*U.S. v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ..............................................................9

*U.S. v. Gwaltney*,
    790 F.2d 1378 (9th Cir. 1986) ................................................................7

*U.S. v. Nacchio*,
    555 F.3d 1234 (10th Cir. 2009) ..............................................................9

*U.S. v. Scholl*,
    166 F.3d 964 (9th Cir. 1999) ..................................................................9

*Valiavicharska v. Celaya*, No. CV 10-4847 JSC,
    2012 U.S. Dist. LEXIS 8191 (N.D. Cal. Jan. 24, 2012).......................10

*Van Der Valk v. Shell Oil Co.*, Case No. SACV 03-565-JVS (JTLx),
    2004 U.S. Dist. LEXIS 30692 (C.D. Cal. Nov. 15, 2004) ....................10

*Whiting v. Boston Edison Co.*,
    891 F. Supp. 12 (D. Mass. 1995) ............................................................7

*Zaremba v. GMC*,
    360 F. 3d 355 (2d Cir. 2004) ..................................................................6

Case No.  12-CV-01179-JVS-ANx

## I.     <u>INTRODUCTION</u>

Plaintiff Securities and Exchange Commission (the "SEC") brings this motion to exclude Dr. Mukesh Bajaj, one of the three expert witnesses proffered by Defendant Moshayedi.

In *SEC v. Tourre*, the defendant, Fabrice Tourre, also hired Dr. Bajaj.  But the court rightly excluded him from offering his opinions in that case.  The court found that Dr. Bajaj's "main experience is as a professional testifying expert," and held that he was not qualified to present his opinions, as his exposure to the structured finance products at issue in that case was entirely in the context of providing expert witness services after the financial crisis in 2007.  *SEC v. Tourre*, No. Civ. 3229 (KBF), 2013 U.S. Dist. LEXIS 87211, *14, 17 (S.D.N.Y. June 18, 2013).  In addition, the court found that Dr. Bajaj's opinion that all "economically material" information had been disclosed invaded both the province of the judge to instruct on the law and the jury to find the facts.  *Id.* at *19-20.  As the court observed:

> No party would doubt—one hopes—that an expert cannot testify as to whether the specific information at issue in a case is or is not "material."  Inserting the word "economically" material does not somehow transform what is a legal proposition and a finding of fact into an admissible opinion.

*Id.* at *20.

The *Tourre* decision was handed down on June 18, 2013.  Dr. Bajaj's expert report in this case was signed that same day.  Not surprisingly, it suffers from the same infirmities as the report he submitted in *Tourre*.[1]

First, as in *Tourre*, Dr. Bajaj is not qualified to give the opinions he has offered. He has no relevant experience in contracting, forecasting, supply chain management or inventory optimization, yet offers opinions on all of these topics.  His only apparent

---

[1] Dr. Bajaj's proffered expert testimony was also recently rejected in *Bank of America, N.A. v. Bears Sterns Asset Management*, No. 08 Civ. 9265 (AJN), 2013 U.S. Dist. LEXIS 125700, *16-28 (S.D.N.Y. Sept. 3, 2013).  In that case, his testimony was rejected as his methodology was unreliable and, in fact, one that Dr. Bajaj understood was inappropriate based on his prior testimony in another case.

relevant expertise with respect to this action is his ability to conduct an event study, but even that is flawed.

Second, just like he did in *Tourre*, all he has done here is review the factual record and then calls it the "economic evidence," as if only he, as a "financial economist," can interpret it.  In reality, that evidence is simply deposition testimony, emails and analysts reports, which can be presented through fact witnesses.  There is no need for Dr. Bajaj to summarize that evidence for the jury.

Third, he creates a series of straw men, suggesting that the SEC alleges that sTec, Inc.'s ("sTec") stock price increase in the first half of 2009 was fraudulent, in order to justify a lengthy dissertation on the drivers of sTec's stock price growth during that period of time.  In fact, the SEC makes no allegation of fraud for the first half of 2009, rendering his opinions both irrelevant and duplicative of the likely testimony of fact witnesses on the same subject.

Similarly, Dr. Bajaj suggests that the SEC contends that the material information on which Moshayedi traded began to leak out to the market beginning August 4 and continuing to November 3, 2009, to justify a lengthy analysis of the purported cause of sTec's stock price drop *prior* to November 3, when sTec disclosed that EMC "might" be carrying inventory.  Again, the SEC makes no such allegation; hence, his analysis of the period between August 4 and November 2 is both irrelevant and methodologically flawed.  It is also duplicative, since Moshayedi offers another expert (Professor Ferrell) to give the exact same irrelevant and flawed opinion.

Finally, on the one subject that may be germane to the issues in this case, Dr. Bajaj opines that the additional $2 million price concession was "economically immaterial" because the combined price discounts associated with the original $120 million supply agreement and the additional $2 million discount in exchange for EMC taking $55 million in product in Q309 was less than what some analysts had suggested was the likely price discount that sTec gave on the $120 million supply agreement alone.  But even here, all Dr. Bajaj is doing is repeating what certain analysts were

suggesting regarding the amount of the initial price discount.  That evidence, to the extent it is even relevant, can best be presented through the analysts themselves, and whatever inferences may be drawn from it is best left to counsel's closing argument.

Accordingly, all of Dr. Bajaj's opinions should be excluded.

## II.    DR. BAJAJ AND HIS PROFFERED OPINIONS[2]

### A.    Dr. Bajaj's Qualifications And Materials Considered

Dr. Bajaj is a managing director of Navigant Economics, a consulting firm for legal and regulatory matters.  *See* Bajaj Report ¶ 1. Since 1997, when he began this work, Dr. Bajaj has testified as an expert in 59 matters, including 25 matters concerning liability and/or damages in securities fraud cases.  *See id.* ¶ 4.

Nowhere in his report does Dr. Bajaj state the area in which he seeks to be qualified as an expert witness in this case.  In his report, he simply claims he is a "financial economist" and that he specializes in "the study of capital markets."  *Id*. ¶ 3; *see also* Bajaj Depo. Tr. at 14:7-12 ("what I mean by 'financial economics' is the field of economics that focuses on capital markets … including, for example, market for grocery, market for houses, et cetera, et cetera.").

Although silent in his report, in his recent deposition Dr. Bajaj admitted that he has no experience in negotiating or implementing contracts and is not an expert in those areas.  *See id*. at 28:8-17.  He also admitted that he has no technical expertise in the solid state drive ("SSD") industry, and has no expertise in pricing, forecasting, or determining optimal levels of inventory in the SSD industry or in any other industry.  *Id*.

---

[2] The expert reports cited in this motion are attached to the Declaration of Gary Y. Leung ("Leung Decl."):  (1) the initial report of the SEC's expert, "Expert Report and Disclosure of Dr. Richard J. Bergin," dated June 18, 2013 ("Bergin Report") (*see* Leung Decl. Ex. 5); (2) Dr. Bergin's "Expert Rebuttal Report," dated July 12, 2013 ("Bergin Rebuttal Report") (*see id*. Ex. 6); (3) the "Expert Report of Mukesh Bajaj," dated June 18, 2013 ("Bajaj Report") (*see id*. Ex. 2); and (4) the "Rebuttal Report of Mukesh Bajaj," dated July 12, 2013 ("Bajaj Rebuttal Report") (*see id*. Ex. 3).  Dr. Bajaj's deposition testimony is also cited in this motion as "Bajaj Depo. Tr. at" and is attached as Exhibit 8 to Mr. Leung's Declaration.

1    at 29:7-17, 31:5-32:4.

2          In performing his work in this case, Dr. Bajaj purportedly relied upon virtually

3    all of the parties' discovery responses in this action; the deposition transcripts and

4    exhibits of 17 of the 18 fact witnesses that were deposed in this case (including the

5    deposition of the defendant);[3] over 100 equity analyst reports; various sTec and EMC

6    filings, press releases and conference call transcripts; and a variety of newspaper

7    articles and academic literature. Bajaj Report at App. 2 (Documents Relied Upon).

8    He and his team at Navigant were also provided access to every document that was

9    produced in the action.  However, Dr. Bajaj did not personally conduct any searches

10   in that database, and he has no idea what searches his team conducted or how they

11   selected any documents for his review.  *See id*. at 47:23-48:5, 51:18-52:15.

12   **B.    Dr. Bajaj's Five "Principal" Opinions**

13         Dr. Bajaj's 70-page report (not including an additional 133 pages of exhibits) is

14   divided into seven discrete sections:  one section entitled "qualifications" (Bajaj Report

15   ¶¶ 1-10), another entitled "scope and opinions," in which he provides a "background"

16   on sTec and purports to summarize the SEC's allegations (*id*., ¶¶  11-20), and five more

17   sections for each of his five opinions.  Based on his review of what Dr. Bajaj coins "the

18   economic evidence"—a euphemism for the deposition testimony, exhibits, and other

19   record evidence in this action—Dr. Bajaj reached five "principal" opinions:

20         (1)  sTec's dramatic stock price increase over the first half of 2009 was "typical

21   of a technology company introducing a new product that had become the early market

22   leader at the brink of 'crossing the chasm' to mainstream markets, a critical phase in the

23   adoption life cycle of a new technology."  *Id.* ¶ 20.

24         (2)  The SEC's allegation that the price discount associated with what Dr. Bajaj

25   calls the "$120 million Bulk Deal" constituted material, non-public information is

26   _____

27   [3] The only deposition of a fact witness that Dr. Bajaj did not review was the deposition
     testimony of sTec's Rule 30(b)(6) witness, Anthony Swiney, who was deposed after Dr.
28   Bajaj wrote his report.

without merit from an "economics perspective," as it is well known that vendors typically grant price concessions to secure volume commitments.  *Id*.  Dr. Bajaj further opines that the "Incremental Price Discount" (*i.e*., the additional $2 million price concession sTec gave EMC in exchange for its agreement to take $55 million in product in Q309), had it been disclosed, "would not have been incremental value relevant information to investors"  because the total combined price discount from $120 million "Bulk Deal" and the "Incremental Price Discount" was less than what some analysts had suggested was sTec's price discount for the $120 million "Bulk Deal" alone.  *Id.*, ¶ 52.

(3)  The SEC's allegation that on August 3, 2009, Moshayedi omitted material non-public information that EMC would not enter into another "bulk deal" is not consistent with the "economic evidence."  *Id*. ¶ 20.  In support of his opinion, Dr. Bajaj states that sTec and EMC negotiated a FY 2010 ZeusIOPS "bulk deal" beginning in July 2009 and continuing until September 2009.  *Id*.

(4)  The SEC's allegation that sTec's 3Q09 revenue was "inflated" is not supported by the "economic evidence."  In support of his opinion, Dr. Bajaj points to EMC's purported "hockey stick" demand pattern, and the fact that sTec's 2Q09 ZeusIOPS revenue guidance issued one month into the quarter had been about one-half of the ZeusIOPS revenues it actually received by the end of the quarter.  *Id*.  Dr. Bajaj also notes that sTec's 3Q09 revenue guidance (although it met analysts' consensus estimates) was considered "lackluster" by certain analysts.  *Id*.

(5)  There is no "economic evidence" to support the SEC's allegation that sTec's stock price decline from August 4, 2009 through November 4, 2009 was driven by the revelation of material non-public information that Moshayedi allegedly possessed on August 3, 2009.  *Id*.

## III.   ARGUMENT

### A.   Legal Standards

The admissibility of expert testimony is governed by Rules 702 and 403 of the Federal Rules of Evidence.  To be admissible under Rule 702, the proposed expert

testimony must "help the trier of fact to understand the evidence or determine a fact in issue." FED. R. EVID. 702(a).  As the Supreme Court explained in *Daubert v. Merrell Dow Pharms., Inc*., Rule 702 imposes a special gatekeeping function upon trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. 579, 590-91 (1993) ("*Daubert I*").[4]

### 1.    An expert must be qualified

"The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular … field." *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*")*,* 43 F.3d 1311, 1315 (9th Cir. 1995).  To satisfy this standard, it is essential that "the proposed witness's qualifying training or experience, and resultant specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact [such] that the witness's proposed testimony will be of assistance to the trier of fact."  3 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Federal Evidence*, P 702[04][1][b], at 702-45 (citing *United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000) (finding proposed expert witness's expertise in international finance insufficient to qualify witness to testify regarding authenticity of security instrument); *see also Diaz v. Johnson Matthey, Inc*., 893 F. Supp. 358, 372 (D.N.J. 1995) (testimony of pulmonologist who had never treated patient with a platinum allergy excluded where expert had read only a few papers on the allergy for purposes of litigation).  An expert does not accumulate relevant experience simply by testifying.  *Malletier v. Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 615-616 (S.D.N.Y); *Zaremba v. GMC*, 360 F. 3d 355, 359-360 (2d Cir. 2004).

---

[4] Rule 702 provides:  "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a)  the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)  the testimony is the product of reliable principles and methods; and (d)  the expert has reliably applied the principles and methods to the facts of the case."  FED. R. EVID. 702.

## 2.    Expert opinions must be both reliable and relevant

For an expert opinion to be admissible, it must be, like any other piece of evidence, relevant.  That is, a court must find "that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315.  The Supreme Court referred to this second prong of the analysis as the "fit" requirement.  *Daubert*, 509 U.S. at 591-92.  In the Ninth Circuit, "[t]he general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony." *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986).

In addition to being relevant, an expert's opinion must be reliable.  As this Court has noted, the Supreme Court in *Daubert I* "provided a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique had been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litig*., 284 F.R.D. 485, 498 (C.D. Cal. 2012) (Selna, J.) (*quoting Domingo ex rel. Domingo v. T.K*, 289 F.3d 600, 605 (9th Cir. 2002)).

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court further held that a trial court may consider "one or more" of the *Daubert* factors in determining the reliability of nonscientific expert testimony.  *Id*.  With respect to such testimony, the reliability of the proffered testimony is necessarily dependent on the knowledge and experience of the expert.  *Id*.  As to that issue, "[t]he question is whether the witness is 'qualified in the *specific* subject matter for which the testimony is offered.'" *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, No. SACV 07-1306 JVS (RNBx), 2008 U.S. Dist. LEXIS 95083, *43 (C.D. Cal. Nov. 13, 2008) (quoting *Whiting v. Boston Edison Co*., 891 F. Supp. 12, 24 (D. Mass. 1995)).  "[S]omething doesn't become 'scientific knowledge' just because it is uttered by a scientist; nor can

an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive…" *Daubert II*, 43 F.3d at 1315-1316.

### 3. Expert testimony is not helpful when it involves matters within the common knowledge of the fact finder or matters that can be addressed through cross-examination or argument

Expert testimony is not relevant and, hence, not admissible, when the subject matter is within the common knowledge of the fact finder. *Mukhtar v. California State Univ.*, 299 F. 3d 1053, 1065, n.9 (9th Cir. 2002); *United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir. 1987); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) ("examination of documents and correspondence … which were equally before the judge and jury" is improper subject of expert testimony); *In re Novatel Wireless Sec. Litig.*, No. 08cv1689 AJB (RBB), 2011 U.S. Dist. LEXIS 133105, *13 (S.D. Cal. Nov. 17, 2011) (same); *Haflich v. McLeod*, No. CV 09-161-M-DWM-JCL, 2011 U.S. Dist. LEXIS 1943, *3 (D. Mont. Jan. 10, 2011) (same); *Hinkle v. LaRoche*, No. CV-07-155-LRS, 2008 U.S. Dist. LEXIS 106433, *8 (E.D. Wash. Aug. 1, 2008) (same).  It is also improper to offer expert testimony "solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005); *see also Tourre,* 2013 U.S. Dist. LEXIS 87211, *12; *Snyder v. Wells Fargo Bank, N.A.*, Case No. Civ. 4496 (SAS), 2012 WL 4876938, *4 (S.D.N.Y. Oct. 15, 2012).  Likewise, expert testimony that merely tells the jury what result to reach is inadmissible. *See, e.g., United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994).

In applying these standards, courts have found that an expert's opinion based on a selective reading of the record is unreliable and should not be admitted. *See In re Oracle Corp. Sec. Litig.*, No. C 01-00988 SI, 2009 U.S. Dist. LEXIS 50995, *86 (N.D. Cal. June 16, 2009) (excluding expert opinion based on selective reading of the record" and "ignored deposition testimony").  Here, Dr. Bajaj's methodology is doubly unreliable, as he not only selectively reviewed the record, but also has no idea how his

staff selected documents for his review. Similarly, unsubstantiated speculation is not a sufficient basis for expert testimony. *Miller v. Thane International, Inc.*, No. SAVC 03-1031-JVS (SGLx), 2005 W.L. 5957833, *8 (C.D. Cal. Mar. 3, 2005); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("courts need not admit bare conclusions or mere assumptions proffered under the guise of 'expert opinions' and nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process"); *see also United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (en banc) ("[t]he trial court's gate keeping function requires more than simply 'taking the expert's word for it.'").

Nor is expert testimony relevant where the same information can be elicited through direct or cross-examination of fact witnesses or presented to the jury through argument of counsel. *Christophe*, 833 F.2d at 1299; *see also United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004) (*en banc*) (expert testimony will not help trier of fact when it offers nothing more than what lawyers for parties can argue in closing); *United States v. Scholl*, 166 F.3d 964, 974 (9th Cir. 1999) (finding trial court did not abuse it discretion in excluding expert testimony on whether accountant exercised proper standard of care, as "additional expert testimony would be a waste of time and would not assist the jury to understand the evidence or determine a fact in issue."); *Highland Capital*, 379 F. Supp. 2d at 469 ("[w]hatever expertise [a potential expert] may possess, no expert may 'supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence.") (citation omitted); *Link Co. Inc. v. Fujitsu Ltd.*, Case No. 00 Civ. 7242 (SAS), 2002 U.S. Dist. LEXIS 12975, *6 (S.D.N.Y. July 16, 2002) (where expert's report was based on a review of "documents, computer files, deposition transcripts and exhibits," the testimony by fact witnesses familiar with those documents would be "far more appropriate … and renders [the expert's] secondhand knowledge unnecessary for the edification of the jury."); *Media

*Sport & Arts v. Kinney Shoe Corp.*, Case No. Civ. 3901 (PKL), 1999 U.S. Dist. LEXIS 16035, *11 (S.D.N.Y. Oct. 18, 1999) (expert testimony may not take the place of testimony from persons who actually negotiated the deal).

It is also well established that an expert in a civil action may not opine on the mental state of the defendant, or whether the defendant's conduct was reasonable. F.R.E. 704: *Valiavicharska v. Celaya*, No. CV 10-4847 JSC, 2012 U.S. Dist. LEXIS 8191, *9-10 (N.D. Cal. Jan. 24, 2012); *AstraZeneca v. Tap Pharm. Prods. Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006);  *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *In re Safety-Kleen Corp.*, 2004 U.S. Dist. LEXIS 30768, *4 (D.S.C. Aug. 30, 2004); *SEC v. Johnson*, 525 F. Supp. 2d 70, 78 (D.D.C. 2007).   It is equally well established that expert testimony on a question of law is not appropriate. *Arbol Media Inc. v. Hartford Casualty Ins. Co.*, No. SAXCV 02-0244-JVS (MLGx), 2003 U.S. Dist. LEXIS 28465, *3 (C.D. Cal. July 7, 2003).

### 4.    Rule 403 also governs expert testimony

Finally, Rule 403 of the Federal Rules of Evidence requires a court to exclude even reliable and relevant expert testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury. *Van Der Valk v. Shell Oil Co.*, Case No. SACV 03-565-JVS (JTLx), 2004 U.S. Dist. LEXIS 30692, * 5 (C.D. Cal. Nov. 15, 2004).  As the Supreme Court noted, in elucidating the "fit" requirement, expert testimony carries special dangers to the fact-finding process because "it can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert I*, 509 U.S. at 595; *see also Tourre*, at *20 ("even with a cautionary instruction to the jury, expert testimony that 'all economically material' information was disclosed may suggest to the jury that their job is done, they have been told the answer to the ultimate question").

### B.    Dr. Bajaj's Opinion No. 1 About sTec's Stock Price Increase Before The Alleged Fraud Is Irrelevant And Unreliable

In his first opinion, Dr. Bajaj spends over 20 pages of his report discussing sTec's

stock price rise in the first half of 2009. *See* Bajaj Report ¶¶ 21-51. He does so because "the SEC appears to suggest, without formally alleging, that [Moshayedi's] remarks [during that period] were inappropriate or caused the stock price to rise inappropriately." *Id*. ¶ 21.[5] But in the next sentence of his report, he concedes that "the SEC has expressly disclaimed any assertion that these pre-August 3 statements constitute material misrepresentations or omissions." *Id*. Recognizing that his dissertation on the sTec's stock price rise in the first half of 2009 is irrelevant to any of the SEC's allegations, he simply asserts that he discussed this time period because Moshayedi's defense counsel asked him to. *Id*. But simply because Moshayedi's counsel directed Dr. Bajaj to analyze this time period does not make an expert's opinion about it relevant. There is no reason for an expert to testify on this subject, particularly one who has no understanding of the SSD industry.

### 1.    His opinions about "crossing the chasm" are baseless

Dr. Bajaj's views about sTec's meteoric stock price increase in the first half of 2009 are based primarily on Geoffrey Moore's "technology adoption life cycle theory," which he read about in Moore's book entitled *Crossing the Chasm: Marketing and Selling Disruptive Products to Mainstream Customers*. Bajaj Report ¶¶ 29-32*; see also id*. at 9, n.34. But Dr. Bajaj's discussion of this theory, and his opinions that are based on it, are inadmissible for two basic reasons.

First, Dr. Bajaj's discussion of Moore's "technology adoption life cycle theory" concerns events before August 3rd. It is therefore irrelevant to any fact in dispute since the SEC is not alleging a fraud before August 3rd. In any event, the fact that analysts paid close attention to sTec's sales to EMC and to other sTec customers, and whether sTec's growth would likely continue, is best related by the analysts themselves. There

---

[5] Dr. Bajaj contends that the SEC is accusing Moshayedi of fraud during the first half of 2009 when it uses the word "touting" in its complaint to describe Moshayedi's public trumpeting of sTec's growth during the first half of 2009. Bajaj Report at p.9, n. 35. The word "touting" does not connote fraud. *See* Merriam-Webster's Collegiate Dictionary (10th Ed.) (defining tout as "to praise or publicize loudly or extravagantly").

is no need for Dr. Bajaj to repeat their testimony or read their reports to the jury.

Second, and perhaps most importantly, Dr. Bajaj now concedes he cannot rely on Moore's *Crossing the Chasm*.  He had assumed Moore's theory was supported by individual case studies, and those supposed case studies were critical to him since they provided concrete support for Moore's thesis.  *See* Bajaj Depo. Tr. at 140:21-141:20; Bajaj Report ¶ 30.  As Dr. Bajaj explained, "[i]f it was just Mr. Moore's idle thinking and he couldn't illustrate through case studies how, in practice, this is how the world works, then it wouldn't be as attractive a proposition for me, it wouldn't—I would not have cited it.  *Id.* 141:5-20.   But, in fact, Moore conducted no case studies at all.  As Moore explained in the introduction to his book:

> Prior to entering the world of high-tech, I was English professor.
> One of the things I learned during this most scholarly period in my
> life was that the importance of evidence and the necessity to
> document its sources.  It chagrins me to say, therefore, that there
> are no documented sources of evidence anywhere in the book that
> follows.  Although I routinely cite numerous examples, I have no
> studies backing them up, no corroborating witnesses, noting.

*Id.* 143:6-19, Leung Decl., Ex. 9 (Bajaj Depo. Ex. 486).

Accepting Dr. Bajaj at his word, he would not have cited *Crossing the Chasm* had he known it was not supported by actual case studies.  But his entire first opinion is based primarily on his reading of this book.  As he made clear in his deposition, Dr. Bajaj has never published any articles on "crossing the chasm" or the "technology adoption life cycle theory," and has never taught the subject.  Rather, his only familiarity with the subject is from having read Moore's book.  *See* Bajaj Depo. Tr. at 135:4-138:17.  Thus, there is no reason for Dr. Bajaj to present to the jury the "technology life cycle adoption theory" when Dr. Bajaj does not even think Moore's book is reliable and when Dr. Bajaj has no independent expertise on the subject.

## 2.    Baja's other opinions about sTec's stock price increase in the first half of 2009 are equally flawed and irrelevant

Dr. Bajaj offers presents several other opinions to support his now admittedly

flawed "crossing the chasm" opinion.  Each is just as unreliable and irrelevant.

First, he has a lengthy discussion of the two "key risks" analysts recognized to sTec's future growth:  (1) competitor entry and (2) slower than expected market adoption for SSDs and ZeusIOPS in particular.  *See* Bajaj Report ¶¶ 33-37.  He then opines that because of these twin risks "analysts also recognized that sTec had a narrow 'window of opportunity' to capitalize on its first-mover advantage."  Bajaj Report ¶ 35.  Dr. Bajaj also comments on EMC's "lumpy" demand and "uneven sales pattern" to explain the fact that sTec only gave one quarter forward-looking guidance.  *Id*. ¶ 37.  However, apart from reading analyst reports and EMC's public filings— something the jury is equally capable of doing—Dr. Bajaj does not explain what expertise he brings to the subject, or why this subject is relevant to any issue before the jury.  *See* Bajaj Depo. Tr. at 154:16-19; 155:10-13 (admitting he did no empirical analysis of EMC's sales or demand patterns in 2009).  Dr. Bajaj should thus not be permitted to testify on the subject.

Second, although he acknowledges that the "SEC has not alleged any omissions or misstatements through August 2, 2009" (Bajaj Report ¶ 43), Dr. Bajaj purports to review and summarize all of sTec's public announcements from March 12, 2009 through July 16, 2009.  *Id*. ¶¶ 38-42.   Again, there is no need for an expert to summarize record evidence that the jury is perfectly capable of reading and understanding.

Third, Dr. Bajaj also points out, from his reading of analyst reports, that different analysts had different projections for sTec's future growth.  *See id*. ¶¶ 44-47.  Again, Dr. Bajaj does not explain why his observation, which he admits is an obvious one, has any relevance to any fact in dispute.  And to the extent Moshayedi's counsel thinks that the range of analysts estimate is relevant, he or she can elicit such evidence from the analysts themselves, and can argue to the jury whatever inferences they think should be drawn from such evidence.  Dr. Bajaj's regurgitation of what is contained in the analysts' reports requires no expertise.

1

2

3       Finally, in his lengthy discussion of pre-August 3rd matters, Dr. Bajaj opines

4   that some analysts considered sTec's third quarter guidance on August 3 to be

5   "lackluster" and that sTec's August 3 stock price decline may be partly attributable to

6   that sentiment (Bajaj Report ¶ 23). Bajaj Report ¶¶ 23, 47-51. Again, Dr. Bajaj

7   creates a straw man just so he can talk about it. The SEC's action concerns what was

8   *not* disclosed on August 3, not what *was* disclosed on that date.[6] In any event,

9   analysts would presumably have found sTec's guidance even more "lackluster" had

10  sTec disclosed the additional $2 million price concession and the context surrounding

11  it. But sTec made no such disclosure. Thus, Dr. Bajaj's observation, based solely on

12  his reading of certain analyst reports, that certain analysts considered sTec's guidance

13  "lackluster," lacks any "fit" to the issues before the jury. Furthermore, the jury is

14  equally capable of reading analyst reports and listening to their testimony. And

15  defense counsel is perfectly able to argue to the jury whatever relevant inferences

16  counsel thinks should be drawn from the fact that certain analysts may have

17  considered sTec's guidance "lackluster."[7]

18  **C.     Dr. Bajaj's Opinion No. 2 About The EMC Price Discounts Is**

19  **Irrelevant And Unreliable**

20      Dr. Bajaj opines that both the initial $4 million price discount given in

21

22  _____

    [6] In his deposition Dr. Bajaj admitted that he did not undertake any analysis to
23  determine which piece of news sTec's released on August 3, 2009 had the biggest
    impact on its stock price that day. Bajaj Depo. Tr. at 90:19-91:2. Thus, he can only
24  offer his conjecture on what analysts may have thought was the most important piece of
    news disclosed that day.

25  [7] In the beginning of his report, Dr. Bajaj offers what he calls a "background" and his
    summary of the SEC's allegations. *See* Bajaj Report at ¶¶ 11-19. While perhaps useful
26  for framing the remainder of his written report, it should not be repeated to the jury. All
    of Dr. Bajaj's observations concerning sTec's "background" are undisputed, and the
27  presentation of that evidence does not require an expert. Nor is an expert required to
    summarize the SEC's allegations.

28

                           14          Case No.  12-CV-01179-JVS-ANx

exchange for EMC's $120 million revenue commitment, and the incremental $2 million price discount in exchange for EMC's Q3 $55 million revenue commitment were "immaterial to investors from an economics perspective." Bajaj Report ¶¶ 52-69. This collection of opinions is inadmissible for several reasons.

First, using Moore's *Crossing the Chasm* as his springboard to opine on the subject, Dr. Bajaj contends that "to expand into mainstream markets, the vendor has a series of negotiations with its initial customers and must offer price concessions." *Id.* ¶ 55, 36, n.139-141 (*citing* Moore). Dr. Bajaj, however, has no expertise in contract negotiations and undertook no analysis of whether or not price discounts for bulk purchases are common in the SSD market. *See* Bajaj Depo. Tr. at 179:12-19. And his primary basis for this "expert" opinion—Moore's book—is a source he has since been forced to recognize as worthless. *See supra*. Moreover, and perhaps most importantly, the SEC is not contending the sTec should have disclosed the initial $4 million price discount. Accordingly, Dr. Bajaj's opinion that the initial discount was "immaterial" is both irrelevant and invades the province of both the Court and the jury.

Second, with respect to the "incremental" $2 million price discount Moshayedi gave EMC in the $55 million side deal, Dr. Bajaj opines that it too "would not have been incremental value relevant information to investors" because the combined price discounts were less than what some analysts were suggesting was the price discount for the $120 million supply agreement standing alone. *See* Bajaj Report ¶ 69. But all Dr. Bajaj is doing is repeating what certain analysts were suggesting regarding the amount of the initial price discount. That evidence, to the extent it is even relevant, can be best presented through the analysts themselves, and whatever inferences may be drawn from it is best left to counsel's closing argument. In addition, the ultimate conclusion that Dr. Bajaj reaches—that the additional price concession was immaterial to investors—does not "fit" the facts of this case, as he does not explain, and has no relevant expertise to explain, why sTec granted EMC an additional price concession or why investors would not consider the additional price concession or the reasons for it important, particularly

if it signaled a decreased demand from sTec's largest customer.

Third, Dr. Bajaj also opines that it was "reasonable from an economics perspective" for sTec to offer the additional $2 million price concession to EMC "as the incremental purchase commitment it obtained in exchange enabled the Company to mitigate significant operational risks it faced and had previously disclosed to investors." *Id.* ¶ 64.  But this is simply expert *ipse dixit*.  Dr. Bajaj has no support for his "expert" opinion that sTec "mitigated operational risks" other than relying on selected portions of the deposition testimony of various facts witnesses.  *See id.* at 41 n.167, 42, n.168, n.169; *see also* Bajaj Depo. Tr. at 199:7-200:1 (discussing "motivations" of sTec's personnel in "pushing" Moshayedi for information, and that Dr. Bajaj knows their motivations "from the various materials that I've cited in my report that I've seen.).

Confronted at his deposition with the fact that that all he had done was review the record evidence on this issue, Dr. Bajaj defended his analysis, claiming he had considered the evidence "[f]rom the prism of an economist in light of economic reason." Bajaj Depo. Tr. at 195:1-7.  But the "prism" that Dr. Bajaj looked through was not that of an "economist" but as a highly-paid advocate for the defendant, as he selectively read the record and ignored the record evidence suggesting that Moshayedi's singular purpose in granting the additional $2 price concession was not to "mitigate operational risks," but to pay EMC's costs of holding excess inventory so that he could issue guidance that met analysts' expectations.  In any event, the jury is equally capable of reviewing all of that evidence.

Fourth, Dr. Bajaj has no expertise in supply chain management in general, or in SSD manufacturing and procurement processes in particular and, hence, is not competent to render an expert opinion on the evidentiary support for Moshayedi's defense that the EMC's $55 million Q3 commitment had value independent of enabling sTec to guide in line with analysts' consensus estimates.

Recognizing he has no expertise in the area, Dr. Bajaj relies on academic literature for the proposition that "it is not unusual for pricing and quantity details to be

reset between OEMS and their suppliers" and that "typically contracts are left partially incomplete." Bajaj Report ¶ 65. From this literature, Dr. Bajaj concludes that "the SEC's claim that the actions were somehow illicit it without merit from an economics perspective." *Id*. ¶ 68. However, the academic articles Dr. Bajaj relies on all deal with long term contracts (with durations of more than five to ten years), where it may be common to leave contractual terms incomplete and to change them over time.[8] But here, the $120 million supply agreement was a short-term six-month contact, and all of its key terms, including price and volume, were filled in at the time of contract execution. Thus, the general proposition that it may not be unusual for contractual terms to be agreed to, or to change, over time, has no application to the facts of this case, where Moshayedi rewrote a basic, essential term of the $120 million supply agreement—*price*—only two weeks after finalizing the deal. In short, Dr. Bajaj's opinions on what may "generally" be the case does not "fit" this case.[9]

### D.   Dr. Bajaj's Opinion No. 3 Regarding The "One-Off" Nature Of The Volume Commitment Is Just His View Of The Record

In his third opinion, Dr. Bajaj plays the role of juror and opines that "[t]he SEC's contention that EMC would never enter into another agreement similar to the $120 million Bulk Deal is not consistent with the economic evidence and hence the SEC's claim about the information should have been disclosed is incorrect." *Id*. ¶ 70.

But this is exactly the type of opinion that the court in *Tourre* rightly rejected. *See Tourre*, 2013 U.S. Dist. LEXIS 87211 at *20. The "economic" evidence that Dr.

---

[8] At his deposition, Dr. Bajaj was not familiar with the academic literature he relied upon and could not recall if they involved studies of long-term contracts. *See* Bajaj Depo. Tr. at 213:19-218:13.

[9] Furthermore, the general concept that contract terms may change is not so complex or out the realm of everyday experience that a jury cannot understand the concept. Indeed, the $120 million supply agreement itself contemplated potential price changes in the event component costs lowered. Bajaj Report ¶ 13. But that is not what happened here. In short, the reasons and motivations as to why Moshayedi granted an additional $2 million price concession to EMC is a hotly disputed factual issue and its resolution properly lies in the hands of the jury, not in Dr. Bajaj's.

Bajaj cites to is simply the evidence, namely, various email exchanges between Moshayedi and EMC.  *Id.* ¶¶ 70-71; *see also id.* at 47, n.189, n.190.  The jury does not require expert assistance to read or interpret those emails.  In addition, Dr. Bajaj selectively quotes from the record, and ignores Moshayedi's investigative testimony, where he testified that on August 3 EMC gave him a "point blank" "no" to further volume agreements and that Moshayedi believed it at the time.  *See* Dkt. No. 130 (SEC Facts) ¶¶ 262-263.

### E. Baja's Opinion No. 4 About sTec's Inflated Q309 Guidance Is Also Just His View Of The Record

Dr. Bajaj opines in his fourth opinion that the SEC's claim that sTec's 3Q09 guidance was "inflated" and "misleading" is "without foundation from an economics perspective for several reasons."  Bajaj Report ¶ 72.  First, Dr. Bajaj notes that it is not uncommon for a company's early guidance to change, as demonstrated by EMC's increased demand for ZeusIOPS drives in 2Q09.  *Id.* ¶ 73.  Second, Dr. Bajaj opines that "[t]he economic evidence presents no reason to assume that EMC would accept more in orders than it thought were optimal from a business perspective."  *Id.* ¶ 74; *see also*, p. 49, n. 195, 197, 198 (citing to fact witness deposition testimony).  He also engages in a linguistic battle with the SEC concerning the concepts of "demand" and "actual demand" by asserting that "all of ZeusIOPS drives that EMC voluntarily purchased from sTec in 3Q 2009 constitute EMC's 'actual demand' regardless of whether EMC immediately consumed these drives or kept them in inventory." *Id.* ¶ 75.  Dr. Bajaj further assets that it is "speculative and illogical" for the SEC to allege that sTec should have known that EMC would eventually deem a portion of the $55 million in drives as "excess" inventory by September 30, 2009, "without knowing EMC's internal views of what [EMC] considered to be the optimal inventory level.  *Id.*, ¶¶ 76-77.[10]  In addition, Dr. Bajaj opines that "even assuming arguendo that sTec had

---

[10] In fact, EMC did have an internal view about the optimal inventory level of ZeusIOPS drive it wanted to hold in 3Q09, and specifically calculated its costs of holding between

disclosed that EMC expected to sell $34 million or $43 million in ZeusIOPS drives in Q3 2009, it is illogical as an economic matter to assume that such an announcement would have necessarily signaled a slowdown in EMC's demand in Q4 2009." *Id*. ¶ 81. Finally, Dr. Bajaj opines that "economic logic indicates that the only fact that sTec could report (as it did) on August 3, 2009 was simply that EMC had agreed to purchase $55 million of the $120 million Bulk Deal in 3Q 2009 (as EMC in fact had). *Id*. ¶ 80.

Dr. Bajaj's observations, arguments, and criticisms have nothing to do with his expertise as a "financial economist."  Again, as in *Tourre*, adding the word "economic" to his review of the factual record does not magically make the evidence the proper subject of expert opinion testimony.  *See Tourre*, 2013 U.S. Dist. LEXIS 87211 at *20. All Dr. Bajaj has done is selectively review the record, and then make arguments that simply parrot those made by Moshayedi's counsel.  And again, such arguments are better left for counsel in closing argument, particularly where Dr. Bajaj lacks any expertise in forecasting, formulating guidance, calculating optimal inventory levels, contract negotiations, or supply chain management.  He is also invading the province of the Court as well as the jury by suggesting that the only "fact" sTec could "economically" disclose is that EMC agreed to take $55 million in 3Q09, and that whatever underlying reasons EMC may have agreed to take that amount were "economically immaterial" and, hence, immaterial to investors.[11]

---

$12 and $21 million in excess drives in inventory at between $267,000 and $467,000. *See* Dkt. No. 130 (SEC Facts) ¶ 225.  Dr. Bajaj simply ignores that evidence.

[11] Dr. Bajaj also points out that "[g]iven EMC's uncertainty about its own demand and given that sTec had even less relevant information than EMC itself regarding EMC's demand, there is no basis to claim that sTec could have known more than EMC."  Bajaj Report ¶ 80.  The SEC makes no such claim.  Rather, it agrees with Dr. Bajaj's observation, and its necessary corollary, that given this disparity, sTec had no basis to reject EMC's 3Q09 demand forecast on the rationale that it somehow knew EMC's future demand better than EMC did.  In any event, expert testimony is not necessary on this self-evident proposition.

### F.   Dr. Bajaj's Opinion No. 5 About sTec's Stock Price Decline Between August And November Is Irrelevant And Cumulative

In his final opinion, Dr. Bajaj claims that the decline in the price of sTec's stock from August 4, 2009 to November 3, 2009, was caused ''by the materialization of known risks,'' namely, the ''the entry of competition and customer failure to adopt new technology.'' Bajaj Report ¶ 86.  This opinion is inadmissible.

First of all, Dr. Bajaj concedes that "the SEC is silent about intervening events from August 3, 2009 through November 2, 2009."  Bajaj Report ¶ 86.  The SEC alleges that the first time EMC's risk of inventory was disclosed to the market was on November 3, 2009, when sTec's stock price dropped 38% on its disclosure that it has recently received "preliminary indications" that EMC "might" hold inventory at the end of the year.  *See* Dkt. No. 1 (Complaint) ¶¶ 87, 91-92.   Accordingly, Dr. Bajaj's purported analysis of the cause(s) for sTec's stock price drops between August 4 and November 2 is not relevant to any issue to be considered by the jury.[12]

Moreover, over the 65-day period Dr. Bajaj purportedly studied, there was a statistically significant abnormal return on only six days.  *See* Bajaj Report, Appx. 3c, column k.  Conclusions about a stock price movement over a 65-day trading period cannot be reached under a properly applied event study methodology based on six trading days in that period.  *See United States v. Ferguson*, 584 F. Supp. 2d 447 (D. Conn. 2008) (rejecting ''leakage'' event study that purported to analyze thirty-day trading period without accounting for other factors that may have contributed to stock price decline).  In addition, as to the six trading days that did show a statistically significant abnormal return, Dr. Bajaj did not determine if the stock price decline was attributable to competition, slower than expected adopted rates, or to some other

---

[12] It is also cumulative of the testimony of Professor Ferrell, another one of Moshayedi's experts.  Professor Ferrell offers the exact same opinions regarding the price movement during this time period.  *See* SEC Mot. to Exclude Prof. Ferrell at 20-21 (and cased cited therein).

news.  Leung Decl., Ex. 6 (Bergin Rebuttal Report) at pp. 9-13.

Finally, as part of this opinion, Dr. Bajaj appears to offer his views about what may have caused the huge price drop on November 4th.  *See* Bajaj Report, ¶ 86.  Dr. Bajaj purports to summarize sTec's salient November 3 disclosures, namely, that it had "recently received preliminary indications" that EMC "might carry inventory" it will use in 2010, and that in "light of this development" sTec and EMC had "jointly initiated a sales and marketing program designed to promote the integrations of sTec's SSD's into [EMC's] systems."  Bajaj Report ¶ 96.  Dr. Bajaj also notes that sTec's stock price closed at $14.14, a 38.9% decline from the previous day's closing price of $23.15.  *Id*.  He further attributes sTec's stock price decline on that date to sTec's "disclosure of recent adverse market developments (*i.e*., slower-than-expected sales and a concomitant inventory build-up of enterprise server systems that use ZeusIOPS drives as an input by EMC and other larger OEM customers), and not due to the revelation of material non-public information that Mr. Moshayedi allegedly possessed as of August 3, 2009."  *Id*.

The SEC and Dr. Bajaj are in apparent agreement that sTec's stock price decline on November 3, 2009, was largely, if not exclusively, attributable to its disclosures regarding EMC's potential inventory problem and the waning demand for sTec's ZeusIOPS drives signaled by that problem.[13]  While in agreement on that subject, Dr. Bajaj should not be permitted to testify on that subject as he did not actually conduct a proper event study for that date.  Although he conducted a regression analysis on the date (indeed, he did so for every date between March 12, 2009 and November 4, 2009) and rotely quotes various news releases on November 3 and November 4 (*see* Bajaj Report, Appendix 3c, pp. 86-91), he made no attempt to disaggregate any of that news. Hence, his analysis is incomplete and his methodology lacks rigor.  *See, e.g., In re*

---

[13] Dr. Bajaj offers no opinion on whether Moshayedi's announcement that the $120 Million Agreement was a "one-off" deal at the time it was negotiated contributed to sTec's stock price decline on November 4, 2009.

*Computer Sciences Corp. Set. Litig.*, 288 F.R.D. 112, 121 (E.D. Va. 2012) (finding Dr. Bajaj's event study unpersuasive where he failed to consider the effect of other information released on days in question).

In addition to his methodological errors, the SEC parts company with Dr. Bajaj when he climbs into the jury box to offer his opinion that the "SEC's allegation that Mr. Moshayedi knew on August 3, 2009, that 'EMC might carry inventory [of ZeusIOPS drives] into 2010' is inconsistent with the economic evidence." Bajaj Report ¶¶ 98-101. Again, the only "economic evidence" that Dr. Bajaj points to is the evidence itself, that is: (1) EMC entered into the $120 million supply agreement; (2) EMC, at is earnings conference call on July 23, 2009, stated that it expected a slight company-wide improvement in Q3 and Q4 2009; (3) EMC, at its earnings conference call on October 22, 2009, expressed "increased confidence in the remainder of 2009;" and (4) certain analysts did not express "shock" by sTec's disclosure of EMC's inventory problem. *Id.* Dr. Bajaj summation of this evidence requires no expertise in the field of "financial economics."

## G.    Dr. Bajaj's Rebuttal Opinions Are Also Inadmissible

Dr. Bajaj also submitted a rebuttal report, purporting to rebut the opinions reached by the SEC's expert, Dr. Richard Bergin.  In his report, Dr. Bergin conducted three event studies, analyzing whether sTec's stock price exhibited a statistically significant abnormal return and, if so, the cause(s), for the following three dates: (1) July 16, 2009, the date sTec announced the $120 million supply agreement; (2) November 4, 2009, the next trading day after sTec announced that EMC's might be carrying inventory of ZeusIOPS drives into 2010 and that the $120 million supply agreement was a "one-off" deal and would not be repeated; and (3) February 24, 2010, the next trading day following sTec's announcement that because of its inventory overhang, EMC was not expected to place any new orders with sTec for the first and second quarters of 2010.  *See* Leung Decl., Ex. 5 (Bergin Report) at 9-10.

In his rebuttal report, although he criticizes Dr. Bergin for "mechanically"

analyzing sTec's stock price reaction on each of those dates (Bajaj Rebuttal Report ¶ 6), in his deposition he conceded that he has no criticism of Dr. Bergin's methodology. *See* Bajaj Depo. Tr. at 75:17-22.  Rather, Dr. Bajaj's criticisms of Dr. Bergin's work have to do, not with what he did, but with what he did not do.  According to Dr. Bajaj, "the central economic issue is what Mr. Moshayedi knew, but failed to disclose, as of the Public Offering Period and whether than information was material as of the Public Offering Period" and that Dr. Bergin failed to analyze that "central" "economic issue." Bajaj Rebuttal Report ¶¶ 9, 11, 71-79.  But unlike Dr. Bajaj, Dr. Bergin was not asked to opine on what Moshayedi knew, but failed to disclose, on the eve of his secondary offering.  That is a quintessential jury question, and not something that an expert should be allowed to testify about.

In addition to that overarching complaint, Dr. Bajaj complains that Dr. Bergin's analysis of the sTec's stock price increase on July 16, 2009, and that the $120 million supply agreement "implied" an increased level of demand from EMC for both 2009 and 2010 (as evidenced by changes in analysts' models), is erroneous because sTec did not say anything about 2010 when it announced that agreement. *See id.* ¶¶ 14-22.  But Dr. Bergin makes no claim about what sTec or Moshayedi said about the supply agreement—that record speaks for itself; rather, Dr. Bergin is expressing his opinion on why sTec's stock price exhibited an abnormal positive return on that date, namely, that "[t]he $120 million for the second half of the year implied an increase that that customer's quarterly run-rate for sTec's SSDs, signaling a stronger demand for its ZeusIOPs." Bergin Report at 32.  But to the extent Moshayedi wants to criticize Dr. Bergin for mischaracterizing what he and sTec actually said on July 16, 2009 (even though Dr. Bergin did not do so) that is a point that can be made by his defense counsel during cross-examination.  There is no need for Dr. Bajaj to repeat that point from the witness stand.

Dr. Bajaj also criticizes Dr. Bergin for not analyzing sTec's disclosures on August 3, 2009, or the materiality, on that date, of the alleged non-public information

that Moshayedi allegedly traded upon.  Bajaj Rebuttal Report ¶¶ 10-14.  But it is impossible to conduct a meaningful event study for August 3, 2009 where: (1) the material non-public information was not disclosed on that date; and (2) significant confounding events were contemporaneously disclosed (*e.g*, the secondary offering). Indeed, Dr. Bajaj himself did not conduct an event study on that date; thus, he should not be heard to complain that Dr. Bergin did not attempt to do the impossible.  *See, e.g., Bricklayers & Trowel Trades Int'l Pension Fund v. Credit*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) (event study that fails to disaggregate the effects of important confounding factors must be excluded); *In re Credit Suisse First Boston Corp. Analyst Sec. Litig*., 250 F.R.D. 137, 143 (S.D.N.Y. 2008) ("[t]o prove that a stock was responding to specific information on a specific day under the generally accepted event study approach (1) the return must be abnormal; (2) the abnormal return must be significant; and (3) there must not be confounding news.").

In addition, Dr. Bajaj complains that Dr. Bergin did not consider a variety of other information, but all of that information is derived from the record evidence and is subject to factual dispute, such as "the economic evidence supporting the demand for the $120 million order."  Bajaj Rebuttal Report ¶ 23-28; *see also id*. at 13, n.39 (citing to various EMC emails and deposition testimony regarding EMC's demand and forecasted demand), 34, n. 115 (citing to various emails regarding FY 2010 contract negotiations).[14]

Finally, Dr. Bajaj criticizes Dr. Bergin's analysis of November 4 and February 23, as Dr. Bergin purportedly ignored "the materialization of previously-known market

---

[14] Dr. Bajaj also criticizes Dr. Bergin for failing to consider what effect, if any, sTec's July 13, 2009 announcement of a contract of a $28 million Mach 8 contract may have had on analysts' models.  Bajaj Rebuttal Report, ¶ 29.  This criticism is not well-founded as sTec's announcement of that deal on July 13 would be readily absorbed into sTec's stock price and would not explain sTec' stock price increase on July 16, 2009, when the $120 million agreement was announced.  *See  Bricklayers & Trowel Trades Int'l Pension Fund v. Credit*, 853 F. Supp. 2d 181, 189 (D. Mass. 2012 ) ("[i]n an efficient market, a company's stock price reacts immediately to new information").

1   risks and company-specific negative information unrelated to the allegations." Bajaj

2   Rebuttal Report ¶¶ 51-70.  In particular, he complains that Dr. Bergin failed to consider

3   the "materialization of known risks regarding slower ramp up of non-EMC ZeusIOPS

4   customers."  *Id*. ¶ 57.  But, again, Dr. Bajaj does not have the expertise to opine on these

5   matters and his event study methodology is flawed.  Most importantly, whether or not

6   sTec's price rose or fell in response to the "materialization" of these risks has nothing to

7   do with Moshayedi's liability for insider trading.  *See infra*.  Also, in the very next

8   paragraph of his rebuttal report, Dr. Bajaj points out that "the risk of non-EMC

9   customers' markets not developing as quickly as analysts expected had already been

10  disclosed as of August 3, 2009."  *Id*. ¶ 58.  Therefore, that previously disclosed risk

11  cannot explain sTec's stock price drop on November 3, 2009.[15]  Dr. Bajaj also criticizes

12  Dr. Bergin for failing to analyze sTec's stock price decline *prior* to November 3 (*see id*.

13  ¶ 74) but, as discussed above, that issue is irrelevant.

14         In short, Dr. Bajaj should be precluded from testifying in rebuttal to Dr. Bergin.

15  Dr. Bajaj's criticisms are largely irrelevant, and to the extent they have any merit, they

16  are more appropriately asserted through counsel's cross-examination of Dr. Bergin.

17  **IV.   CONCLUSION**

18         For the foregoing reasons, the SEC respectfully requests that Dr. Bajaj be

19  excluded as a witness in this action.

20  Dated:  September 23, 2013              Respectfully submitted,

21                                         */s/  Donald W. Searles*

22                                         John W. Berry
                                           Donald W. Searles
23                                         Gary Y. Leung
                                           Attorney for Plaintiff
24                                         Securities and Exchange Commission

25  ─────────────────────
    [15] *See* Bajaj Depo. Tr. at  56:5-57:3 ("[s]o when we observe abnormal return on a
26  particular day, that abnormal return should not, under those assumptions, be attributed
    to old information that was already in the public domain because it could have already
27  been reflected in prices.  So the price change should not be understood as response to
    old information.")

28

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648
Telephone No. (323) 965-3213; Facsimile No. (323) 965-3908.

On September 23, 2013, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF MUKESH BAJAJ UNDER RULES 403 AND 702 OF THE FEDERAL RULES OF EVIDENCE** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _September 23, 2013                /s/ Donald W. Searles_____
                                        DONALD W. SEARLES

1

### SEC v. MANOUCHEHR MOSHAYEDI
United States District Court—Central District of California
Case No. 12-CV-01179 (JVS) (ANx)

### SERVICE LIST

Sean M.  Berkowitz
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Direct Dial: 312-777-7016
sean.berkowitz@lw.com

Matthew Rawlinson
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: 650-463-3076
matt.rawlinson@lw.com

Colleen Smith
LATHAM & WATKINS LLP
600 W.  Broadway, Suite 1800
San Diego, CA 92101
Direct Dial: 619-238-2950
colleen.smith@lw.com

Everett Bulthuis (Paralegal)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925
Direct Dial:  714-755-8247
Cell:  714-747-1814
everett.bulthuis@lw.com

Thomas A.  Zaccaro
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomaszaccaro@paulhastings.com

*Attorneys for Defendant*

Patrick Gibbs
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-4696
patrick.gibbs@lw.com

William R.  Baker, III
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.  20004-1304
Direct Dial:  202-637-1007
william.baker@lw.com

Jennifer S.  Duckworth (Paralegal)
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-3012
jennifer.duckworth@lw.com

Thomas P.  O'Brien
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomasobrien@paulhastings.com

*Attorneys for Defendant*