JOHN W. BERRY (bar admission pending, L.R. 83-2.4.1)
Email: berryj@sec.gov
DONALD W. SEARLES, Cal. Bar No. 135705
Email: searlesd@sec.gov
GARY Y. LEUNG (bar admission pending, L.R. 83-2.4.1)
Email:  leungg@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>MANOUCHEHR MOSHAYEDI,<br><br>　　　　Defendant. | Case No.  12-CV-01179-JVS-ANx<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF PROFSSOR ALLEN FERRELL UNDER RULES 403 AND 702 OF THE FEDERAL RULES OF EVIDENCE**<br><br>Date:　　October 21, 2013<br>Time:　　1:30 p.m.<br>Ctrm:　　10C<br>Judge:　Hon. James V. Selna |

# TABLE OF CONTENTS

I.      INTRODUCTION .............................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................ 3

        A.     The SEC's Allegations and Its Expert, Dr. Richard Bergin ................ 3

        B.     Ferrell's Proposed Rebuttal Opinions ................................................. 4

               1.     Ferrell's critique of the SEC's disgorgement calculation ............ 5

               2.     Ferrell's disgorgement calculation ............................................... 6

               3.     Ferrell's foundational assumption of a fraud on July 16 ............. 6

               4.     Ferrell opinions about sTec's competitive landscape .................. 8

               5.     Ferrell's opinions about sTec's stock price in the fall of 2009 ........... 9

               6.     Ferrell's factual opinion about purported negotiations of
                      another EMC volume agreement ................................................. 10

               7.     The overlap between Ferrell's and Bajaj's opinions .................. 10

III.    ARGUMENT ................................................................................................. 11

        A.     Ferrell's Opinions Should Be Excluded Under Rule 26(a)(2) Because
               They Are Not Rebuttal Opinions ....................................................... 11

        B.     Ferrell's Opinions Are Inadmissible Under Rules 403 and 702 .......... 14

               1.     Ferrell's "avoided loss" opinions are irrelevant ...................... 15

               2.     Ferrell's "but-for" analysis has never been accepted by any
                      court and is unreliable ............................................................... 17

               3.     Ferrell's opinions about the price movement in the fall of 2009
                      are irrelevant, unreliable and cumulative ................................. 20

               4.     Ferrell's opinions about supposed volume agreement
                      negotiations are not admissible ................................................ 22

               5.     Ferrell's opinions are duplicative of Moshayedi's other expert .......... 23

IV.     CONCLUSION ............................................................................................. 24

# <u>TABLE OF AUTHORITIES</u>

*A.D. v. Cal. Highway Patrol, No. C 07-5483 SI,*
   2009 WL 733872 (N.D. Cal. March 17, 2009) ..................................... 17, 20

*Blake v. Securitas Serv., Inc.*, No. 12-1349 (JEB),
   2013 WL 1814895 (D.D.C. May 1, 2013) ............................................. 12, 14

*C.N. v. Wolf*, No. SACV 05-868 JVS (MLGx),
   2006 WL 5105270 (Nov. 13, 2006) (Selna, J.) .....................................12

*Cabrera v. Cordis Corp.*,
   134 F.3d 1418 (9th Cir. 1998) ........................................................24

*Cappuccio v. Prime Capital Funding, LLC*, No. 07-4627,
   2008 WL 7700925 (E.D. Pa. Sept. 16, 2008).........................................17, 20

*Daubert v. Merrell Dow Pharms.*,
   43 F.3d 1311 (9th Cir. 1995) .........................................................15, 17, 20

*Daubert v. Merrell Dow Pharms., Inc*.,
   509 U.S. 579 (1993)................................................................ 14, 15, 20, 21

*Domingo ex rel. Domingo v. T.K*,
   289 F.3d 600 (9th Cir. 2002) ..........................................................18

*Donell v. Fidelity Nat'l Title Agency of Nevada*, No. 2:07-cv-00001-KJD-PAL,
   2012 WL 170990 (D. Nev. Jan. 20, 2012) ............................................. 12, 14

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
   66 F.3d 604 (3d Cir. 1995) ...........................................................24

*Highland Capital Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...............................................22

*In re Air Crash Disaster*,
   86 F.3d 498 (6th Cir. 1996) ..........................................................24

*In re DVI, Inc. Sec. Litig.*, No. 2:03-cv-05336,
   2010 WL 3522090 (E.D.Pa. Sept. 3, 2010).........................................20

*In re Executive Telecard, Ltd. Sec. Litig.*,
   979 F.Supp. 1021 (S.D.N.Y. 1997) ..................................................19

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
   252 F.Supp.2d 1005 (C.D. Cal. 2003)................................................18

*In re Northern Telecom Ltd. Sec. Litig.*,
   116 F.Supp.2d 446 (S.D.N.Y. 2000) .................................................19

*In re Oracle Sec. Litig.*,
   829 F.Supp. 1176 (N.D.Cal.1993).....................................................18

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litig.*,
284 F.R.D. 485 (C.D. Cal. 2012) (Selna, J.) ...............................................18

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)...............................................................................15

*LaPlace-Bayard v. Batlle*,
295 F.3d 157 (1st Cir. 2002).................................................................24

*Link Co. Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS),
2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. July 16, 2002)...........................23

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
340 F.Supp.2d 415 (S.D.N.Y.), *affirmed in part*, *vacated in part*, *on other grounds*,
454 F.3d 108 (2d Cir. 2006) ..................................................................20

*Metabolife Intern., Inc. v. Wornick*,
264 F.3d 832 (9th Cir. 2001) ................................................................19

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, SACV 07-1306 JVS (RNBx),
2008 WL 4906433 (C.D. Cal. Nov. 13, 2008) (Selna, J.) .........................21

*Robert S. v. Stetson Sch., Inc.*,
256 F.3d 159 (3d Cir. 2001) .................................................................24

*SEC v. Drucker*,
528 F.Supp.2d 450 (S.D.N.Y. 2007) ......................................................21

*SEC v. First City Financial Corp., Ltd.*,
890 F.2d 1215 (D.C. Cir. 1989)..............................................................21

*SEC v. Leslie*, No. C 07-3444,
2010 WL 2991038 (N.D. Cal. July 29, 2010) ..........................................12

*SEC v. Perry*,
Case No. 2:11-cv-01309-R, Dkt. No. 120 (C.D. Cal. July 9, 2012) ...........16

*SEC v. Rind*,
991 F.2d 1486 (9th Cir. 1993) ..............................................................17

*Snyder v. Wells Fargo Bank, N.A.*, Case No. Civ. 4496 (SAS),
2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012).............................................22

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994) .....................................................................22

*Van Der Valk v. Shell Oil Co.*, No. SACV 03–565–JVS (JTLx),
2004 WL 5486643 (C.D. Cal. Nov. 15, 2004) (Selna, J.)..........................15

*Whiting v. Boston Edison Co.*,
891 F. Supp. 12 (D. Mass. 1995)...........................................................21

*Williams v. Cty. of Orange*, No. 03 Civ. 5182(LMS),

2005 WL 6001507 (S.D.N.Y. Dec. 13, 2005)................................................24

*Wong v. Regents of the Univ. of Cal.*,
    410 F.3d 1052 (9th Cir. 2005) ...........................................................12

*Yetti By Molly Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ...........................................................12

## I.    <u>**INTRODUCTION**</u>

Defendant Moshayedi has offered three different experts to testify before the jury, and Plaintiff Securities and Exchange Commission ("SEC") brings this motion to exclude testimony from his putative "rebuttal" expert, Professor Allen Ferrell.

Prof. Ferrell's expert opinions are inadmissible for several reasons.  First of all, most of his opinions are not even rebuttal opinions.  Instead, as his report explicitly points out, he is attacking the SEC's proposed disgorgement calculation and offering his own "avoided loss" dollar amounts.  On the other hand, Dr. Richard Bergin, the SEC's expert witness whom Prof. Ferrell is supposedly rebutting never offered an opinion about disgorgement or even mentioned the SEC's calculation that Prof. Ferrell focuses on.  Prof. Ferrell's disgorgement opinions, therefore, should be excluded because they should have been offered when initial expert reports were due under Rule 26(a)(2).  That is especially true since the SEC's disgorgement calculation that Prof. Ferrell attempts to discredit was disclosed to Moshayedi with the SEC's response to Moshayedi's interrogatories well before initial expert reports were due (indeed, Prof. Ferrell himself points this out in his report).  This tactic to delay the disclosure of Prof. Ferrell's opinions has seriously prejudiced the SEC, because it prevented the SEC from presenting its own rebuttal to Prof. Ferrell's flawed analysis.

Not only are Prof. Ferrell's disgorgement opinions improper rebuttal opinions, they are also wholly irrelevant to the case being presented to the jury.  This Court, and not the jury, will be addressing disgorgement if the jury finds Moshayedi liable.  Only then should Prof. Ferrell be provided, if at all, the opportunity to offer his views on how disgorgement should be calculated.

Prof. Ferrell's opinions are also based on the false assumption that the SEC has alleged a "disclosure deficiency," as he puts it, on July 16, 2009.  Throughout his report, Prof. Ferrell relies on that assumption in claiming that the $3.58 price increase on July 16, 2009—the day sTec announced the $120 million supply agreement—is the "maximum" measure of the financial impact of Moshayedi's fraud.  He even

1

claims the opinions of the SEC's expert, Dr. Bergin, are "flawed" because Dr. Bergin never showed that there was a link between the July 16th stock price increase and the disclosure deficiencies in this case. But Prof. Ferrell is chasing ghosts. The SEC has not alleged a fraud on July 16th—a fact he recognizes—so all of his opinions that are based on that assumption should be stricken.

Prof. Ferrell also has not done an event study himself. Instead, he performs his own "but-for" pricing impact study—a study that is only based on his own academic theories and one that has never been used in practice or accepted by any court. His unproven analysis also uses as its "logical starting point" the irrelevant July 16th price increase. This analysis, which he uses solely to compare his "but-for" price "impacts" to the SEC's disgorgement calculation to discredit the SEC's disgorgement theory, is therefore unreliable and irrelevant.

In addition, Prof. Ferrell offers opinions about the price movement of sTec's stock between mid-August and early November 2009. Not only does he not do any kind of quantitative analysis about this price movement to address the threshold question of whether the price changes are due to events unique to sTec—which an event study would have done, had he done one—but he also admits he did not even review all of the public information that was in the market during this period. What's more, his August to November 2009 analysis has absolutely nothing to do with Moshayedi's liability. None of the alleged non-public information Moshayedi possessed in early August at the time of his secondary offering was disclosed during this August-to-November period. The only conceivable relevance (if any) that this August-November analysis has would be to the issue of disgorgement. But, again, that issue is not before the jury.

Finally, Prof. Ferrell offers opinions about what he claims were continued negotiations over a potential sTec-EMC volume commitment for 2010. But his opinion is really just his subjective view of the factual record. It is the job of the jury, not Moshayedi's paid expert, to interpret that record. And this opinion, as well as his

Case No. 12-CV-01179-JVS-ANx

opinion about the stock price changes from August to November, are the exact same opinions Moshayedi's other expert, Dr. Bajaj, plans to offer.  There is no reason Moshayedi should be allowed to offer two experts to say the same thing.

For all of these reasons, this Court should not permit Prof. Ferrell to testify.

## II.   STATEMENT OF FACTS[1]

### A.   The SEC's Allegations and Its Expert, Dr. Richard Bergin

Because this is a fraud and insider trading case, the SEC has the burden of establishing the materiality of the non-public information Moshayedi was aware of when he insider traded and made false and misleading statements in August and November 2009.  As to Moshayedi's August misstatements and stock sale, the SEC must prove that the following three pieces of information were material:  (1) the foreseeability that EMC would be holding a substantial amount of inventory as a result of the $55 million side deal between EMC and sTec; (2) the fact that EMC's forecasted demand was far less than the $55 million included in sTec's third quarter guidance; and (3) the fact that EMC had told him that the $120 million supply agreement, which he had touted as an indication of sTec's future growth, was just a "one-off" contract and would not be repeated again.  And as to Moshayedi's November 3 misstatements, the SEC must prove that Moshayedi's statement that he and sTec had received "preliminary indications" that EMC "might" be holding inventory of ZeusIOPS drives heading into 2010 was materially misleading.  Much of this non-public information was finally disclosed on November 3, 2009 when

---

[1] The expert reports cited in this motion are attached to the Declaration of Gary Y. Leung ("Leung Decl."):  (1) the initial report of the SEC's expert, "Expert Report and Disclosure of Dr. Richard J. Bergin," dated June 18, 2013 ("Bergin Report") (*see* Leung Decl. Ex. 5); (2) the putative "Rebuttal Report of Professor Allen Ferrell, Ph.D," dated July 12, 2013 ("Ferrell Report") (*see id*. Ex. 1); and (3) the "Expert Report of Mukesh Bajaj," dated June 18, 2013 ("Bajaj Report") (*see id*. Ex. 2). Prof. Ferrell's deposition testimony is also cited in this motion as "Ferrell Depo. Tr." and is attached as Exhibit 7 to Mr. Leung's Declaration.

Moshayedi disclosed that EMC "might" have an inventory build-up, and then on February 23, 2010, when he disclosed that EMC really did have an inventory balance and thus would not be buying any more sTec product in the near-term.

To help make this showing, the SEC has proffered as an expert, Dr. Richard Bergin, who undertook a thorough event study analysis of sTec's stock price movement and disclosures on three dates:  July 16, 2009, November 3, 2009 and February 24, 2010.  *See* Bergin Report at 9-10.  For each date, he concluded that sTec's stock price "experienced" a statistically significant abnormal return, and attributed those returns to specific disclosures made on each date.

Dr. Bergin's conclusions are not controversial.  First, he concluded that sTec's almost 10% stock price increase on July 16 was attributable to the announcement on that day that sTec had entered into the $120 million supply contract, which reflected EMC's continued commitment to purchasing sTec's drives and thus an increased and recurring demand for those drives.  *See id*. at 9.  Second, he concluded that the almost 40% stock price drop on November 3rd was attributable to Moshayedi's disclosures on that day that EMC "might" have "preliminary indications" of an inventory buildup of sTec's products, and that the all-important EMC supply agreement was just a "one-off" contract.  *See id*.  And third, Dr. Bergin concluded that sTec's almost 25% stock price drop on February 24, 2010 was attributable to what was disclosed the previous day—namely, the devastating news that EMC had a huge inventory balance of sTec drives and so would not be purchasing any more drives in the first part of the year. *See id*. at 10.

### B.    Ferrell's Proposed Rebuttal Opinions

Under the Court's case management order, as modified on June 4, 2013, the parties' initial expert reports were due June 18, 2013, and rebuttal reports were due July 12, 2013.  *See* Dkt. No. 81 (modified scheduling order).  Moshayedi offered Professor Allen Prof. Ferrell only as a rebuttal witness to Dr. Bergin's proposed testimony, and disclosed his report on July 12th, about a month after Dr. Bergin's

report was disclosed.  According to Prof. Ferrell's report, he would offer the following opinions.

### 1.     Ferrell's critique of the SEC's disgorgement calculation

In Section IV of his report, Prof. Ferrell does not rebut any of Dr. Bergin's disclosed opinions; instead, Prof. Ferrell only opines that the SEC's proposed disgorgement calculation is wrong.  As Prof. Ferrell specifically acknowledges, Dr. Bergin did not do a disgorgement calculation.  *See* Ferrell Report at 5-6.  Indeed, Section IV of his report is entitled "Dr. Bergin's Report Does Not Calculate 'Avoided Losses.'"  *Id.* at 5; *see also id.* ¶ 6 (claiming Dr. Bergin did not "provide the requisite analytical basis for such a [disgorgement] calculation"); Ferrell Depo. Tr. at 104:2-4 ("Q.  And Dr. Bergin didn't calculate disgorgement, correct?  A. That's right.").

Instead, as Prof. Ferrell also acknowledges, the disgorgement calculation he criticizes was done by the SEC and was disclosed by the SEC in its response to Moshayedi's interrogatories in discovery.  As he explains in his report, the SEC provided that calculation in response to Moshayedi's Interrogatory No. 20, which was "a request for Plaintiff's estimate of the amount that Defendant 'should be required to disgorge.'"  *Id.* ¶ 16.  Prof. Ferrell block quotes the SEC's response, emphasizing in bold and italics that the SEC's proposed disgorgement calculation was based on a $19.49 per share amount, which is the difference between the $29.76 stock price when Moshayedi sold his shares in his secondary offering and the $10.27 stock price on February 24, 2010, when the non-public information he traded with was finally disclosed.  *See id.* ¶16 (*quoting* SEC response:  "'Accordingly, *the Defendant avoided losses of* at least approximately $87,705,000 (*i.e.*, 4.5 million shares times *the difference between the offering price ($29.76) and the February 24, 2010 price ($10.27)*)).' (emphasis added)") (*quoting* SEC Int. Resp. (5/31/2013), p. 63) (emphasis in original).

Prof. Ferrell then opines that the correct disgorgement amount should be no more than $3.58 per share, and not the $19.49 amount proposed by the SEC:

Case No.  12-CV-01179-JVS-ANx

> … the maximum amount by which Mr. Moshayedi could have been enriched by any alleged disclosure deficiency, by virtue of being able to sell shares at an inflated price in the secondary offering, is $3.58, *not the $19.49 per share that the SEC calculates as avoided losses*.

*Id*. ¶ 18 (emphasis added).  In addition, Prof. Ferrell opines that "$15.91 of the $19.49 price decline" noted by the SEC is attributable to "'non-fraud related factors,'" which he discusses in Section V of his report.  *Id*. ¶ 19; *see infra*.  The SEC's expert, Dr. Bergin, never calculates or even mentions this $19.49 per share differential challenged by Prof. Ferrell.  *See generally* Bergin Report.

### 2.    Ferrell's disgorgement calculation

Prof. Ferrell expands on his views about "avoided losses" (*i.e.*, disgorgement) in Section VII of his rebuttal report, where he provides "but-for" prices for what he thinks the offering price would be if the alleged "disclosure deficiency" is taken into account.  *See* Ferrell Report ¶¶ 80-101.  Or, as he puts it, "these but-for prices measure the per share price impact attributable to the alleged omissions."  *Id*. ¶ 9; *see also id*. ¶ 80 (he "estimate[d] a but-for price for STEC stock which removed the value of the alleged material non-public information from STEC's secondary offering price after underwriting discounts").

At the end of his "but-for" analysis, Prof. Ferrell compares his results to the $19.49 price differential referenced in the SEC's response to Moshayedi's interrogatory.  *See id*. ¶ 103; *see also id*., Ex. 5 (chart comparing Prof. Ferrell's but-for prices to the SEC's $19.49 price differential).  He concludes that "all of my estimates of the per share impact of additional disclosures are significantly lower than the SEC's estimate of $19.49 per STEC share."  *Id*. ¶ 103.

### 3.    Ferrell's foundational assumption of a fraud on July 16

In his report, the SEC's expert, Dr. Bergin, analyzed the stock market reaction to sTec's and Moshayedi's disclosures on July 16.  *See* Bergin Report at 9.  His conclusion was that there was an abnormal return of positive 12.98%, or an increase of $3.58 per share.  *See id*.  But, as discussed above, his only conclusion is that this

return is attributable to the disclosure regarding the $120 million supply agreement. *See id*. Nowhere does Dr. Bergin opine that the July 16th date involved some kind of alleged disclosure deficiency.

Yet Prof. Ferrell's entire rebuttal report is based on the premise that the alleged misrepresentations and omissions made by Moshayedi occurred on July 16, 2009.  As he specifically states at the very beginning of his report:  "The first date of July 16, 2009 is allegedly when there was an alleged disclosure deficiency." *Id*. ¶ 5.  He then goes on to argue throughout his report that Dr. Bergin's analysis is "flawed" because Dr. Bergin failed to "link" the July 16th $3.58 abnormal return to any "disclosure deficiencies." *See id*. ¶¶ 8, 48.

In addition, Prof. Ferrell's "but-for" analysis is based on his assumption that that the SEC has alleged there was fraud on July 16th.  As he states explicitly in his introduction to that analysis in Section VII of his report, "STEC's residual return on July 16, 2009 is a logical starting point." *Id*. ¶ 80.  He then goes on to use that July 16th residual return to calculate "[t]he impact of the putative deliberate withholding of the one-off nature of the agreement." *Id*. ¶ 85.  But the SEC does not even allege that Moshayedi knew, as of July 16, EMC's forecasted third quarter demand, or that the supply agreement with EMC was a "one-off" and would not be repeated again, so there was nothing to "withhold" as of that date.

In his deposition, Prof. Ferrell was all over the map as to why he focused so heavily on July 16th.  When asked if the SEC has ever alleged that there was a "disclosure deficiency" on July 16, he answered:

> No, not that I can recall.  There is—and my understanding is there is a claim or an allegation of disclosure deficiency concerning the fact that it was a one-time deal or one-off deal, and so that is an allegation.  And I address the price impact of that information using July 16th.  So I think it's—it's relevant in that way.  And, moreover, Dr. Bergin claims that information was revealed on November 3rd, and so it would help one's assessment of that date.

Ferrell Depo. Tr. at 138:10-22; *see also id*. at 123:5-15.  Then, when asked if his

analysis assumed "there's a disclosure deficiency on July 16th," he answered:

> Yes.  It's assuming—it's assuming—well, yes, in the following—let me take that back. Let me restart the answer.  It's assuming that Dr. Bergin's 3.58 and his focus on July 16th has some relationship to the allegations in this case, which, at the heart, is a disclosure deficiency.  So. again, if you're telling me—and it might well be true—that July 16th and the 3.58 has no meaning in the context of this case, then—then fine.  Then—then there's no evidence for inflationary impact. But this statement would still be accurate.  It's still a maximum amount.

*Id*. at 118:18-119:7.  As he tried to explain further:

> Because, as I say—and I was very careful when I wrote this—the maximum amount—and it could well be lower.  And, in fact, later in the report I document it's lower—it's 3.58.  But, again, if Dr. Bergin is presenting a number that has no relationship to the disclosure deficiencies alleged in this case, then my response would be that I'm not sure what the point is. I mean—but it would be serving no function.

*Id*. at 119:8:21.  Later, when asked why he said the $3.58 July 16th price increase would be the maximum per share measure of Moshayedi's ill-gotten gains, he explained:  "[b]ecause that's the only figure that exists…. So if you were to say to me, 3.58 is irrelevant to this case, then fine.  Then there's nothing."  *Id*. at 124:9:22.

### 4.    Ferrell opinions about sTec's competitive landscape

In Section V of his report, Prof. Ferrell offers opinions as to what he thinks were the "non-fraud" factors that caused sTec's stock price to decrease in the fall of 2009.  Specifically, he opines that "the rapidly changing competitive landscape during the August 6, 2009 - February 24, 2010 period" explains "the decline in STEC's stock price during this (roughly) six month period."  Ferrell Report ¶ 19.  For example, he opines that:

- "STEC's competitive advantage related to its use of single level cell or 'SLC'-based enterprise SSDs such as ZeusIOPS was under pressure" (*id*. ¶ 32);

- "multi-level cell or 'MLC'-based SSDs … were not yet competitive in terms of some aspects of their performance" (*id*.);

- "MLC-based SSDs had a noteworthy advantage—they were significantly less expensive than SLC-based drives" (*id.*); and
- "broad economic conditions, among other things, impeded the speed of adoption thus lowering the overall demand for STEC's products" (*id.* ¶ 35).

However, Prof. Ferrell openly admits he has no specialized knowledge on these topics. He agreed he has no specialized knowledge in the solid state drive market. *See* Ferrell Depo. Tr. at 18:21-19:2. Nor does he deny that he does not have any expertise on the topic of competition in the SSD market, or regarding the competitive advantages or disadvantages of a particular type of SSD. *See id.* at 19:17-21, 19:22-20:3. Indeed, he concedes he has no expertise regarding solid state drives, or SLC- or MLC-based solid state drives. *See id.* at 19:11-16.[2]

### 5. Ferrell's opinions about sTec's stock price in the fall of 2009

In his analysis of so-called "non-fraud" factors, Prof. Ferrell attempts to link certain stock price movements during the period from August 2009 to February 2010 to disclosures in the market. For example, he notes that, during this period, "there was significant discussion among equity analysts noting increased competition facing STEC." *Id.* ¶ 25. He also notes that "STEC's stock price declined" after various disclosures relating to competitive threats to sTec. *Id.* ¶¶ 26-31.

Prof. Ferrell did not do an event study to determine if the stock price movements he identified (*see id.* ¶¶ 26, 28, 29, 31) were abnormal returns or not. *See* Ferrell Depo. Tr. at 230-232. The "full extent" of his analysis was his review of analyst reports and other disclosures during the period, but he did not even try to make sure he had reviewed all of the reports or disclosures on the days he was

---

[2] In his deposition, Prof. Ferrell claimed that he was not offering the opinion that STEC actually faced competition at the time. Instead, he testified that he was only opining that the market—the stock analysts—thought STEC was facing competition. But that is not what his report says. *See* Ferrell Report ¶¶ 32, 35.

9                                   Case No. 12-CV-01179-JVS-ANx

discussing.  *Id*. at 230:24-231:7, 232:4-13.

### 6.     Ferrell's factual opinion about purported negotiations of another EMC volume agreement

Prof. Ferrell also offers an "opinion" about what he calls the "continued negotiations for additional volume agreements."  Ferrell Report at 22.  Specifically, he claims there is no factual support for the SEC's claim that Moshayedi knew when he sold his shares that EMC had told him it would never do another volume commitment with sTec again:

> Dr. Bergin's basis for concluding that STEC could have disclosed that the EMC volume agreement was a 'one-off' contract as of July 16, 2009 (or August 2009) is unclear and contradicted by correspondence between STEC and EMC….  My understanding is that STEC and EMC in fact continued negotiating over a possible second volume contract through at least September 10, 2009.

*Id*. ¶ 69.  He then goes on to cite EMC's July 23, 2009 earnings call as support for his interpretation of the factual record regarding whether another volume commitment was possible.  *See id*. ¶ 70.

However, Prof. Ferrell openly recognized that "it's inappropriate for an expert to opine on purely factual issues."  Ferrell Depo. Tr. at 38:5-7.  He also admits he made no attempt to investigate the full evidentiary record regarding the negotiations of volume agreements with EMC—including the "correspondence between STEC and EMC" he refers to in his opinion.  Ferrell Report ¶ 69; *see* Ferrell Depo. Tr. at 39:5-19 ("Q.  But did you make an effort to try and review all the correspondence that's in the record in either case regarding the supply agreement or its negotiation? A. No. What I needed was the necessary context to do the analysis that I thought was appropriate for my role.  So I do not review the entire record in litigation. That would not be cost effective or reasonable.").

### 7.     The overlap between Ferrell's and Bajaj's opinions

Finally, Moshayedi's other "finance" expert, Dr. Mukesh Bajaj, offers some of the *exact same* opinions as Prof. Ferrell.  First, both Prof. Ferrell and Dr. Bajaj offer

Case No.  12-CV-01179-JVS-ANx

opinions about the stock price drop between mid-August and early-November 2009. *Compare id*. Ferrell Report ¶¶ 69-70 *with* Bajaj Report ¶¶ 86-95.  Like Prof. Ferrell, Dr. Bajaj opines that the same so-called "non-fraud" factor of "intensifying competition" led to sTec's stock price movement (Bajaj Report ¶ 87), and he even cites and quotes the same disclosures and analysts reports that Prof. Ferrell does in making this point.  *Compare* Ferrell Report ¶¶ 25-31 (citing and quoting disclosures regarding Pliant, Sun Microsystems and Fusion-io, and citing and quoting analyst reports by Wedbush, Oppenheimer, Stifel Nicolaus, and Hapoalim Securities) *with* Bajaj Report ¶¶ 88-94 (citing and quoting exact same disclosures).

Similarly, both experts offer purely factual opinions about whether or not sTec and EMC continued to negotiate for another volume agreement.  *Compare* Ferrell Report ¶¶ 25-31 *with* Bajaj Report ¶¶ 86-95.  Both claim that their review of the "evidence" shows that these discussions continued after August 3, 2009, and both opine that the SEC's claim that Moshayedi could have disclosed that the contract would not be repeated is "incorrect."  Bajaj Report ¶ 71; *see also* Ferrell Report ¶ 69. In fact, they cite the same emails in support of their interpretation of the record on this point.  *Compare* Ferrell Report, Appx. B (items 73-77) *with* Bajaj Report at 47, n.189, n.190.

## III.  ARGUMENT

### A.  Ferrell's Opinions Should Be Excluded Under Rule 26(a)(2) Because They Are Not Rebuttal Opinions

As a threshold matter, Moshayedi presented Prof. Ferrell only in rebuttal to the SEC's expert, Dr. Bergin, on July 12, 2013—about a month after initial experts were identified by the parties.  However, many of Prof. Ferrell's opinions do not rebut Dr. Bergin's opinions.  Instead, Prof. Ferrell critiques only the SEC's disgorgement calculation.  Moshayedi could and should have timely disclosed these opinions with the initial expert disclosures, but did not.  *See* Dkt. No. 81 (modified scheduling order).  As a result, Prof. Ferrell's report was an improper and untimely rebuttal

report in violation of Rule 26(a)(2) of the Federal Rules of Civil Procedure.  *See* FED. R. CIV. P. 26(a)(2)(D)(ii).  His opinions about the SEC's disgorgement calculation should therefore be stricken.  *See Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1061-63 (9th Cir. 2005); *Yetti By Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105-07 (9th Cir. 2001).

      Rule 26(a)(2) specifically states that a party's rebuttal expert report must be "intended solely to contradict or rebut" the opinions offered by the opposing party's initial expert.  FED. R. CIV. P. 26(a)(2)(D)(ii).  Therefore, courts have "wide latitude" in determining whether to strike expert disclosures that violate this rule, *Yetti*, 259 F.3d at 1106, and routinely do so to exclude expert rebuttal testimony when a party attempts to game the schedule by delaying the disclosure of an expert's opinions to make sure the other side will have no opportunity to rebut them.  "Where a party attempts to designate as a 'rebuttal' expert someone whose proposed testimony is beyond the scope of appropriate rebuttal, that witness may be viewed as an initial expert who was not timely designated and whose testimony may be struck by the Court for violating Rule 26(a) and the Court's governing scheduling order."  *Blake v. Securitas Serv., Inc.*, No. 12-1349 (JEB), 2013 WL 1814895, *1, 3 (D.D.C. May 1, 2013) (excluding plaintiff's rebuttal opinion because it was "outside the scope of the opinions proffered by Defendant's [initial] experts"); *see also Donell v. Fidelity Nat'l Title Agency of Nevada*, No. 2:07-cv-00001-KJD-PAL, 2012 WL 170990, *3 (D. Nev. Jan. 20, 2012) (excluding plaintiff's rebuttal expert because his "testimony is proffered to 'contradict an expected and anticipated portion of' Fidelity's case, and therefore is not appropriately characterized as rebuttal expert testimony); *SEC v. Leslie*, No. C 07-3444, 2010 WL 2991038, *16 (N.D. Cal. July 29, 2010) (excluding portions of opinion testimony of plaintiff's rebuttal expert because it did not rebut defendant's initial expert opinions); *C.N. v. Wolf*, No. SACV 05-868 JVS (MLGx), 2006 WL 5105270, *4-5 (Nov. 13, 2006) (Selna, J.) (excluding expert who was designated after Rule 26(a)(2) disclosure deadline).

That is exactly what happened here.  In Section IV of Prof. Ferrell's report,
Prof. Ferrell makes it clear that he is challenging the SEC's disgorgement calculation,
not Dr. Bergin's, who expressed no opinion on the subject.  *See* Ferrell Report ¶¶ 15-
20.  Prof. Ferrell opines that "the maximum amount by which Mr. Moshayedi could
have been enriched by any alleged disclosure deficiency … is $3.58, *not the $19.49
per share that the SEC calculates as avoided losses*."  *Id*. ¶ 18 (emphasis added).  He
then offers a "but-for" analysis in Section VII of his report that calculates "the per
share price impact attributable to the alleged omissions."  *Id*. ¶ 9.  Prof. Ferrell
compares the results of his pricing analysis to the $19.59 price differential used by
the SEC to calculate disgorgement, and argues that "all" of his "but-for" "estimates of
the per share impact of additional disclosures are significantly lower than the SEC's
estimate of $19.49 per STEC share."  *Id*. ¶ 103; *see also id*., Ex. 5 (chart comparing
disgorgement amounts).

But the SEC's expert, Dr. Bergin, did not calculate a disgorgement amount,
and never even mentions the $19.49 per share differential that Prof. Ferrell critiques.
In fact, Prof. Ferrell openly concedes that Dr. Bergin did not do this calculation.  *See
id*. at 5, ¶ 15.  The only disgorgement calculation Prof. Ferrell identifies is the *SEC*'s
calculation, which he found in the *SEC's* response to Moshayedi's interrogatory
responses.  *See id*. ¶¶ 16-17.  Likewise, Prof. Ferrell's "but-for" analysis, found in
Section VII of his report, makes no attempt to rebut or critique Dr. Bergin's analysis.
Not once in this section of his report does Prof. Ferrell ever mention or refer to Dr.
Bergin or his report, opinions or analysis.  Instead, Prof. Ferrell merely notes at the
beginning of Section VII that "[c]ounsel for Mr. Moshayedi has asked me" to do the
but-for pricing analysis.  *Id*. ¶ 80.  And he concludes his "but-for" analysis by
claiming his results are all lower than the *SEC*'s $19.49 price differential that the
SEC used to estimate disgorgement, and summarizes that in a result, again comparing
his results to the SEC's $19.49 price differential.  *See id*. ¶103, Ex. 5.

Moshayedi has no justifiable excuse for holding back Prof. Ferrell's

13

disgorgement opinions until the rebuttal phase of expert disclosures, and his strategic delay severely prejudiced the SEC.   Moshayedi and his defense team had the SEC's interrogatory response—which included the SEC's estimate of disgorgement and the $19.49 price differential that is the focus of Prof. Ferrell's report—a full month before initial expert disclosures were due. *See id*. at 6 n.17 (Ferrell citing SEC's May 31, 2013 interrogatory response).  And because Moshayedi strategically waited to present Prof. Ferrell's opinions regarding disgorgement as rebuttal, the SEC was not able to offer any kind of rebuttal to his flawed analysis.

No matter how much Moshayedi and Prof. Ferrell may try to twist it now, they cannot avoid the simple fact that Dr. Bergin did not do a disgorgement analysis or offer an opinion on a $19.49 price differential.  The SEC did, and it disclosed that estimation back in May during fact discovery.  Moshayedi's late attempt to attack the SEC's estimation in the rebuttal phase of expert reports in order to prevent the SEC from being able to reply to that criticism is rightly prohibited under the rules.  Therefore, the Court should strike Prof. Ferrell's critique of the SEC's disgorgement calculation as impermissible rebuttal testimony.  *See* Ferrell Report ¶¶ 15-20, 80-103; *Blake*, 2013 WL 1814895 at *3; *Donell*, 2012 WL 170990 at *3; FED. R. CIV. P. 37(c)(1) ("[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness … unless the failure was substantially justified or is harmless").

### B.    Ferrell's Opinions Are Inadmissible Under Rules 403 and 702

Prof. Ferrell's opinions should also be excluded under Rules 403 and 702 of the Federal Rules of Evidence.  To be admissible, Rule 702 requires that expert testimony must "help the trier of fact to understand the evidence or determine a fact in issue." FED. R. EVID. 702(a).  As the Supreme Court explained in *Daubert v. Merrell Dow Pharms., Inc*., Rule 702 imposes a special gatekeeping function upon trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. 579, 590-91 (1993) ("*Daubert I*"); *see also*

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  Thus, for an expert to be allowed to testify, he or she must have "specialized knowledge" beyond what a court may have and on matters that directly relate to issues in the case.  *See id*.  In addition, Rule 403 "requires a court to exclude even reliable and relevant expert testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury."  *Van Der Valk v. Shell Oil Co*., No. SACV 03–565–JVS (JTLx), 2004 WL 5486643, *1 (C.D. Cal. Nov. 15, 2004) (Selna, J.).  Indeed, expert testimony carries special dangers to the fact-finding process because "it can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert I*, 509 U.S. at 595.

The party offering the expert testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."  FED. R. EVID. 702, Notes of Advisory Committee on 2000 amendments (*citing Bourjaily v. United States*, 483 U.S. 171 (1987)); *see also In re Live Concert Antitrust Litig.*, 863 F.Supp.2d 966, 971 (C.D. Cal. 2012) (Wilson, J.).  Here, Moshayedi cannot meet that burden for Prof. Ferrell.  Prof. Ferrell's opinions fail to satisfy both Rule 702 and 403 requirements, and they should therefore be excluded.

### 1.  Ferrell's "avoided loss" opinions are irrelevant

As a threshold matter, Prof. Ferrell's opinions regarding disgorgement—or, as he puts it, "avoided losses"—are not relevant.  "The general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' form such testimony."  *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986).  Therefore, "'[e]xpert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful."  *Daubert I*, 509 U.S. at 591 (*quoting* 3 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 702[02], p. 702-18); *see also Daubert v. Merrell Dow Pharms*., 43 F.3d 1311, 1315 (9th Cir.  1995) ("*Daubert II*") (expert testimony is relevant when "it logically advances a material aspect of the proposing party's case"); *SEC v. Perry*, Case No. 2:11-cv-01309-R, Dkt. No. 120

15

(C.D. Cal. July 9, 2012) (Leung Decl. Ex. 13) (excluding expert opinion regarding conformity of company's disclosure controls and procedures with SEC Rule 13a-15 "because the [SEC] has not alleged violations of that Rule, and adherence to that Rule has no bearing on the violations alleged").

Prof. Ferrell's opinions cannot satisfy this fundamental requirement.  First of all, his entire analysis is premised on the false assumption that an alleged disclosure deficiency on July 16th is part of this case.  But the SEC does not allege anywhere in its complaint that Moshayedi made misrepresentations or omissions on that day.  *See* Dkt. No. 1 (Compl.); Ferrell Depo. Tr. at 138:10-13 (admitting no allegation of fraud on July 16).[3]  Yet Prof. Ferrell, in the introduction to his report, states there was "an alleged disclosure deficiency" on July 16th.  *See* Ferrell Report ¶ 5.  He then proceeds in Section VI, part A of his report to opine that Dr. Bergin failed to "attribute" or "link" the "market impact of the alleged disclosure deficiency" to the "residual price change of $3.58 on July 16."  *Id.* ¶ 48; *see also id.* ¶¶ 8, 39-48 (Section VI.A of report).  Ferrell's but-for pricing analysis also uses the July 16th "residual price change" as the "starting point" of his analysis.  *Id.* ¶ 80.

Because his entire analysis assumes an alleged "disclosure deficiency" on July 16, and because the SEC has not alleged Moshayedi committed fraud on that date, his opinions are based on a faulty premise.  They are therefore wholly irrelevant to the only question the jury must decide—did Moshayedi engage in a fraud in August and November 2009?  For this reason alone, his opinions should be stricken.

Moreover, opinions regarding disgorgement are irrelevant to the case that is being presented to the jury.  Disgorgement is an equitable remedy, and so the amount of disgorgement that Moshayedi should pay if he is found liable is a question for the

---

[3] Nowhere in Dr. Bergin's report—the opinions Prof. Ferrell was tasked with supposedly rebutting—does Dr. Bergin ever suggest there were misrepresentations or omissions made on July 16, or that his opinions are based on such an allegation.

Case No.  12-CV-01179-JVS-ANx

Court, not the jury, to decide.  *See SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) (affirming SEC's motion to strike defendant's demand for jury on issue of disgorgement).  Therefore, Prof. Ferrell's criticism of the SEC's disgorgement calculation (*see* Ferrell Report, § IV, ¶¶ 15-20) and his "but-for" analysis that he uses to propose alternatives to the SEC's disgorgement number (*see id.*, § VII, ¶¶ 80-103) have no bearing on the case that the jury will hear.  *See, e.g.*, *A.D. v. Cal. Highway Patrol*, No. C 07-5483 SI, 2009 WL 733872, *10 (N.D. Cal. March 17, 2009) (court "agrees with plaintiff that the [expert] testimony would be irrelevant and unfairly prejudicial in the liability phase of the trial, but finds that it would be appropriate at the damages phase); *Cappuccio v. Prime Capital Funding, LLC*, No. 07-4627, 2008 WL 7700925, *1 (E.D. Pa. Sept. 16, 2008) ("[a]dmission of expert testimony is inappropriate where such testimony is irrelevant to the jury's determination of material facts," and so expert's "opinion regarding what may be required to fairly compensate Plaintiff is irrelevant" since "Plaintiff's available remedies are … established by law").

### 2. Ferrell's "but-for" analysis has never been accepted by any court and is unreliable

Not only is Prof. Ferrell's "but-for" disgorgement analysis irrelevant to Moshayedi's liability, this analysis is also not sufficiently reliable.  In assessing the reliability of an expert's opinion under Rule 702, a court's task "is to analyze not what the experts say, but what basis they have for saying it."  *Daubert II*, 43 F.3d at 1316.  As this Court has noted, the Supreme Court in *Daubert I* "provided a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique had been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community."  *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales*

*Practices, and Products Liability Litig.*, 284 F.R.D. 485, 498 (C.D. Cal. 2012) (Selna, J.) (*quoting Domingo ex rel. Domingo v. T.K*, 289 F.3d 600, 605 (9th Cir. 2002)).

Moshayedi cannot meet this burden for Prof. Ferrell's "but-for" analysis.  To the extent Prof. Ferrell claims he is attempting to offer an opinion that is somehow relevant to the materiality of the non-public information at issue in this case, an "event study" is the well-established methodology for doing so.  *See*, *e.g.*, *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F.Supp.2d 1005, 1015 (C.D. Cal. 2003) (Wilson, J.) (event study is widely accepted method for assessing whether price movements are attributable to disclosures, and thus for assessing how fraud impacted market); *In re Oracle Sec. Litig.*, 829 F.Supp. 1176, 1181 (N.D.Cal.1993) (similar). An event study is a regression analysis that attempts, first, to determine whether a company's stock price movement is due to factors unique to the company and, second, to determine whether that movement is attributable to disclosures made at the time.  *See id*.  And, as Prof. Ferrell himself agreed, an event study is "a very standard thing to do" and is "a fairly well-established methodology."  Ferrell Depo. Tr. at 61:24-62:16.

But Prof. Ferrell did not do an event study analysis.  *See id*. at 55:17-56:21 (confirming he did not do any kind of event study analysis for sTec stock price movement on or after July 16, November 3 or February 23).  That is, Prof. Ferrell made no effort to determine if these stock price declines were unique to sTec or not— a fundamental step in determining whether a stock price movement is attributable to a disclosure concerning the subject company.  *See*, *e.g.*, *In re Imperial*, 252 F.Supp.2d at 1015 ("Because of the need 'to distinguish between the fraud-related and non-fraud related influences of the stock's price behavior,' a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar.") (*quoting* and *citing In re Oracle*, 829 F.Supp. at 1181 ("As a result of [expert's] failure to employ such a study, the results reached by [plaintiffs' expert] cannot be evaluated by

Case No.  12-CV-01179-JVS-ANx

standard measures of statistical significance" and "the reliability … of his value estimates are incapable of verification") and *citing In re Northern Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 460 (S.D.N.Y. 2000) (giving no weight to plaintiff's expert testimony because it was "fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information"); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F.Supp. 1021, 1024-26 (S.D.N.Y. 1997) (finding expert's methodology unreliable because he failed to conduct event study or regression analysis to detect whether stock price declines were result of forces other than alleged fraud).

Moreover, Prof. Ferrell's "but-for" analysis is no more than an academic exercise based on his own theories. *See* Ferrell Depo. Tr. at 149:9-151:25. In this analysis, he begins with the assumption that the $3.52 price increase on July 16th [4] is the maximum measure of the per share impact of Moshayedi's alleged fraud. He then attempts to calculate what the price reaction would have been if the market had known the information he says was "deliberately withheld" on that day (even though, again, no fraud was alleged on that day). *See* Ferrell Report ¶¶ 85-87. However, while he says it is "standard to try and disentangle confounding information with quantification," Prof. Ferrell is not aware of anyone else using, much less any court adopting, this *sui generis* "but-for" pricing approach that he uses here. *Id.* There is no reason that this Court should be his guinea pig to test out his academic theories, or that the jurors should be forced to decipher it (especially when it has nothing to do with liability). *See Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir. 2001) (expert's opinion and methodology that was created for litigation and was not peer-reviewed may be admissible as long as expert can "'explain precisely how they

---

[4] In his but-for pricing analysis, Prof. Ferrell inexplicably uses the $3.52 residual price increase of sTec's stock on July 16th as measured by his cohort, Dr. Bajaj, and not the $3.58 price increase calculated by the SEC's expert, Dr. Bergin, who he was supposed to be rebutting. *See* Ferrell Report ¶ 82; Ferrell Depo. Tr. at 156:21-157:25.

Case No.  12-CV-01179-JVS-ANx

went about reaching their conclusions and point to some objective source ... to show

that they have followed the scientific method….'") (*quoting Daubert II*, 43 F.3d at

1315); *In re DVI, Inc. Sec. Litig.*, No. 2:03-cv-05336, 2010 WL 3522090, *12

(E.D.Pa. Sept. 3, 2010) (excluding as "unreliable and unfit" expert opinion that was

not an event study where expert "can point to no other federal court that has admitted

this theory"); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F.Supp.2d 415,

451 (S.D.N.Y.), *affirmed in part*, *vacated in part*, *on other grounds*, 454 F.3d 108 (2d

Cir. 2006) (excluding expert because his trademark dilution study "has never been

accepted or endorsed by *any* court in the context of trademark dilution") (emphasis in

original).

### 3.   Ferrell's opinions about the price movement in the fall of 2009 are irrelevant, unreliable and cumulative

Prof. Ferrell's opinions regarding the stock price movement in the fall of 2009

are inadmissible for several reasons. *See* Ferrell Report, § V, ¶¶ 21-36.

First, these opinions are not relevant. Whether or not sTec's stock price went

up or down between mid-August and early-November 2009 has nothing to do with

the materiality of the non-public information Moshayedi traded on or misrepresented

in August and November. As Moshayedi and Prof. Ferrell both know, the SEC

asserts that disgorgement for his insider trading should be measured by the difference

between the stock price when he sold in August and the price when the non-public

information was finally revealed in November and February. So, while Moshayedi

may argue that this disgorgement amount is overstated because sTec's stock price

decreased from August to November on account of "non-fraud" factors, as Prof.

Ferrell opines, that does not mean that this "non-fraud" price decline is relevant to the

issue of liability. It clearly is not, and thus should not be presented to the jury in the

liability phase of the case. *See Daubert I*, 509 U.S. at 591; *Cal. Highway Patrol*,

2009 WL 733872 at *10; *Cappuccio*, 2008 WL 7700925 at *1. Nor is it even

relevant to the Court's disgorgement calculation. *See SEC v. First City Financial*

*Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) ("[i]n the insider trading context, courts typically require the violator to return all profits made on the illegal trades, and have rejected calls to restrict the disgorgement to the precise impact of the illegal trading on the market price"); *SEC v. Drucker*, 528 F.Supp.2d 450, 451 (S.D.N.Y. 2007) (ordering defendant to disgorge all losses he avoided from date he knew material, non-public information to date information was publicly disclosed, even though the price of the stock declined significantly between those two dates, because "[f]rom the time [defendant] acquired that inside information, he was barred from trading in, or causing anyone else to trade in, [the subject] stock until such time as the information became public").

Second, Prof. Ferrell is admittedly not qualified to offer the opinions he offers in his report. It is, of course, fundamental that an expert must be qualified to offer an opinion before that opinion can be admissible. *See Daubert I*, 509 U.S. at 580. As this Court has explained, "[t]he question is whether the witness is 'qualified in the *specific* subject matter for which the testimony is offered.'" *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, SACV 07-1306 JVS (RNBx), 2008 WL 4906433, *15 (C.D. Cal. Nov. 13, 2008) (Selna, J.) (*quoting Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995)) (emphasis in original). In Section V of his report, Prof. Ferrell offers several opinions about competition in the SSD market and the competitive strengths of sTec's drives. *See* Ferrell Report ¶¶ 19, 32, 35. But he admits he has no expertise on any of these subjects. *See* Ferrell Depo. Tr. at 18:21-19:2, 19:11-20:3.

Third, Prof. Ferrell's opinions about the price movements in the fall of 2009 are inherently unreliable. Although he suggests that concerns over competition may have caused the price movement (*see* Ferrell Report ¶¶ 26, 28, 29, 31), he did not do any kind of event study analysis to reach that conclusion. *See* Ferrell Depo. Tr. at 230-232. In fact, he did not do any quantitative analysis at all. Instead, all he did was review some analyst reports and disclosures. *See id.* He did not even check to see if

there were other reports or disclosures that may be relevant.  *See id*. at 230:24-231:7, 232:4-13 ("I have not affirmed that there's no other firm, specific piece of information disclosed on that day"); *Perry* (Leung Decl. Ex. 13) at 1 (excluding expert opinion because his "comparisons of other comparable banks is unreliable because of the lack of appropriate methodology used in selecting which banks were comparable").

### 4.       Ferrell's opinions about supposed volume agreement negotiations are not admissible

Prof. Ferrell also claims to have reviewed the correspondence between sTec and EMC to reach his conclusion that this evidence "contradicts" the SEC's claim that Moshayedi knew the volume agreement would not be repeated again.  *See* Ferrell Report, § VI.B.4, ¶¶ 69-71.  This is not permissible expert testimony.

As even Prof. Ferrell recognizes, "it's inappropriate for an expert to opine on purely factual issues."  Ferrell Depo. Tr. at 38:5-7.  He is right.  A court and a jury do not need an expert to testify about his interpretations of the factual record, because those interpretations are for the court or jury to make.  It is thus well established that an expert is not allowed to provide his own "factual narrative based upon record evidence."  *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005); *see also United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.") (emphasis in original); *Snyder v. Wells Fargo Bank, N.A*., Case No. Civ. 4496 (SAS), 2012 WL 4876938, *4 (S.D.N.Y. Oct. 15, 2012) (excluding expert testimony that amounted to "little more than a summation from the witness stand" and addressed matter the jury was capable of understanding without help) (internal citations and quotations omitted).  Likewise, experts are not allowed to take the role of a fact witness or to make factual arguments that can and should be made by counsel.  *See Highland Capital*, 379 F. Supp. 2d at 469 ("Whatever expertise [a

potential expert] may possess, no expert may 'supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence.") (citation omitted); *Link Co. Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 U.S. Dist. LEXIS 12975, *6 (S.D.N.Y. July 16, 2002) (where expert's report was based on a review of "documents, computer files, deposition transcripts and exhibits," the testimony by fact witnesses familiar with those documents would be "far more appropriate … and renders [the expert's] secondhand knowledge unnecessary for the edification of the jury.").

This is all that Prof. Ferrell is doing here.  He has no "specialized knowledge" that he can offer the jury in interpreting the record.  In fact, he admits he made no attempt to investigate the full evidentiary record regarding the negotiations of volume agreements with EMC—including the "correspondence between STEC and EMC" he refers to in his opinion.  Ferrell Report ¶ 69; *see* Ferrell Depo. Tr. at 39:5-19 ("Q. But did you make an effort to try and review all the correspondence that's in the record in either case regarding the supply agreement or its negotiation?  A. No. What I needed was the necessary context to do the analysis that I thought was appropriate for my role.  So I do not review the entire record in litigation. That would not be cost effective or reasonable.").  Thus, not only has he improperly supplanted the jury by offering his views of the factual record, he has done a poor inquiry of that record. His beliefs about this record, therefore, are clearly inadmissible.[5]

### 5. Ferrell's opinions are duplicative of Moshayedi's other expert

Finally, Prof. Ferrell's opinions about the price movements in the fall of 2009 and the purported volume commitment negotiations are the same as those that Moshayedi's other expert, Dr. Bajaj, plans to testify about.  A party, however, does

---

[5] Similarly, his opinion that Dr. Bergin's analysis is flawed because Dr. Bergin did "not provide any evidence that analysts felt misled by STEC's earlier disclosures" is irrelevant.  Dr. Bergin correctly offered no opinions about what relevant witnesses "felt" or believed because that is not the role of an expert witness.

Case No.  12-CV-01179-JVS-ANx

not have the "absolute right to force upon an unwilling tribunal an unending and superfluous mass of testimony limited only by its own judgment and whim." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 609 (3d Cir. 1995) (affirming trial court's mid-trial imposition of time limits because it was "frustrated with what it perceived as duplication of evidence").  So, even if an expert's opinion is admissible under Rule 702 (which Prof. Ferrell's is not), a court may still exclude the opinion under Rule 403 if it is cumulative or duplicative of other evidence before the court.  *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1421-22 (9th Cir. 1998) (affirming exclusion of one of plaintiff's experts because expert's opinions were cumulative of opinions of plaintiff's other expert "because its probative value was outweighed by the waste of time that would be involved"); *In re Air Crash Disaster*, 86 F.3d 498,527 (6th Cir. 1996) (even if expert testimony may be admissible under Rule 702, "a court is free to exclude *any* expert testimony, including the testimony of an announced expert, if the testimony is cumulative or redundant under Fed. R. Evid. 403") (emphasis in original).[6]  There is no reason Moshayedi should be able to present two expert witnesses to testify about the exact same thing.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the SEC respectfully requests that the Court exclude Prof. Ferrell's proposed opinion testimony (a) Section IV of his report, criticizing the SEC's disgorgement calculation, because it is impermissible rebuttal testimony under Rule 26(a)(2); (b) in Sections IV, VI.A and VII of his report, regarding "avoided

---

[6] *See also*, *e.g.*, *LaPlace-Bayard v. Batlle*, 295 F.3d 157, 163-64 (1st Cir. 2002) (affirming exclusion of cumulative expert opinion); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 169-70 (3d Cir. 2001) (precluding under Rule 403 additional expert offered to testify on "the same issues" as the party's other experts); *Williams v. Cty. of Orange*, No. 03 Civ. 5182(LMS), 2005 WL 6001507, at *6 (S.D.N.Y. Dec. 13, 2005) (proposed expert testimony was cumulative and should have been excluded where the expert's "report does not provide the Court with an opinion that is distinct from the expert testimony proffered by the Defendants' principal expert.").

losses" and the July 16th disclosures because they are irrelevant; (c) in Section VII of his report, regarding his "but-for" analysis, because it is based an unreliable and not generally accepted methodology; (d) in Section V of his report because it is unreliable, unqualified and cumulative expert opinion testimony; and (e) in Section VI.B.4 because it is impermissible fact testimony from an opinion expert.

Dated:  September 23, 2013                     Respectfully submitted,

                                              /s/  John W. Berry
                                              John W. Berry
                                              Donald W. Searles
                                              Gary Y. Leung
                                              Attorney for Plaintiff
                                              Securities and Exchange Commission

Case No.  12-CV-01179-JVS-ANx

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648
Telephone No.  (323) 965-3213; Facsimile No.  (323) 965-3908.

On September 23, 2013, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF PROFSSOR ALLEN FERRELL UNDER RULES 403 AND 702 OF THE FEDERAL RULES OF EVIDENCE** on all the parties to this action addressed as stated on the attached service list:

☐     **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐     **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐     **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐     **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐     **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐     **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒     **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐     **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  September 23, 2013          */s/ John W. Berry*
                                                      JOHN W. BERRY

1

## SEC v. MANOUCHEHR MOSHAYEDI
### United States District Court—Central District of California
### Case No. 12-CV-01179 (JVS) (ANx)

## SERVICE LIST

Sean M.  Berkowitz
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Direct Dial: 312-777-7016
sean.berkowitz@lw.com

Matthew Rawlinson
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: 650-463-3076
matt.rawlinson@lw.com

Colleen Smith
LATHAM & WATKINS LLP
600 W.  Broadway, Suite 1800
San Diego, CA 92101
Direct Dial: 619-238-2950
colleen.smith@lw.com

Everett Bulthuis (Paralegal)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925
Direct Dial: 714-755-8247
Cell: 714-747-1814
everett.bulthuis@lw.com

Thomas A.  Zaccaro
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomaszaccaro@paulhastings.com

*Attorneys for Defendant*

Patrick Gibbs
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-4696
patrick.gibbs@lw.com

William R.  Baker, III
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.  20004-1304
Direct Dial:  202-637-1007
william.baker@lw.com

Jennifer S.  Duckworth (Paralegal)
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-3012
jennifer.duckworth@lw.com

Thomas P.  O'Brien
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomasobrien@paulhastings.com

*Attorneys for Defendant*