JOHN W. BERRY (bar admission pending, L.R. 83-2.4.1)
Email: berryj@sec.gov
DONALD W. SEARLES, Cal. Bar No. 135705
Email: searlesd@sec.gov
GARY Y. LEUNG (bar admission pending, L.R. 83-2.4.1)
Email: leungg@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>MANOUCHEHR MOSHAYEDI,<br><br>Defendant. | Case No.  12-CV-01179-JVS-ANx<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF LISA L. TROE UNDER RULES 403 AND 702 OF THE FEDERAL RULES OF EVIDENCE**<br><br>Date:      October 21, 2013<br>Time:     1:30 p.m.<br>Ctrm:    10C<br>Judge:   Hon. James V. Selna |

# **TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................... 1

II.  MS. TROE'S PROFFERED OPINIONS ................................................ 3

   A.  "Reasonable Basis" Opinions ...................................................... 3

   B.  General Guidance Opinions ........................................................ 4

   C.  OEM Industry Opinions .............................................................. 5

   D.  sTec Operational Opinions .......................................................... 5

   E.  Opinion on Materiality from "an Accounting Standpoint" ........... 5

   F.  "Disclosed Risk" Opinion ............................................................ 6

III.  ARGUMENT ........................................................................................ 6

   A.  Ms. Troe's Opinions Are Just Her Views Of The Factual Record And Should Be Excluded ........................................................................ 7

      1.  Ms. Troe's opinions invade the province of the Court, the jury and the lawyers ................................................................. 7

      2.  Ms. Troe is not qualified to give opinions on the business relationship between sTec and EMC ................................. 14

      3.  Ms. Troe's opinions are premised on a selective reading of the evidentiary record ....................................................... 16

   B.  Ms. Troe's "Reasonable Basis" Opinions Should Be Excluded ............................................................................ 18

      1.  Her opinion does not "fit" the SEC's claims ...................... 18

      2.  Her opinion that there was a reasonable basis to guide at $55 million—even without the side deal—should be excluded ............... 19

      3.  Her opinions about actual recognition of 3Q09 revenue should be excluded .................................................................. 20

      4.  Ms. Troe's "general guidance" opinions should be excluded ........... 22

   C.  Ms. Troe Should Be Prohibited From Rendering Any Opinion On "Materiality" ............................................................. 23

IV.  CONCLUSION .................................................................................... 24

Case No.  12-CV-01179-JVS-ANx

1

# <u>TABLE OF AUTHORITIES</u>

2

3

*Arbol Media Inc. v. Hartford Casualty Ins. Co.*, Case No. SAXCV 02-0244-JVS (MLGx),
4
    2003 U.S. Dist. LEXIS 28465 (C.D. Cal. July 7, 2003) ...............................24

5
*Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936 (KMW),
    2011 WL 1674796 (S.D.N.Y. May 2, 2011)................................................16
6

*AstraZeneca v. Tap Pharm. Prods. Inc.*,
7
    444 F. Supp. 2d 278 (D. Del. 2006) ...........................................................9

8
*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)............................................................................ 6, 23
9

*Diaz v. Johnson Matthey, Inc.*,
10
    893 F. Supp. 358 (D.N.J. 1995) ...............................................................16

11
*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................................14
12

*Haflich v. McLeod*, Case No. CV 09-161-M-DWM-JCL,
13
    2011 U.S. Dist. LEXIS 1943 (D. Mont. Jan. 10, 2011) ...............................8

14
*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) ......................................................11
15

*Hinkle v. LaRoche*,
16
    2008 U.S. Dist. LEXIS 106433 (E.D. Wash. Aug. 1, 2008).........................8

17
*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ......................................................14
18

*In re Novatel Wireless Sec. Litig.*,
19
    2011 U.S. Dist. LEXIS 133105 (S.D. Cal. Nov. 17, 2011)...........................8

20
*In re Oracle Corp. Sec. Litig.*, Case No. C 01-00988 SI,
    2009 U.S. Dist. LEXIS 50995 (N.D. Cal. June 16, 2009)..........................17
21

*In re Rezulin Prods. Liability Litig.*,
22
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................... 9, 11, 12

23
*In re STEC , Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx),
    2011 WL 2669217 (C.D. Cal. June 17, 2011).............................................14
24

*Kumho Tire Co. v. Carmichael*,
25
    526 U.S. 137 (1999)...................................................................................6

26
*Link Co. Inc. v. Fujitsu Ltd.*, Case No. 00 Civ. 7242 (SAS),
    2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. July 16, 2002)..................... 10, 11
27

*Marx & Co. v. Diners' Club, Inc.*,
28
    550 F.2d 505 (2d Cir. 1977) ......................................................................8

*Media Sport & Arts v. Kinney Shoe Corp.*, Case No. Civ. 3901 (PKL),
 1999 U.S. Dist. LEXIS 16035 (S.D.N.Y. Oct. 18, 1999)...............................10

*Mukhtar v. California State Univ.*,
 299 F. 3d 1053 (9th Cir. 2002) ...........................................................7

*Nimely v. City of New York*,
 414 F.3d 381 (2d Cir. 2005) ...................................................... 12, 16

*Salem v. United States Lines Co.*,
 370 U.S. 31 (1962)...........................................................................8

*SEC v. Johnson*,
 525 F. Supp. 2d 70 (D.D.C. 2007)....................................................9

*SEC v. Tourre*, No. Civ. 3229 (KBF),
 2013 U.S. Dist. LEXIS 87211 (S.D.N.Y. Jun. 18, 2013)............................24

*U.S. v. Chang*,
 207 F.3d 1169 (9th Cir. 2000) ........................................................16

*U.S. v. Christophe*,
 833 F.2d 1296 (9th Cir. 1987) ...........................................................7

*U.S. v. Downing*,
 753 F.2d 1224 (3d Cir. 1985) .........................................................23

*U.S. v. Frazier*,
 387 F.3d 1244 (11th Cir. 2004 (*en banc*))........................................11

*U.S. v. Nacchio*,
 519 F.3d 1140 (2008), *rev'd on other grounds*,
 555 F.3d 1234 (10th Cir. 2009) ......................................................18

*U.S. v. Scholl*,
 166 F.3d 964 (9th Cir. 1999) ..........................................................10

*U.S. v. Scop*,
 846 F.2d 135 (2d Cir. 1988) ...........................................................12

*Valiavicharska v. Celaya*, Case No. CV 10-4847 JSC,
 2012 U.S. Dist. LEXIS 8191 (N.D. Cal. Jan. 24, 2012)..............................8

*Van Der Valk v. Shell Oil Co.*, Case No. SACV 03-565-JVS (JTLx),
 2004 U.S. Dist. LEXIS 30692 (C.D. Cal. Nov. 15, 2004) ..........................24

*Williamson v. Verizon Comm'ns, Inc.*, No.11-cv-4948(LTS),
 2012 WL 5425033 (S.D.N.Y. Nov. 7, 2012) ......................................16

## I.    __INTRODUCTION__

Plaintiff Securities and Exchange Commission (the "SEC") alleges that
Defendant Moshayedi traded while in possession of material, non-public information,
and that Moshayedi made misrepresentations and omissions to the market about the
growth curve for sTec's ZeusIOPS product line, and in particular, the demand of
sTec's largest customer—EMC Corporation—for that storage technology.  This case
does not involve any questions of GAAP or revenue recognition, yet Defendant
Moshayedi proffers an accountant, Lisa L. Troe, to testify at trial on those very
subjects.  Since this is not an accounting fraud case, her testimony should be
excluded.

By training, Ms. Troe is a forensic accountant.  She has no relevant experience
in the solid state drive industry or the enterprise server market that sTec's customer,
EMC, occupied in 2009.  She disavows having any special expertise in understanding
demand for a growth-stage storage technology like sTec's solid state drives in 2009.
Nor does she have any expert understanding of the give-and-take between sTec and
EMC in 2009, when sTec's ZeusIOPS business exploded on the strength of its EMC
account.

In her report, however, she nonetheless opines that:  (1) EMC's late-July
demand forecast of $34 million was "misleadingly low," that "EMC's forecasting
was unreliable" and its "expected purchases" were "uncertain—to everyone;" (2) the
$55 million EMC commitment was "supported by a legitimate business purpose" and
had "obvious value" to Moshayedi because it "enabled sTec to schedule production
with certainty;" and (3) because "EMC had no reason to bend to requests or demands
made by sTec," "it is unreasonable to believe that EMC would enter into an
arrangement in which it would hold inventory simply to help sTec meet its revenue
goals."

Despite her accounting background, only a miniscule portion of Ms. Troe's
sprawling and discursive expert report is devoted to her specialized knowledge in her

chosen field.  The vast majority of her "opinions" are instead a recitation of emails, deposition testimony, and other documentary evidence, combined with her own interpretation of that factual record.  Indeed, after initially identifying the relevant guidelines governing sTec's third quarter revenue guidance, Ms. Troe fails to write the words, "Regulation S-K" or "AICPA" ever again in the remaining 31 pages of her report.  Rather than using her expertise as a forensic accountant, she assumes the role of a forensic psychiatrist, and attempts to tell jury what Moshayedi knew or should have known at the time of his secondary offering and whether his conduct was fraudulent.

Ms. Troe's expert report and deposition testimony repeatedly betray this fundamental flaw in her supposed expert analysis.  As she made clear in her deposition, her approach was singularly focused on trying to figure out what Moshayedi was thinking:

> What I did was look at the evidentiary record—placing particular weight on contemporaneous documentary evidence, ***focused on what was in the defendant's head on August 3rd***.

Ms. Troe similarly testified that "I understand what people's self-interests or conflicts of interest are" and "[I] take that into consideration" when "making those judgments about ... what are actually the facts."  And true to her belief that her task was to be the juror, judge and attorney all at once, she explained she was "looking at all the data points and assessing what is this total mix of information because data points are different from one another, and one has to look at things within context."

But it is not for Ms. Troe to engage in rank speculation on Moshayedi's state of mind and EMC's subjective reasons for agreeing to the $55 million 3Q09 side deal.  Nor does Rule 702 give her carte blanche to weigh the evidence, scrutinize the credibility of witnesses, or parrot the factual arguments of Moshayedi's counsel at trial.  Ms. Troe's summary judgment brief—masked in the form of an expert report— should be excluded.

## II.   MS. TROE'S PROFFERED OPINIONS

Ms. Troe's lengthy report offers dozens of varied opinions, which may be summarized and grouped into six categories of opinions, as follows:

### A.   "Reasonable Basis" Opinions

In this category of opinions, Ms. Troe opines that sTec's 3Q09 revenue guidance had a reasonable basis.  To reach her opinions, she purports to delve into the mind of Moshayedi and the sTec employees responsible for forecasting EMC's ZeusIOPS demand in 3Q09 by summarizing their deposition testimony and their contemporaneous communications with EMC.  And in a tautological argument remarkable for its circularity, she points to the 3Q09 $55 million EMC commitment as the "reasonable basis" for sTec's forecasted guidance, without considering whether the non-disclosure of that side deal and the context surrounding it rendered sTec's guidance misleading.  In short, she offers the following opinions:

(1)   sTec's $55 million forecast for 3Q09 EMC revenue (incorporated in its publicly announced guidance of $95-97 million for the quarter) had a "reasonable basis" because EMC agreed to purchase that amount of product (Troe Report at pp. 7-8, ¶¶ 19-21);[1]

(2)   even in the absence of the $55 million 3Q09 EMC commitment, sTec still had a reasonable basis to forecast and announce guidance incorporating $55 million in 3Q09 revenue from EMC, based sTec's recent past experience with sales of drives to EMC (*id.* at p. 29, ¶ 78 and p. 43, ¶ 105);

(3)   sTec's 3Q09 guidance proved accurate because two months later, when, at  the close of 3Q09, sTec recognized $55 million of 3Q09 revenue from ZeusIOPS

---

[1] The "Expert Report of Lisa L. Troe," dated June 18, 2013 ("Troe Report Report"), cited in this motion is attached to the Declaration of Gary Y. Leung ("Leung Decl.") as Exhibit 4.  Ms. Troe's July 26th and August 2nd deposition testimony is cited in this motion as "Troe Depo. Tr." and is attached as Exhibit 10 to Mr. Leung's Declaration.

sales to EMC in accordance with "GAAP and sTec's revenue recognition policy" (*id.* at pp. 8, ¶22, 14, ¶ 31(10));

(4)  sTec did not have a "reasonable basis" to base its guidance on the $34 million 3Q09 EMC forecast under Regulation S-K and the AICPA guidelines on the preparation and development of financial forecasts (*id.* at pp. 8, ¶ 23, 13, ¶ 29(8));

(5)  the $55 million 3Q09 EMC commitment "permitted sTec's forecast to be more reliable than it otherwise would have been" (*id.* at p. 12, ¶ 29(7)); and

(6)  GAAP literature on revenue recognition and sTec's revenue recognition policy are "relevant criteria" for assessing the reasonableness of sTec's $55 million forecast for 3Q09 EMC revenue.  *Id.* at pp. 13-14, ¶ 31(9).

## B.    General Guidance Opinions

For this group of opinions, Ms. Troe gives opinions about what information guidance should or should not be based upon.  In doing so, she fundamentally misapprehends the SEC's claims by focusing on her attention on the demand for EMC's products.  But the SEC's claims are about *EMC's demand for sTec's products*.  She also ignores the undisputed record on how sTec formulated its revenue guidance in the first half of 2009.  Her opinions on this topic, as flawed as they are, are as follows:

(1)  revenue guidance should be formulated based on sTec's forecast of sTec revenue, rather than a forecast of EMC's revenue (*id.* at p. 10, ¶ 29(1));

(2)  sTec should not be required to base its revenue guidance on EMC's demand projections (*id.* at p. 10, ¶ 29(1));

(3)  sTec should not be required to base its guidance on the amount of EMC's committed orders received by sTec at the time guidance is issued (*id.* at p. 10, ¶ 29(2); and

(4)  the SEC incorrectly asserts that sTec should have based its 3Q09 revenue guidance "on when its customer [EMC] sells [EMC's] product to [EMC's] own customers, who are further down the supply chain."  *Id.* at p. 13, ¶ 30.

### C.     OEM Industry Opinions

In expressing these opinions, Ms. Troe purports to offer specialized industry knowledge on the business dynamic between an OEM like EMC and a component supplier such as sTec.  In particular, she opines, without any specialized knowledge on the relevant industry, that:

(1)   there are "a variety of reasons" for why an OEM will buy solid state drive parts for its enterprise server products, even when that OEM does not have a pending enterprise server sale to its own customers (*id.* at p. 11, ¶ 29(3)); and

(2)   a commitment like the EMC $120 million volume agreement "reflects the minimum amount of revenue the seller can reasonably expect to earn from the agreement."  *Id.* at p. 11, ¶ 29(4).

### D.     sTec Operational Opinions

For these opinions, Ms. Troe offers opinions as to why she believes the 3Q09 $55 million EMC commitment was "legitimate" given the particulars of sTec's manufacturing and operational situation in late-July 2009.  Specifically, she claims:

(1)   the July 29, 2009 3Q09 $55 million EMC commitment was not actively concealed (*id.* at p. 12, ¶ 29(6));

(2)   the July 29, 2009 3Q09 $55 million EMC commitment "was supported by legitimate business purposes" (*id.* at p. 12, ¶ 29(6)); and

(3)   "[g]iven the time it takes sTec to produce ZeusIOPS SSDs from the time an order is placed, and EMC's 'hockey stick' sales pattern ... obtaining such a commitment as Mr. Moshayedi ... successfully did, which was followed immediately by EMC's ZeusIOPS detailed specifications, was extremely valuable to sTec as it enabled it to effectively manage its production operations by knowing specifically how much and which type of ZeusIOPS drives to manufacture."  *Id.* at pp. 12-13, ¶ 29(7).

### E.     Opinion on Materiality from "an Accounting Standpoint"

Ms. Troe also weighs in on the issue of materiality, arguing that the late-July

1  $33-34 million "EMC Total Q3 Forecast" was not "material" "from an accounting

2  standpoint."  *Id.* at pp. 11-12, ¶ 29(6).

3    **F. "Disclosed Risk" Opinion**

4    Finally, Ms. Troe offers the (astounding) legal conclusion that sTec's

5  boilerplate risk disclosures insulate Moshayedi from any and all securities fraud

6  liability arising from sTec's 3Q09 revenue guidance.  As she states in her report:  "In

7  connection with sTec's August 3, 2009 guidance, sTec fully disclosed—and therefore

8  the market and investors were fully informed about—risks inherent in its revenue

9  guidance."  *Id.* at pp. 15-17, ¶ 37.

10  **III. ARGUMENT**

11    Ms. Troe's opinions are inadmissible under Rules 403 and 702 of the Federal

12  Rules of Evidence, and should be excluded.  To be admissible, Rule 702 requires that

13  expert testimony must "help the trier of fact to understand the evidence or determine

14  a fact in issue." FED. R. EVID. 702(a).  As the Supreme Court explained in *Daubert v.*

15  *Merrell Dow Pharms., Inc*., Rule 702 imposes a special gatekeeping function upon

16  trial courts to "ensure that any and all scientific testimony or evidence admitted is not

17  only relevant, but reliable."  509 U.S. 579, 590-91 (1993) ("*Daubert I*"); *see also*

18  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).[2]  Thus, for an expert to be

19  allowed to testify, he or she must have "specialized knowledge" that is sufficiently

20  related to the issues and evidence before the trier of fact such the witness's proposed

21  testimony will be helpful to the trier of fact.  *See* 3 Jack B. Weinstein and Margaret

22  A. Berger, *Weinstein's Federal Evidence*, P 702[04][1][b], at 702-45.

23  

24  [2] Rule 702 provides:  "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise

25  if:  (a)  the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony

26  is based on sufficient facts or data; (c)  the testimony is the product of reliable principles or methods; and (d)  the expert has reliably applied the principles and

27  methods to the facts of the case."  FED. R. EVID. 702.

28

### A.    Ms. Troe's Opinions Are Just Her Views Of The Factual Record And Should Be Excluded

Ms. Troe's survey of the evidence has nothing do with her expertise as a forensic accountant.   Instead, she presents an improper factual narrative that simply weighs the evidence and assesses witness credibility on matters which are fully within a lay juror's common knowledge and ability.  She also impermissibly speculates on the subjective motivations of fact witnesses who are able to give their own, first-hand account to the jury at trial.

### 1.    Ms. Troe's opinions invade the province of the Court, the jury and the lawyers

First, expert testimony is not relevant and, hence, not admissible, when the subject matter is within the common knowledge of the fact finder.  *Mukhtar v. California State Univ.*, 299 F. 3d 1053, 1065, n. 9 (9th Cir. 2002); *United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir. 1987).  Ms. Troe is not a percipient witness and to the extent she possesses specialized knowledge in the financial accounting area, none of that expertise is brought to bear in her report.  In the preliminary sections of her report, she explains that sTec's 3Q09 revenue guidance is scrutinized under Regulation S-K and the AICPA Audit and Accounting guide for the preparation and issuance of financial forecasts and projections.  *Id.* at p. 17, ¶38-41.  In contrast, Ms. Troe states that guidance announcements like sTec's August 3rd release are not audited under GAAP.  *Id.* at p. 15, ¶ 35.

But after setting out the operative Regulation S-K and AICPA guidelines, not once does Ms. Troe refer again to either standard in the ensuing 31 pages of her report.   Instead, Ms. Troe argues the facts in the form of a brief, with headings like: "A 'Secret' Side Deal?—But EMC Bargained for More, Not Fewer, Units," "Actual Third Quarter 2009 Results Confirm the Guidance," "sTec Already Had At Least $34 Million of EMC Orders," "EMC's Optimistic Statements About Growth," "EMC's Past History of Exceeding Forecasts," and "EMC's Expected Purchases Uncertain—

To Everyone."  Troe Report at ¶¶ 65-66, 79-88, 90, 98-100, 110-112.  It should be plain that these issues—*i.e.*, whether a forecast can be  reliable, whether pricing discussions occur between buyers and sellers, , and whether a customer's order history is a reliable indicator of future demand—are all matters of common understanding.  The jury's comprehension of the e-mail and testimonial evidence considered and recited by Ms. Troe in the bulk of her report would be in no way aided by her forensic accounting expertise, and because Ms. Troe lacks any industry expertise, she has nothing to offer on that front either.

Ms. Troe has therefore exceeded the permissible boundaries of Rule 702 testimony.  *See*, *e.g.*, *Marx & Co. v. Diners' Club, Inc*., 550 F.2d 505, 510 (2d Cir. 1977) ("examination of documents and correspondence … which were equally before the judge and jury" is improper subject of expert testimony);  *In re Novatel Wireless Sec. Litig*., 2011 U.S. Dist. LEXIS 133105, *13 (S.D. Cal. Nov. 17, 2011) ("no specialized or technical knowhow is required to read and draw conclusions from the internal documents and testimony cited [by the expert].  The documents are not complicated and speak for themselves."); *Hinkle v. LaRoche*, 2008 U.S. Dist. LEXIS 106433, *8 (E.D. Wash. Aug. 1, 2008) ("Jurors are perfectly capable of drawing whatever inferences they believe are warranted from the evidence presented to them and not need expert testimony to assist them in that regard."); *Haflich v. McLeod*, Case No. CV 09-161-M-DWM-JCL, 2011 U.S. Dist. LEXIS 1943, *3 (D. Mont. Jan. 10, 2011) ("expert testimony is unnecessary in those situations where jurors are 'as capable of comprehending the primary facts and drawing correct conclusions from them as are witnesses possessed with special knowledge or peculiar training.'") (quoting *Salem v. United States Lines Co*., 370 U.S. 31, 35 (1962)).

Second, expert testimony on the mental state of the witnesses is impermissible. Fed. R. Evid. 704; *Valiavicharska v. Celaya*, Case No. CV 10-4847 JSC, 2012 U.S. Dist. LEXIS 8191, *9-10 (N.D. Cal. Jan. 24, 2012) (expert may not opine on party's subjective knowledge); *AstraZeneca v. Tap Pharm. Prods. Inc*., 444 F. Supp. 2d 278,

293 (D. Del. 2006) (expert witnesses not permitted to testify about defendant's intent, motive, or state of mind, or evidence by which such state of mind may be inferred).

Here, Ms. Troe's opinions share a common undercurrent—they are nearly all based on her speculation about Moshayedi's and the EMC witnesses' motives, state of mind, and reasons for their actions. As Ms. Troe explained in her deposition, while gesturing to her forehead for added emphasis, she believes her task was to figure out what Moshayedi was thinking:

> What I did was look at the evidentiary record—placing particular weight on contemporaneous documentary evidence, ***focused on what was in the defendant's head on August 3rd***. To the extent information that existed after August 3rd, I considered for purposes of my report, was to the extent, if at all, that later information bore on or gave an indication of what was—***what information was available in the head of the forecaster on August 3rd***.

Troe Depo. Tr. at 80:4-81:10 (emphasis added); *see also id.* at 104:20-105:14. Thus, on the central questions of scienter, Ms. Troe purports to opine on Moshayedi's and EMC's intent and state of mind in entering into the 3Q09 $55 million deal, and how that arrangement had nothing to do with sTec's 3Q09 revenue guidance. *See*, *e.g.*, *id.* at 88:15-89:9 ("I understand what people's self-interests or conflicts of interest are … and take that into consideration in terms of … making those judgments about … what are actually the facts."), Troe Report at ¶ 67 (Moshayedi's "reasons" for pursuing the side deal "were unrelated to revenue forecasts") and ¶ 62 ("EMC had no reason to bend to requests or demands made by sTec … it is unreasonable to believe that EMC would enter into an arrangement in which it would hold inventory simply to help sTec meet its revenue goals.").

This kind of opinion testimony is clearly impermissible. "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *SEC v. Johnson*, 525 F. Supp. 2d 70, 78 (D.D.C. 2007) ("Determinations of individuals'

Case No.  12-CV-01179-JVS-ANx

intent is quintessential jury question.").

Moreover, Ms. Troe has no foundation to explain EMC's motivations, business objectives or intent in taking the actions that it did, nor does she know how sTec prepared its internal EMC demand forecasts, or on what information sTec relied upon in creating those forecasts. Troe Depo. Tr. at 268:25-269:13, 285:10-288:9. At her deposition, she fully agreed that sTec and EMC witnesses should give their own account of what occurred. *Id.* at 285:10-288:9 ("Q. And would you agree with me that Mr. Anvari is the person that we need to talk to if we need to understand whatever it is that he considered, what information he considered, when preparing these forecasts in 2009? A. I would certainly concede that it is not me."), 289:9-290:19.

Thus, under the law and even according to Ms. Troe, her opinions on Moshayedi's or the EMC witnesses' state of mind, intent, and motive are all inadmissible. *See also Link Co. Inc. v. Fujitsu Ltd.*, Case No. 00 Civ 7242 (SAS), 2002 U.S. Dist. LEXIS 12975, *6 (S.D.N.Y. July 16, 2002) (where expert's report was based on a review of "documents, computer files, deposition transcripts and exhibits," the testimony by fact witnesses familiar with those documents would be "far more appropriate … and renders [the expert's] secondhand knowledge unnecessary for the edification of the jury."); *Media Sport & Arts v. Kinney Shoe Corp.*, Case No. Civ. 3901 (PKL), 1999 U.S. Dist. LEXIS 16035, *11 (S.D.N.Y. Oct. 18, 1999) (expert testimony may not take the place of testimony from persons who actually negotiated the deal); *United States v. Scholl*, 166 F.3d 964, 974 (9th Cir. 1999) (finding trial court did not abuse it discretion in excluding expert testimony on whether accountant exercised proper standard of care, as "additional expert testimony would be a waste of time and would not assist the jury to understand the evidence or determine a fact in issue.").

Third, it is improper to offer expert testimony "solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital*

*Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).  Despite lacking any special insight on the industry matters in dispute or any percipient knowledge of the motives and state of mind of the witnesses, Ms. Troe's report nonetheless constructs her own subjective narrative on the entire course of relevant events.[3]

Indeed, the sum and substance of Ms. Troe's report should be familiar to any reader of Moshayedi's summary judgment briefing.  It is overwhelmingly comprised of factual arguments, the very same arguments espoused by Moshayedi's attorneys when litigating this case.  Ms. Troe's mere compilation and arrangement of the evidence in Moshayedi's favor adds nothing—it is for counsel to make arguments about the meaning and significance of that evidence, arguments that a lay juror is capable of rejecting or accepting without the "aid" of Ms. Troe's "arguments and conclusory statements about questions of fact masquerading behind a veneer of technical language."  *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *1; *see also United States v. Frazier,* 387 F.3d 1244, 1262-63 (11th Cir. 2004 (*en banc*) (expert testimony will not help trier of fact when it offers nothing more than what lawyers for parties can argue in closing); *In re Rezulin*, 309 F. Supp. 2d at 551 ("Dr. Gale's 'history of Rezulin' is merely a 'narrative of the case which a juror is equally capable of constructing' ... Such material, to the extent it is admissible, is properly presented

---

[3] *See, e.g.*, Troe's account of the parties' negotiation and execution of the $120 million volume agreement (¶¶ 46-47), EMC and sTec's expectations for the agreement and their interpretation of its terms (¶¶ 48-53), the operational benefits sTec realized from the $120 million volume agreement (¶ 50), EMC's motives in signing the $120 million volume agreement and the $55 million 3Q09 commitment shortly thereafter (¶¶ 52-53), sTec's motives in securing the $55 million side deal (¶¶ 55-56, 60, 67), EMC's reasons for agreeing to increase its 3Q09 orders to $55 million (¶¶ 58-59, 63, 68), the relative bargaining positions of EMC and sTec (¶¶ 57, 62), the common place nature of sTec and EMC's renegotiation of pricing only two weeks after signing the $120 million volume agreement (¶ 67), how it is illogical from a business standpoint to publicly disclose customer pricing (¶ 69), EMC's 2009 order and forecasting history (¶¶ 90-91, 100-101, 107-109), and EMC's pattern of "hardball" negotiating tactics (¶112).

Case No.  12-CV-01179-JVS-ANx

through percipient witnesses and documentary evidence.").  And the character of Ms. Troe's likely testimony at trial is informed by the nature of her deposition testimony. At her deposition she repeatedly gave non-responsive answers in the form of a lengthy, talking points-laden summation of Moshayedi's construction of the evidence, bereft of any connection to accounting principles or her expertise in that field.  Indeed, Ms. Troe agreed that her "opinions" were factual narrative.  *See* Troe Depo. Tr. at 279:18-280:5.

Fourth, Ms. Troe's opinions should be excluded for the basic reason that an expert cannot simply weigh the evidence and evaluate the credibility of witnesses. *See Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702"); *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("The credibility of witnesses is exclusively for the determination [of] the jury").  Ms. Troe's report is tellingly peppered with phrases like, "the evidentiary record indicates," "there is overwhelming evidence," "it is unreasonable to believe," "it seems illogical," "there was no reason to believe," "it would have been reasonable to expect," and "it would not have been unreasonable to give little weight."  At bottom, Ms. Troe "merely repeat[s] facts or opinions stated by other potential witnesses or in documents produced in discovery and then draws speculative inferences about what that evidence means and what weight it should be accorded by the jury.  *See In re Rezulin*, 309 F. Supp. 2d at 546-47.

To underscore the very point, one would look no further than Ms. Troe's own description of her "methodology."  As she made clear in her deposition, she was "focused on what was in the defendant's head on August 3rd."  *Supra*.  She also explained:

- "I'm looking at all the data points and assessing what is this total mix of information because data points are different from one another, and one

12                              Case No.  12-CV-01179-JVS-ANx

has to look at things within context."

- "Conflicting evidence.  I did not see ... the type of conflicting evidence ... that I think about as conflicting evidence."

- "[S]o e-mails can be interpreted differently when taken in the vacuum by different people ....  So did I see conflicting or contrary, you know, evidence?  Not the way I would think about conflicting or contrary evidence that I've seen in numerous investigations ...."

- "I believe that contemporaneous documentary evidence is the strongest evidence.  With respect to testimonial evidence, frankly, I give less—I— 'discount' isn't the right word, but I—I understand what people's self-interests or conflicts of interest are in what they are talking about—and take that into consideration as well in terms of weighting[,] making those judgments about, you know, what is actually—what are actually the facts."

Troe Depo. Tr. at 80:4-89:11; *see also id.* at 102:24-103:10, 105:6-14, 106:25-107:4, 107:18-22, 122:2-123:2, 136:21-137:14, 138:25-141:5, 157:2-158:4, 161:21-162:11, 201:18-202:22, 263:1-16, 264:13-266:4, 275:24-279:16,  279:18-280:5.

Fifth, and finally, not only does she supplant the role of the jury with her repeated but flawed interpretation of the factual record, Ms. Troe has also attempted to play judge.  In a single paragraph of her 49-page report, Ms. Troe expresses and putatively supports her opinion that "[i]n connection with sTec's August 3, 2009 guidance, sTec *fully disclosed*—and therefore the market and investors were *fully informed* about—risks inherent in its revenue guidance."  Troe Report at pp. 15-17, ¶ 37 (emphasis added).  Ms. Troe has no legal expertise to opine on the sufficiency of sTec's boilerplate disclosures.  All she can do is quote them.  Ms. Troe makes no effort to correlate that language with the facts of the case, for the evident reason that had she tried, that effort would have proved fruitless in light of sTec's 38.9% stock price drop on November 4, when sTec disclosed that EMC "might" be holding

1    inventory at the end of the year.  *See also In re STEC* , *Inc. Sec. Litig.*, No. SACV 09-

2    1304 JVS (MLGx), 2011 WL 2669217, *9-10 (C.D. Cal. June 17, 2011) (sTec risk

3    disclosures "are not meaningfully cautionary because they do not 'relate directly to

4    the forward-looking statements at issue'") (quoting *In re Copper Mountain Sec.*

5    *Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004)).   Because Ms. Troe's "Disclosed

6    Risk" opinion is not supported by a reliable methodology—indeed, it lacks *any*

7    methodological basis—it should be excluded as impermissible *ipse dixit*.  *See*

8    *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("courts need not admit bare

9    conclusions or mere assumptions proffered under the guise of 'expert opinions' and

10   nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to

11   admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

12   expert.")

13        Accordingly, Ms. Troe proposes to do precisely what federal courts have

14   forbidden—she weighs what she understands to be the SEC's allegations against the

15   documentary and testimonial evidence that she deems credible in order to reach the

16   determination that Moshayedi had a reasonable basis to forecast $55 million in

17   revenue from EMC in 3Q09.  This is plainly impermissible.

### 2.    Ms. Troe is not qualified to give opinions on the business relationship between sTec and EMC

20   Ms. Troe's report is also rife with her subjective judgment on what the

21   evidence means in the context of sTec's and EMC's business relationship, the

22   electronic storage industry, and sTec purported operational concerns.  A

23   representative sample of such opinions includes:

24        • "There are a variety of reasons for an OEM to purchase components

25          parts [sic] such as drives, even when that OEM does not have a pending

26          sale to its customer."  Troe Report at p. 11, ¶ 29(3).

27        • "[I]t would have been unreasonable for sTec to expect on August 3,

28          2009 that EMC would purchase only $34 million for the entire third

quarter of 2009." *Id.* at ¶ 48.

- "From sTec's perspective ... the EMC purchase commitment was a starting point for forecasting sales[.]" *Id.* at ¶ 51.

- "EMC did not know, but at least considered the possibility that it might need to purchase additional drives in excess of" $120 million. *Id.* at ¶ 52.

- "Clearly, sTec did not have much leverage to twist EMC's arm into agreeing to the July 29, 2009 deal." *Id.* at ¶ 57.

- "EMC had an incentive to manage its cost of goods sold; EMC would have been motivated to reduce the average cost of the component parts it used ... EMC's motives for ordering ZeusIOPS drives include having sufficient inventory to meet demand and obtaining that inventory at as low a cost as possible." *Id.* at ¶¶ 58, 63.

- "Mr. Moshayedi secured certainty for sTec's manufacturing operations and reduced business risk[.]" *Id.* at ¶ 60.

- "[I]f EMC required fewer units of product ... EMC would be expected to have bargained for a reduction in the aggregate dollar amount of its purchase commitment, not an increase in the number of units it would obtain[.]" *Id.* at ¶ 66.

- The July 26-29 negotiation between Smith and Moshayedi "were typical of those to occur between a customer and a purchaser. Both parties benefited from the agreement, and had legitimate business reasons that were unrelated to revenue forecasts." *Id.* at ¶67.

It is undisputed, however, that Ms. Troe has no relevant industry experience. She has no expertise in the solid state drive or enterprise server industries. More broadly, she does not purport to be an expert on the negotiation of contracts, supply-chain management, or the logistical and operational issues faced by technology manufacturers. Troe Depo. Tr. at 70:4-9, 75:18-76:14. And even within her chosen

field of forensic accounting, Ms. Troe has never investigated whether forward-looking revenue guidance by a technology firm was supported by a "reasonable basis." *Id.* at 17:1-18:1, 21:3-25, 27:9-15, 31:10-16, 32:22-33:8.[4]

Because courts routinely hold that experts cannot testify if their background—no matter how impressive—does not encompass the proposed subject matter of their testimony, all of Ms. Troe's industry and operational opinions should be stricken. *See United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000) (finding proposed expert witness's expertise in international finance insufficient to qualify witness to testify regarding authenticity of security instrument); *Nimely*, 414 F.3d at 399 n.13 (forensic pathologist not qualified on specific issues of human perception and cognition); *Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936 (KMW), 2011 WL 1674796, at *5 (S.D.N.Y. May 2, 2011) (despite expert's "technological expertise," expert not qualified on specific statistical issues); *Williamson v. Verizon Comm'ns, Inc.*, No.11-cv-4948(LTS), 2012 WL 5425033, at *2 (S.D.N.Y. Nov. 7, 2012) (expert with "extensive experience" in related areas not qualified to testify on specific "technical aspects of computer networks"); *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 372 (D.N.J. 1995) (testimony of pulmonologist who had never treated patient with a platinum allergy excluded where expert had read only a few papers on the allergy for purposes of litigation).

### 3.   Ms. Troe's opinions are premised on a selective reading of the evidentiary record

In addition, Ms. Troe's conclusions are inappropriately drawn from a selective

---

[4] In addition, Ms. Troe has never been qualified as an expert on Regulation S-K, in the area of financial forecasting, or in other any aspect of the accounting field.  Troe Depo. Tr. at 45:25-46:2, 69:22-70:14.  She has not published on the topic of Regulation S-K.  *Id.* at 46:7-8.  She has not spoken on the subject of Regulation S-K.  *Id.* at 46:12-47:5.  Last, Ms. Troe has no specialized knowledge of sTec's investment characteristics, and has never worked as an equities analyst.  *Id.* at 71:18-72:24.

Case No.  12-CV-01179-JVS-ANx

reading of the evidentiary record.  *See In re Oracle Corp. Sec. Litig.*, Case No. C 01-00988 SI, 2009 U.S. Dist. LEXIS 50995, *86 (N.D. Cal. June 16, 2009) (excluding expert opinion based on selective reading of the record" and "ignored deposition testimony").  To assure herself that no one was "hiding the ball" from her, Ms. Troe relied on the competence of Moshayedi's counsel in selecting documents and testimony for her review.  Troe Depo. Tr. at 86:6-87:12.  But even with respect to that lawyer-selected record, Ms. Troe's review and analysis was deficient.

In her expert report, Ms. Troe claimed to have considered the deposition testimony and exhibits of all 18 fact witnesses deposed in this case (with the exception of Anthony Swiney, who was deposed after the disclosure of Ms. Troe's report), the deposition testimony of eight sTec and EMC witnesses in the federal shareholder action, and five investigative testimonies taken by the SEC pre-suit. Leung Decl., Ex. 10 (Troe List of Documents Considered) at p. 1, No. 2.  Of those 30 testimonies, however, Ms. Troe conceded at her deposition that she had only reviewed six transcripts in whole or in substantial part.  Troe Depo. Tr. at 57:15-64:9, 318:11-17.

On the subject of documentary evidence, both parties identified their primary documentary evidence when responding to contention interrogatories.  *See id.* at 64:21-65:6, 65:14-21.  While Ms. Troe personally reviewed all of the documents cited in Moshayedi's response, she neglected to review all of the documentary evidence identified in the SEC's contention interrogatory responses.  *Id.* at 64:21-66:15.  When asked why, Ms. Troe explained that it would have been inconvenient. *Id.* at 65:22-66:15.[5]

---

[5] As just one example, one need look no further than Ms. Troe's opinion regarding buffer inventory to see how her selective review of the record renders her opinions wholly unreliable.  It is undisputed that the amount of buffer requested by EMC reflected its assessment of how much insurance it needed to guard against unanticipated, end-of-quarter upside demand in excess of EMC's current forecast. Dkt. No. 146 at ¶¶ 205-206.  However, citing to only four e-mails from February, March, May and June 2009, Ms. Troe concludes that because "EMC had used the

**B.    Ms. Troe's "Reasonable Basis" Opinions Should Be Excluded**

**1.    Her opinion does not "fit" the SEC's claims**

For the reasons given above, Ms. Troe's opinions are not proper expert testimony and are not in any case informed by a reliable methodology.  Those deficiencies aside, Ms. Troe's opinions, when distilled to their essence, remain ill-suited and lack the required "fit" to the claims in the case.  As she aptly explained in her deposition:

> I'm expressing an opinion on the reasonableness of the [$55 million 3Q09 EMC] forecast in connection there with looking at the facts, drawing some conclusions about those facts.

Troe Depo. Tr. at 136:21-137:14.  Ms. Troe ends her analysis there.  Putting aside the fact that this is, on its face, impermissible expert opinion testimony, it is also inherently unreliable because she never considered whether disclosure of the circumstances surrounding the $55 million 3Q09 EMC commitment was required by Regulation S-K.  *Id.* at 314:1-315:1.

Moreover, her opinion on the purported "reasonableness" of sTec 3Q09 guidance has no bearing on the SEC's insider trading claim.  *See U.S. v. Nacchio*, 519 F.3d 1140, 1161 (2008), *rev'd on other grounds*, 555 F.3d 1234 (10th Cir. 2009) ("The [reasonable basis] rule exists to encourage companies to disclose estimates regarding future performance by protecting companies and their officers from liability so long as their estimates had a reasonable basis.  But in an insider trading case, the reason to create a safe harbor for public statements—to encourage

---

buffer inventory" during 1Q09 and 2Q09, Moshayedi had a "reasonable basis" to believe that EMC would use *all* $9 million of the buffer inventory it requested in 3Q09.  The four e-mails referenced by Ms. Troe fall well short of demonstrating that for all six of the density and configuration variations of ZeusIOPS sold to EMC in 2009, the entire balance of EMC's buffer request was exhausted at any time in the first and second quarters of 2009.  Rather than viewing four e-mails in isolation, Ms. Troe (or her staff) could have actually calculated sTec's EMC buffer inventory levels during the relevant period.  She conceded, however, that she and her staff had not done that.  Troe Depo. Tr. at 301:9-304:2.

Case No.  12-CV-01179-JVS-ANx

companies to make predictions—does not apply.  Decreeing this information immaterial would mean that insiders could trade *without* disclosing it.  This would turn the purpose of [the reasonable basis rule] on its head …").  And as for the SEC's misrepresentation claims, the question presented—whether sTec's 3Q09 revenue guidance was materially false and misleading—is not answered *even if* Moshayedi had a firm commitment from EMC to take $55 million in product in the third quarter.[6]

Therefore, Ms. Troe's proffered testimony on "reasonable basis" does not consider, and therefore does not answer and would be of no appreciable assistance to the jury, the operative question of non-disclosure.   Furthermore, the "reasonableness" of sTec 3Q09 guidance, and whether it was materially misleading, is a subject for fact testimony, counsel's closing argument, and the court's instructions to the jury.  What Ms. Troe thinks on the subject is irrelevant.

## 2. Her opinion that there was a reasonable basis to guide at $55 million—even without the side deal—should be excluded

Although not discussed in her summary opinions, Ms. Troe's report asserts in passing that "the forecast of $55 million in sales of ZeusIOPS to EMC for the entire quarter ended September 30, 2009 was reasonable, *even without the July 29, 2009 agreement* made by EMC to guarantee that it would purchase $55 million by the end of the quarter."  Troe Report at ¶¶ 78, 105.  Excluding the effect of the side deal, the "reasonable basis" cited by Troe is confined to "data points" concerning "purchases made to date during the quarter, recent past experience with sales of the drives to

---

[6] This appears consistent with the Court's discussion in its tentative ruling on the parties' cross-motions for summary judgment, where the Court explained:  "[E]ven though EMC indeed committed to buy $55 million in ZeusIOPS for 3Q09, sTec's guidance numbers may still have been materially misleading ....  The <u>failure to disclose</u> the [$55M Volume Commitment] is the main issue here, and is separate from the fact that the transaction itself may not have been inherently illegal or improper."  Leung Decl., Ex. 15 at pp. 23-24 (emphasis in original).

EMC, including the timing of when orders typically occur during a quarter, and EMC's public statements (which were made outside the context of price negotiations." *Id.* at ¶78.

This "conclusion" is perhaps the most flagrant example of the outcome-driven nature of Ms. Troe's report. The record is replete with evidence on how sTec formulated its guidance in the first half of 2009: it did not look to generalized public statements by EMC about the strength of its flash-based product line, nor did it look at first month orders and then rotely apply some rough multiplier based on "historical" patterns. What sTec did was formulate guidance which tracked the amount of EMC orders received for the quarter as of the guidance announcement date, or if "the difference was not significant," sTec based its guidance on a demand forecast prepared by EMC and provided to Anvari and his sales staff. Dkt. No. 146 at ¶¶ 72-109; *see also* Leung Decl. Ex. 11 (Depo. Ex. 446) ("As for Q3 and Q4 EMC sales projection, [Anvari] noted that the comment he made in mgmt. meeting regarding quarter-over-quarter doubling of EMC sales was purely based on EMC's verbal remark at this point and thus this is not firm.").

Applying Ms. Troe's logic, if sTec had based guidance on EMC's historical break-down of orders between the first, second, and third month of a quarter, sTec would have had a reasonable basis to forecast not just $55 million in EMC revenue for 3Q09, but *$98 million*. *See* Troe Report at ¶¶ 103-105 (using Troe's figures to average second and third month % of quarterly revenue from Q1 2008 to Q2 2009 (78.87%), and then applying the same "historical pattern" to $20 million in EMC orders as of August 3, 2009). No fact witness in the case has come remotely close to drawing that conclusion, and Ms. Troe's willingness to read the record in this manner demonstrates her lack of objectivity.

### 3. Her opinions about actual recognition of 3Q09 revenue should be excluded

In her report, Ms. Troe discusses at length her staff's determination that

following the close of 3Q09, sTec in fact recognized $55 million in revenue from EMC in accordance with GAAP and sTec's revenue recognition policy.  Troe Report at ¶¶ 22, 31(10), 79-87.  She then concludes that with this hindsight, "it seems illogical to judge [sTec's $55 million forecast] as unreasonable."  *Id.* at ¶ 88.

However, Ms. Troe's views on the probative value of hindsight are hopelessly conflicted.  At her deposition, she opined that "[o]f course, applying hindsight isn't appropriate in assessing or developing understanding [of] what was known at the time of the forecast[.]"  Troe Depo. Tr. at 18:2-19:10.  Then Ms. Troe suggested that hindsight "can be useful," but it would depend "on what it is that one is looking at."  *Id.* at 158:15-160:5.  Ms. Troe subsequently backpedaled again, urging that it isn't "necessarily" the case that when forecasting revenue, a data point becomes more reliable if it later proves to be accurate.  *Id*. at 164:11-165:5.  She then said:

> If, coincidentally, for some forecast or some accounting accrual estimate, the actual turns out to be the same as the estimate or prediction of the future event, that doesn't necessarily mean the forecast is reliable.

*Id.* at 165:1-5.  By expressing this view, Ms. Troe fatally undermined many of her own opinions.

Ms. Troe's testimonial flailing arose from a Hobson's choice.  Ms. Troe opines that "the actual revenue that sTec recognized in the third quarter of 2009 supports the view that its revenue forecast made on August 3, 2009 was reasonable and not due to a fraudulent scheme."  Troe Report at ¶¶ 79-80.  This information is, of course, "hindsight"—it occurred subsequent to the events in question.[7]  But when confronted

---

[7] Ms. Troe's argument is also circular.  sTec met its earlier-announced guidance *because* of the $55 million EMC 3Q09 commitment.  The SEC's claims are not directed to sTec's August 3rd revenue guidance in isolation—the SEC alleges Moshayedi insider traded and made misrepresentations and omissions based not only on EMC's negative July demand forecast, but also on the ensuing undisclosed side deal between Moshayedi and EMC and that agreement's import for the accuracy and completeness of sTec's public statements about its forecasted 3Q09 revenue, the growth pattern of its ZeusIOPS product line, and the $120 million volume agreement

with another "data point"—EMC's February 9th $7.873 million 1Q09 forecast, and sTec's actual 1Q09 EMC results of $7.553 million—Ms. Troe balked.[8]  *See* Troe Depo. Tr. at 164:11-165:6.  Because she testified that "hindsight isn't appropriate in assessing or developing [an] understanding [of] what was known at the time of the forecast," she has effectively conceded that her "$55 million in GAAP revenue" opinion is irrelevant and does not "fit" the facts of this case.  *See In re Rezulin*, 309 F. Supp. 2d at 540 (expert testimony must have a valid connection to the pertinent inquiry).

In addition, her opinion that sTec 3Q09 guidance was "reasonable" because EMC ended up taking $55 million in product by the end of third quarter is totally irrelevant and provides yet another example of her tautological reasoning that avoids the actual issues in this case.  Whether or not EMC took $55 million in product is not disputed; rather, what is in dispute is whether Moshayedi knew or should have known, at time of his secondary offering, that a substantial portion of those deliveries would be held by EMC in inventory.

**4.    Ms. Troe's "general guidance" opinions should be excluded**

Finally, Ms. Troe's general opinions on guidance should be excluded because she either misperceives the SEC's claims, or has purposefully erected and refuted a straw argument.  Specifically, Ms. Troe opines that: (1) revenue guidance should be based on sTec's ZeusIOPS sales to EMC, rather than EMC's downstream sales of EMC products incorporating sTec solid state drives, (2) sTec should not be required to base its revenue guidance on EMC's demand forecasts, and (3) sTec should not be required to base its revenue guidance solely on committed orders from EMC.  Troe

---

signed with EMC.

[8] EMC's February 9, five-week 1Q EMC forecast isn't even hindsight.  These events occurred long before August 3rd and were presumably a "data point" available to sTec and Moshayedi when formulating 3Q09 guidance in late-July.

Report at pp. 10-11, ¶ 29(1) and (2), ¶ 30.

First, this case was not brought on evidence of EMC's sales to its own customers, and the SEC is at a loss as to why Ms. Troe believes to the contrary. The late-July forecast transmitted from EMC to sTec represented *EMC's demand for sTec ZeusIOPS products*—it is not a forecast of demand for EMC's enterprise server products. Second, in arguing that sTec has no obligation to formulate its revenue guidance on the basis of EMC-prepared forecasts, Ms. Troe ignores the fact that this is what sTec in fact did in 2009. sTec calculated revenue guidance by looking to purchase orders received at the time guidance was announced, and by considering demand information and forecasts provided by its customers, including EMC. *See* Dkt. No. 146 at ¶¶ 72-109. Finally, the SEC does not singly contend that sTec's 3Q09 revenue guidance was misleading because it far exceeded the $20.7 million in EMC purchase orders that sTec had received as of August 3rd. As explained in *supra* note 5, Ms. Troe's opinion that "a public company is not required to have committed orders from its customers to have a reasonable basis" would be of no help to the jury because the SEC does not assert to the contrary—the totality of the events at issue must be considered, and the SEC does not claim that any fractional fact in isolation gives rise to Moshayedi's liability for securities fraud. All of Ms. Troe's "General Guidance" opinions should therefore be excluded as failing to meet Rule 702's "assist" requirement. *See Daubert*, 509 U.S. at 591-92; *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985) ("An additional consideration under Rule 702– and another aspect of relevancy–is whether the expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute).

## C.    Ms. Troe Should Be Prohibited From Rendering Any Opinion On "Materiality"

Any testimony by Ms. Troe on legal materiality would be stricken. *Arbol Media Inc. v. Hartford Casualty Ins. Co*., Case No. SAXCV 02-0244-JVS (MLGx),

2003 U.S. Dist. LEXIS 28465, *3 (C.D. Cal. July 7, 2003) (expert testimony on a question of law is not appropriate). Mindful of this, Ms. Troe's materiality opinion is meticulously crafted: she opines that the late-July $33-34 million "EMC Total Q3 Forecast" was not material "from an accounting standpoint." Troe Report at pp. 11-12, ¶ 29(6). This is a distinction without a difference. Ms. Troe's report admitted that materiality from "an accounting standpoint" "is in substance identical to the formulation used by the courts in interpreting the federal securities laws." *Id.* at p. 12, n. 1.

As a result, any testimony by Ms. Troe on the subject of "materiality," whether framed in the context of the accounting field or not, would create an unacceptable risk of undue prejudice under Fed. R. Evid. 403. *See Van Der Valk v. Shell Oil Co*., Case No. SACV 03-565-JVS (JTLx), 2004 U.S. Dist. LEXIS 30692, * 5 (C.D. Cal. Nov. 15, 2004) (Rule 403 requires a court to exclude even reliable and relevant expert testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury); *SEC v. Tourre*, No. Civ. 3229 (KBF), 2013 U.S. Dist. LEXIS 87211, * 20 (S.D.N.Y. Jun. 18, 2013) ("No party would doubt—one hopes—that an expert cannot testify as to whether the specific information at issue in a case is or is not "material." Inserting the word "economically" material does not somehow transform what is a legal proposition and a finding of fact into an admissible opinion.").

At her deposition, Ms. Troe disclaimed having any opinion on the materiality of EMC's late-July demand forecast, even from an "accounting standpoint." Troe Depo. Tr. at 136:21-137:14. To the extent Ms. Troe has second thoughts at trial, her views on "accounting" materiality should be excluded by the Court.

## IV.   **CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that Ms. Troe be excluded as a witness in this action.

Case No.  12-CV-01179-JVS-ANx

Dated:  September 23, 2013                    Respectfully submitted,


                                              /s/ Gary Y. Leung
                                              John W. Berry
                                              Donald W. Searles
                                              Gary Y. Leung
                                              Attorney for Plaintiff
                                              Securities and Exchange Commission

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648
Telephone No.  (323) 965-3213; Facsimile No.  (323) 965-3908.

On September 23, 2013, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF LISA L. TROE UNDER RULES 403 AND 702 OF THE FEDERAL RULES OF EVIDENCE** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  _September 23, 2013                    /s/ Gary Y. Leung _____
                                              GARY Y. LEUNG

1

### SEC v. MANOUCHEHR MOSHAYEDI
**United States District Court—Central District of California**
**Case No. 12-CV-01179 (JVS) (ANx)**

### SERVICE LIST

Sean M.  Berkowitz
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Direct Dial: 312-777-7016
sean.berkowitz@lw.com

Matthew Rawlinson
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: 650-463-3076
matt.rawlinson@lw.com

Colleen Smith
LATHAM & WATKINS LLP
600 W.  Broadway, Suite 1800
San Diego, CA 92101
Direct Dial: 619-238-2950
colleen.smith@lw.com

Everett Bulthuis (Paralegal)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925
Direct Dial: 714-755-8247
Cell:  714-747-1814
everett.bulthuis@lw.com

Thomas A.  Zaccaro
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomaszaccaro@paulhastings.com

*Attorneys for Defendant*

Patrick Gibbs
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-4696
patrick.gibbs@lw.com

William R.  Baker, III
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.  20004-1304
Direct Dial:  202-637-1007
william.baker@lw.com

Jennifer S.  Duckworth (Paralegal)
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-3012
jennifer.duckworth@lw.com

Thomas P.  O'Brien
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomasobrien@paulhastings.com

*Attorneys for Defendant*