JOHN W. BERRY (bar admission pending, L.R. 83-2.4.1)
Email: berryj@sec.gov
DONALD W. SEARLES, Cal. Bar No. 135705
Email: searlesd@sec.gov
GARY Y. LEUNG (bar admission pending, L.R. 83-2.4.1)
Email: leungg@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>     vs.<br><br>MANOUCHEHR MOSHAYEDI,<br><br>             Defendant. | Case No.  12-CV-01179-JVS-ANx<br><br>**[SUBMITTED FOR FILING UNDER SEAL – UNREDACTED]**<br><br>**EXHIBITS 1 – 4 TO DECLARATION OF GARY Y. LEUNG IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S (1) MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. MUKESH BAJAJ; (2) MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LISA L. TROE; AND (3) MOTION TO EXCLUDE THE EXPERT TESTIMONY OF PROFESSOR ALLEN FERRELL**<br><br>Date:     October 21, 2013<br>Time:     1:30 p.m.<br>Ctrm:     10C<br>Judge:   Hon. James V. Selna |

# EXHIBIT 1

REDACTED

# EXHIBIT 2

REDACTED

# EXHIBIT 3

REDACTED

# EXHIBIT 4

REDACTED

# EXHIBIT 5A

*SEC v. Moshayedi*

Case No. 12-CV-01179-JVS-JPR

---------------------------------------------------------------------------------------------------------------------------------

# EXPERT REPORT AND DISCLOSURE OF

## DR. RICHARD J. BERGIN

PRINCIPAL

KPMG, LLP

SUBMITTED JUNE 18, 2013

CONTAINS CONFIDENTIAL INFORMATION

SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| 1. | PROFESSIONAL BACKGROUND | 4 |
| 2. | SCOPE OF ASSIGNMENT | 6 |
| 3. | SUMMARY OF OPINIONS | 9 |
| 4. | GENERAL BACKGROUND OF THE CURRENT MATTER | 11 |
| | A. Company Background | 11 |
| | B. Data Storage Solutions Industry | 12 |
| | C. Key Events And Disclosures | 16 |
| 5. | METHODOLOGIES EMPLOYED | 21 |
| | A. Assessing Materiality Of Disclosures Using Event Studies | 21 |
| | i. General Event Study Methodology | 21 |
| | ii. My Two-Factor Event Study Model | 23 |
| | iii. Isolating Idiosyncratic Returns Attributable To Specific Disclosures | 26 |
| | B. Confirming Materiality Of Disclosures Using Market Participant Expectations | 28 |
| | i. Review Of Equity Research Reports | 28 |
| | ii. Review Of Equity Analyst Declarations | 30 |
| | iii. Review Of Equity Analyst Models | 30 |
| 6. | MATERIALITY OF STEC'S DISCLOSURES & RESULTANT STOCK PRICE IMPACT | 32 |
| | A. July 16, 2009 | 32 |
| | i. Summary Of Disclosures | 32 |
| | ii. Event Study Results | 33 |
| | iii. Exclusion Of Offsetting & Overlapping Material Disclosures | 34 |
| | iv. Return Attributable To Specific Material Disclosures | 34 |
| | v. Confirmation Of Specific Disclosures' Materiality Using Analyst Expectations | 34 |
| | B. November 3, 2009 | 40 |
| | i. Summary Of Disclosures | 40 |
| | ii. Event Study Results | 44 |
| | iii. Exclusion Of Offsetting & Overlapping Material Disclosures | 44 |
| | iv. Return Attributable To Specific Material Disclosures | 47 |
| | v. Confirmation Of Specific Disclosures' Materiality Using Analyst Expectations | 47 |
| | vi. Incomplete Inventory Overhang Disclosure | 53 |
| | C. February 23, 2010 | 54 |
| | i. Summary Of Disclosures | 54 |
| | ii. Event Study Results | 56 |
| | iii. Exclusion Of Offsetting & Overlapping Material Disclosures | 56 |
| | iv. Return Attributable To Specific Material Disclosures | 58 |
| | v. Confirmation Of Specific Disclosures' Materiality Using Analyst Expectations | 59 |

FIGURES, SCHEDULES, AND EXHIBITS:

FIGURE 1:        STEC Stock Price, July 2009 - February 2010

FIGURE 2:        STEC Event Study Returns

FIGURE 3:        Analysts' FY 2010 Median Revenue Estimates


SCHEDULE 1:      Availability of Equity Analyst Coverage, Before & After Disclosure
                 Dates

SCHEDULE 2a:     Analyst Revenue Estimates, 6/16/09 - 8/4/09

SCHEDULE 2b:     Analyst Revenue Estimates, 8/6/09 - 9/9/09

SCHEDULE 2c:     Analyst Revenue Estimates, 9/14/09 - 11/4/09

SCHEDULE 2d:     Analyst Revenue Estimates, 11/17/09 - 2/24/09

SCHEDULE 3a:     Analyst EPS Estimates, 6/16/09 - 8/4/09

SCHEDULE 3b:     Analyst EPS Estimates, 8/6/09 - 9/9/09

SCHEDULE 3c:     Analyst EPS Estimates, 9/14/09 - 11/4/09

SCHEDULE 3d:     Analyst EPS Estimates, 11/17/09 - 2/24/10

SCHEDULE 4:      STEC Stock Price Data

SCHEDULE 5:      STEC's Comparable Companies Peer Index Stock Price Data

SCHEDULE 6:      S&P 500 Price Data

SCHEDULE 7:      Regression Output and Event Study Model Summary


EXHIBIT 1:       Expert's Curriculum Vitae

EXHIBIT 2:       Documents Relied Upon

## 1. PROFESSIONAL BACKGROUND

I am a principal (partner) with KPMG's Forensic Services practice and co-head of
KPMG's U.S. Economics & Regulation practice. I have over 20 years of experience
assisting clients with economic, financial, and valuation analyses related to
investigations, litigation, and regulatory scrutiny of their businesses. I have served as an
expert who has testified in court and also have provided clients with consulting
services.

I have testified, or assisted in the preparation of expert witness testimony, in federal as
well as state courts, and international administrative proceedings. I have also directed
numerous engagements involving significant events affecting financial services
companies; engagements have included representing clients involved in investigations
and enforcement activity by the SEC, CFTC, DOJ, and state attorneys general. In these
matters, I have addressed issues such as Rule 10b-5 materiality, damage quantification,
trading analysis, investment management, due diligence, broker-dealer disputes,
investment suitability, insider trading, market manipulation, commodities trading, risk
management, market definition, market power, tying, collusion, predatory conduct,
unfair competition, class certification, fiduciary duty, and valuation.

I earned my Doctorate and MBA degrees with highest distinction from Harvard
Business School. I was also awarded a Bachelor's in Chemical Engineering with the
University Medal (top graduate) from the University of Sydney. My curriculum vitae,
attached as Exhibit 1 to this report, further describes my professional credentials,
including disclosures that I understand are required under Federal Rule of Civil
Procedure 26(a)(2)(B).

4

I was engaged for this assignment based upon my billing rate plus expenses. My billing rate is $575 per hour. I have also been assisted in this assignment by members of my professional staff at KPMG who have provided their services based upon their hourly billing rates as set by KPMG. Our fees are not contingent upon the opinions expressed herein or the outcome of this matter.

## 2. SCOPE OF ASSIGNMENT

This matter involves claims brought by the United States Securities and Exchange Commission ("SEC" or the "Commission") against Manouch Moshayedi ("Moshayedi"), former chairman and CEO of STEC, Inc. ("STEC"), regarding an alleged fraudulent scheme by Moshayedi to engage in and conceal illegal insider trading and to make false and misleading representations and omissions concerning the nature of STEC's commercial relationship and business contract with EMC Corporation ("EMC") in connection with his August 2009 sale of shares of STEC's common stock in a secondary offering and with his statements during the August and November 2009 disclosures and earnings calls for STEC.

I have been retained by the Commission to prepare certain analyses to assist the trier of fact in considering both the materiality of certain disclosures ("disclosures of interest") made by Moshayedi and their impact on STEC's stock price on three separate dates in 2009 and 2010. For purposes of my analysis, I have been asked to focus on STEC's and Moshayedi's disclosures to the market, and the subsequent impact on the stock price of STEC, in July 2009, November 2009, and February 2010. Specifically, I have been asked to focus on the following disclosures on the three dates below:

July 16, 2009:

1. STEC disclosed that it had signed an agreement with "one of its largest OEM customers for sales of $120 million of ZeusIOPs SSDs in the second half of 2009."

2. STEC disclosed that it believed that this agreement reflected a "continued commitment" by this customer "to integrate STEC's SSD technology" into the customer's systems.

6

November 3, 2009:

1. STEC disclosed that it had received indications from its customer that the
   customer "might" carry inventory of ZeusIOPs at the end of 2009 which the
   customer would use in 2010.

2. STEC disclosed that its customer's July 2009 $120 million agreement was a "one-
   off", and thus was non-recurring in nature.

February 23, 2010:

1. STEC disclosed that the first half of 2010 would be a "trough period" for its
   business, as STEC was not expecting "any meaningful production orders" from
   its largest customer in either the first or second quarter due to the extent of the
   customer's ZeusIOPs inventory overhang.

I understand I may be asked to review and comment on any report(s) submitted by the
Defendant and/or any opinions expressed by any experts retained by the Defendant.
My opinions may be modified or supplemented based upon additional information that
may become available to me up to and during trial.

My analyses and opinions are based on information gathered and provided to me as of
the date of this report using standard and reliable methodologies. Additionally, in
performing the analyses I have relied on my skills, knowledge, experience, education,
and training. I assume the information provided to me to be reliable unless I specifically
note herein. The specific procedures performed in reaching my opinions were
performed by me and by professionals working under my direct supervision. I have
considered documents produced in this case by the parties as well as publicly available
information. Materials I relied on are cited in my report and presented in Exhibit 2
hereto. It is usual and customary for experts in my field to rely upon the kinds of

7

materials reflected in Exhibit 2. If and when any additional information becomes
available to me, I reserve the right to amend my report and/or opinions accordingly.

## 3. SUMMARY OF OPINIONS

A. On July 16, 2009, STEC's stock price exhibited an abnormal return of 12.98% (an increase of $3.58). This abnormal return was attributable to STEC's disclosures that: 1) STEC had signed a $120 million supply agreement with one of its largest customers (*i.e.*, EMC)[1] for the second half of 2009, implying a much higher than previously anticipated quarterly demand for its SSDs in the second half of 2009, and 2) this deal reflected the customer's continued commitment to STEC's SSDs, implying increased demand of a recurring nature leading to an increased quarterly run-rate for STEC's SSDs in future periods consistent with the $120 million to be purchased in the third and fourth quarters of 2009 under the supply agreement.

B. On November 4, 2009, STEC's stock price exhibited an abnormal return of -38.82% (a decrease of $8.99). This abnormal return was attributable to STEC's disclosures that: 1) EMC might carry inventory of ZeusIOPs at the end of 2009 which it would use in 2010, indicating that EMC's demand for ZeusIOPs may not actually be $120 million for two quarters, and therefore that its demand for STEC's SSDs may be lower than expected in the second half of 2009 and in future periods, and 2) the supply agreement with EMC was a "one-off," implying a decreased visibility into STEC's future periods' revenue, and providing additional confirmation that EMC's future quarterly demand may be lower than the $60 million implied by the July 2009 supply agreement.

---

[1] Although STEC did not specifically identify EMC as the counter-party to the $120 million supply agreement, industry analysts widely, and accurately, understood that the agreement was with EMC.

9

C. On February 24, 2010, STEC's stock price experienced an abnormal return of -23.33% (a decline of $3.13). This abnormal return was attributable to STEC's disclosure that, due to the extent of EMC's inventory overhang (resulting from the July 2009 supply agreement) – which was not disclosed on November 3rd because Moshayedi specifically disclaimed any knowledge of EMC's inventory amounts – STEC was not expecting any orders from EMC during the first and second quarters of 2010, negatively affecting its financial performance over that time period and demonstrating that EMC's future quarterly demand for ZeusIOPs would be much lower than the $60 million initially implied by the July 2009 supply agreement.

## 4. GENERAL BACKGROUND OF THE CURRENT MATTER

### A. *STEC Company Background*

STEC, headquartered in Santa Ana, California, describes itself as a leading provider of enterprise-class Flash solid-state drives ("SSDs"), which are designed to increase the performance of companies' storage systems and servers to retain and access their critical data.[2] STEC, formerly known as SimpleTech, Inc. was founded in 1990 by Manouch, Mark, and Mike Moshayedi.[3] In the latter half of the 1990s, STEC transitioned from making memory products for a variety of uses to focusing on memory modules and SSD drives for industrial and military applications.[4]

Specifically, STEC designs and develops SSD controllers, enhancing them with its own proprietary firmware and combining them with third-party Flash memory components to form SSDs.[5] STEC's signature SSD product, its ZeusIOPs SSD, is an enterprise-class data storage solution. Its customers include leading storage and server original equipment manufacturers ("OEMs") which integrate STEC's SSDs into storage systems and servers used by enterprises in a variety of industries, including financial services, government, transportation, defense and aerospace and transaction processing.[6] STEC also manufactures small form factor Flash SSDs, cards and modules, as well as custom high density dynamic random access memory ("DRAM") modules for networking, communications and industrial applications.[7]

---

[2] STEC, Inc., 10-K for the fiscal year ended December 31, 2009, pg. F-7.

[3] J.P. Morgan. *STEC – Initiating at Overweight; First-Mover Advantage and Solutions Focus Underpin High-Growth Opportunity*, pg. 20. September 9, 2009.

[4] J.P. Morgan. *STEC – Initiating at Overweight; First-Mover Advantage and Solutions Focus Underpin High-Growth Opportunity*, pg. 20. September 9, 2009.

[5] STEC, Inc., 10-K for the fiscal year ended December 31, 2009, pg. 1.

[6] STEC, Inc., 10-K for the fiscal year ended December 31, 2009, pg. 1.

[7] STEC, Inc., 10-K for the fiscal year ended December 31, 2009, pg. 1.

11

By 2007, STEC had started shipping samples of its enterprise-class SSDs to potential customers. That year, STEC generated nearly $189 million in revenue,[8] with its top ten customers accounting for 74.1% of its total revenues in 2007; SMART Modular (50.1%) was the lone STEC customer to account for more than 10% of its 2007 revenues.[9] By 2008, STEC's revenue had increased to $227 million,[10] with its ten largest customers accounting for 77.2% of total revenue; SMART Modular (34.4%) and EMC (15.2%) were the only two STEC customers to contribute to more than 10% of its revenues that year.[11] By 2009, STEC was able to increase its sales to more than $354 million,[12] with its top ten customers accounting for 86.9% of total revenues, and with EMC (45.1%) as the only customer accounting for more than 10% of revenues.[13] In 2010, STEC generated revenues of more than $280 million,[14] with its top ten customers contributing 88% of this revenue; EMC accounted for 37.8% of total 2010 revenues.[15]

B. _Data Storage Solutions Industry_

The data storage industry is comprised of companies that manufacture components for electronic storage devices, as well as companies that provide storage solutions through a variety of technologies such as disk drives, tape storage, and flash memory.[16] Within this larger data storage industry, STEC is part of a group of companies that transform components into hardware storage solutions.[17] In the latter half of the 20th century,

---

[8] STEC, Inc., 10-K for the fiscal year ended December 31, 2007, pg. F-4.
[9] STEC, Inc., 10-K for the fiscal year ended December 31, 2008, pg. 4 & 5.
[10] STEC, Inc., 10-K for the fiscal year ended December 31, 2008, pg. F-4.
[11] STEC, Inc., 10-K for the fiscal year ended December 31, 2008, pg. 4 & 5.
[12] STEC, Inc., 10-K for the fiscal year ended December 31, 2009, pg. F-4.
[13] STEC, Inc., 10-K for the fiscal year ended December 31, 2009, pg. 4 & 5.
[14] STEC, Inc., 10-K for the fiscal year ended December 31, 2010, pg. F-4.
[15] STEC, Inc., 10-K for the fiscal year ended December 31, 2010, pg. 2 – 3, 11 – 12.
[16] Seagate Technology, 10-K for the fiscal year ended July 2, 2010, pg. 4.
[17] Seagate Technology, 10-K for the fiscal year ended July 2, 2010, pg. 4.

computing system OEMs mainly relied on two storage technologies: dynamic random access memory ("DRAM") and hard disk drives ("HDD").[18] DRAM is a high-density form of data storage allowing for stored data to be accessed in random order and providing high-speed data storage and retrieval.[19] By contrast, HDDs are electromechanical devices that store digitally encoded data on rapidly rotating disks with magnetic surfaces.[20] SSDs, first implemented in the late 1970s but limited in use until the 2000s, are solid state drives formed from semiconductor materials; unlike HDDs, they require no mechanical movement to store information.[21] The usage of SSDs had been previously limited due to their cost; however, price declines began to enable their implementation into PCs, USB-based drives, and later enterprise storage systems and servers.[22]

This development in SSD pricing, coupled with the cost- and power-prohibitive nature of DRAM for many applications,[23] led to the emergence of a debate regarding the use of either HDDs or SSDs. According to J.P. Morgan in 2009, the enterprise hard disk drive market, which STEC was targeting to compete against with its ZeusIOPs SSDs, had annual revenues of approximately $7.5 billion.[24] J.P. Morgan estimated that SSDs would

---

[18] STEC, Inc., 10-K for the fiscal year ended December 31, 2010, pg. 3.
[19] Micron Technology, Inc., 10-K for this fiscal year ended September 2, 2010, pg. 2.
[20] Seagate Technology, 10-K for the fiscal year ended July 2, 2010, pg. 4.
[21] J.P. Morgan. *STEC – Initiating at Overweight; First-Mover Advantage and Solutions Focus Underpin High-Growth Opportunity*, pg. 14 & 15. September 9, 2009.
[22] J.P. Morgan. *STEC – Initiating at Overweight; First-Mover Advantage and Solutions Focus Underpin High-Growth Opportunity*, pg. 15. September 9, 2009.
[23] STEC, Inc., 10-K for the fiscal year ended December 31, 2010, pg. 3.
[24] J.P. Morgan. *STEC – Initiating at Overweight; First-Mover Advantage and Solutions Focus Underpin High-Growth Opportunity*, pg. 6. September 9, 2009.

13

eventually capture 15 – 20% of this market segment,[25] placing the total market for enterprise-class SSDs at around $1.5 billion per annum.

Within the storage solutions sector, there were a number of key players that competed with STEC. For example, SanDisk Corporation ("SanDisk") designs, develops, and manufactures data storage solutions in a variety of form factors using flash memory and controller and firmware technologies.[26] In addition to providing removable storage card products for use in consumer electronic devices, SanDisk also produces embedded flash products and provides high-speed high-capacity SSDs for computing platforms to be used in lieu of HDDs.[27] Similar to STEC, the majority of its products are made by combining flash memory with a controller chip.[28] SanDisk generated revenues of $2.84 billion, $3.15 billion, and $4.46 billion for the fiscal years 2008, 2009, and 2010, respectively.[29]

Also in the data storage solutions industry, Seagate Technology ("Seagate") designs, manufactures, and sells HDDs, and is the world's biggest producer of HDDs based on revenue.[30] Its design and manufacturing operations are based on technology platforms that enable it to serve multiple data storage applications and markets.[31] Seagate produces a broad range of disk drive products used in devices such as notebook computers, personal data backup systems, external storage systems, enterprise servers,

---

[25] J.P. Morgan. *STEC – Initiating at Overweight; First-Mover Advantage and Solutions Focus Underpin High-Growth Opportunity*, pg. 6 & 8. September 9, 2009.
[26] SanDisk Corporation, 10-K for the fiscal year ended January 3, 2010, pg. 3.
[27] SanDisk Corporation, 10-K for the fiscal year ended January 2, 2011, pg. 3.
[28] SanDisk Corporation, 10-K for the fiscal year ended January 2, 2011, pg. 3.
[29] SanDisk Corporation, 10-K for the fiscal year ended January 2, 2011, pg. F-5.
[30] Seagate Technology, 10-K for the fiscal year ended July 2, 2010, pg. 4.
[31] Seagate Technology, 10-K for the fiscal year ended July 2, 2010, pg. 7.

14

mainframes, and workstations.[32] For the fiscal years ended June 27, 2008, July 3, 2009, and July 2, 2010, Seagate had revenues of $12.7 billion, $9.8 billion, and $11.4 billion, respectively.[33]

Similar to Seagate, Western Digital Corporation ("Western Digital") designs, develops, manufactures, and sells HDDs.[34] Western Digital's HDDs are used in a variety of devices, including desktop computers, notebook computers, and enterprise applications such as servers, workstations, network attached storage, and storage area networks.[35] Its customers include OEMs and original design manufacturers ("ODMs").[36] Western Digital had net sales of $8.1 billion for the fiscal year ended June 27, 2008, $7.5 billion for the fiscal year ended July 3, 2009, and $9.9 billion for the fiscal year ended July 2, 2010.[37]

Also competing in the data storage solutions industry, SMART Modular Technologies ("SMART Modular") is a designer, manufacturer, and supplier of subsystem products primarily to OEMs.[38] Its products include memory modules and solid state storage products such as embedded flash and SSDs.[39] SMART Modular's subsystem products are incorporated into a broad array of devices, including notebooks, routers, servers, workstations, and storage systems.[40] For the fiscal year ended August 29, 2008, SMART Modular generated net sales of $670 million.[41] This decreased to $441 million for the

---

[32] Seagate Technology, 10-K for the fiscal year ended July 2, 2010, pg. 4.
[33] Seagate Technology, 10-K for the fiscal year ended July 3, 2009, pg. 73 & 10-K for the fiscal year ended July 2, 2010, pg. 70.
[34] Western Digital Corporation, 10-K for the fiscal year ended July 2, 2010, pg. 4.
[35] Western Digital Corporation, 10-K for the fiscal year ended July 2, 2010, pg. 4.
[36] Western Digital Corporation, 10-K for the fiscal year ended July 2, 2010, pg. 4.
[37] Western Digital Corporation, 10-K for the fiscal year ended July 2, 2010, pg. 53.
[38] SMART Modular Technologies, 10-K for the fiscal year ended August 27, 2010, pg. 2.
[39] SMART Modular Technologies, 10-K for the fiscal year ended August 27, 2010, pg. 2.
[40] SMART Modular Technologies, 10-K for the fiscal year ended August 27, 2010, pg. 2.
[41] SMART Modular Technologies, 10-K for the fiscal year ended August 27, 2010, pg. 57.

year ended August 28, 2009, but rebounded to $703 million for the year ended August
27, 2010.[42]

Micron Technology, Inc. ("Micron") is a manufacturer and marketer of semiconductor
devices, memory technologies, and packaging solutions for use in a variety of
products.[43] Micron markets its products primarily to OEMs and retailers located around
the world.[44] Its memory segment primarily focuses on two types of products: 1) DRAM,
such as its DDR3 and DDR2 for use in main system memory in computers and servers,
and 2) NAND flash memory, which is incorporated into its products such as its
RealSSD drives for enterprise server and notebook applications.[45] Micron generated net
sales of $5.8 billion in fiscal year 2008, $4.8 billion in fiscal year 2009, and $8.5 billion in
fiscal year 2010.[46]

C.   *Key Events and Disclosures*

For purposes of my report, I have been asked by the Commission to focus on STEC's
disclosures on the following three dates:

1.  July 16, 2009

2.  November 3, 2009

3.  February 23, 2010

After reviewing STEC's public press releases, STEC's SEC filings issued on those days,
and any corresponding quarterly earnings call minutes, I determined that the following
new disclosures were made to the market on each of those days, as discussed in detail
below.

---

[42] SMART Modular Technologies, 10-K for the fiscal year ended August 27, 2010, pg. 57.
[43] Micron Technology, Inc., 10-K for this fiscal year ended September 2, 2010, pg. 1.
[44] Micron Technology, Inc., 10-K for this fiscal year ended September 2, 2010, pg. 1.
[45] Micron Technology, Inc., 10-K for this fiscal year ended September 2, 2010, pg. 1 – 3.
[46] Micron Technology, Inc., 10-K for this fiscal year ended September 2, 2010, pg. 45.

_July 16, 2009_

As part of a press release and announcement, STEC and Moshayedi made the following two disclosures to the market:

1. STEC signed a supply agreement with one of its largest enterprise storage customers for sales of $120 million of ZeusIOPS SSDS in the second half of 2009;[47] and

2. STEC stated that it "believes that this agreement reflects the enterprise storage manufacturer's continued commitment to integrate STEC's SSD technology into the manufacturer's systems and validates significant storage system performance improvements enabled by STEC's ZeusIOPS SSDs in these enterprise systems."[48]

_November 3, 2009_

On November 3, 2009, STEC and Moshayedi announced STEC's results for the third quarter of 2009 after the market close. In STEC's associated press release, 10-Q, and quarterly earnings call, STEC and Moshayedi made the following new disclosures:

1. STEC announced its financial results for the third quarter ended September 30, 2009.[49]

2. Moshayedi stated: "One of our customers placed a $120 million supply agreement with us for shipments covering the second half of 2009. We recently received preliminary indications that our customer might carry inventory of our ZeusIOPS at the end of 2009 which they will use in 2010."[50]

---

[47] STEC 7/16/09 Press Release, pg. 1.
[48] STEC 7/16/09 Press Release, pg. 1.
[49] STEC 11/3/09 Press Release, pg. 1.
[50] STEC 11/3/09 Press Release, pg. 2.

During the quarterly earnings conference call, Moshayedi also stated, in response to questions from equity analysts asking about the size of the inventory accumulation at EMC for the third and fourth quarters:

- "Unfortunately, we don't have exact numbers from our customer…"[51]
- "We don't know exactly how many they shipped across each system in Q3. The only indication that we got from them was that, hey, we do have an inventory here and we've got to work through it…. So, that's the total amount of indication of numbers and volumes and things like that that we have at this point…."[52]
- "We really don't have a good estimate of what EMC has done in Q3 and to this date in Q4…."[53]
- "On the number [amount of inventory buildup at EMC], and I have no idea."[54]

3.  Moshayedi stated: "We currently expect fourth quarter of 2009 revenue to range from $101 million to $103 million (net of $2.4 million of estimated reserves related to sales and marketing incentive programs) with diluted non-GAAP earnings per share to range from $0.51 to $0.53;"[55]

4.  Moshayedi stated: "So when we did sign the last of our agreement [with EMC], we did – this was a one-off type of a deal…I don't think we are going to be asking our customer for another commitment on – I don't think we are going to need a commitment;"[56] and

5.  Moshayedi stated: "In light of this development, we have jointly initiated a strategic sales and marketing incentive program designed to promote the integration of

---

[51] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 4.
[52] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 13.
[53] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 22.
[54] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 26.
[55] STEC 11/3/09 Press Release, pg. 3.
[56] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 10.

STEC's SSDs into their systems. As of September 30, 2009, we have accrued $1.5
million of estimated costs for this marketing initiative program…"[57]

Moshayedi also stated: "We were notified about, I would say, seven, eight, days ago
about the fact that there was this inventory…"[58]

_February 23, 2010_

On February 23, 2010 after the close of the market, STEC and Moshayedi announced
STEC's results for the fourth quarter of 2009, as well as for the full year of 2009. In
STEC's associated press release, 10-Q, and quarterly earnings call, STEC and Moshayedi
made the following new disclosures:

1. "STEC, Inc. (Nasdaq:STEC) announced today the company's financial results for the
   fourth quarter and full-year ended December 31, 2009;"[59]

2. "The management and the Board of Directors believe in the long-term value of our
   Company, and have approved the repurchase of up to $80 million of Company's
   common shares on the open market;"[60]

3. Moshayedi stated: "We believe that the first half of 2010 will be a trough period for
   our business due to an inventory carryover by our largest customer. Although, we
   believe the marketing programs that we implemented last quarter have had a
   positive effect on the sell-through of SSDs, based on our best estimates we now
   anticipate this inventory carryover to continue to negatively impact our sales to this
   customer during the first half of 2010, as we do not expect any meaningful
   production orders from this customers during that time;"[61] and

---

[57] STEC 11/3/09 Press Release, pg. 2.
[58] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 12.
[59] STEC 2/23/10 Press Release, pg. 1.
[60] STEC 2/23/10 Press Release, pg. 2.
[61] STEC 2/23/10 Press Release, pg. 1.

4.  Moshayedi stated: "We currently expect first quarter of 2010 revenue to range from
    $33 million to $35 million with diluted non-GAAP loss per share to range from $0.11
    - $0.13."[62]

---

[62] STEC 2/23/10 Press Release, pg. 2.

5. **METHODOLOGIES EMPLOYED**

   A. _Assessing Materiality of Disclosures Using Event Studies_

       i.     _General Event Study Methodology_

I performed event studies to determine the materiality of STEC's and Moshayedi's disclosures and their subsequent impact on STEC's stock price on the three dates in question. I did so because the event study methodology is widely used in the accounting and finance fields, is commonly used in securities litigation, and can be applied to the analysis of a variety of firm-specific events, including earning announcements.[63] Specifically, an event study relies on statistics to examine the impact of the release of information on security prices at a particular point in time.[64] Event studies can be used to assess the materiality of the information being disclosed vis-à-vis the price changes of the security being analyzed.[65]

The event study framework maintains that, given rationality in the marketplace, the effect of a material event will be quickly reflected in asset prices; thus, the economic impact of this event can be measured using security prices observed over a relatively short time period.[66] This is because, according to financial theory, the value of any asset is equal to the discounted present value of expected future cash flows generated by the asset.[67] Therefore, the price of an asset should reflect the cash flows that it is expected to

---

[63] Campbell, John Y., Lo, Andrew W. and MacKinlay, A. Craig. _The Econometrics of Financial Markets_, pg. 149. 1997 and Tabak, David I. and Dunbar, Frederick C. _Materiality and Magnitude: Event Studies in the Courtroom_, NERA Working Paper #34, pg. 2. April 1999.

[64] Ross, Stephen A., Westerfield, Randolph W. and Jaffe, Jeffrey. _Corporate Finance, 6th Edition_, pg. 922.

[65] Tabak, David I. and Dunbar, Frederick C. _Materiality and Magnitude: Event Studies in the Courtroom_, NERA Working Paper #34, pg. 3 – 6. April 1999.

[66] Campbell, John Y., Lo, Andrew W. and MacKinlay, A. Craig. _The Econometrics of Financial Markets_, pg. 149. 1997.

[67] Damodaran, Aswath. _Investment Valuation: Tools and Techniques for Determining the Value of Any Asset (2nd Edition)_, Ch. 2 pg. 1.

generate.[68] The expected generation of these future cash flows is driven by a variety of factors, as captured by the total mix of information available. If security prices reflect all currently available information, then price changes must reflect the incremental impact of new information disclosed to the market on the company's anticipated future cash flows.[69,70]

To perform an event study, several conditions must be met, including:

- The time that news of the event reaches the market is known;
- The market did not know about the event prior to its disclosure; and
- The impact this specific event has on the company's stock price can be isolated from that of market-wide, industry-wide, and other firm specific factors.[71]

Generally, event studies estimate the abnormal return (the actual ex post return of the security during the event window minus the normal return of the firm during the event window, where the normal return is defined as the return that would have been expected had the event not taken place)[72] on the date when the new information is disclosed to the market, and attribute the abnormal return to this new information.[73] Typically, event studies make use of econometric regressions[74] to control for outside

---

[68] Damodaran, Aswath. *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset (2nd Edition)*, Ch. 1 pg. 2.

[69] Bodie, Zvi, Kane, Alex and Marcus, Alan J. *Investments, 5th Edition*, pg. 351.

[70] Tabak, David I. and Dunbar, Frederick C. *Materiality and Magnitude: Event Studies in the Courtroom*, NERA Working Paper #34, pg. 3. April 1999.

[71] Tabak, David I. and Dunbar, Frederick C. *Materiality and Magnitude: Event Studies in the Courtroom*, NERA Working Paper #34, pg. 3. April 1999.

[72] Campbell, John Y., Lo, Andrew W. and MacKinlay, A. Craig. *The Econometrics of Financial Markets*, pg. 151. 1997.

[73] Bodie, Zvi, Kane, Alex and Marcus, Alan J. *Investments, 5th Edition*, pg. 352.

[74] A regression is a statistical tool used to estimate the relationship between a dependent variable and a set of explanatory variables. See: Bodie, Zvi, Kane, Alex and Marcus, Alan J. *Investments, 5th Edition*, pg. 986, and Tabak, David I. and Dunbar, Frederick C. *Materiality and Magnitude: Event Studies in the Courtroom*, NERA Working Paper #34, pg. 8. April 1999.

influences on the company's stock price.[75] This can be done by running a regression of the company's stock price on a market index and/or an industry index over a specified period of time, thus controlling for the market and/or industry impact on the stock price during the event in question.[76]

### ii.    My Two-factor Event Study Model

In performing my analyses, I ran an event study on the following three dates: July 16, 2009, November 4, 2009, and February 24, 2010.[77] This was done in an attempt to: 1) determine the materiality of STEC's disclosures on each of the dates, based on measures of statistical significance; and 2) quantify the change in STEC's stock price attributable to those specified disclosures. To perform my event study, I used a two-factor model that includes both a market factor and an industry factor. I utilized a market factor and an industry factor to separately control for, and thus isolate and remove, both general market and industry specific influences on STEC's stock price. Specifically, I regressed STEC's daily stock price performance on the daily price performance of the market as well as on a peer group of industry comparable companies during the period from July 16, 2009 to February 24, 2010. I selected this time period because it contained each of the three days in question, starting with July 16, 2009 (the day when STEC issued a public press release announcing its $120 million agreement with EMC for the second half of 2009) and ending with February 24, 2010 (the first trading day following STEC's after-hours reporting of its fourth quarter and fiscal year 2009 results).

---

[75] Tabak, David I. and Dunbar, Frederick C. *Materiality and Magnitude: Event Studies in the Courtroom,* NERA Working Paper #34, pg. 8. April 1999.

[76] Tabak, David I. and Dunbar, Frederick C. *Materiality and Magnitude: Event Studies in the Courtroom,* NERA Working Paper #34, pg. 3, 4, 8, 9. April 1999.

[77] November 3, 2009 and February 23, 2010 disclosures were made after the market had closed. To measure these disclosures' impact on STEC's stock price, its price change was examined on November 4, 2009 and February 24, 2010, respectively.

Because I ran my regression over the period from July 16, 2009 through February 24, 2010, I included data from the three event windows in the model regression. For the three dates in question, I made an adjustment by including three separate dummy variables, each taking on a value of 1 for its respective date on which returns were measured and 0 otherwise.[78] By using this dummy variable approach, the estimated abnormal return on each event date is equal to the estimated coefficient for the corresponding dummy variable,[79] thus simplifying the computation of the abnormal return on the days in question. Note, however, that these coefficients representing the abnormal return do not necessarily reflect the full magnitude of the stock price change attributable to the specific disclosures in question; as a result, it is established practice to perform additional calculations to quantify the precise magnitude of the specific disclosures' stock price impact if required,[80] as explained in section iii. below.

As previously noted, my regression included a peer index of companies whose business is comparable to STEC's to serve as my industry index. Specifically, I created an equal-weighted index comprised of the following five publicly traded companies: SanDisk (SNDK), SeaGate (STX), Western Digital (WDC), SMART Modular (SMOD), and Micron (MU).[81] By incorporating and selecting an industry index for inclusion in an event study regression, the goal was to control for industry-specific influences on STEC's stock price.[82] I created an index that would represent the industry in which STEC operated,

---

[78] For example, the July dummy variable would take on a value of 1 on July 16, 2009, and would be equal to 0 for all other days during the period over which returns were analyzed.

[79] Salinger, Michael. *Standard Errors in Event Studies,* pg. 42. *The Journal of Financial and Quantitative Analysis,* Vol. 27, No. 1. March 1992.

[80] Tabak, David I. and Dunbar, Frederick C. *Materiality and Magnitude: Event Studies in the Courtroom,* NERA Working Paper #34, pg. 11. April 1999.

[81] See Schedule 5 for STEC's Comparable Companies Peer Index Stock Price Data.

[82] Tabak, David I. and Dunbar, Frederick C. *Materiality and Magnitude: Event Studies in the Courtroom,* NERA Working Paper #34, pg. 8. April 1999.

comprising companies with similar products, subject to the same business risk, and having the same business drivers as STEC. In other words, I attempted to select those companies most directly comparable to STEC. In doing so, this index controlled for business and economic developments affecting data storage solutions and memory companies that were similar to STEC.

In choosing companies to comprise this index, I explicitly considered:

- Companies that were listed as competitors of STEC in STEC's fiscal year 2008, 2009, and 2010 10-K filings;
- Companies that were mentioned as competitors of STEC in various equity research reports during the second half of 2009 and early 2010;
- Companies that listed STEC as a competitor in their respective 2008, 2009, and 2010 SEC filings; and
- Companies whose self-descriptions of their business and products in SEC filings were consistent with STEC's.

Specifically, I selected SanDisk, SeaGate, Western Digital, SMART Modular, and Micron because all were listed as competitors of STEC in the company's 2008, 2009, and 2010 SEC filings. These companies also appeared in several equity research reports covering STEC in late 2009 or early 2010 as competitors to STEC. In addition, each of these companies (with the exception of Micron) separately identified STEC as one of its own competitors in its respective annual reports during the same time period. Further, each of these companies were part of the data storage solutions industry, had business descriptions similar to that of STEC, and offered either HDD or SSD products that competed with STEC's SSDs. A brief business overview of STEC and selected comparable companies was included in section 4 of this report.

In my regression model, I also included a market index to separately control for any market-wide influences indicative of macroeconomic factors that would generally impact stock prices, including STEC's. Specifically, I used the S&P 500 as a proxy for the general market.[83] I opted for the S&P 500 over other indices, such as the Nasdaq Composite, in order to capture a more diverse constituency of companies and represented industries, thus providing a more robust proxy for general, as opposed to industry-specific, macroeconomic conditions and influences.

To perform my event study, I utilized STEC's and other comparable companies' daily stock prices, as well as daily values of the S&P 500 Index. All security prices and index values were adjusted for any dividends and stock splits. Price data was obtained from both Yahoo! Finance and Bloomberg.

     iii.    *Isolating Idiosyncratic Returns Attributable to Specific Disclosures*

As previously explained, my two-factor event study model calculated the abnormal return of STEC's stock price attributable to company-specific information on the three dates in question. Note, however, that the abnormal return's full magnitude is not necessarily fully attributable to the STEC disclosures of interest. Specifically, part of the abnormal return could be attributable to other company-specific information that was disclosed on the same day. As a result, when performing an event study, the change in stock price attributable to any such concurrent disclosures should be isolated, if possible.[84]

---

[83] See Schedule 6 for S&P 500 Price Data.

[84] Tabak, David I. and Dunbar, Frederick C. *Materiality and Magnitude: Event Studies in the Courtroom,* NERA Working Paper #34, pg. 11. April 1999.

Before isolating the potential price change attributable to other STEC disclosures
(besides the disclosures of interest) concurrently made to the market, these other
disclosures had to be evaluated for materiality. This assessment aimed to determine
whether the information contained in these disclosures could have contributed to
STEC's observed price movements.

Specifically, I considered each new disclosure to the market on the dates in question,
and assessed whether it would have warranted a material change to STEC's current and
future financial performance. I did so by examining the extent to which equity analysts
commented on each disclosure in their research reports and declarations, as well as the
importance they placed on each piece of information disclosed as conveyed by their
diction and changes to their models driven by such information. In addition, I relied
upon my own professional skills and formal training to determine whether these other
disclosures would have materially impacted STEC's financial performance.

If disclosures were judged to be immaterial, they were ignored because they would not
have contributed to STEC's stock price movements. I then evaluated the remaining
material disclosures whether they would have positively or negatively impacted the
stock price.

If these material disclosures would have contributed to STEC's stock price in a way that
was directionally opposite to its observed stock price movement (*e.g.*, there was a new
and materially positive disclosure, but STEC's stock price actually declined on the date

in question), then such information was conservatively treated as having no stock price impact.[85]

If these material disclosures would have influenced the stock price in the same direction as the observed price movement, I assessed whether any of these disclosures overlapped with the disclosures of interest. Specifically, I evaluated whether these remaining material disclosures contained pieces of information that represented direct results of the information conveyed by the disclosures of interest. Any such disclosures were judged to be overlapping with the disclosures of interest and were ignored because they would not have exerted a unique impact on STEC's stock price.[86]

B. *Confirming Materiality of Disclosures Using Market Participant Expectations*

i. *Review of Equity Research Reports*

An event study is a statistical study that examines how the disclosure of information affects prices at a particular time.[87] To perform an event study, there must be an event or a piece of information, which was not previously known by the market participants, and which was disclosed to the market at a specific point in time. Therefore, I examined equity research reports in order: 1) to verify that the disclosures of interest represented

---

[85] This is due to the fact that such disclosures would have had an offsetting price impact relative to that of the dominant disclosures made on that day (disclosures of interest). Their exclusion is therefore conservative, as doing so potentially understates the magnitude of the dominant disclosures' impact on STEC's stock price.

[86] To provide an illustrative example: if a company separately disclosed that, as compared to the prior quarter, 1) its revenue had held constant; 2) its costs had increased; and 3) its profitability had decreased, the third disclosure overlaps with the first and second disclosures – specifically, it is because revenues did not change, and because costs simultaneously rose, that the profitability fell. As such, any value attributable to the third disclosure has already been accounted for, and is subsumed by, the two prior disclosures – the company could have disclosed only that revenues had remained flat, and that costs had increased, and the market would have correctly concluded that profitability had thus decreased even if the company had not made a separate disclosure about its profitability.

[87] Ross, Stephen A., Westerfield, Randolph W. and Jaffe, Jeffrey. *Corporate Finance, 6th Edition,* pg. 922.

events released to the market at a specific point in time and which were previously
unknown to the general market; and 2) to confirm the materiality of these new
disclosures by observing their impact on STEC's current and projected future financial
performance as estimated by the research analysts' models. Specifically, I reviewed
equity research reports covering STEC from all investment banks and brokerage firms
providing STEC coverage[88] during the period June 16, 2009 (the date on which STEC
issued a press release increasing its guidance for the second quarter) through February
24, 2010: B. Riley & Co., Northland Securities, Capstone Investments, Needham & Co.,
Noble Financial, Pacific Crest Securities, Stifel Nicolaus, Thomas Weisel Partners, J.P.
Morgan, Deutsche Bank, Think Equity LLC, Wedbush, and Oppenheimer & Co.[89]

In my analysis of these equity research reports, I evaluated several things. First, I
performed a review of what each analyst expected before the company's disclosures.
For each of the three dates in question, for each analyst, I reviewed reports that had
been written prior to the disclosure date. This was done to discern if, before the
disclosure date, the analyst knew and thus explicitly wrote about what STEC eventually
disclosed on that day. If the analysts were privy to a certain fact prior to STEC actually
disclosing it, then that fact was judged to have been known by the market prior to the
disclosure and already reflected in STEC's stock price. If, however, this fact was not
discussed in the analysts' reports prior to STEC's disclosure, then this information was
judged to not have been known to the market prior to the disclosure. This would
indicate that it represented new material information that could have influenced STEC's
stock price.

---

[88] See JPMSTEC00000750 for a list of firms comprising the consensus for STEC as of August 2009.
[89] See Schedule 1 for availability of equity research reports before and after each of the three disclosure
dates.

In addition to analyzing market participant expectations and commentary before the disclosures of interest, I also analyzed the change in such expectations and commentary immediately following each of the three disclosure dates. Not only did I pay particular attention to how each analyst's expectations changed relative to his or her pre-disclosure expectations, but I also evaluated the extent to which the analyst discussed each of the disclosures that were released on that day, as well as the analyst's emphasis on each piece of information that was disclosed. I did so to discern the importance, and thus materiality, of each disclosure to the analyst.

### ii.    Review of Equity Analyst Declarations

Akin to my review of the commentary contained in the equity research reports, I also reviewed the declarations of several equity analysts who covered STEC during the relevant time period. Specifically, I considered the declarations of Kevin Cassidy (Thomas Weisel), Gary Hsueh (Oppenheimer), Kevin Vassily (Pacific Crest), Aaron Rakers (Stifel Nicolaus), Jeffrey Schreiner (Capstone), Michael Crawford (B. Riley), and Betsy Van Hees (Wedbush). In my review of these declarations, I focused on the analysts' pre-disclosure expectations, the change of expectations following the disclosure, and their perceived importance of each disclosure. I also focused on the analysts' characterization of the events at the time, the most significant factors affecting their valuation of STEC, and their assessment of STEC's performance and future prospects. This was done to confirm the materiality of the disclosures of interest on each date.

### iii.    Review of Equity Analyst Models

In connection with my analysis of equity research reports, I also reviewed analyst models forecasting the company's financial performance before and after the disclosures on July 16, 2009, November 3, 2009, and February 23, 2010. I examined the

extent to which analysts' views about STEC's current and future financial performance changed as a result of the disclosures in order to confirm their materiality.

Specifically, I examined the analysts' modeled estimates of revenues and earnings per share ("EPS"), analyzing how they changed over time and specifically in response to STEC's disclosures on the specific dates.[90] In addition to evaluating this information at an individual analyst level, I also aggregated the results across all analysts whose reports I had access to in order to observe a "consensus" expectation of revenues and EPS. This was done because analysts' consensus revenue and earnings estimates can be a proxy for the market's expectations.[91] From these aggregate results, I analyzed how the maximum, minimum, mean, and especially median estimate changed both before and immediately following STEC's three disclosure dates. By performing this analysis, I was able to verify that the disclosures which I deemed to be material, and which were commented on in the equity research reports and analysts declarations, actually translated into changes in market participants' expectations of STEC's top-line and bottom-line financial performance. Observing the magnitude of these changes served as a quantitative validation of the materiality of the disclosures in question.

---

[90] Note that each analyst who covered STEC did not write a report on every single day during the period from July 16, 2009 through February 24, 2010. New reports were assumed to be issued by each analyst when their respective model changed. Thus, I assumed that, between dates for which separate reports were issued by the same analyst, that analyst's models did not change.

[91] Jones, Charles P. *Investments: Analysis and Management, 11th Edition*, pg. 385. Also see: Declaration of Gary Hsueh, par. 6, Declaration of Kevin Cassidy, par. 7, Declaration of Kevin Vassily, par. 7, Declaration of Aaron Rakers, par. 7, Declaration of Jeffrey Schreiner, par. 6, Declaration of Michael Crawford, par. 6, & Declaration of Betsy Van Hees, par. 8.

31

## 6. MATERIALITY OF STEC'S DISCLOSURES & RESULTANT STOCK PRICE IMPACT

### A. *July 16, 2009*

#### i. *Summary of Disclosures*

On July 16, 2009, STEC announced that it had signed a $120 million supply agreement for ZeusIOPs SSDs in the second half of 2009. As part of this announcement, STEC made the following two disclosures:

1. STEC "signed an agreement with one of its largest enterprise storage customers for sales of $120 million of ZeusIOPs SSDs in the second half of 2009."[92]

This disclosure informed the market that STEC had agreed to a large supply contract in the form of a revenue commitment from a key OEM customer. The $120 million for the second half of the year implied an increase in that customer's quarterly run-rate for STEC's SSDs, signaling a stronger demand for its ZeusIOPs. This is confirmed by comments of several equity analysts in their reports and declarations, as shown in section v. below.

2. "STEC believes that this agreement reflects the enterprise storage manufacturer's continued commitment to integrate STEC's SSD technology into the manufacturer's systems and validates significant storage system

---

[92] STEC 7/16/09 Press Release, pg. 1.

performance improvements enabled by STEC's ZeusIOPS SSDs in these
enterprise systems."[93]

This disclosure indicated that the increased demand for the second half of 2009 was
explained by the manufacturer's continued commitment to use STEC's SSD technology
due to its value proposition. This development portended sustainability of the
increased level of demand already experienced in the second half of 2009 into the future
periods. This is confirmed by several equity analysts in their research reports and
declarations as shown in section v. below.


ii.      *Event Study Results*

My two-factor model indicated that STEC's stock price exhibited an abnormal return of
12.98% (price increase of $3.58) after separately controlling for both market- and
industry-specific effects on July 16, 2009.[94] This means that, after accounting for general
market influences on STEC's stock price, as well as any influences common to the data
storage solutions industry, STEC's stock price demonstrated a positive return of 12.98%
that was "abnormal", or unrelated to these factors. As such, the 12.98% increase can be
attributed to company-specific information disclosed on that day. In addition, the fact
that this abnormal return was highly statistically significant reveals that the disclosures
by STEC on this date, which are associated with the 12.98% price climb, were
definitively material in nature. Please refer to Schedule 7 for a summary of my
regression results.

---

[93] STEC 7/16/09 Press Release, pg. 1.
[94] See Figure 2.

iii.    *Exclusion of Offsetting & Overlapping Material Disclosures*

No additional material disclosures were identified on July 16, 2009.

iv.    *Return Attributable to Specific Material Disclosures*

The full magnitude of STEC's abnormal return, 12.98%, was attributable to the two disclosures of interest.

v.    *Confirmation of Specific Disclosures' Materiality Using Analyst Expectations*

    a.    *Equity Analysts' Commentaries*

To confirm the materiality of the two specific disclosures of interest, I reviewed analysts' commentary of these items. In my review, I focused on: 1) the analysts' remarks and comments prior to the disclosures, to confirm that the market did not have prior knowledge of the information contained in the disclosures; 2) the analysts' remarks immediately following the disclosures, to affirm that the disclosures of interest were indeed important and highly material to the analysts; and 3) changes to STEC's expected financial performance metrics, as captured by analysts' models, to validate that the disclosures did indeed alter their forecasts of STEC's future financial performance.

With respect to the disclosures of interest – that STEC had signed a deal with a customer to supply $120 million worth of ZeusIOPs in the second half of 2009, and that this represented a "continued commitment" to STEC's ZeusIOPs SSDs – the market did not demonstrate knowledge of these facts prior to STEC's press release on July 16, 2009. A review of all equity research reports prior to the deal's announcement reveals that not a single analyst explicitly stated expectations that STEC would agree to a large supply agreement with EMC or any other single STEC customer for the second half of the year. In fact, the market demonstrated an array of opinions regarding STEC's potential key

business drivers and customers in the second half of 2009, none of which included such large recurring demand from EMC as well as potential recurring supply agreements adding visibility into future demand. Moreover, some market participants were expecting IBM rather than EMC to be the greater opportunity for STEC. For example, Northland Securities' analyst remarked that STEC "is not getting demand in volume from IBM, who we believe can be the largest Zeus IOPS customer for STEC in 2009."[95] Similarly, Stifel Nicolaus' analyst noted that STEC "believes that IBM will represent a significant customer opportunity with a production ramp anticipated to take shape in the 3Q09 timeframe. Our conversations with management suggested that they believe IBM could ramp to a more meaningful customer than EMC exiting 2009."[96] And as potential drivers for additional upside, Oppenheimer's analyst opined that "for further catalysts, the company expects 3-4 new ZeusIOPS customer announcements in the near term, including NTAP based on our checks."[97] Further, only 10 days before the announcement of the supply agreement with EMC, Think Equity's analyst noted that, in terms of market risks related to specific customers "STEC has a high customer concentration with Cisco, at almost 40% of revenues."[98]

These expectations clearly changed as a result of STEC's July 16th disclosures. A review of equity research reports for STEC shows that market participants interpreted the July 16th disclosure of the $120 million supply agreement and the "continued commitment" to STEC's drives to indicate that EMC's level of demand implied by the July 16, 2009

[95] Northland Securities. *STEC, Inc. – STEC: Raises 2Q09 Guidance; Reiterate Outperform, Raise Target to $32*, pg. 1. June 16, 2009.
[96] Stifel, Nicolaus & Company, Inc. *STEC, Inc. – STEC Raises Guidance for C2Q09 Driven by Increased ZeusIOPS Performance*, pg. 3. June 16, 2009.
[97] Oppenheimer & Co. Inc. *STEC Inc. – Pre-Announcement Justifies Parabolic Stock – Clear Visibility on ~$2 in EPS*, pg. 1. June 16, 2009.
[98] Think Equity LLC. *STEC, Inc. – STEC: Lead in FC SSD Market; 2H09 Ramps; Raising Estimates*, pg. 2. July 6, 2009.

supply agreement would be recurring in nature. Specifically, Noble Financial's analyst explained that "based on [the] supply agreement signed between STEC and storage customer (likely EMC), we are materially raising our estimates for all periods" and that "given the higher-than-expected level of ZeusIOPS sales to EMC, we are substantially increasing our revenue, gross margin and EPS for all periods."[99] Stifel Nicolaus' and Pacific Crest Securities' analysts echoed similar beliefs about EMC's anticipated quarterly ordering patterns from STEC.[100]

Similarly, Oppenheimer's analyst stated, "STEC brought out the big gun today...and announced a $120M ZeusIOPS contract for 2H. Relative to our prior model that included ~$60-$70M contribution from EMC, this news raises our model by $50M. Looking ahead to '10, we now expect rev from EMC alone of >$250M, vs. our old model for total ZeusIOPS rev of ~$300M."[101] Oppenheimer's analyst also noted that "the visibility it provided into STEC's revenues for second half of 2009, and the apparent reliability of the revenues STEC would derive from that agreement, provided a relatively firmer basis for my estimates of STEC's growth for the remainder of 2009 and 2010."[102]

Thomas Weisel's analyst explained that the contract "was important to my analysis in that it reflected EMC's strong commitment to STEC's ZeusIOPS SSD products" and that when he modeled STEC's growth over a 12 month period, "I used that $120 million contract as a baseline for going forward into calendar year 2010 such that, at a minimum, EMC could reasonably be expected to purchase at least $60 million of STEC's

---

[99] Noble Financial. *STEC, Inc. - Raising Estimates, Again,* pg. 1 – 2. July 16, 2009.
[100] Declaration of Aaron Rakers, par. 15 – 17 & Declaration of Kevin Vassily, par. 15 – 16.
[101] Oppenheimer & Co. Inc. *STEC, Inc. - Bringing Out the Big Gun--2H Contact Ups Visibility Ests, PT, Everything,* pg. 1. July 16, 2009.
[102] Declaration of Gary Hsueh, par. 13.

ZeusIOPS SSDs each quarter."[103] Additionally, analysts at Wedbush, Capstone
Investments, and B. Riley explained that they all used the $120 million agreement with
EMC in modeling STEC's growth over the next twelve-month period.[104]

In addition, expectations of the recurrence of similar supply agreements in the future
began to be established soon after the press release on July 16, 2009. For example,
Oppenheimer's analyst reported the day that the $120 million supply agreement was
announced that "we...believe/suspect that a similar supply contract with EMC for all of
'10 must be in the works."[105] According to the analyst, this conclusion was based on a
July 2009 phone conversation with Moshayedi, when the analyst asked Moshayedi
whether it would be reasonable to expect similar agreements with EMC in the future
calendar year. According to the analyst, Moshayedi "responded that this would be a
reasonable expectation on my part."[106] This conversation also supported the analyst's
belief that "EMC would likely renew that contract for a full year at twice the initial
contractual amount,"[107] and "that other OEMs could likely follow suit with similar
revenue commitment agreements."[108]

Following the second quarter earnings call on August 3, 2009, market expectations that
STEC would operate under similar supply agreements in the future became more
prevalent. During the call, in response to a question from an analyst regarding whether
STEC would sign similar supply agreements in the future, Moshayedi stated, "I think

---

[103] Declaration of Kevin Cassidy, par. 13 & 15.
[104] Declaration of Betsy Van Hees, par. 15, Declaration of Jeffrey Schreiner, par. 14, & Declaration of
Michael Crawford, par. 13.
[105] Oppenheimer & Co. Inc. *STEC, Inc. - Bringing Out the Big Gun--2H Contact Ups Visibility Ests, PT,
Everything*, pg. 1. July 16, 2009.
[106] Declaration of Gary Hsueh, par. 15.
[107] Declaration of Gary Hsueh, par. 15.
[108] Declaration of Gary Hsueh, par. 13.

it's going to be more normal for us to get those agreements in place with their large customers once their TAM becomes big."[109] Thomas Weisel's analyst noted that he "understood Moshayedi's response…to mean that it would be reasonable to expect STEC to enter into future supply agreements with its OEM customers, including EMC."[110] Analysts at Wedbush, Pacific Crest Securities, and B. Riley also noted an explicit understanding that it was reasonable to expect STEC to agree to additional supply agreements with EMC in the future based on these comments by Moshayedi.[111] Likewise, consistent with his July 16th report, the analyst at Oppenheimer explained that he interpreted this response by Moshayedi to mean "that it would be reasonable to expect STEC to enter into future supply agreements with its OEM customers, which I considered to be an important, positive development,"[112] in part because "such contracts would improve visibility into revenues."[113] This statement, coupled with his earlier July 16th report,[114] make it clear that Oppenheimer's analyst also expected STEC to have future supply agreeements with EMC. In totality, such remarks demonstrate that a number of market participants expected STEC's supply agreement to be recurring in nature.

From such commentaries, it is clear that the signing of the EMC deal was a material disclosure that resulted in the analysts upwardly revising their estimates of future EMC demand. The analysts' commentary also shows that market participants understood that, based on Moshayedi's and STEC's disclosures on July 16 and August 3, 2009, the

---

[109] Q2 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 8.
[110] Declaration of Kevin Cassidy, par. 19.
[111] See: Declaration of Betsy Van Hees, par. 18, Declaration of Kevin Vassily, par. 19, & Declaration of Michael Crawford, par. 16.
[112] Declaration of Gary Hsueh, par. 20.
[113] Declaration of Gary Hsueh, par. 20.
[114] Oppenheimer & Co. Inc. *STEC, Inc. – Bringing Out the Big Gun -- 2H Contract Ups Visibility, Ests, PT, Everything*, pg. 1. July 16, 2009.

supply agreement with EMC would be recurring in nature. Moreover, this commentary confirms that this disclosure was material because it gave analysts a more reliable basis by which to estimate STEC's revenues and growth in 2009 and in future periods.

### b. Changes in Equity Analysts' Models

Additional corroboration of these two disclosures' materiality is provided by changes to the analysts' forecast revenue and EPS for STEC. On July 6, 2009, the last day that a new equity research report was released prior to STEC's announcement of the EMC supply contract, the median analyst estimate for 2009 revenue was $331 million, and the median estimate for 2010 revenue was $417 million.[115] By July 16th, the day that STEC announced the EMC deal, median revenue estimates had risen to $346 million and $497 million for 2009 and 2010, respectively.[116] These upwards revisions, particularly with regards to fiscal year 2010, confirm that the two specified disclosures were material. The market increasing the median revenue estimate for 2009 by more than $14 million provides a quantitative check on the materiality of the first disclosure – that is, STEC's announcement of the deal for the second half of 2009. Likewise, the median analyst increasing 2010 revenue by more than $80 million implies the market participants' assumption from this disclosure that the current level of demand, as reported in the $120 million supply agreement, would extend into future periods.[117]

---

[115] See Schedule 2a.
[116] See Schedule 2a.
[117] See Schedule 2a.

B.  *November 3, 2009*

   i.    *Summary of Disclosures*

On November 3, 2009, STEC announced its results for the third quarter of 2009 after the
market close. In its associated press release, 10-Q, and earnings conference call, STEC
made the following disclosures:

> 1.  STEC announced its financial results for the third quarter ended September
>     30, 2009: revenue was $98.3 million, and non-GAAP diluted EPS was
>     $0.50;[118]

This announcement merely revealed STEC's actual financial performance for the third
quarter. The company's performance slightly exceeded analyst's expectations for
revenue, and was in-line with expectations for EPS.

> 2.  Moshayedi noted that, from its customer (i.e., EMC) who had placed a $120
>     million supply agreement for ZeusIOPs for second half of 2009, STEC had
>     "recently received preliminary indications that our customer might carry
>     inventory of our ZeusIOPS at the end of 2009 which they will use in
>     2010."[119]
>
>     Moshayedi also stated, in response to questions from equity analysts asking
>     about the size of the inventory accumulation at EMC for the third and
>     fourth quarters:
>
>     "Unfortunately, we don't have exact numbers from our customer…"[120]

---

[118] STEC 11/3/09 Press Release, pg. 1.

[119] STEC 11/3/09 Press Release, pg. 2.

[120] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 4.

"We don't know exactly how many they shipped across each system in Q3. The only indication that we got from them was that, hey, we do have an inventory here and we've got to work through it…. So, that's the total amount of indication of numbers and volumes and things like that that we have at this point…."[121]

"We really don't have a good estimate of what EMC has done in Q3 and to this date in Q4…."[122]

"On the number [amount of inventory buildup at EMC], and I have no idea."[123]

This disclosure highlighted a key issue: that EMC's actual sell through of STEC's ZeusIOPs was below expectations. Because the actual sell through to end customers was less than anticipated, EMC was not selling all the ZeusIOPs that they had purchased for the second half of 2009 under the terms of the July 2009 supply agreement. As a result, EMC was likely holding inventory of ZeusIOPs SSDs, which would likely be used in 2010 rather than in the third or fourth quarter of 2009. This indicated that EMC's demand for ZeusIOPs was not actually $120 million for two quarters, and thus that its demand for STEC's SSDs was lower than expected.[124] This interpretation of the disclosure is confirmed by several equity analysts in their reports and declarations as shown in section v. below.

---

[121] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 13.
[122] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 22.
[123] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 26.
[124] It is important to note that at this point, Moshayedi and STEC did not inform the market about the magnitude of the inventory overhang. As a result, while the market was able to understand that this inventory indicated an actual sell-through of SSDs to end customers that was below expectations, market participants were unable to accurately assess the extent of the issue.

3. Moshayedi explained that:

"[I]n light of this development [with EMC's inventory], we have jointly initiated a strategic sales and marketing incentive program designed to promote the integration of STEC's SSDs into their systems. As of September 30, 2009, we have accrued $1.5 million of estimated costs for this marketing initiative program…"[125]

"We were notified about, I would say, seven, eight, days ago about the fact that there was this inventory…"[126]

This disclosure communicated that, in order to help drive sales of its ZeusIOPs at EMC, STEC had initiated a marketing program with EMC. Because, according to Moshayedi, EMC "might" carry inventory of ZeusIOPs into 2010, this marketing program was designed to "promote the integration of STEC's SSDs" into EMC's systems in an effort to minimize the impact of this "development" – the existence of inventory at EMC. This characterization is confirmed by several equity analysts in their reports and declarations as shown in section iii. below.

4. Regarding guidance for the next quarter, Moshayedi stated that "we currently expect fourth quarter of 2009 revenue to range from $101 million to $103 million (net of $2.4 million of estimated reserves related to sales and marketing incentive programs)" and that STEC expected "diluted non-GAAP earnings per share to range from $0.51 to $0.53."[127]

---

[125] STEC 11/3/09 Press Release, pg. 2.
[126] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 12.
[127] STEC 11/3/09 Press Release, pg. 3.

42

STEC's disclosure of its revenue and EPS guidance for the next quarter revealed how the company expected to perform in the coming period. While STEC's estimated EPS was largely in-line with expectations, the guidance was slightly below market expectations with regards to revenue. Specifically, STEC guided to revenue of $101 - $103 million, while the market consensus was $106 million.[128]

5.   During the conference call with analysts, Moshayedi revealed that "when we did sign the last of our agreement [with EMC], we did – this was a one-off type of a deal. It was a very big deal for us and we had to go buy the products. Once we bought the products and we've got chips coming into us, and since the rest of the customers haven't picked up yet, I don't think we are going to be asking our customer for another commitment on – I don't think we are going to need a commitment."[129]

This disclosure explicitly communicated that the deal with EMC was a "one-off", and thus was non-recurring in nature.

I have been asked by the Commission to specifically focus on STEC's and Moshayedi's disclosures of interest that 1) EMC "might" carry inventory of STEC's SSDs at the end of 2009, which would be used in 2010, and 2) STEC's supply agreement with EMC was non-recurring in nature, shown above as declarations #2 and #5, respectively.

---

[128] See: Declaration of Kevin Vassily, par. 29, Declaration of Aaron Rakers, par. 32, & Declaration of Betsy Van Hees, par. 31.
[129] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 10.

ii.    *Event Study Results*

My two-factor event study model showed that, on November 4th, STEC's stock price
had an abnormal return of -38.82% after separately controlling for both market-wide
and industry-specific effects.[130] This means that, after accounting for general market
influences on STEC's stock price, as well as any influences common to the data storage
solutions industry, STEC's stock price demonstrated a negative return of 38.82% that
was "abnormal", or unrelated to these factors. As such, the 38.82% decline can be
attributed to company-specific information disclosed on that day. In addition, the fact
that this abnormal return was highly statistically significant reveals that the disclosures
by STEC on November 3rd, which are associated with this 38.82% price drop, were
definitively material in nature. Please refer to Schedule 7 for a summary of my
regression results.

iii.    *Exclusion of Offsetting & Overlapping Material Disclosures*

Next, I analyzed the remaining disclosures to determine if any were material, but either
overlapped with the disclosures of interest or would have had an offsetting price
impact to that exerted by the disclosures of interest (dominant disclosures). STEC's
disclosure regarding its joint marketing and sales program with EMC (disclosure #3)
was an overlapping disclosure as it overlapped with the inventory overhang issue.
STEC created the marketing program precisely because EMC's actual sell through of
ZeusIOPs was below expectations. In fact, STEC explicitly referred back to the
inventory issue when mentioning the marketing program, stating, "In light of this
development," – that EMC might carry inventory of ZeusIOPs at the end of 2009 which
they will use in 2010 – it had initiated a marketing program specifically "designed to
promote the integration of STEC's SSDs into their [EMC's] systems." From STEC's

---

[130] See Figure 2.

44

explanation for the marketing program's impetus, it is clear that EMC's inventory overhang was the reason STEC and EMC created the marketing program. This is bolstered by Moshayedi's own comments during the third quarter earnings call, in which he claimed that the new marketing program with EMC "will push through any sort of inventory issues."[131] In addition, equity analysts' remarks further validate that EMC's inventory problem was the catalyst for the marketing program. For example, the Oppenheimer analyst stated that "the big news for the quarter was the stalled sell-through at EMC, which prompted STEC to establish a $1.5M/qtr marketing program to help EMC in pushing SSD-based servers."[132] As such, the value of the disclosure about the marketing program is already captured in the overlapping disclosure of interest – the inventory overhang at EMC.

STEC's downwardly revised guidance for the fourth quarter of 2009 (disclosure #4) was also an overlapping disclosure. While STEC's estimated EPS was largely in-line with expectations, guidance for fourth quarter revenue was slightly below market expectations. However, this slight top line guidance miss vs. consensus overlapped with STEC's disclosure of the joint marketing and sales program at EMC. Specifically, it was because of the joint marketing and sales program at EMC that STEC's revenue guidance for the fourth quarter fell short of expectations. Reserves associated with the marketing program (which was initiated precisely because of the inventory overhang) prevented STEC from meeting consensus guidance estimates. Stifel Nicolaus' analyst explained that, because STEC's fourth quarter guidance was net of $2.4 million of reserves related to its marketing program, he did not consider STEC's fourth quarter guidance being slightly below consensus "independently significant, in and of itself, as

---

[131] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 4.
[132] Oppenheimer & Co. Inc. *STEC Inc. - No Smoking Gun, But Pistol-Whipped Instead: Downgrading to Perform, $21 PT*, pg. 5. November 3, 2009.

it was largely attributable to…STEC's estimated reserves for its joint marketing program with EMC."[133] Similar remarks that the guidance miss was not independently significant due to the marketing program's charges largely precipitating the miss were made by analysts at Oppenheimer, Pacific Crest Securities, Thomas Weisel, and B. Riley.[134] From such statements, it is clear that market participants considered STEC's fourth quarter revenue guidance to be slightly below market expectations because of the marketing program, and thus because of the inventory overhang, at EMC.

After considering these overlapping items, I then evaluated whether any of the disclosures could have exhibited a stock price impact directionally opposite to that actually experienced by STEC. On November 4th, because STEC's stock price declined, any remaining disclosures that were indicative of positive, material news could not have contributed to this observed drop. STEC's revelation of its actual financial performance for the third quarter (disclosure #1) falls into this category. Because STEC not only met analyst expectations with regards to EPS, but actually exceeded their expectations for revenue, this clearly represents positive information. B. Riley's analyst provided an implicit confirmation of such when he stated that "though the results are destined to be lost in the shuffle, STEC did manage to post a Q3 above revenue and EPS consensus despite the EMC situation."[135] News regarding STEC's financial performance for the third quarter, if isolated, would have caused STEC's stock price to remain flat or even appreciate; this link between meeting and/or exceeding analyst expectations, and

---

[133] Declaration of Aaron Rakers, par. 32.

[134] See: Declaration of Gary Hsueh, par. 31, Declaration of Kevin Vassily, par. 29, Declaration of Kevin Cassidy, par. 29, and Declaration of Michael Crawford, par. 27.

[135] B. Riley & Co. LLC. *STEC - Event: STEC: Did Not EMC This Coming; Q3 Beat Takes Backseat to Inventory Concerns at $120MM 2H '09 Customer*, pg. 2. November 4, 2009.

the resulting increase in stock price, has been verified by academic research.[136] In light
of this, any potential impact of this disclosure was conservatively treated as having no
price effect, and was ignored.

    *iv.*    *Return Attributable to Specific Material Disclosures*

The full magnitude of STEC's abnormal return, solely attributable to idiosyncratic
information, was -38.82%. I then concluded that none of the additional disclosures
required backing out, that two of the other disclosures (#3 and #4) overlapped with the
disclosures of interest, and that STEC's disclosure of positive third quarter financial
results (#1) would have had no negative price impact. Thus, the abnormal price decline
of 38.82% is attributable to the two specific disclosures of interest: 1) that EMC might
carry inventory of ZeusIOPs at the end of 2009 which would be used in 2010, and 2) that
STEC's deal with EMC was a "one-off" and thus non-recurring in nature.

    *v.*    *Confirmation of Specific Disclosures' Materiality Using Analyst Expectations*

        *a. Equity Analysts' Commentaries*

To confirm the materiality of the specific disclosures of interest, I reviewed analysts'
commentary on these items. As before, I focused on: 1) the analysts' remarks and
comments prior to the disclosures, to confirm that the market did not have prior
knowledge of STEC's disclosures; 2) the analysts' remarks immediately after the
disclosures, to affirm that the specific disclosures were indeed important and highly
material to the analysts; and 3) changes in the analysts' models of revenue and EPS for
STEC, to quantitatively check that the disclosures did alter their forecasts.

---

[136] See, for example: Bartov, Eli, Givoly, Dan and Hayn, Carla. *The Rewards to Meeting or Beating Earnings
Expectations*, pg. 1 – 3, October 2000.

Regarding the first specific material disclosure, that EMC "might" carry inventory of ZeusIOPs at the end of 2009 which would be used in 2010 (thus signaling a lower level of demand for STEC's SSDs than previously anticipated), the market displayed no advance knowledge of this news. To the contrary, before the November 3rd disclosure, many market participants expected continued or even increased demand for SSDs from EMC. For example, Stifel Nicolaus' analyst remarked that "our checks within EMC have remained positive on STEC's positioning and likely benefits from a stronger SSD adoption from the new high-end Symmetrix V-Max product cycle and a stronger adoption of SSDs in the company's midrange CLARiiON arrays." [137] He also noted that "we view EMC's forthcoming release of the FAST technology…to further open up the market opportunity for SSD adoption going forward."[138] In a similar vein, Capstone Investments' analyst noted in September that "checks suggest STEC momentum continues and no near-term slowdown in customers ordering patterns are likely. EMC…will continue to increase quantity of SSDs used. We don't see any near-term slowdown during Sept./Dec. quarter in STEC customer adoption."[139] And even as late as October 30, Deutsche Bank's analyst noted that "we believe EMC business is moving along smoothly."[140] From such statements, it is clear that the market did not anticipate the announcement of an inventory problem at EMC on November 3, 2009.

The importance of the disclosure of an inventory problem, as well as the market's surprise at this development, is validated by analysts' comments immediately following STEC's November 3rd disclosures. For instance, Capstone's analyst explained, "While

[137] Stifel, Nicolaus & Company, Inc. *STEC, Inc. – Solid Results w/ Conservative Guide; Secondary Could Pressure Shares – Hold*, pg. 4. August 4, 2009.

[138] Stifel, Nicolaus & Company, Inc. *STEC, Inc. – Solid Results w/ Conservative Guide; Secondary Could Pressure Shares – Hold*, pg. 4. August 4, 2009.

[139] Capstone Investments. *STEC, Inc. – STEC: Competitive Concerns Likely Misunderstood – Creates Near-Term Trading Opportunity – Maintain Hold*, pg. 1. September 22, 2009.

[140] Deutsche Bank. *STEC – Earning Preview for F3Q09 Results – Expect In Line Q*, pg. 1. October 30, 2009.

both revenues and pro-forma EPS exceeded prior guidance, and CapStone/Consensus,
inventory concerns regarding largest customer EMC weighed heavily on results."[141]
Similarly, Deutsche Bank remarked that "the big announcement on the call was that
EMC may not be able to sell the entire $120M it has committed to purchasing in F2H09,
creating the potential for lower sales in F1Q10."[142] Simultaneously, Noble Financial
opined that "shares are coming under pressure not because of poor third-quarter results
or poor fourth-quarter guidance. Rather, it is unknown how much STEC inventory
EMC will be carrying at the end of the fourth quarter,"[143] and Pacific Crest noted that
the "mention of he word inventory sends shares reeling."[144] From these remarks, it is
unequivocally clear that the inventory problem at EMC was highly material and
contributed to the precipitous decline in STEC's stock price. Further, as evidenced by
Deutsche Bank's commentary above, this potential inventory overhang likely stemmed
from EMC's inability to sell through the SSDs it had committed to purchase under the
supply agreement during the second half of 2009.

Turning next to the second disclosure of interest – that the EMC deal was a "one-off" –
it is clear from the analysts' reports that they had no prior knowledge that the supply
agreement was definitively non-recurring in nature. Certain analysts conveyed such
information explicitly, plainly stating their expectations for similar long-term volume
commitments in the future at the time STEC announced the $120 million agreement on
July 16, 2009.  Wedbush's analyst stated in August: "We expect the company to likely
announce a substantial supply agreement for 2010E with its leading Enterprise
customer [EMC] and we look for several more supply agreements from its emerging

[141] Capstone Investments. *STEC, Inc. - STEC: Sept Qtr Results Deliver No Magic - Dec Guidance Implies SSD Ramp Hits Near-Term Wall - Reiterate Hold*, pg. 2. November 4, 2009.
[142] Deutsche Bank. *STEC – F3Q09 results: adoption of SSDs gets pushed out*, pg. 1. November 3, 2009.
[143] Noble Financial. *STEC, Inc. – Without Uncertainty there Can be no Inefficiency*, pg. 2. November 4, 2009.
[144] Pacific Crest Securities. *STEC, Inc. - Strong Q3; Q4 Guidance Below Consensus*, pg. 1. November 4, 2009.

customers."[145] Likewise, Oppenheimer's analyst believed that "the contract would likely set a precedent with EMC, and with other OEM customers, that to ramp to meaningful volumes, 'a contract is a must,'"[146] and stated that the "supply agreement for $120M in ZeusIOPS revenue in 2H:09...which indicates...a revenue run-rate of ~$60M/qtr over the next couple quarters for this particular customer, and >$70M/qtr in 2010."[147] Such indicates both an explicit espousal of the belief that the EMC deal was recurring or long-term in nature, as well as an implicit communication of this belief via estimated revenue run-rates in future quarters.

These expectations clearly changed following STEC's November 3rd disclosures – no longer did analysts either explicitly or implicitly communicate a belief that the EMC agreement represented a recurring deal and thus a sustainable level of demand in future periods. As a result, there was a great deal of market uncertainty regarding the future ordering behavior of EMC, as evinced by B. Riley's statements that "the great unknown is Q1'10, and the whole year flows through from there,"[148] and that "until the market has a better feel for the pace of EMC's current demand, expect continued volatility."[149] In other words, the explicit announcement of the EMC's deal one-off nature erased some of the value imparted by the supply agreement and its previous characterizations. As Oppenheimer's analyst explained, the supply agreement had been valuable because it provided "visibility...into STEC's revenues for second half of 2009,

---

[145] Wedbush. STEC *Inc. (STEC) – Initiate Coverage with Outperform Rating and $37 Target*, pg. 7. August 10, 2009.

[146] Declaration of Gary Hsueh, par. 15.

[147] Oppenheimer & Co. Inc. STEC, *Inc. – Pretty on the Inside Too – Reiterate Outperform, $45 PT*, pg. 2 - 3. August 6, 2009.

[148] B. Riley & Co. LLC. STEC - Event: STEC: *Did Not EMC This Coming; Q3 Beat Takes Backseat to Inventory Concerns at $120MM 2H '09 Customer*, pg. 2. November 4, 2009.

[149] B. Riley & Co. LLC. STEC - Event: STEC: *Did Not EMC This Coming; Q3 Beat Takes Backseat to Inventory Concerns at $120MM 2H '09 Customer*, pg. 2. November 4, 2009.

and the apparent reliability of the revenues STEC would derive from that agreement, provided a relatively firmer basis for my estimates."[150] Further, Wedbush's analyst opined that she "considered Mr. Moshayedi's November 3 statement regarding the fact that the $120 million supply agreement was a 'one-off type of deal' to be negative news, separate and apart from the news that EMC 'might' be carrying inventory at the end of the fourth quarter of 2009,"[151] and similar statements were made by analysts at Thomas Weisel Partners, Stifel Nicolaus, Capstone Investments, and Pacific Crest Securities.[152] It is clear from these remarks that revelation of the non-recurring or one-off nature of STEC's agreement with EMC was indeed a unique and material disclosure.

### b. Changes in Equity Analysts' Models

Additional confirmation of the materiality of these two disclosures is provided by changes to the analysts' forecast revenues for STEC, particularly with regards to fiscal year 2010.[153] On July 16, 2009, the day the deal with EMC was first announced, the median analyst estimates for 2010 revenues was $497 million.[154] As of November 2, 2009, the day just prior to the disclosure, this estimate remained virtually unchanged at nearly $491 million.[155, 156] This validates the assertion that market participants did not have prior knowledge of either the inventory overhang at EMC, or the one-time nature of the EMC deal, as the analysts' estimates barely changed during this period. However,

---

[150] Declaration of Gary Hsueh, par. 13.

[151] Declaration of Betsy Van Hees, par. 41.

[152] See: Declaration of Kevin Cassidy, par. 40, Declaration of Aaron Rakers, par. 42, Declaration of Jeffrey Schreiner, par. 38, & Declaration of Kevin Vassily, par. 39.

[153] See Figure 3.

[154] See Figure 3 and Schedule 2a.

[155] See Figure 3 and Schedule 2c.

[156] For pre-disclosure expectations, expectations as of November 2, 2009 were used because this was the date when the last research report prior to STEC's disclosures on November 3, 2009 was issued. For post-disclosure expectations, November 4, 2009 was used, because most analysts issued updated reports on STEC on November 4th (only Deutsche Bank and Oppenheimer issued a post-disclosure report on November 3, 2009, subsequent to STEC's own disclosures after hours on that day).

by November 4th, the median estimate had declined to $420 million.[157] This decline demonstrates that the highlighted disclosures were important to the analysts, precipitating downward revisions in their revenue forecasts and causing the median 2010 revenue estimates to decrease by roughly $71 million.[158]

Moreover, the change of analysts' median estimate of Q1 2010 revenue after the November 3rd disclosures can lead to several observations. If a company's customer (e.g. EMC) has an inventory overhang at the end of one reporting period, then (assuming other customers' revenue remains constant) that company's revenue for the next period will likely decrease – because the customer in question will not purchase additional product until the inventory overhang has been worked off. After the November 3rd disclosures, analysts' median estimate of STEC's Q1 revenue decreased from $105 million to $88.5 million, or $16.5 million, after it was disclosed that EMC "might" have an inventory overhang and that EMC will not enter into another supply agreement with EMC. Therefore, at least part of the median decrease in revenue of $16.5 million was attributable to the analysts' expectations of what the inventory overhang might have been at EMC.

Further, the largest decrease in a Q1 estimate by any analyst was $33.2 million by Northland Securities. As such, the decline in STEC's stock price (all else being equal) did not reflect the belief by the market that the extent of the inventory problem exceeded $33.2 million - the largest change of estimated Q1 revenue by any one analysts covering STEC.

---

[157] See Figure 3 and Schedule 2c.
[158] See Schedule 2c.

*vi.* *Incomplete Inventory Overhang Disclosure*

While disclosure #2 above was sufficient to inform the market about an inventory overhang portending potentially lowered demand in future periods, it provided no details as to the magnitude of the problem. Moshayedi's statements were consistently ambiguous with regards to the extent of the inventory overhang. When asked about the size of EMC's inventory buildup during the quarterly earnings call, he stated:

- "Unfortunately, we don't have exact numbers from our customer."[159]

- "We don't know exactly how many they shipped across each system in Q3. The only indication that we got from them was that, hey, we do have an inventory here and we've got to work through it…. So, that's the total amount of indication of numbers and volumes and things like that that we have at this point…."[160]

- "We really don't have a good estimate of what EMC has done in Q3 and to this date in Q4…."[161]

- "On the number [amount of inventory buildup at EMC], and I have no idea."[162]

As shown in his statements above, Moshayedi specifically disclaimed any knowledge or understanding as to how much inventory of accumulated STEC drives EMC had accumulated in the third quarter or how much EMC was projecting it would accumulate in the fourth quarter. As a result, while the market was able to understand that there "might" be an accumulation of inventory at EMC of STEC's ZeusIOPS drives, market participants did not know the complete extent of the issue.

---

[159] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 4.
[160] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 13.
[161] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 22.
[162] Q3 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 26.

Given Moshayedi's incomplete disclosures about the extent of the inventory overhang on November 3, 2009, the market did not know the full extent of EMC's likely inventory overhang until Moshayedi's disclosure on February 23, 2010.

C. *February 24, 2010*

i.    *Summary of Disclosures*

On February 23, 2010, after the close of the market, STEC announced its results for the fourth quarter of 2009 and for the full year of 2009. On that day, STEC made the following new disclosures:

1.  STEC announced the company's financial results for the fourth quarter and
    full-year ended December 31, 2009.  Revenue for the fourth quarter was
    $106.0 million and non-GAAP diluted EPS was $0.51, while revenue for the
    full-year 2009 was $354.2 million and non-GAAP EPS was $1.61.[163]

This announcement revealed STEC's actual financial performance for both the fourth quarter and the full-year of 2009. For the fourth quarter, the company's performance slightly exceeded analyst's expectations for revenue, and was roughly in-line with expectations for EPS.

2.  "The management and the Board of Directors believe in the long-term value of
    our Company, and have approved the repurchase of up to $80 million of
    Company's common shares on the open market."[164]

---

[163] STEC 2/23/10 Press Release, pg. 1.
[164] STEC 2/23/10 Press Release, pg. 2.

This disclosure informed the market that STEC would be buying back up to $80 worth of its common stock in the market.

3.  "We believe that the first half of 2010 will be a trough period for our business due to an inventory carryover by our largest customer. Although, we believe the marketing programs that we implemented last quarter have had a positive effect on the sell-through of SSDs, based on our best estimates we now anticipate this inventory carryover to continue to negatively impact our sales to this customer during the first half of 2010, as we do not expect any meaningful production orders from this customer during that time."[165]

This disclosure revealed the true extent of the inventory problem at EMC thus correcting disclosure #2 from November 3, 2009. The ambiguous inventory problem described on November 3, 2009 gave way to the revelation that STEC was expecting no production orders from EMC during the entire first half of the year. Indeed, Moshayedi confirmed that EMC would not be purchasing any product from STEC during that time.[166] As a result, STEC's financial performance in both Q1 and Q2 of 2010 would be negatively affected, as EMC's demand for its SSDs was not materializing as previously anticipated. This interpretation is confirmed by several equity analysts in their reports and declarations as shown in section vi. below.

4.  "We currently expect first quarter of 2010 revenue to range from $33 million to $35 million with diluted non-GAAP loss per share to range from $0.11 - $0.13."[167]

---

[165] STEC 2/23/10 Press Release, pg. 1.
[166] Q4 2009 STEC, Inc. Earnings Conference Call, final transcript, Thomson StreetEvents, pg. 9.
[167] STEC 2/23/10 Press Release, pg. 2.

STEC's guidance here indicated how the company expected to perform during the next quarter. As compared to the market's prior expectations, STEC's guidance was far below expectations with regards to both revenues and EPS.

The Commission has asked me to specifically focus on STEC's disclosure of interest that revealed the full extent of the inventory overhang problem at EMC to the market, shown above as item #3.

ii. Event Study Results

My two-factor event study model showed that, on February 24, 2010, the first trading day following STEC's after-hours disclosure of its fourth quarter and full-year 2009 results, STEC's stock price had an abnormal return of -23.33% after separately controlling for both market-wide and industry-specific effects.[168] This means that, after accounting for general market influences on STEC's stock price, as well as any influences common to the data storage solutions industry, STEC's stock price demonstrated a negative return of 23.33% that was "abnormal", or unrelated to these factors. As such, the 23.33% decline can be attributed to company-specific information disclosed on February 23rd. In addition, the fact that this abnormal return was highly statistically significant reveals that the disclosures by STEC on this date, which are associated with the 23.33% price drop, were unequivocally material in nature. For a summary of my regression results, please refer to Schedule 7.

iii. Exclusion of Offsetting & Overlapping Material Disclosures

Next, I analyzed the remaining disclosures to determine if any were material, but either overlapped with the disclosures of interest or would have had an offsetting price

---

[168] See Figure 2.

impact to that exerted by the dominant disclosures. Because STEC's stock price fell on February 24th, any remaining disclosures that were indicative of positive material news could not have contributed to this observed drop. In fact, STEC's disclosures #1 and #2 were favorable to STEC's stock price.  Regarding STEC's financial results for the fourth quarter of 2009, the market's consensus estimates were $102 million of revenues, with pro forma EPS of $0.51;[169] STEC's actual results were $106 million and $0.51, respectively. This demonstrates that STEC exceeded expectations on the top line while simultaneously meeting expectations for EPS. As such, had only this news been released, STEC's stock price likely would have appreciated, as beating analysts' expectations is associated with stock price appreciation.[170] In light of this, any potential impact of this disclosure was conservatively treated as having no price effect and was ignored.

In a similar fashion, STEC's announcement of its plan to repurchase up to $80 million of its common shares was also favorable to STEC's stock price and was conservatively treated as having no negative price impact. Company stock repurchases are positive developments because they cause earnings per share to increase. Specifically, EPS rises due to the decline in the number of shares outstanding – all else being equal, the same earnings are distributed over a smaller number of outstanding shares. In light of this, any potential impact of this disclosure was conservatively treated as having no price effect and was ignored.

---

[169] Needham & Company, LLC. *STEC, Inc. – STEC Reports 4Q09 Inline to Better vs. Street But Guidance Even Worse Than Feared. Revising Estimates Lower Once More. Maintain Hold Pending Resumption of Orders*, pg. 1. February 24, 2010.
[170] Bartov, Eli, Givoly, Dan and Hayn, Carla. *The Rewards to Meeting or Beating Earnings Expectations*, pg. 1 – 3, October 2000.

I then turned my attention to any other disclosures that overlapped with the disclosure of interest, STEC's revelation to the market regarding the full extent of the inventory problem at EMC. The company's disclosure of below-consensus guidance (disclosure #4) for the first quarter of 2010 was overlapping with the disclosure of interest; in fact it was a direct consequence of the inventory overhang. Due to the extent of the inventory overhang at EMC, STEC explained that it was not expecting any production orders from EMC during the first half of the year, a development that would drag down total revenue for the first quarter of 2010. This is corroborated by statements from equity analysts covering STEC. Think Equity's analyst explained that "we attribute the 1Q shortfall to an expected trough period from STEC's SSD business due to an inventory carryover at EMC,"[171] and Thomas Weisel's analyst remarked that STEC's "March quarter outlook came in well below even the most cautious Street estimates...the cautious outlook reflects SSD inventory overhang at its largest customer, EMC, resulting in orders expected to halt through the June quarter."[172] Wedbush's analyst went so far as to write that "ZeusIOPS inventory over-hang at leading OEM crushes Q1 outlook."[173] These statements make it clear that the disappointing guidance for the first quarter of 2010 was a direct consequence of the inventory overhang at EMC, and thus overlaps with the disclosure of interest.

iv.    *Return Attributable to Specific Material Disclosures*

The full magnitude of STEC's abnormal return on February 24, 2010, solely attributable to company specific information, was a decline of 23.33%. After reviewing the four

---

[171] Think Equity LLC. *STEC, Inc. – STEC: Disappointing Guidance with Continued Headwinds*, pg. 1. February 24, 2010.

[172] Thomas Weisel Partners. *STEC, Inc. – Searching for SSD Adoption; Lowering Rating to Market Weight*, pg. 1. February 24, 2010.

[173] Wedbush. *STEC Inc. (STEC) – Significant Q1 Inventory Over-Hang Overshadows Record Q4 Results; Maintain NEUTRAL Rating but Once Again Reducing Our Estimates and Price Target to $10 from $14*, pg. 1. February 24, 2010.

aforementioned disclosures made by STEC, I concluded that none of them had to be backed out from the abnormal return, that two of the other disclosures (#1 and #2) were positive disclosures that could not have contributed to the stock price decrease, and that STEC's underwhelming first quarter guidance (#4) overlapped with its disclosure regarding the full extent of EMC's inventory overhang. As a result, the abnormal return of -23.33% can be attributed to the specific disclosure of interest – that EMC's inventory overhang of ZeusIOPs was so problematic, EMC would not be ordering any of STEC's SSDs in the first half of 2010, thus hurting STEC's financial performance over the same period. This served as a corrective disclosure to Moshayedi's incomplete disclosure about the inventory overhang made on November 3, 2009.

     *v.*    *Confirmation of Specific Disclosures' Materiality Using Analyst Expectations*
          *a.  Equity Analysts' Commentaries*

As before, to confirm the materiality of the specific disclosure of interest, I reviewed analysts' reports and declarations for commentary on EMC's ZeusIOPs inventory problem. In particular, I focused on: 1) the analysts' remarks and comments prior to the disclosures, to confirm that the market did not have prior knowledge of STEC's releases; 2) the analysts' remarks immediately following the disclosures, to affirm that the specific disclosures were indeed important and highly material to the analysts; and 3) changes in the analysts' models of revenues and EPS for STEC, to quantitatively check that the disclosures did alter their forecasts.

A review of analyst's comments prior to the disclosure date shows that the market did not anticipate the full extent of the inventory problem. For example, in response to STEC's and Moshayedi's disclosure on November 3, 2009 that EMC might be carrying

inventory at the end of the fourth quarter, Oppenheimer's analyst explained that he reduced his estimate of STEC's 2010 revenue by only $7 million,[174] while Thomas Weisel's analyst kept his estimate for 2010 overall revenue unchanged.[175] In early 2010, Needham & Co.'s analyst explained that "to incorporate our conservative stance that EMC may not reorder during 1Q...we are lowering our March quarter forecast to $46.5M...for the balance of 2010, we assume a more modest recovery in EMC business to $35M in 2Q..."[176] This statement demonstrates that, at worst, Needham's analyst thought EMC would buy nothing in the first quarter and then $35 million in the second quarter, rather than nothing at all during the entire first half of 2010. Similarly, Stifel Nicolaus' analyst noted that as of February 18, 2010, "in the absence of any hard data from STEC, we estimated the inventory overhang to be as much as $50 to $60 million, which was based on an estimated sell-thru of approximately $40 million"[177] in the fourth quarter. Even as late as February 22, equity analysts did not display foreknowledge of the extent of EMC's inventory issues. Northland Securities' analyst noted that "our conservative case scenario calculates that EMC would purchase ~$10M of SSDs from STEC in 1Q10, far lower than our previous $40M assumption,"[178] and that he was "lowering our assumption for EMC sell-in for 1H10 to $40M ($10M in 1Q10 and $30M in 2Q10) ...to reflect inventory risk."[179] Such statements illustrate that at the time, he did not believe that EMC would make zero ZeusIOPs purchases in the first two quarters. In much the same way, Pacific Crest's analyst explained that due to the

[174] Declaration of Gary Hsueh, par. 33.
[175] Declaration of Kevin Cassidy, par. 32.
[176] Needham & Company, LLC. *STEC, Inc. – We Are Downgrading STEC to Hold From Strong Buy as 1Q Order Air Pocket Clouds 2010 Ramp*, pg. 2. February 16, 2010.
[177] Declaration of Aaron Rakers, par. 35.
[178] Northland Securities. *STEC: EMC SSD Inventory Poses Risk to 1H10 Zeus IOPS Sell-In; Lowering Estimates, Target to $18*, pg. 2. February 22, 2010.
[179] Northland Securities. *STEC: EMC SSD Inventory Poses Risk to 1H10 Zeus IOPS Sell-In; Lowering Estimates, Target to $18*, pg. 2. February 22, 2010.

inventory overhang, he had reduced STEC's Q1 revenue estimate by only $15 million, and that despite all the negative chatter, "Our field findings throughout the quarter had a positive slant on at least two fronts. First, there seems to have been a positive reaction to the sales incentive program (which should not be a surprise). Second, EMC's introduction of its FAST software…has also eased the sales process."[180] Additionally, Deutsche Bank's analyst noted that "we agree that it has been difficult to glean what the inventory situation is at EMC and that this does create some risk to F1Q-10 guidance. However, we see EMC's bullish tone as indicative of longer term positive trends for STEC."[181] In totality, such remarks emphatically show that while the market was aware of an inventory issue at EMC, it did not grasp the true magnitude of the situation.

Following STEC's disclosures on February 23, however, the market expectations changed dramatically. Deutsche Bank's analyst remarked, "STEC delivered an in-line F4Q-09, but guidance for F1Q-10 was worse than even our worst-case expectations, as mgmt sees no sales to EMC in F1H-10 due to the inventory overhang,"[182] while J.P. Morgan's analyst stated, "We had been too optimistic, thinking the EMC inventory overhang would be a one-quarter issue. The size of the 1Q10 miss is bigger than expected, and the disappearance of sustainable revenue momentum up-ended our prior view that STEC was the high-growth story in SMid Cap."[183] In a related fashion, Oppenheimer's analyst opined that "when EMC disclosed last month that it intentionally built ~$100M of component inventory exiting '09, we knew the overhang

---

[180] Pacific Crest Securities. *STEC, Inc. – Q4 Call Should Not Lack Drama*, pg. 2. February 22, 2010.
[181] Deutsche Bank. *STEC – F4Q-09 Preview and Thoughts on F1Q-10*, pg. 1. February 22, 2010.
[182] Deutsche Bank. *STEC – F4Q-09 Results: F1Q-10 Worse than Worst-case Scenario*, pg. 1. February 23, 2010.
[183] J.P. Morgan. *STEC – Downgrading to Neutral; Major Downdraft in Outlook Derails High-Growth Story*, pg. 2. February 24, 2010.

for STEC at EMC was non-trivial in 1Q, we just had no idea it would be this bad."[184] Similarly, analysts at Pacific Crest, Stifel Nicolaus, Capstone Investments, B. Riley, and Wedbush explained that it was only on February 23, 2010, when STEC revealed that it was not expecting any orders from EMC in the first half of 2010, that they fully understood the extent of the inventory issue at EMC and its consequences to STEC.[185] Undoubtedly, the true size of EMC's SSD inventory problem shocked the market.

This surprise resulted in a significant change in the analyst's commentary as compared to before STEC's earnings release, demonstrating the materiality of this information. As the analyst at Oppenheimer explained, "Now that EMC's supply contract with STEC for $120M is indicative of a full-year run rate vs. half year, we are resetting our '10E EPS to $0.15, and dropping our PT to $10 from $21,"[186] and added, "In light of EMC's 'transition' from a 62% customer in 4Q to 0% in 1Q, we find ourselves resetting our model for STEC."[187] Other analysts expressed similar sentiments. Deutsche Bank's analyst stated that "STEC indicated on its call that it believes EMC will likely take the first half to sell through its inventory, meaning our F1H-10 numbers trend down significantly,"[188] while B. Riley's analyst noted, "Given the drastic difference between actual and expected end-customer demand, we have to wonder why STEC didn't work with EMC and spread shipments over a longer time period – minimizing the disruption

---

[184] Oppenheimer & Co. *STEC Inc. – Hitting Rock Bottom at EMC – Resetting Estimates; PT to $10*, pg. 1. February 24, 2010.

[185] See: Declaration of Kevin Vassily, par. 33, Declaration of Aaron Rakers, par. 36, Declaration of Jeffrey Schreiner, par. 33, Declaration of Michael Crawford, par. 30, & Declaration of Betsy Van Hees, par. 35.

[186] Oppenheimer & Co. *STEC Inc. – Hitting Rock Bottom at EMC – Resetting Estimates; PT to $10*, pg. 1. February 24, 2010.

[187] Oppenheimer & Co. *STEC Inc. – Hitting Rock Bottom at EMC – Resetting Estimates; PT to $10*, pg. 2. February 24, 2010.

[188] Deutsche Bank. *STEC – F4Q-09 Results: F1Q-10 Worse than Worst-case Scenario*, pg. 1. February 23, 2010.

all the way around."[189] What's more, Pacific Crest's analyst remarked that the "prospect of a two-quarter pause in orders from EMC, whose purchase order (whatever the motivation) of $120 million in Q2 of last year has proved to be wildly optimistic relative to customer uptake, prompts us to lower our rating on STEC,"[190] and went as far as to remark that "there is no getting around the appearance (warranted or not) that management sold equity based on a purchase rate from EMC that did not reflect its near-term ability to attach flash memory to its systems."[191] Such commentary incontrovertibly shows that the extent of inventory problems at EMC was indeed a material disclosure by STEC.

### b.  Changes in Equity Analysts' Models

Additional confirmation of this release's materiality is provided by the changes in the analysts' forecast revenue. Following STEC's incomplete disclosure of a potential inventory problem at EMC on November 3, 2009, the analysts showed a median estimate of $420 million in revenues for the full year 2010. [192] By February 22, 2010, only one day prior to STEC disclosing the full extent of the problem to the market, this estimate stood at $415 million – a decrease of only 1%.[193, 194] Following STEC's announcements on February 23rd however, this measure of revenue plunged to $209

---

[189] B. Riley and Co., LLC. *STEC – Event: Can You Drive a STEC; Looking to Regain Forward Momentum After Stalls in 1H'10*, pg. 2. February 24, 2010.

[190] Pacific Crest Securities. *STEC, Inc. – Downgrading to Sector Perform; Nothing to Do for a While*, pg. 2. February 24, 2010.

[191] Pacific Crest Securities. *STEC, Inc. – Downgrading to Sector Perform; Nothing to Do for a While*, pg. 2. February 24, 2010.

[192] See Figure 3 and Schedule 2c.

[193] See Figure 3 and Schedule 2d.

[194] For pre-disclosure expectations, expectations as of February 22, 2010 have been used because this was the date when the last research report prior to STEC's disclosures on February 23, 2010 was issued. For post-disclosure expectations, February 24, 2010 was used, because most analysts issued updated reports on STEC on February 24th (only Deutsche Bank issued a post-disclosure report on February 23, 2010, subsequent to STEC's own disclosures after hours).

million by February 24th – a decline of nearly 50%.[195] Such stability in the estimates between November 2009 and February 22, 2010, and their subsequent tumble as a result of the February 23, 2010 disclosure of interest, demonstrates that the market did not have advance knowledge of the extent of EMC's inventory overhang, and that such information was highly material.

---

[195] See Figure 3 and Schedule 2d.

\*\*\*\*\*

My report, with supporting schedules and exhibits, is contained herein, and presents my opinion and the bases and reasons thereof. The schedules and exhibits are an integral part of this report and support the opinions contained herein. To the extent any additional information is produced by either party, I reserve the right to incorporate such additional information into my report. This report was prepared solely in connection with SEC v. Moshayedi and should not be used for any other purpose without prior written authorization.

Respectfully submitted,

KPMG LLP

Dr. Richard J. Bergin