# EXHIBIT 7

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    SECURITIES AND EXCHANGE       )
     COMMISSION,                   )
5                                  )
                     Plaintiff,    )
6                                  )
               v.                  )  No. 12-CV-01179(JVS)(MLG)
7                                  )
     MANOUCHEHR MOSHAYEDI,         )
8                                  )
                     Defendant.    )
9    _____)

10

11

12

13

14              VIDEOTAPED DEPOSITION OF

15              FRANK ALLEN FERRELL, III

16               Los Angeles, California

17               Tuesday, July 30, 2013

18

19

20

21

22

23

     Reported by:
24   BRIDGET R. MONTERO
     CSR No. 10020, CRR, RMR
25   Job No. 130730BMO

                                                        1

1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                     )
5                                    )
                    Plaintiff,       )
6                                    )
             v.                      ) No. 12-CV-01179(JVS)(MLG)
7                                    )
     MANOUCHEHR MOSHAYEDI,           )
8                                    )
                    Defendant.       )
9    _____)

10

11

12              Videotaped deposition of FRANK ALLEN

13         FERRELL, III, taken on behalf of Plaintiff,

14         commencing at 9:12 a.m., Tuesday, July 30,

15         2013, at 5670 Wilshire Boulevard,

16         Los Angeles, California 90036, before

17         BRIDGET R. MONTERO, CSR No. 10020.

18

19

20

21

22

23

24

25

                                                              2

```
 1   APPEARANCES:

 2

 3   For Plaintiff:

 4        SECURITIES AND EXCHANGE COMMISSION
          BY:  JOHN W. BERRY, ESQ.
 5        BY:  GARY Y. LEUNG, ESQ.
          5670 Wilshire Boulevard
 6        11th Floor
          Los Angeles, California 90036
 7        (323) 965-3890
          (323) 965-3213
 8        berryj@sec.gov
          leungg@sec.gov
 9

10
     For Defendant MANOUCHEHR MOSHAYEDI
11

12        LATHAM & WATKINS LLP
          BY:  PATRICK E. GIBBS, ESQ.
13        140 Scott Drive
          Menlo Park, California 94025
14        (650) 328-4600
          patrick.gibbs@lw.com
15

16   For Defendant MANOUCHEHR MOSHAYEDI:

17

18        PAUL HASTINGS LLP
          BY:  D. SCOTT CARLTON, ESQ.
          515 South Flower Street
19        25th Floor
          Los Angeles, California 90071
20        (213) 683-6113
          scottcarlton@paulhastings.com
21

22
     Also Present:
23
          FRANK KAP - VIDEOGRAPHER
24

25
```

3

1            And so I assessed, as an economic matter, the

2    riskiness of the SIV paper and whether the SIV paper was

3    liquid, because that affected various aspects of the

4    case, and I also calculated damages, assuming liability.

5        Q.   Okay.  Have you ever offered expert testimony

6    on behalf of a plaintiff in a securities fraud case?

7        A.   I mean, I would have -- the answer would be I

8    would have to go back to Pacific Select, and I don't

9    remember whether it was just negligence or fraud.  I

10   would have to take a look.

11       Q.   Okay.  But just to be clear, Pacific Select,

12   that you listed in Appendix A of your report, is the

13   only case where you offered testimony on behalf of a

14   plaintiff, as best you can remember?

15       A.   As best I can remember.

16            Let me take a quick look here.  I believe

17   that's correct.

18       Q.   Okay.  Has your expert testimony ever been

19   stricken by a court?

20       A.   No.

21       Q.   Has the court ever -- has a court ever

22   disagreed with any aspect of the expert testimony you've

23   given?

24       A.   No.

25       Q.   And just to be clear, when I say "stricken," I

17

1    mean for any reason.

2         A.   No.

3         Q.   Okay.  Now, do you consider yourself to have

4    an expertise in any -- or specialized knowledge in any

5    certain subject matter?

6         A.   Yes.

7         Q.   Which subject matter or subject matters?

8         A.   So my area of expertise would be corporate

9    finance, empirical corporate finance, and that would

10   include econometric analysis of financial data.

11        Q.   So just to make sure I understand, when you

12   say "empirical corporate finance," what do you mean?

13        A.   There's a body of knowledge that falls under

14   corporate finance.  It involves the financing of firms.

15   It involves the operation of the capital markets.

16   Involves capital structure of firms.  And, as I said,

17   that would also include the econometric analysis of

18   financial data.

19            So that's what my Ph.D. was on.  That's what

20   I've written about as an academic and teacher.

21        Q.   Okay.  Would you consider yourself an expert

22   or to have specialized knowledge in the solid state

23   drive enterprise market?

24        A.   I would not say -- no, I would not -- the way

25   I would frame my expertise is the way I just gave it to

                                                          18

1   you, so I would not say that I'm an expert on the solid

2   state drive industry.

3        Q.   By the way, we're going to use that phrase a

4   lot.  Is it okay if I call it "SSD" instead of "solid

5   state drive"?

6        A.   Please.

7        Q.   Would you consider yourself an expert or have

8   specialized knowledge in customer or supplier/vendor

9   relationships in the SSD enterprise market?

10        A.   No.

11        Q.   Would you consider yourself an expert in solid

12   state drives, generally?

13        A.   No.

14        Q.   How about multilevel solid state drives or

15   single level solid state drives?

16        A.   No.

17        Q.   Would you consider yourself an expert in the

18   area of the competition in the SSD market?

19        A.   Again, I would not consider myself an expert

20   in all these various aspects of the SSD market.  I would

21   frame it the way we were just discussing earlier.

22        Q.   Okay.  So I take it you wouldn't consider

23   yourself an expert in the competitive advantages or

24   disadvantages of a type of an SSD.

25        A.   No.

19

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

1      Q.    And I take it you wouldn't take -- consider

2   yourself an expert in the adoption of SSDs by consumers

3   in the SSD market.

4      A.    I would not frame my expertise in that way.

5      Q.    And I take it you wouldn't consider yourself

6   an expert in the forecasting of sales in the SSD market.

7      A.    That would be a strange expertise to have, but

8   no, I would not frame my expertise that way.

9      Q.    Okay.  When were you -- let me step back.

10         Who are you engaged by with respect to the

11   report that we've marked as 455?

12      A.    I was engaged by counsel for -- and I'm --

13   I'm -- forgive me in advance for mispronouncing this --

14   Moshayedi.

15      Q.    Mr. Moshayedi?

16      A.    Yes.

17      Q.    Okay.  Are you engaged by STEC, Inc.?

18      A.    I don't believe so, but I would have to

19   double-check.

20      Q.    Okay.  And when were you engaged in connection

21   with the report that we've marked -- the rebuttal report

22   that we marked as Exhibit 455?

23      A.    At some point in the spring; spring of this

24   year.  I don't have the -- I don't remember the exact

25   date.

20

1      Q.   Can you tell me which month?  April?  May?

2      A.   I'm not sure.  It could be February, March,

3  April; somewhere in there.  I would have to go back and

4  look.  I don't -- I don't have a clear recollection.

5      Q.   Okay.  What would you have to go back and look

6  at, the engagement letter?

7      A.   I would look at the engagement letter, see if

8  I did any billing on the matter.

9      Q.   Okay.  When did you start working on the

10  matter?

11      A.   So I did some work, some preliminary work,

12  prior to the filing of Dr. Bergin's report, but not a

13  lot.  So I did some preliminary work prior to that.

14  Most of the work was subsequent to that.

15      Q.   And when you say "preliminary work," what do

16  you mean by that?

17      A.   I looked at the complaint to refamiliarize

18  myself with that.  I believe I looked at some analysts'

19  reports, just to become familiar with the factual

20  context.

21          I'm trying to think if there's anything else.

22  I think those are the primary things.

23      Q.   Well, did you formulate, in your mind, any

24  theories about what the avoided losses should be in this

25  case?

                                                        21

1        A.    Sure.

2        Q.    -- purposes of the rebuttal report in this

3   case?

4        A.    Sure.

5             So I believe -- and, again, my memory is that

6   when I went through the -- did the initial rebuttal

7   report from last year, I reviewed a lot of the

8   depositions.  So let me give you an example here.

9             So on item 106 of my first rebuttal report, I

10  list the deposition of Mr. Moshayedi, April 4th.  That's

11  listed in 19 here.  April 5th is there, as well.  That's

12  item 107.  So at least for those depositions, I had

13  talked about it earlier.  I don't know if there's

14  others, as well.

15            The -- the -- the other answer is -- putting

16  aside those two depositions, is I wanted to see

17  depositions of the analysts, because that played a

18  critical role in my analysis.

19       Q.    Well, how -- I'll represent to you that you

20  don't list in this Appendix B the deposition of

21  Mr. Moshayedi, the defendant, that was taken in this

22  case.

23            Is there a reason why you did not review his

24  deposition in connection with your rebuttal report?

25       A.    That's not a specific reason.  I reviewed the

37

1    April 2012, and I thought that gave me the context that

2    I needed.  I am not a fact witness, obviously, so this

3    is really by way of context.

4        Q.   What do you mean by you're not a fact witness?

5        A.   Well, my understanding is that it's

6    inappropriate for an expert to opine on purely factual

7    issues, such as subjective intentions.  What I'm trying

8    to do is provide objective market evidence as to what

9    the total mix information was over time.  And so to

10   that -- that's what I mean by "fact witness."

11       Q.   Okay.  Did you review -- well, step back.

12            Have you reviewed, either in connection with

13   this report or your prior report, all of the

14   correspondence that has been produced to date, either in

15   this case or the shareholder case, regarding -- strike

16   that.  Let me -- that was a mouthful.

17            Have you reviewed in connection with this

18   report that you've issued in this case or the report you

19   issued in the shareholder case all of the correspondence

20   between EMC and STEC that have been produced to date

21   either -- in either one of the two cases, the SEC

22   enforcement case or the parallel shareholder case,

23   regarding the $120 million supply agreement that was

24   executed in 2009?

25       A.   Well, all the documents I relied upon are

                                                        38

1 listed there.  So if there are other documents, the

2 answer is I have not reviewed the entire record.

3     Q.   And have you -- you used that phrase, "the

4 entire record."

5          So have you reviewed the entire record of

6 correspondence between STEC and EMC regarding the

7 negotiation of that agreement?

8     A.   Again, all the documents I relied upon are

9 listed, so if there's other documents in the record that

10 are not on the list, I have not reviewed it.

11     Q.   But did you make an effort to try and review

12 all the correspondence that's in the record in either

13 case regarding the supply agreement or its negotiation?

14     A.   No.  What I needed was the necessary context

15 to do the analysis that I thought was appropriate for my

16 role.

17          So I do not review the entire record in

18 litigation.  That would not be cost effective or

19 reasonable.

20     Q.   Okay.  Did you review -- did you make an

21 effort to review the entire record regarding the topic

22 of competition that STEC faced in 2009?

23     A.   I did review the analyst reports, and I did my

24 best to review all the analysts' reports speaking to

25 that issue.  So to that extent, the answer is yes.  I'm

39

1    not sure if you're referring to something else.

2        Q.   Well, besides analyst reports, did you

3    endeavor to review the record in either the shareholder

4    case or the current enforcement case regarding

5    competition that STEC faced in 2009?

6        A.   Well, again, I looked at the analyst reports.

7    I looked at some press releases.  So I did what I

8    thought was necessary to understand the total mix of

9    information.

10            If you're saying -- if you're representing

11   that there's other documents that speak to that issue

12   that are not listed in my documents relied upon list,

13   then I have not reviewed it, and, again, assuming it's

14   not in Dr. Bergin either, because I reviewed that

15   report, as well.

16       Q.   Okay.  So it's fair to say that if it's not

17   analyst reports or public disclosures or something

18   listed in your Appendix B, you didn't review that

19   record, to the extent there is one, regarding

20   competition that STEC faced in 2009?

21       A.   I think we can agree that my Appendix B is my

22   documents relied upon list, and if it's not listed

23   there, then it's not a document I'm relying upon.

24       Q.   Well, did you -- just to finalize this, and to

25   use Patrick's phrase, beat a dead horse here -- so just

40

1    to what he was saying about confounding information on

2    November is to go back and look at what analysts'

3    expectations were in August.

4           And to be more specific, what analysts'

5    expectations were in August as to non-EMC ZeusIOP -- am

6    I abbreviating that correctly -- sales.

7    Q.   Okay.  So the purpose that -- the extra piece

8    of information, if you will, that's not in your rebuttal

9    report of your reaction to Dr. Bergin's testimony on

10   November 3rd concerned non-EMC ZeusIOPs revenue?

11   A.   To be clear, expectations by analysts as of

12   August of non-EMC ZeusIOP sales going forward.  And if

13   you look at the -- just to get to the punch line, if you

14   look at the full year that -- the expectation of

15   analysts for the remainder of the year, as of August,

16   they were expecting -- you know, the median roughly

17   around $35 million in sales for non-EMC ZeusIOPS going

18   forward.

19          And so I think that was a helpful additional

20   piece of information that I garnered in thinking about

21   what he said in his deposition.

22   Q.   And so you performed an analysis to determine

23   what the median was?

24   A.   Yes.  I went back to the August analysts'

25   reports and looked at -- backed out what their non-EMC

54

1   forecast was.  So it's a very mechanical, simple

2   calculation, but I did take a look at that.

3          MR. BERRY:  Okay.  So, I guess, Patrick, just

4   to the extent -- if he's called to testify, we ask for

5   the production of the spreadsheet or whatever his

6   analysis was.

7          (REQUESTED-INFORMATION)

8          MR. GIBBS:  Okay.  I think it's pretty simple

9   arithmetic.  But if there's a document to be produced,

10   we'll certainly produce it.

11   BY MR. BERRY:

12      Q.   And we'll come back to this issue, but I want

13   to go back to Dr. Bergin's report.  The -- as you said,

14   you've reviewed Dr. Bergin's initial report in this

15   case, right?

16      A.   Yes.

17      Q.   Okay.  And it's fair to say he did an event

18   study on three days -- July 16th, November 3rd, and

19   February 23rd of 2010 -- correct?

20      A.   Among other things, yes.

21      Q.   When you say "among other things," what do you

22   mean?

23      A.   Well, Dr. Bergin is opining on materiality,

24   and he's very clear about that.  So he's providing a

25   materiality opinion based, in part, on the event study,

55

1    but also based on his analysis of the total mix of

2    information and how it was impacted by various

3    disclosures.

4            I think we're in agreement that an event study

5    by itself cannot tell you what the market is reacting to

6    if you, in fact, find a firm specific abnormal return.

7    And so he does an event study coupled with his total mix

8    of information analysis that forms the predicate for his

9    materiality opinion.

10       Q.   Well focusing on the event study analysis that

11   he did, putting aside your agreement or disagreement

12   with his ultimate conclusions, did you have any critique

13   or feel there were any shortcomings in the methodology

14   or approach that he employed in doing the event studies

15   for those three days?

16       A.   In terms of the mechanical, putting aside the

17   total mix of information, just the event study by

18   itself, I'm not opining on that.

19       Q.   Okay.  And you yourself have not done an event

20   study for any one of those three days, correct?

21       A.   That's correct.

22       Q.   You haven't done an event study for any day of

23   any price movement of STEC stock for this case, correct?

24       A.   That's right.  I carefully reviewed both of

25   the event studies that are presented in this litigation,

56

1    and as I point out in my report, that either event study

2    would -- whether you adopt one event study or the other,

3    it doesn't change my opinions in a qualitative way.

4         Q.   Okay.  Let's talk generally about event

5    studies before we get into your opinion.

6              MR. BERRY:  I'm going to mark as Exhibit 456

7    an article --

8              MR. LEUNG:  7.

9              MR. BERRY:  -- 457 an article entitled

10   "Forward-casting 10b-5 Damages:  A Comparison to other

11   Methods."  That is authored by you and a man name Atanu

12   Saha.

13        A.   Atanu.

14        Q.   Atanu?

15        A.   Atanu Saha.

16             (Exhibit 457 marked for identification.)

17             MR. BERRY:  I'm also going to mark as

18   Exhibit 458 an article entitled "The Loss Causation

19   Requirement for Rule 10b-5 Causes-of-Action," Authored

20   by yourself and Mr. Saha.

21             (Exhibit 458 marked for identification.)

22             MR. BERRY:  Finally, I'm going to mark as

23   Exhibit 459 an article written by the same authors,

24   yourself and Mr. Saha, entitled "Event Study Analysis."

25             (Exhibit 459 marked for identification.)

                                                              57

1   particular date or dates is statistically significant.

2   So that would involve an estimation of a market model

3   that would then be used to assess statistical

4   significance.

5          So the regression analysis, which constitutes

6   the event study, would generate a standard error for the

7   regression that you would then use to calculate a T

8   statistic, which we would then use to assess statistical

9   significance on particular dates of interest to the

10  researcher.

11      Q.    So if a company's stock price falls after that

12  company makes a disclosure, can one just assume that

13  that stock price drop is attributable to what the

14  company disclosed?

15      A.    No.

16      Q.    Why not?

17      A.    There's random variation in stock prices.

18  That's what the standard error is going to help -- it's

19  going to help quantify.

20      Q.    And that's, basically, what event studies are

21  designed to do?

22      A.    Sure, in part, yes.

23      Q.    Well, part of what they're designed to do is

24  determine whether the price drop can actually be

25  attributed to what was disclosed on that particular day?

60

1      A.    No.   I want to be careful here.

2      Q.    Please.

3      A.    So the event study by itself is going to tell

4    you, based on your estimation of your market model,

5    whether there's an excess return on that date that

6    statistically significant.

7           The event study, I think, is getting to your

8    question, is not going to tell you by itself what is

9    causing the excess return or an excess return that's

10   statistically significant.

11     Q.    But what -- what analysis or methodology do

12   you think should be employed to figure out what

13   disclosure is attributable to an excess return?

14     A.    You have to look at the total mix of

15   information prior to the disclosure in question, look at

16   the disclosure in question and how that might have

17   changed the total mix of information that preexisted the

18   disclosure at issue, and often a standard thing to do is

19   look at what analysts were saying or other market actors

20   were saying in response to that disclosure to try to

21   ascertain whether any statistically significance excess

22   return can be reliably attributed to the disclosure in

23   question.

24     Q.    Right.   So -- but if one is going to try and

25   figure out if a company's disclosure is attributable in

                                                          61

1    any way to stock price movement, is it fair to say the

2    first best step is to do an event study?

3         A.    I don't want to generalize too much, but

4    certainly, that's a very standard thing to do, which is,

5    if you think about stock price impact and thinking about

6    materiality not as -- in the pure legal sense, the TSC

7    industry sense, but rather than an economic matter, you

8    know, stock price impact for a publicly traded stock is

9    certainly a very common analysis.

10        Q.    Okay.  And it's -- and in your experience,

11   it's a fairly well-established methodology to use in

12   securities fraud cases as part of that first step in

13   determining what stock price movement is attributable to

14   certain disclosures?

15            MR. GIBBS:  Objection to form.

16            THE WITNESS:  Yes, so I -- I agree with that.

17   BY MR. BERRY:

18        Q.    Okay.  And then the next step to try to figure

19   out if those disclosures are actually attributable to

20   the price movement you're analyzing is to do the

21   analysis you described earlier about the total mix of

22   information; is that right?

23        A.    Yes.

24        Q.    Now, did you undertake what I just described

25   as that two-step process in this case?

62

1     A.    No.   As I said, I relied -- as I said, there

2  are two event studies at issue or presented in this

3  litigation.   Either event study would support my -- my

4  analysis so it was not necessary for me to do my own

5  event study.

6     Q.    So you didn't do what we just discussed as the

7  first step in this process.   Did you do the second step?

8     A.    Well, I want to be clear on the record.   That

9  first step was already done by both experts in this

10 case.   And regardless of which event study you used, the

11 results were the same, so it was not necessary for a

12 third expert to do a third event study.

13    Q.    Okay.   Did you do the second step you just

14 described?

15    A.    Yes.

16    Q.    And you did that second step for which

17 disclosure days?

18    A.    I did it for all the disclosure days in

19 question.   So Dr. Bergin identifies July 16th, November

20 3rd, and February 24 as his three disclosure days of

21 interest, and I analyzed the total mix of information on

22 those dates.

23    Q.    And you did that as part of your process in

24 connection with issuing your rebuttal report in this

25 case?

63

1    calculated avoided losses based on the difference

2    between the stock price on August 3rd and the stock

3    price on February 24th, 2010, which is approximately

4    $19; is that right?

5         A.   That's my understanding.

6         Q.   Okay.  And, well -- and it's your opinion that

7    this is the wrong way to calculate avoided losses in

8    this case?

9         A.   No, that's incorrect.  I'm not providing an

10   opinion on disgorgement.

11        Q.   Are you providing an opinion on avoided

12   losses?

13        A.   No.

14        Q.   You don't have any criticism the way the SEC

15   is proposing to calculate avoided losses in this case?

16        A.   The only criticism I -- my criticisms are

17   levied against Dr. Bergin.  Now, some of those

18   criticisms might be applicable to hypothetical

19   disgorgement calculations, but I'm not offering an

20   opinion on this particular disgorgement calculation.

21   I'm only talking about it in connection with exploring

22   Dr. Bergin's opinions.

23        Q.   Well, Dr. Bergin didn't calculate avoided

24   losses, did he?

25        A.   That's what I say in the title, "Dr. Bergin's

103

```
 1   Report Does Not Calculate Avoided Losses."
 2        Q.   And Dr. Bergin didn't calculate disgorgement,
 3   correct?
 4        A.   That's right.
 5        Q.   Okay.  So is your critique that he just didn't
 6   do it?
 7        A.   No.
 8        Q.   What is your critique of him with regard to
 9   avoided losses, since he didn't do it?
10        A.   Right.  So there's two points here.  One is,
11   I'm making the observation with respect to his analysis
12   that's inconsistent with this disgorgement calculation.
13        So I'm not -- I'm not providing an opinion on
14   the disgorgement analysis, but I am noting that it's
15   inconsistent with the disgorgement -- there's an
16   inconsistency there between what he's doing and this
17   disgorgement analysis.
18        The other -- the other point is that the
19   disgorgement calculation does reference the same dates
20   as Dr. Bergin, November 3rd and February 24th, and so I
21   do have criticisms of using stock price reactions on
22   those dates in Dr. Bergin's report, and so in that
23   sense, there's overlap.
24        But, again, I do want to emphasize my
25   criticisms are levied against Dr. Bergin and --
```

104

1       Q.    Okay.  Let me go into each one of those.

2            You said one aspect is that you believe

3    Dr. Bergin's analysis is inconsistent with the SEC's

4    avoided loss calculation; is that right?

5       A.    Yes.  And I say that in the first sentence of

6    paragraph 17.

7       Q.    Okay.

8       A.    Or the first sentence of paragraph 17.

9       Q.    And you're saying the other aspect is that --

10   I think you're going to have to explain the other part.

11   You talked about stock prices --

12      A.    Right.

13      Q.    -- stock prices that are used by the SEC in

14   response to interrogatory 20 and the fact that

15   Dr. Bergin refers to those same stock prices.

16      A.    Well, it's more than that.  All I'm saying is,

17   as a factual matter -- this is not -- I'm not offering

18   an opinion here.  It's just a fact that the disgorgement

19   calculations, as I emphasize in the bold here, when I

20   cite to the disgorgement, references November 3rd and

21   February 24th.  I put it in bold February 24th.  So I'm

22   just observing that the disgorgement calculation is

23   using the same dates as Dr. Bergin.  And so this is just

24   a vehicle to critique Dr. Bergin's use of those dates

25   and the price reactions thereof.

                                                        105

1    the -- on the plaintiff's side, is Dr. Bergin's

2    analysis.  And the only disclosure date in that analysis

3    that's positive, that positively affects the stock

4    price, is the 3.58.  So that's the basis for focusing on

5    3.58.

6            It's the only number presented in this

7    litigation by an expert that looks at the price impact

8    of an alleged -- a price impact of a disclosure, I

9    should say.

10           Now, if we were to stipulate that 3.58 has

11   nothing to do with any disclosure deficiency that has

12   nothing to do with the allegations in this case, then I

13   would still stand by this, because I say it's the

14   maximum amount.  I assume in that situation it would be

15   zero, but it's certainly a maximum.

16       Q.   Well, to say that he was enriched by a

17   disclosure deficiency --

18       A.   Am I talking it too quickly?

19           THE REPORTER:  Yes.

20           THE WITNESS:  Sorry.  I heard the sigh.

21   BY MR. BERRY:

22       Q.   To say that Mr. Moshayedi was, as you say,

23   enriched by an alleged disclosure deficiency measured by

24   July 16th, are you assuming that he traded on material,

25   nonpublic information, or made misreps or omissions on

117

1   July 16th, or did something else wrong on July 16th in

2   order to be enriched?

3        A.    I'm not making any of those assumptions.

4        Q.    What assumptions are you making?

5        A.    I'm simply saying a couple things.  Number

6   one, it's just a fact that Mr. Bergin -- Dr. Bergin

7   estimates 3.58 on July 16th.  So I think we can all

8   agree to that.  It's also a fact that the only positive

9   number presented, that I've seen in this litigation by

10  Dr. Bergin, in terms of the price impact of the

11  disclosure that's positive, is 3.58.

12            So if you want to look at the inflationary

13  impact, the maximum amount by which the share parts

14  could have been impacted by a disclosure deficiency,

15  it's 3.58, just simply by virtue of the fact that

16  there's no other number presented, and hence, I use the

17  phrase "maximum amount."

18        Q.    Well, isn't that assuming that there's a

19  disclosure deficiency on July 16th?

20        A.    Yes.  It's assuming -- it's assuming -- well,

21  yes, in the following -- let me take that back.  Let me

22  restart the answer.

23            It's assuming that Dr. Bergin's 3.58 and his

24  focus on July 16th has some relationship to the

25  allegations in this case, which, at the heart, is a

118

1    disclosure deficiency.

2             So.  Again, if you're telling me -- and it

3    might well be true -- that July 16th and the 3.58 has no

4    meaning in the context of this case, then -- then fine.

5    Then -- then there's no evidence for inflationary

6    impact.  But this statement would still be accurate.

7    It's still a maximum amount.

8        Q.   What if there is -- what if there's no alleged

9    disclosure deficiency on July 16th, would your analysis

10   change?

11       A.   No.

12       Q.   Why not?

13       A.   Because, as I say -- and I was very careful

14   when I wrote this -- the maximum amount -- and it could

15   well be lower.  And, in fact, later in the report I

16   document it's lower -- it's 3.58.

17            But, again, if Dr. Bergin is presenting a

18   number that has no relationship to the disclosure

19   deficiencies alleged in this case, then my response

20   would be that I'm not sure what the point is.  I mean --

21   but it would be serving no function.

22       Q.   If the alleged disclosure deficiencies on

23   August 3rd and November 3rd in this case -- let me step

24   back.

25            If you were trying to figure out the maximum

                                                          119

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

1    enrichment amount and the alleged disclosure deficiency

2    is on August 3rd and November 3rd, would you look at the

3    July 16th date?

4            MR. GIBBS:  Objection.  On November 3rd?  You

5    didn't amend your complaint, John.  The complaint was

6    not amended.  There are no alleged disclosure

7    deficiencies on November 3rd --

8            MR. BERRY:  That's not correct.

9            MR. GIBBS:  -- in this case.

10           MR. BERRY:  That's not correct, but objection

11   noted.

12           MR. GIBBS:  I'm quite sure that's what Judge

13   Selna thinks.

14           MR. BERRY:  Let's -- objection noted, but

15   incorrect.  And we'll have to agree to disagree on that.

16   BY MR. BERRY:

17       Q.   But if the case is about alleged disclosure

18   deficiencies on August 3rd -- and I'm just -- I won't

19   even mention November 3rd, for Mr. Gibbs's purposes, but

20   if the case is just about alleged August 3rd disclosure

21   deficiencies and you were doing an analysis of the

22   enrichment amount from the alleged disclosure

23   deficiency, would you be looking at July 16th?

24       A.   Embedded in your -- your question said

25   enrichment amount, and I want to be very cautious here.

                                                      120

1    but I have not analyzed it.  So I have not thought about

2    how I would analyze August 3rd, since it's outside of

3    the scope what Dr. Bergin did.

4    BY MR. BERRY:

5        Q.   I understand Dr. Bergin did not analyze August

6    3rd.  But I'll ask it again.  I'll try to rephrase it,

7    to make it more clear.

8            If -- if the alleged disclosure deficiency in

9    this case is only about alleged disclosure deficiencies

10   that occurred on or about August 3rd and you were tasked

11   with finding the maximum amount by which Mr. Moshayedi

12   could have been enriched by that alleged disclosure

13   deficiency, would you be analyzing the dollar impact on

14   July 16th to the stock price?

15           MR. GIBBS:  Objection; incomplete

16   hypothetical; beyond the scope of his opinion.

17           THE WITNESS:  I would need to think about the

18   relationship between August 3rd and July 16th.  Is the

19   theory that it's just confirming an earlier

20   misrepresentation on August 3rd?

21           So I would need to know more in terms of

22   thinking about the relationship between July 16th and

23   August 3rd, and I just haven't analyzed it.

24   BY MR. BERRY:

25       Q.   So, I mean, stepping back even more.  In a

                                                        122

1    general hypothetical, if you've got an alleged

2    disclosure deficiency on -- let's just use August 3rd --

3    August 3rd of 2009 --

4         A.   Okay.

5         Q.   -- is there any reason to calculate the

6    maximum amount by which a defendant was enriched by that

7    alleged deficiency using dates before August 3rd?

8         A.   You know, it depends on the nature of the

9    allegation about August 3rd.  So if the claim is -- and

10   I'm not saying this is true here.  But if the claim is

11   August 3rd is an omission date, you failed to provide

12   truthful -- you omitted to disclose information, and the

13   market was misled because of an earlier representation

14   in time, then you might want to look at the earlier

15   representation.

16        So it really depends on the nature of the

17   allegation, omission, misrepresentation, what the market

18   was learning at different points in time, and it's just

19   not an analysis I've done.

20        Q.   Okay.  But the -- under that hypothetical,

21   there must be some kind of relationship between the

22   alleged omission on, say, August 3rd, and any -- and if

23   you choose a prior date to analyze the maximum

24   enrichment amount and the disclosures on that prior

25   date, correct?

123

1      A.    Look, I'm not here to construct a theory for

2  the SEC in terms of their allegations or as an expert

3  for the SEC.  I was simply asked to assess Dr. Bergin's

4  analysis.

5          And all I'm saying here is the only figure

6  he's given is 3.58, and that's really the point here.

7  In terms of the allegations about August 3rd and how you

8  would assess it, I have not done that analysis.

9      Q.    Well, I understand that Dr. Bergin gave a 3.58

10  figure, but you have expressed an opinion that the

11  maximum amount by which Mr. Moshayedi could have been

12  enriched by an alleged disclosure deficiency is measured

13  by price movement on July 16th, correct?

14      A.    Correct.  Because that's the only figure that

15  exists.  So if you were to exclude 3.58, there is

16  nothing else.  And, in part, that's a function of the

17  confounding nature of the November -- I'll rephrase

18  that.  And that's, in part, a function of the

19  inappropriate use of November and February.

20          So if you were to say to me, 3.58 is

21  irrelevant to this case, then fine.  Then there's

22  nothing.

23      Q.    Well, at a minimum, the disclosures on

24  July 16th must be related to the alleged disclosure

25  deficiency on August 3rd for the July 16th impact to be

124

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

1    relevant to an enrichment by the disclosure deficiency,

2    correct?

3              MR. GIBBS:  Objection to form.

4              THE WITNESS:  I mean, again, if we're using

5    enrichment to mean disclosure impact or omission impact

6    on stock price, then yes, you would want to think about

7    the relationship between the two dates and the nature of

8    the allegation.

9              Again, none of that work has been done.

10   Certainly Dr. Bergin doesn't do it, so I just don't have

11   an opinion on it.

12   BY MR. BERRY:

13       Q.   And you haven't attempted to do that work,

14   correct?

15       A.   Correct.  Because Dr. Bergin does not analyze

16   August 3rd.

17       Q.   I'm sorry.  I -- maybe I'm just not

18   understanding your answers, but I don't understand how a

19   dollar impact measure of 3.58 on July 16th has anything

20   to do with the maximum amount Mr. Moshayedi could have

21   been enriched by alleged disclosure deficiencies on

22   August 3rd.  Can you explain that?

23       A.   Sure.  So if you were to say -- and I'm -- I

24   mean, if you were to stipulate that 3.58 has nothing to

25   do with any disclosure deficiency, which is what I think

125

1   ultimately opining on -- he's providing an opinion

2   there.

3        Q.   Okay.  If he had not offered an opinion at all

4   about July 16th --

5        A.   Uh-huh.

6        Q.   -- could you give an opinion about what the

7   maximum inflation in this case would be?

8        A.   Depends on when the alleged disclosure

9   deficiency is.  So if the alleged disclosure deficiency

10  is you didn't disclose or the company or the individual

11  defendant didn't disclose the fact that it was

12  nonrecurring, then my opinion would still stand, because

13  I would still use July 16th to construct the but-for

14  price.

15       So the answer is yes, I think July 16th does

16  have information about the market impact of -- the

17  market impact that a disclosure that the agreement was

18  nonrecurring, you can use July 16th for that.

19       And for my second but-for price, if all the

20  demand in 2010 and the rest of '09 were disclosed -- I

21  estimate but-for prices there, and I used July 16th, as

22  well.  So I think all that analysis would still stand.

23       Q.   But, I mean, you agree that the SEC has not

24  alleged that there was any alleged disclosure deficiency

25  on July 16th, correct?

137

1          MR. GIBBS:  Objection; lack of foundation.

2          MR. BERRY:  Well, fair enough.

3     BY MR. BERRY:

4          Q.   Have you -- you've read the complaint in this

5     action, correct?

6          A.   I have.

7          Q.   Okay.  Are you familiar with the allegation

8     the SEC has posited in that complaint?

9          A.   In a general way.

10         Q.   Okay.  Are you aware of any allegation the SEC

11    has made that there's a disclosure deficiency on

12    July 16th?

13         A.   No, not that I can recall.  There is -- and my

14    understanding is there is a claim or an allegation of

15    disclosure deficiency concerning the fact that it was a

16    one-time deal or one-off deal, and so that is an

17    allegation.  And I address the price impact of that

18    information using July 16th.

19              So I think it's -- it's relevant in that way.

20    And, moreover, Dr. Bergin claims that information was

21    revealed on November 3rd, and so it would help one's

22    assessment of that date.

23         Q.   If you were going to do your own analysis

24    independent of what Dr. Bergin or Dr. Bajaj did to

25    figure out what the price impact of the alleged

138

1    disclosure deficiencies in this case, why wouldn't you

2    start with the August 3rd date?

3         MR. GIBBS:  Objection.  It's beyond the scope.

4         Answer, if you can.

5         THE WITNESS:  So if the claim is -- if the

6    allegation is you didn't disclose as a one-off deal, I

7    present in this report price impact that would be

8    associated with a hypothetical disclosure that's a

9    one-off deal.  And so, again, if that's one of the

10   allegations in the complaint and one of the things that

11   Dr. Bergin thinks was disclosed on November 3rd, my

12   analysis would still stand, even if he hadn't opined on

13   July 16th.

14        So just to be clear, I present but-for prices

15   associated with different pieces of information in part

16   6 of my report, and they intersect with my understanding

17   of the allegations and what Dr. Bergin claims was

18   disclosed in November and February.

19   BY MR. BERRY:

20        Q.   But there are no allegations made -- sorry.

21        There are no disclosures made on July 16th

22   about the recurring nature of the contract; is that

23   right?

24        A.   Well, Dr. Bergin has an opinion on that.  So

25   Dr. Bergin opines that -- there's a reference to

139

1     assumption that it will be recurring.

2         Q.   Okay.  The first question, you mentioned these

3     two signals, right?

4         A.   I would use signal for one of them.

5         Q.   So you use signal for the signal that

6     regardless of whether or not it's recurring, this is a

7     good product and demand will increase?

8         A.   Fair enough.

9         Q.   Okay.  And then the other effect of the

10    disclosure, rather than signal, is some analysts believe

11    this would be recurring and some did not?

12        A.   That's right.

13        Q.   Okay.  Let me make sure I understand --

14        A.   Just a clarification.  You said "analysts."  I

15    mean, the one that's clear that is expected recurring is

16    Oppenheimer.

17        Q.   Okay.

18        A.   The other ones we can talk about, but that's

19    -- so there's one analyst where that's clear.

20        Q.   Do you have an opinion as to whether or not

21    the market, as a whole, believed that this contract

22    would be recurring based on the July 16th announcement?

23        A.   I think there's different views.  So I think

24    Oppenheimer, which is a proxy for market -- some portion

25    of the market thought it was going to be recurring and

                                                          148

1   others did not, so there's differences of opinion on

2   that.  As -- using the proxy of analysts' coverage.

3        Q.   Okay.  And would you agree that at least some

4   part of the market thought that this announcement of the

5   contract signaled good news because it meant that EMC

6   saw this as a good product and, therefore, there's going

7   to be increased demand?

8        A.   I agree with that.

9        Q.   Okay.  Now, this methodology that you

10  described, is there a name for it?

11       A.   Well, I would just say it's -- I don't know if

12  there's a name like forward casting.  I would just say

13  it's using market actors' assessment of the disclosure,

14  which is a standard thing to look at.

15       Q.   Okay.  Well, that piece is standard.  You go,

16  if I understand correctly, one step further and try to

17  segregate out how the price reaction to these two -- one

18  is a signal and one is an effect, right?

19       A.   Uh-huh.

20       Q.   Is there a name for that segregation and

21  methodology you did?

22       A.   I mean, Dr. Bergin tries -- I mean, Dr. Bergin

23  looks at what market actors are saying to assess

24  importance, and so I'm doing the same thing except

25  using, you know -- using these numbers to try to do some

149

1    quantification.

2         Q.   Is there a name for the method you used in

3    terms of trying to segregate out the impacts based on

4    these two signals or effects coming from that

5    disclosure?

6         A.   I would call it disentanglement.

7         Q.   Now, is this disentanglement methodology

8    peer-reviewed?

9         A.   Well, as we discussed, forward casting is an

10   attempt to disentangle.  As we discussed, that's based

11   on analysts' expectations and earnings misses.  It's

12   standard in the literature to look at coefficient --

13   response coefficients of analysts' expectations to think

14   about price reaction.

15            So I think the relevant academic literature

16   is -- I would say is the accounting finance literature

17   on earnings coefficient response -- coefficient

18   response -- response coefficient estimates.

19        Q.   Have you ever seen the disentanglement method,

20   that you've just described, used before?

21        A.   So in this -- the signaling versus the

22   non-signaling?  No, not this very particular fact

23   situation, July 16th.  So the answer to that is no.

24            In terms of looking at analysts' estimates to

25   think about price impact, I think that's standard, and I

                                                          150

1   would reference the accounting literature that I cite in

2   my forward-casting article.

3        Q.   It's one thing when you have two aspects of

4   the disclosure and see how the analysts reacted to it.

5   That's one thing that you're talking about doing, right?

6        A.   Yes.

7        Q.   Okay.  It's another to try to quantify the

8   difference between the impacts of those two pieces of

9   information, correct?

10       A.   Yeah.  I mean, the quantification is an

11  analysis, that's true.

12       Q.   And you went through and attempted to do that

13  quantification, correct?

14       A.   That's right.  Under a range of assumptions.

15       Q.   Right.  Have you ever seen that approach used

16  before, trying to quantify the different reactions of

17  the market to different pieces of information?

18       A.   Sure.  Sure.  So it's standard to try to

19  disentangle confounding information with quantification.

20  I've seen it in a number of cases that I've been

21  involved in.  So I don't think there's anything unusual

22  about that.

23            And, again -- I know I'm being repetitive --

24  relevant academic literature where this is routinely

25  done is that accounting literature.

151

1      Q.   Are there any criticisms, that you're aware

2  of, of this disentanglement methodology that you use?

3      A.   I don't know if it's a criticism, but you have

4  to have sufficient analyst coverage with sufficient

5  variation to be able to do it.  And as I'm -- as I

6  explain, I come up with a range of estimates based on

7  different assumptions.  That's not a criticism, but it's

8  just a function of the data that I had.

9      Q.   And do you think you have enough variation

10  here to be able to apply it effectively?

11      A.   Yes, I think it comes up with a reasonable

12  range.

13      Q.   And how do you assess whether or not you have

14  enough variation or not?

15      A.   Well, you have to look at what the research

16  question is here.  So the key variable here is, is there

17  variation along the dimension of expectations as to

18  whether the volume agreement would be recurring or not.

19  So that's the key.

20           I think there, one end of that spectrum,

21  CapStone; at the other end of the spectrum, Oppenheimer.

22  So I do think that that provides two poles.

23      Q.   Okay.  Why don't we look at the scenarios you

24  ran.  You ran -- for this section you ran three

25  different scenarios; is that right?

                                                        152

1    paragraph 89 of your report, the results and work for

2    that is reflected in the document I've marked as

3    Exhibit 463, entitled "Exhibit 1"; is that right?

4         A.   I believe so, just sitting here.

5         Q.   Let's make sure it's right before we get into

6    answering questions.

7         A.   I believe so.

8         Q.   And then scenario two, which you begin

9    discussion of on paragraph 92, the work for that and the

10   exhibit for that are reflected in Exhibit 2, marked -- I

11   mean, Exhibit 464, which is entitled "Exhibit 2"?

12        A.   I believe so.

13        Q.   And then the third scenario you ran, starting

14   on page 94, the work for that and the exhibit for that

15   is reflected in Exhibit 465 entitled "Exhibit 3"; is

16   that right?

17        A.   I believe so.

18        Q.   I want to go to the second scenario, because

19   it's the easier one for me to understand.

20        A.   Sure.

21        Q.   And then we'll work from there.

22             So let's look at Exhibit 464, entitled

23   "Exhibit 2."

24        A.   Yes.

25        Q.   Is it fair to say what you're doing is you're

155

1   comparing -- you're essentially comparing Jeffrey

2   Schreiner at CapStone and Mr. Hsueh at Oppenheimer as

3   part of your analysis; is that right?

4        A.   Yes.

5        Q.   Okay.  Well, in the other scenarios you're

6   using medians of analysts' reactions.  In scenario two,

7   in Exhibit 2, you're focused on the reactions of the two

8   analysts, Mr. Schreiner and Mr. Hsueh?

9        A.   Yes.  Yes, except --

10       Q.   Okay.

11       A.   -- with the caveat that for '09 median

12  analysts EPS, I use all the analysts for the 17 cents.

13  But once you subtract off the 17 cents, you're correct.

14       Q.   And you used that median 17 cents for all your

15  scenarios, correct?

16       A.   Yes.

17       Q.   Okay.  I was trying to get to the major

18  differences -- scenario two is about comparing two

19  analysts, correct?

20       A.   Yes.

21       Q.   Now, you start with -- your logical starting

22  point, as we've been talking about, is July 16th,

23  correct?

24       A.   Yes.

25       Q.   And you use -- but you don't use Dr. Bergin's

                                                      156

1  calculation of the excess return dollar figure for that

2  day, do you?

3       A.   No.   As I say in my report, if you plug in

4  this 3.58, it wouldn't change anything.

5       Q.   Okay.   But you used Dr. Bajaj's?

6       A.   That's right.

7       Q.   Why -- before you've been -- we've been

8  talking about -- and in an earlier part of your report

9  you talk about the maximum enrichment amount and the

10 inflation amount would be 3.58 on that day.   Why in this

11 case are you using 3.52?

12      A.   As I say in footnote 94 of my report, it

13 doesn't make a difference.   So it's immaterial.   I had

14 to pick a number so I picked the 3.52.   It doesn't make

15 it -- if you increase it by six cents, it's not going to

16 change anything.

17      Q.   Well, I understand you say it doesn't make a

18 difference.   I'm just curious why in one part of your

19 report you're using 3.58 and why you chose in this part

20 of the report to use 3.52.

21      A.   In an earlier part of the report, I'm talking

22 about Dr. Bergin's inflationary analysis, so I talk

23 about 3.58.   For this part of the report, it doesn't

24 matter.   You can do 3.52 to 3.58.   Why did I pick 3.52?

25 I had to pick a number.   Doesn't make a difference.

157

1      Q.   Okay.  Well, had this analysis started before

2   you had gotten the number from Dr. Bergin, and that's

3   why you've got it that way?

4      A.   No.

5      Q.   Okay.  So I'm going to walk through and

6   describe it, just so I can make sure I understand what

7   you've done, and then I'll ask you some questions.

8           So I'm now looking at Exhibit 464.  You start

9   with a -- you start with 3.52, and then you also

10   calculate the median analysts upper division for the

11   second half of 2009 after the July 16th announcement,

12   right?

13      A.   Yes.

14      Q.   And that is 17 cents per share?

15      A.   Yes.

16      Q.   And that's the median for every analyst, that

17   you're aware of, that was covering the stock?

18      A.   I believe so.  And that's contained on the

19   next page, with the caveat that it's the EPS estimates

20   for analysts that are providing the EPS in the immediate

21   aftermath of July 16th.

22      Q.   Okay.

23      A.   The few days after that.

24      Q.   And you subtract that 17 cents from the 3.52.

25   Why is that?

                                                      158

1      Q.   -- what you're talking about?

2           For example, you say that STEC's competitive

3      advantage related to its use of SLC-based enterprise

4      SSDs, do you see that?

5      A.   Uh-huh.

6      Q.   Now, it's the same question I asked before --

7      well, let me go through all of them and then we'll --

8      then you have -- the next sentence is, There was an

9      alternative technology known as MLC-based SSDs.  Do you

10     see that?

11     A.   I do.

12     Q.   But then you go on to say that those MLC-based

13     SSDs were not yet competitive.  You make that comment?

14     A.   Uh-huh.

15     Q.   And then in the final sentence you say, the

16     MLC-based SSDs had a noteworthy advantage.  Do you see

17     that?

18     A.   Yeah, I do.

19     Q.   Okay.  And similar to what I had asked before:

20     You were not offering an opinion personally on any of

21     those conclusions you set forth in paragraph 32,

22     correct?

23     A.   That's correct.

24     Q.   Okay.  All that is, is you're summarizing your

25     understanding of what was in the total mix based on your

229

1    review of analyst reports, right?

2         A.   Yes.  And --

3         Q.   Okay?

4         A.   -- not just analyst reports but these other

5    publicly available reports.

6         Q.   Okay.  And then in paragraph 35, you say,

7    Broad economic conditions, among other things, impeded

8    the speed of adoption, thus lowering overall demand for

9    STEC's products.

10        A.   Yes.

11        Q.   Do you see that?

12        A.   I do see that.

13        Q.   It's the same question:  You yourself are not

14   giving an opinion that economic conditions impeded the

15   speed of adoption, correct?

16        A.   Same answer.

17        Q.   The answer is no?

18        A.   I'm not -- I have not -- this is a summary of

19   the total mix of information.

20        Q.   Okay.  And then, finally -- flip back a page,

21   in paragraph 28, you say that the price declined on

22   September 17th by 16.8 percent.  Do you see that?

23        A.   I do.

24        Q.   You haven't done an analysis to find out what

25   disclosures are attributable to that price decline,

230

1    correct?

2         A.    The analysis I've done is contained in

3    paragraph 27 where there's a disclosure on that date of

4    competitive concerns.

5         Q.    That's the full extent of that analysis,

6    correct?

7         A.    Yes.

8         Q.    You haven't done an event study to see what

9    disclosures could be attributable to that decline,

10   correct?

11        A.    As we've discussed, there's already two event

12   studies.  Under both, this data is statistically

13   significant.

14        Q.    Okay.  Well, Dr. Bergin didn't do an event

15   study on this date, correct?

16        A.    Well, sure, because in his event study, by

17   construction, he'll have an excess return on each day --

18        Q.    Fair point.  But --

19        A.    -- so you'll know from the standard error if

20   it's statistically significant.

21             Frankly speaking, a 16.8 percent decline,

22   you'll need statistical analysis to know if it's

23   statistically significant.

24        Q.    But you haven't yourself analyzed the

25   disclosures that were made that day to figure out what

                                                         231

1    could be attributed to that decline, correct?

2        A.    The only disclosure that I know of is the

3    September 17th report.

4        Q.    Okay.  And so is it your opinion that that

5    report is the only thing that's attributable to that

6    decline?

7        A.    I haven't done a search on that day for other

8    possible reports.  If this is, in fact, the only other

9    piece of information publicly available about the

10   company, then my conclusion would be that that does

11   account for the price decline, but I have not affirmed

12   that there's no other firm, specific piece of

13   information disclosed on that day.

14       Q.    Because you haven't done that, you're not

15   offering an opinion that that Wedbush announcement on

16   September 17th is attributable to that price decline; is

17   that correct?

18       A.    That's correct.  It's consistent with it, but

19   I'm not offering an opinion on causation.

20            MR. BERRY:  Okay.  So why don't we take a

21   break.

22            THE WITNESS:  That would be great.

23            THE VIDEOGRAPHER:  This is the end of Tape and

24   Disk Four of Volume I of the videotaped deposition of

25   Allen Ferrell.  We are going off the record, and the

                                                    232

 1   time is 3:37 p.m.

 2            (Recess:  3:37 - 3:49 p.m.)

 3            THE VIDEOGRAPHER:  This is the beginning of

 4   Tape and Disk Five, Volume I, of the videotaped

 5   deposition of Allen Ferrell.  We are back on the record,

 6   and the time is 3:49 p.m.

 7   BY MR. BERRY:

 8        Q.   So, Professor Ferrell, going back to paragraph

 9   20, in that paragraph you are comparing the price

10   impacts measured by Dr. Bergin of 3.58 on July 16th,

11   8.99 on November 3rd, and 3.13 on February 24th; do you

12   see that?

13        A.   Yes.

14        Q.   And then you say -- sorry, you say that --

15   because Dr. Bergin, in your opinion, is saying that

16   November 3rd and February 23rd disclosures are

17   corrective disclosures, you say that it follows there

18   must be confounding information, i.e., non-fraud

19   information, being released on November 3rd and February

20   23rd.  Do you see that?

21        A.   I do.

22        Q.   Is that a fair characterization of what you're

23   saying?

24        A.   What it says is exactly what I'm saying.

25        Q.   I'm trying to understand it.  Is what I said a

                                                        233

SEC v. Manouchehr Moshayedi
*Case 8:12-cv-01179 JVS-MLG*
Deposition of Allen Ferrell – Notice of Errata

    I, the undersigned, do hereby declare that I have read the attached deposition transcript of Allen Ferrell (07/30/2013) and that to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Page | Line | Change | Reason for Change |
|------|------|--------|-------------------|
| 12 | 11 | Replace "claim" with "claims" | Correct transcription error |
| 15 | 19 | Replace "sale" with "sales" | Correct transcription error |
| 30 | 8 | Replace "requests" with "request" | Correct transcription error |
| 30 | 9 | Replace "was" with "were" | Correct word choice |
| 30 | 18 | Replace "was" with "were" | Correct word choice |
| 31 | 1-2 | Replace "that there's" with "of their" | Correct transcription error |
| 33 | 19 | Replace "mails" with "emails" | Correct transcription error |
| 37 | 25 | Replace "That's" with "There's" | Correct transcription error |
| 38 | 9 | Insert "of" after "mix | Correct transcription error |
| 49 | 24 | Insert "on" before "July" | Correct transcription error |
| 50 | 1 | Insert "of" after "memory" | Correct transcription error |
| 50 | 22 | Insert "in" after "confounding" | Correct transcription error |
| 52 | 14 | Insert "to" after "subsequent" | Correct transcription error |
| 53 | 22 | Insert "I" after "deposition" | Correct transcription error |
| 58 | 13 | Replace "peer review" with "peer-reviewed" | Correct transcription error |
| 59 | 24 | Replace "Event studies is a statistical analysis" with "Event studies are statistical analyses" | Correct word choice |
| 61 | 21 | Replace "significance" with "significant" | Correct transcription error |
| 62 | 7 | Replace "industry" with "Industries" | Correct transcription error |
| 74 | 21 | Replace "accumulate" with "cumulate" | Correct transcription error |
| 74 | 23 | Replace "accumulate" with "cumulate" | Correct transcription error |
| 75 | 5 | Replace "accumulative" with "cumulative" | Correct transcription error |
| 84 | 23 | Insert "rate" after "discount" | Correct transcription error |
| 89 | 9 | Replace "is" with "has" | Correct transcription error |

| 93 | 1 | Replace "effect" with "affect" | Correct transcription error |
|---|---|---|---|
| 94 | 15 | Replace "going" with "doing" | Correct transcription error |
| 96 | 2 | Insert "an" before "opinion" | Correct transcription error |
| 96 | 23 | Insert "into" before "the" | Correct transcription error |
| 99 | 4 | Replace "earning" with "earnings" | Correct transcription error |
| 100 | 2 | Replace "in" with "and" | Correct transcription error |
| 130 | 6 | Replace the first "to" with "of" | Correct transcription error |
| 142 | 21 | Insert "whether" before "the analysts" | Clarify testimony |
| 159 | 12 | Delete "we" after "If" | Correct transcription error |
| 162 | 20 | Delete "be" after "going" | Correct transcription error |
| 163 | 12 | Replace "you with" with "with you" | Correct transcription error |
| 165 | 16 | Replace "enumerator" with "numerator" | Correct transcription error |
| 173 | 14 | Insert "be" before "directionally" | Correct transcription error |
| 173 | 20 | Insert "uses that" before "is" | Clarify testimony |
| 177 | 9 | Replace "directly" with "directionally" | Correct transcription error |
| 181 | 18 | Replace "Is" with "It's" | Correct transcription error |
| 185 | 1 | Replace "annul" with "actual" | Correct transcription error |
| 195 | 13 | Replace "SDC's" with "STEC's | Correct transcription error |
| 197 | 21 | Replace "'04" with "'09" | Correct transcription error |
| 204 | 12 | Replace "actually" with "actual" | Correct transcription error |
| 208 | 11 | Replace "North" with "Northland" | Correct transcription error |
| 223 | 12 | Delete "had" | Correct transcription error |
| 223 | 12 | Replace "company's" with "companies'" | Correct transcription error |
| 232 | 12 | Replace "firm, specific" with "firm-specific" | Correct transcription error |
| 237 | 4 | Insert period after "3.58" | Correct transcription error |
| 237 | 9 | Insert "he" after "what" | Correct transcription error |
| 257 | 21 | Replace "accept" with "except" | Correct transcription error |
| 264 | 4 | Insert "the" before "second" | Correct transcription error |
| 272 | 8 | Replace the second "analyst" with "analysts" | Correct transcription error |
| 272 | 21 | Replace "is" with "are" | Correct word choice |
| 275 | 18 | Delete comma after "do" and add comma after "that" | Correct transcription error |

| 277 | 9 | Insert "on" before "November" | Correct transcription error |
| 281 | 16 | Replace "disclosures" with "disclosure" | Correct transcription error |
| 282 | 11 | Delete "the" before "IDC" | Clarify testimony |
| 283 | 5 | Change "was" to "were" | Correct word choice |
| 291 | 8 | Insert "on" before "November" | Correct transcription error |
| 299 | 19, 25 | Insert quotation marks before "Moshayedi" and after "issue." | Correct transcription error |
| 299 | 23 | Replace "were" with "was" | Correct word choice |
| 301 | 16 | Replace "there" with "they" | Correct transcription error |
| 312 | 13 | Replace "Q10 2002" with "Q1 2010" | Correct transcription error |

Date:   September 10, 2013        Signature of Deponent:

1

2

3

4

5

6

7

8

9        I, FRANK ALLEN FERRELL, III, do hereby declare

10   under penalty of perjury that I have read the foregoing

11   transcript of my deposition; that I have made such

12   corrections as noted herein, in ink, initialed by me, or

13   attached hereto; that my testimony as contained herein,

14   as corrected, is true and correct.

15        EXECUTED this 10th day of September ,

16   2013 , at Cambridge , Massachusetts .
                    (City)                    (State)

17

18

19   _____
                    FRANK ALLEN FERRELL, III

20

21

22

23

24

25

                                                      318

1

2

3

4         I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6         That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14         I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney or any of the parties.

17         IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated:  7/31/13

21

22

23                               
BRIDGET R. MONTERO

24                               CSR No. 10020

25