# EXHIBIT 8

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
5                                   )
                    PLAINTIFF,      )
6                                   )
            vs.                     ) No. 12-CV-01179(JVS)(MLG)
7                                   )
     MANOUCHEHR MOSHAYEDI,          )
8                                   )
                    DEFENDANT.      )
9    _____)

10

11                      MUKESH BAJAJ, Ph.D.

12                   LOS ANGELES, CALIFORNIA

13                        August 2, 2013

14

15

16

17

18

19

20

21

22

23
     Reported by:
24   Judith Hollifield
     CSR No. 12564
25   Job No. 130802JHO

                                                              1

1             UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4   SECURITIES AND EXCHANGE      )
    COMMISSION,                  )
5                                )
                    PLAINTIFF,   )
6                                )
         vs.                     ) No. 12-CV-01179(JVS)(MLG)
7                                )
    MANOUCHEHR MOSHAYEDI,        )
8                                )
                    DEFENDANT.   )
9   _____)

10

11          Deposition of MUKESH BAJAJ, Ph.D., taken

12   on behalf of Plaintiff commencing at 10:05 a.m.,

13   August 2, 2013, at Los Angeles, California, before

14   J. Hollifield, a Certified Shorthand Reporter,

15   License No. 12564.

16

17

18

19

20

21

22

23

24

25

2

```
 1      APPEARANCES:

 2        FOR PLAINTIFF:

 3        SECURITIES AND EXCHANGE COMMISSION
          BY:  John W. Berry, Esq.
 4             Gary Y. Leung, Esq.
               5670 Wilshire Boulevard
 5             Seventh Floor
               Los Angeles, California 90036
 6             323.965.4573
               BerryJ@SEC.gov

 7
          FOR DEFENDANT MANOUCHEHR MOSHAYEDI and
 8        WITNESS MUKESH BAJAJ, Ph.D.:

 9        LATHAM & WATKINS LLP
          BY:  Matt Rawlinson, Esq.
10             140 Scott Drive
               Menlo Park, California 94025
11             650.328.4600
               Matt.Rawlinson@LW.com

12
          FOR DEFENDANT MANOUCHEHR MOSHAYEDI:

13
          PAUL HASTINGS LLP
14        BY:  D. Scott Carlton, Esq.
          BY:  Thomas A. Zaccaro, Esq.
15             515 South Flower Street
               25th Floor
16             Los Angeles, California 90071
               213.683.6000
17             ScottCarlton@PaulHastings.com
               ThomasZaccaro@PaulHastings.com

18
          ALSO PRESENT:

19
               Frank Kap, Videographer
20

21

22

23

24

25
```

3

10:14:16  1          A     That is correct.

          2          Q     And you -- just explain for me what you

          3    understand liability to be -- correct -- in that

          4    context?

10:14:24  5          A     So, for example, it's my understanding

          6    that in this particular action, the plaintiff --

          7    that is, the SEC -- has alleged certain disclosure

          8    deficiencies.

          9                And part of my analysis has to do with

10:14:46 10    analyzing price impact of certain disclosures or

         11    certain hypothetical counterfactual disclosures on

         12    the stock of STEC and to put into economic context

         13    various allegations, analyses, and conclusions in

         14    that connection through my economic research.

10:15:18 15                So I understand that my work in this case

         16    would be relevant to determining whether the

         17    defendant is, in fact, liable for the disclosure

         18    deficiencies at issue.  And it may or may not also

         19    be relevant for damages, if any, that are assessed

10:15:41 20    in this case.

         21          Q     Okay.  Thank you.

         22                In Paragraph 7, you mentioned that you

         23    authored or co-authored more than 25 publications

         24    in the field of financial economics.  What do you

10:15:55 25    mean by that term "financial economics"?

                                                                    13

```
10:15:58   1        A     Yeah.  So one minor clarification.  The

           2    paragraph at issue says that I've authored or

           3    co-authored more than 25 publications and working

           4    papers.  So the number 25 pertains to both

10:16:11   5    categories put together.

           6        Q     Thank you.

           7        A     And what I mean by "financial economics"

           8    is the field of economics that focuses on capital

           9    markets.  So the field of economics at large

10:16:28  10    pertains to all kinds of markets, including, for

          11    example, market for grocery, market for houses, et

          12    cetera, et cetera.

          13          But financial economists focus their

          14    attention on capital markets, and that's my area of

10:16:45  15    specialty.  And that is primarily the area in which

          16    I have published.

          17        Q     Okay.  Thank you.

          18          Have you ever testified or offered an

          19    opinion as an expert as to the materiality of

10:17:02  20    material nonpublic information in an insider

          21    trading case?

          22        A     So it's my understanding now that the word

          23    "materiality" is a word of art that has several

          24    legal connotations, and I am not able to fully

10:17:26  25    fathom all the nuances of the legal connotations of
```

14

10:17:31  1   that word.

2          So perhaps I can describe what I mean by

3   "materiality" the way I have used the word in my

4   work in this matter.

10:17:41  5          What I mean by "materiality" is to

6   evaluate the price impact observed of various

7   announcements and disclosures that are at issue in

8   this case, or evaluation of what would be price

9   impact of certain counterfactual disclosures that

10:18:04 10   may be relevant to evaluate in connection with this

11   case.

12          And I have also provided an economic

13   context of STEC's business and what was driving the

14   stock price over the relevant period to be able to

10:18:23 15   assist the trier of fact in determining the import

16   and, quote/unquote, materiality of various

17   disclosure defects that are alleged in this case.

18          And that's how I interpret the word

19   "materiality," and that's the way I have used it in

10:18:40 20   my work in this case.  And that's precisely the way

21   I have been asked to evaluate, quote/unquote,

22   materiality in various other cases in which I've

23   been asked to do so.

24      Q    Okay.  Can I call it "materiality" from an

10:18:55 25   economic perspective?  Does that make sense?  I

15

10:35:11  1    decide whether or not my engagement fits what you

       2    have in mind.

       3           I do a fair amount of work for many

       4    technology companies in helping them determine

10:35:23  5    transfer pricing.

       6           In other words, when these companies have

       7    operations that span different tax jurisdictions,

       8    my understanding is that tax law requires that the

       9    transactions that these companies engage in

10:35:45 10    involving intercompany transactions and different

      11    tax jurisdictions have to be governed by what is

      12    called an arm's length standard.

      13           Namely, the prices for those tractions in

      14    the internal market have to be consistent with

10:36:04 15    prices that an arm's length party would arrive at.

      16           And that analysis requires understanding a

      17    company's business, understanding its operations,

      18    understanding how a company creates economic value,

      19    and which parts of the company perform what

10:36:20 20    functions and take what risk to contribute to that

      21    value creation because those concentrations go into

      22    giving the company advice on what should be

      23    transfer prices consistent with this arm's length

      24    standard.

10:36:38 25        Q    Okay.  Well, would you consider yourself

                                                                    27

10:36:39    1    an expert in the field of customer, supplier,

2    vendor relationships in the SSD enterprise market?

3        A    Again, from the perspective of

4    understanding the import of these relationships for

10:36:55    5    creating value for the company, yes.  But not from

6    the perspective of managing day-to-day operations

7    within a company in this field.

8        Q    Okay.  And would you consider yourself an

9    expert in the field of supply agreements or volume

10:37:13   10    commitments in the SSD enterprise market?

11        A    So, again, I believe I'm qualified to

12    evaluate the implications of these agreements to a

13    company's value from a capital markets perspective.

14    But I'm not a lawyer who negotiates contracts.  I'm

10:37:36   15    not an operations person who implements contracts.

16    So I'm not an expert from an industry perspective

17    in that way.

18        But I deal with these kinds of issues in

19    my work all the time as a financial economist, and

10:37:52   20    that's the perspective I bring to the table.

21        Q    Well, have you ever been asked to offer

22    advice about pricing terms or other terms in a

23    supply agreement between participants in an -- in

24    the SSD market?

10:38:11   25        A    So when I was engaged for transfer pricing

28

10:38:15  1   related engagements by several storage companies, I

2   would have advised them on pricing from a transfer

3   pricing perspective.  But I don't know if that's

4   what you were getting at or you had a different

10:38:37  5   point of view when you ask that question.

6        Q    Thank you.

7            So putting aside transfer pricing issues,

8   have you ever been asked to give advice or input on

9   the term, such as pricing, and the -- in an

10:38:49  10  agreement between participants in the SSD market?

11       A    Not in a day-to-day business sense.  And

12  to clarify my preceding answer, I had -- I needed

13  to but forgot to clarify when I talked about my

14  work for storage companies.  I know those storage

10:39:09  15  companies to be large companies in the storage

16  space.  I wasn't asked to focus on SSD part of

17  their business per se.

18       Q    And -- and with respect to the transfer

19  pricing, were you focused on the SSD business and

10:39:26  20  the valuation of SS -- of the SSD business?

21       A    So that's what I clarified.  I was focused

22  on their business transactions, the terms at which

23  their intellectual property could be utilized in

24  their international operations consistent with

10:39:40  25  arm's length standard whether or not my evaluation

29

10:39:46   1    pertained to only the SSD part of their business.

2          It was for the entire company and not

3    focused in particular on the SSD part of their

4    business.  That was the clarification I wanted to

10:40:00   5    offer.

6          Q    Okay.  Thank you.

7          Well, would you consider yourself an

8    expert in the competitive advantages or

9    disadvantages of products that are sold in the SSD

10:40:09  10    enterprise market?

11         A    Again, from the perspective that we've

12    been discussing, I do believe I have a useful

13    perspective to offer to evaluate implications of

14    those issues for a company's valuation, but I'm not

10:40:26  15    an industry expert in the way that I've described

16    it here.

17         Q    In other words, you don't think you have

18    expertise to talk about whether a particular

19    product in SSD market has competitive disadvantages

10:40:40  20    or advantages in the market; is that right?

21         A    So if the question is whether a particular

22    product or technology has competitive advantages

23    because it has various technical features that

24    other competitors don't have, no, I'm not a

10:40:56  25    technical expert to evaluate that.

30

10:40:58 | 1        In terms of looking at business dynamics

2    of a business and understanding its import for why

3    the market values the business the way it does, I

4    do believe I have useful insights to offer.

10:41:11 | 5        Q    And have you ever been asked to study or

6    consult on the issue of the adoption of solid state

7    drives or the storage systems by the ultimate end

8    users who buy them?

9        A    No.

10:41:32 | 10       Q    And have you ever been asked to consult on

11   or give advice with respect to the forecasting of

12   sales of SSDs to OEMs in the SSD market?

13       A    Again, Counsel, I -- I think my -- what

14   I'll answer is that I have never been -- I have

10:41:58 | 15   never worked as an employee of an SSD business.

16   I've never managed an SSD business on a day-to-day

17   basis or made operational decisions or advised on

18   operational decisions.

19            My expertise is relevant only from the

10:42:16 | 20   point of view of understanding how a company

21   creates value in the marketplace and what are the

22   implications of that insight on the company's

23   valuation and how market perceives certain

24   disclosures that have been made or might react to

10:42:38 | 25   certain counterfactual disclosures that may be

31

| | | |
|---|---|---|
| 10:42:41 | 1 | relevant. |
| | 2 | Hopefully, this clarifies things for you. |
| | 3 | Of course, I'm happy to answer each and every |
| | 4 | question the way you want to pose it. |
| 10:42:50 | 5 | Q   Okay.  Thank you. |
| | 6 | But has -- has a company ever asked you to |
| | 7 | give advice or consult on how to forecast sales of |
| | 8 | SSDs in the SSD enterprise market? |
| | 9 | A   No. |
| 10:43:01 | 10 | Q   Okay.  Has a company ever asked you to |
| | 11 | give advice or consult on the optimal levels of |
| | 12 | inventory of an SSD manufacturer? |
| | 13 | A   Not an SSD manufacturer, no. |
| | 14 | Q   Has a company ever asked you to consult on |
| 10:43:22 | 15 | or give you advice on the optimal levels of |
| | 16 | inventory of a storage device manufacturer? |
| | 17 | A   As I was telling you, I have had several |
| | 18 | clients which are large companies in storage |
| | 19 | business. |
| 10:43:40 | 20 | And in that connection, I have done what |
| | 21 | transfer pricing people call "functional analysis"; |
| | 22 | namely, understanding how these companies make |
| | 23 | money, what are their competitive advantages, |
| | 24 | whether the money that they make can be attributed |
| 10:44:01 | 25 | to certain functions or certain risks. |

32

10:44:04  1              And inventory considerations play a part

2     in that analysis, but I've never been asked to

3     advise on operational decisions regarding the

4     amount of inventory a storage company should carry.

10:44:19  5         Q    Okay.  Do you think -- do you consider

6     yourself an expert in what should or should not be

7     publicly disclosed in order to comply with the

8     securities laws?

9         A    Not from regulatory perspective, not from

10:44:49 10    legal perspective.  I do consider myself to have

11    expertise to be able to evaluate whether or not a

12    certain disclosure or a counterfactual disclosure

13    may be significant to shareholders of the company,

14    for example.

10:45:05 15        Q    But not whether or not the particular

16    disclosure should have been disclosed or should not

17    have been disclosed; correct?

18        A    Not from a legal obligation point of view.

19        Q    Okay.  Do you consider yourself an expert

10:45:20 20    in what the -- what the securities laws require

21    should be publicly disclosed by companies?

22        A    Again, I am not a lawyer.  I don't have

23    expertise that bears on that question from either a

24    legal or from a regulatory perspective or, for that

10:45:37 25    matter, from accounting disclosure perspectives.

33

11:02:09  1          Q     That's the -- the bullet point right

        2    before the section entitled "Academic Literature."

        3    Do you see that?

        4          A     Yes.

11:02:14  5          Q     And it's -- that last bullet point is a

        6    list of a bunch of documents that are Bates

        7    numbered.  Do you see that?

        8          A     Yes.

        9          Q     So did -- did you request those documents

11:02:24 10    and -- and -- so that you could consider or rely

       11    upon them in issuing your report?

       12          A     Counsel, to the best of my recall, these

       13    Bates numbers concern various exhibits that were

       14    part of the deposition record that I was talking

11:02:41 15    about earlier, that these were exhibits to various

       16    deposition transcripts.  That's my recall as I sit

       17    here right now.

       18          Q     So is it your recall that these are the

       19    only exhibits that you considered or relied upon --

11:02:52 20    let me try again.

       21          Is it -- is it your best recollection that

       22    these are the only exhibits to depositions that you

       23    consider or relied upon in issuing this report?

       24          A     No.  As the title of the document says and

11:03:09 25    as we discussed at the time this document was

                                                            46

11:03:12  1    produced, these were exhibits that I actually

2    relied upon in preparing my report.

3         Q    Okay.  So these are the exhibits you

4    relied upon.  Other exhibits you may or may not

11:03:25  5    have considered; is that right?

6         A    Yes.  They were provided to me, but I may

7    or may not have.  So in that -- in some technical

8    sense, I considered them, but I did not rely upon

9    them.

11:03:36  10        Q    Okay.  Did you undertake any efforts to

11    review all of the correspondence between EMC and

12    STEC that have been -- been produced in this case

13    or in the parallel shareholder class actions

14    regarding the $120 million supply agreement?

11:03:56  15        A    So, Counsel, not having been involved in

16    the legal process of discovery, I don't know that I

17    can answer that question beyond the fact that it's

18    my understanding from counsel that they made

19    available to us on the FTP site the entire record

11:04:20  20    in this particular action as I described earlier,

21    and certain categories of record in the shareholder

22    class action that I also described earlier.

23        Q    Okay.  So you had access through this FTP

24    site of every document, as far as you know, that

11:04:39  25    was produced in either this case or the class

47

11:04:41  1    action?

          2        A    To the best of my knowledge and recall, as

          3    of the date this report was issued, I believe I and

          4    my team were provided access to the entire record

11:04:53  5    of this case --

          6        Q    Okay.

          7        A    -- as I described earlier.

          8        Q    And given that access, did you or your

          9    team undertake an effort to try and review all of

11:05:02 10    the correspondence between EMC and STEC regarding

         11    the $120 million supply agreement?

         12        A    I couldn't answer that question unless I

         13    knew what that set of correspondence is in

         14    totality.  As I said, I was not involved in the

11:05:22 15    discovery aspect of the case, so --

         16        Q    I'm -- I'm not asking you to know if you

         17    reviewed it.  I'm asking you did you attempt to or

         18    did you ask your team to attempt to, to review all

         19    of that correspondence?

11:05:36 20        A    When you say "all of that correspondence,"

         21    from my vantage point, I don't know what all is

         22    included in all of that correspondence.

         23             So I was careful in telling you what was

         24    made available to me, what I therefore considered,

11:05:52 25    and I've disclosed that; and what I relied upon in

                                                                    48

11:05:58  1    preparing Exhibit 483, which I've also disclosed.

       2            I'm not trying to be difficult.  I'm just

       3    trying to give you an accurate answer to your

       4    question.

11:06:09  5        Q    But did you ask your team to conduct

       6    searches in that FTP database to look for documents

       7    regarding the $120 million supply agreement?

       8        A    Yes.  To the extent it was relevant to my

       9    analysis and my opinions, I asked them to review

11:06:22 10    the available records for materials that would be

      11    relevant to my work in this matter.

      12        Q    Well, how did you identify what would be

      13    relevant?

      14        A    So maybe I'm not understanding your

11:06:39 15    question because it appears that my answer, which I

      16    thought was as comprehensive as it could be, is

      17    apparently not sufficient.

      18        Q    Well, can I -- can I try again.

      19        A    Yes, please.

11:06:52 20        Q    Okay.  So if you -- you know, if you --

      21    hypothetically speaking -- okay -- if given in a

      22    record and a lawyer wants to find out -- based on

      23    that record, find all the relevant documents in the

      24    record regarding the negotiation of a contract, the

11:07:08 25    lawyer could then undertake an effort to find every

                                                              49

11:07:12   1    document through searches or other -- other means

           2    concerning the contract.  Do you understand my

           3    hypothetical?

           4        A    I do even though, from the vantage point

11:07:21   5    of a nonlawyer --

           6        Q    Okay.

           7        A    -- I am not a lawyer.  I haven't practiced

           8    as a lawyer.  But I understand --

           9                  (Simultaneous colloquy.)

11:07:27  10        A    -- conceptually what you mean.

          11        Q    Okay.  Put aside lawyer.  A person,

          12    somebody who wanted to find out and understand the

          13    negotiations of a contract and they had a -- a

          14    record before them, they could try to look into

11:07:39  15    that record and find every document that pertains

          16    to that contract negotiation.  Do you understand?

          17        A    So the only word that gives me a little

          18    pause here is the word "every."

          19        Q    Well, that's why I'm asking.

11:07:52  20        A    Yeah.

          21        Q    Did you or your team undertake an effort

          22    to try to find every document that concerns the

          23    $120 million supply agreement in the record that

          24    you had access to?

11:08:05  25        A    So I told my team that we should look for

                                                                    50

11:08:08  1   every relevant piece of information that is related

2   to my analysis of that question.  I don't know

3   whether a particular research analyst in assisting

4   me went about locating those records through a

11:08:26  5   certain kind of keyword search or in some other

6   way.

7            I know that we reviewed the deposition

8   testimony which was extensive.  We became aware of

9   what exhibits would be relevant for doing our work

11:08:46  10  on the various issues that we considered in this

11  matter.

12           And my instructions always were learn

13  everything you can that is relevant from my

14  perspective on this issue.  And if it's not

11:09:04  15  tertiary and irrelevant information, bring it to my

16  attention.  And that's how we did our work.

17       Q    I -- I -- thank you.  I understand.

18           You -- you asked members of your team to

19  go about and search the record for information

11:09:19  20  relevant to topics like the supply agreement and

21  other issues in your report.  Is that fair to say?

22       A    Including my own review where I myself

23  looked at documents and materials that are

24  considered to be helpful to me, I was assisted by

11:09:37  25  my team.  And I did tell them to be comprehensive

51

11:09:40   1    in their examination of the record to the extent

2    practical to bring to my attention economic facts

3    that are relevant to my work.

4        Q    But -- but did you yourself personally

11:09:54   5    conduct searches of this record database?

6        A    I did not sit in front of the database and

7    do keyword searches.

8        Q    And sitting here today, do you know what

9    searches your team conducted to find these

11:10:05  10    documents you're talking about?

11        A    No.  I did not stand over their shoulders

12    and look --

13        Q    Okay.

14        A    -- at the research they did.

11:10:13  15        Q    Thank you.

16        A    Is this a good time for us to take a

17    two-minute break?

18        Q    Sure.  It actually is.

19        THE VIDEOGRAPHER:  Let me go ahead and change

11:10:20  20    media.  This is the end of Tape and Disk 1, volume

21    1, of the videotaped deposition of Mukesh Bajaj,

22    Ph.D.  We are going off the record.  And the time

23    is 11:10 a.m.

24                    (A recess was taken from

11:18:32  25                    11:10 until 11:19 a.m.)

52

| | | |
|---|---|---|
| 11:18:45 | 1 | THE VIDEOGRAPHER:  This is the beginning of |
| | 2 | Tape and Disk 2, Volume 1, of the videotaped |
| | 3 | deposition of Mukesh Bajaj, Ph.D.  We are back on |
| | 4 | the record, and the time is 11:19 a.m. |
| 11:19:01 | 5 | BY MR. BERRY: |
| | 6 | Q    Okay.  Dr. Bajaj, I'd like to next turn to |
| | 7 | the event study you did in support -- you -- you |
| | 8 | did do an event study in this case; correct? |
| | 9 | A    That is correct. |
| 11:19:16 | 10 | Q    Okay.  And -- and you describe that |
| | 11 | methodology in Appendix 3-A of your initial report; |
| | 12 | correct? |
| | 13 | A    Yes. |
| | 14 | Q    Okay.  Now, if you can just briefly |
| 11:19:45 | 15 | describe for me, what is -- what is an event study? |
| | 16 | A    So I think there is general agreement |
| | 17 | are -- as to what constitute various steps in an |
| | 18 | event study, but there's some difference in |
| | 19 | terminology and how people describe what is an |
| 11:20:03 | 20 | event study. |
| | 21 | So an event study has essentially two |
| | 22 | parts.  One part is the statistical work which is |
| | 23 | looking at a particular security's periodic returns |
| | 24 | and, through statistical analysis, understanding or |
| 11:20:28 | 25 | developing what is called a "market model" that |

53

11:20:33  1    tells you on average how -- what is the

2    relationship between that security's return and

3    market-wide or industry returns.

4              So the idea is, once you have that

11:20:50  5    statistical relationship, then over any particular

6    period, you can look at a security's return and

7    subtract from it part of the return that will be

8    expected under the assumption that the average

9    statistical relationship between the return of --

11:21:13 10    on the security and the market and industry held on

11    this day.  And the difference is called "abnormal"

12    or "residual return."

13             So that's the part of the return on any --

14    during any given measurement period that is over

11:21:31 15    and above what could be attributed to market-wide

16    or industry-specific relationship.

17             The second part of the event study is

18    trying to develop an understanding of whether or

19    not the abnormal return, if any, on that day was

11:21:57 20    caused by a particular disclosure or news that was

21    received by the market over that same period -- oh,

22    I forgot to add one thing with regards to the

23    first -- forgot to say one thing with regards to

24    the first part.

11:22:21 25             When you do the statistical study I

54

11:22:23  1    described and you compute abnormal return, you

2    evaluate whether or not the particular abnormal

3    return observed over any particular period is,

4    quote/unquote, statistically significant; namely,

11:22:38  5    large enough that there would be less than

6    five percent chance given the statistical

7    relationship of observing such a large return on

8    the basis of random noise alone.

9         So the focus for the second part of the

11:22:55 10   event study is to understand whether abnormal

11   return, if significant, can be attributed to a

12   certain economic reason.

13        Now, some people talk of event study as

14   only the first part.  Some people talk of an event

11:23:12 15   study as both the parts combined.  I generally

16   refer to both the parts combined as an event study.

17   Q    Thank you.  And -- and that helps.

18        So if I understand correctly -- well, with

19   respect to the first part in connection with your

11:23:30 20   report, you did the first part, the statistical

21   part with respect to 165 days in 2009; is that

22   correct?

23   A    That is correct.

24   Q    Okay.  The -- the second part, the -- the

11:23:46 25   understanding of -- of what the abnormal return is

55

11:23:50  1    attributed to, does that involve trying to

       2    understand what the total mix of information is in

       3    the market at the time of the -- the event at

       4    issue?

11:24:01  5        A    Yes.  So in order to conduct an event

       6    study in the context such as this, there is either

       7    an explicit assumption or an implicit assumption

       8    that the security that you are analyzing trades in

       9    what is called a "semi-strong form efficient

11:24:23  10   market"; namely, significant public information

       11   gets quickly incorporated in price of that

       12   security.

       13        So when we observe abnormal return on a

       14   particular day, that abnormal return should not,

11:24:44  15   under those assumptions, be attributed to old

       16   information that was already in the public domain

       17   because it could have already been reflected in

       18   prices.  So the price change should not be

       19   understood as response to old information.

11:25:03  20        And to determine whether or not abnormal

       21   return over a period can be related to a certain

       22   economic causality, you need to analyze mix of

       23   information that existed prior to that date to

       24   determine what was new information or news that the

11:25:23  25   market received on that day and then seeing if

                                                           56

11:25:28  1    economic evidence would suggest that the abnormal

2    return that you observe was, in fact, causally

3    related to the news at issue.

4         Q    And -- and that's the second step of the

11:25:39  5    process that you described; is that right?

6         A    That is correct.

7         Q    Okay.  And -- and do you think in your

8    opinion it's appropriate to look at analyst reports

9    that were issued at the time that are

11:25:50  10   contemporaneous to the event as part of the second

11   step?

12        A    Indeed, one should look at all available

13   public information.  And analyst reports are part

14   of the mix of information as of a particular point

11:26:07  15   in time.

16        Q    And -- and it's your opinion, I take it,

17   that analyst reports can be proxies for how the

18   market is assessing the total mix information at

19   the time?

11:26:17  20        A    I think that statement is a bit stronger

21   than I would prefer.

22             Analyst reports and analyst opinions are

23   certainly part of the information mix that the

24   market considers.

11:26:31  25             But market could consider information and

57

11:26:36  1    react to it even if the market didn't learn that

2    information from a particular analyst report, or

3    the market may react to certain information as if

4    it was economically significant even if one or more

11:26:55  5    analysts feel differently.

6        Q    Okay.  Well, could you look at just one

7    analyst report to try to understand the total mix

8    information as part of your -- this Step 2?

9        A    Well, you don't want to ignore any

11:27:11 10    relevant information in considering total mix of

11    information.  Whether a particular analyst report

12    is relevant to evaluating the mix of information or

13    not is a fact and circumstances issue.

14            So, for example, if we observe abnormal

11:27:27 15    return on a particular day and the economic

16    hypothesis or the research question is to

17    understand whether or not that return was because

18    market expected next quarter earnings expectations

19    to have gone up or down, you may find that one

11:27:50 20    analyst reacted to that -- to the new information

21    that was received and others didn't.

22            In this factual situation, it would be

23    perfectly appropriate to consider the opinion

24    expressed by the analyst who actually reacted to

11:28:11 25    this information, and those analysts who were slow

58

11:48:15  1    that we were talking about.

2              But if you're referring to what appears to

3    be, in my mind, Dr. Bergin's misunderstanding of

4    the opinions I expressed in Section 7 of the report

11:48:31  5    and somehow you are coming from a perspective that

6    I used a three-month long event window, et cetera,

7    et cetera, then I think record would be better

8    served by my explaining to you what I did and what

9    I concluded and why Dr. Bergin is misinformed in

11:48:50  10   his criticism.

11             Q    But if we go to Appendix 3-C --

12             A    Okay.

13             Q    -- that shows the results of your

14   regression analysis for each of the days in your

11:49:04  15   estimation period.

16             A    Correct.

17             Q    It's got a column for the t-statistic;

18   correct?

19             A    Yes.

11:49:12  20             Q    Okay.  And the t-statistic, as long as the

21   t-statistic is greater than one -- or greater than

22   or equal to 1.96, the abnormal return is considered

23   statistic -- statistically significant; correct?

24             A    Yes.  At 5 percent level, using a

11:49:28  25   two-tailed test of statistical significance, that's

74

11:49:32  1    additional statistical jargon but necessary.  Yes.

2         Q    Okay.  So if we go through this list, any

3    day that has a statistical -- a t-statistic that is

4    less than 1.96, its return is not statistically

11:49:49  5    significant; correct?

6         A    Its return on that day over that

7    measurement period is not deemed to be

8    statistically significant at the level of

9    significance that I've described.

11:50:05 10        Q    Okay.  And -- and we've been talking about

11   Dr. Bergin.  You -- you've reviewed his event

12   studies that he did; correct?

13        A    I have reviewed his event study.  Yes.

14        Q    And you described as event study as a

11:50:17 15   two-method -- two-step process; correct?

16        A    Yes.

17        Q    Okay.  Putting aside your disagreement

18   over his conclusions, do you have any -- any

19   criticisms of the methodology he used in conducting

11:50:31 20   Step 1 of an event study approach?

21        A    So for issues that we are addressing in

22   that case, the answer is no.

23        Q    Okay.  And so -- so you agree with

24   Dr. Bergin that the statistical -- I'm sorry, that

11:50:55 25   the return on July 16th, 2009, was abnormal and

75

11:51:02  1    statistically significant; correct?

2        A    It was statistically significantly large.

3    Yes.

4        Q    And you agree with Dr. Bergin that the

11:51:13  5    return on November 4th was abnormal and

6    statistically significant; correct?

7        A    It was statistically significantly

8    negative.  Correct.

9        Q    Okay.  Now, if we go back to your -- your

11:51:41 10   opinion that you give in Section 7, looking at Page

11   57 on your report, is -- is it correct that it's

12   your opinion that from August 4th to November 2nd,

13   2009, the stock price dropped during that period of

14   STEC's stock price was attributable to two

11:52:08 15   things -- well, the materialization of two known

16   risks, competition and slower than expected

17   adoption of STEC's products; is that right?

18       A    Well, I think the opinion that Section 7

19   is providing details on is pertaining to a summary

11:52:33 20   of opinion as stated in -- on Page 11 of

21   Exhibit 483.  Namely, the main opinion is that

22   there is no economic evidence to support SEC's

23   allegation that STEC's stock price declined from

24   August 4 to November 4 was driven by revelation of

11:53:11 25   material nonpublic information that Mr. Moshayedi

76

12:07:23  1   Appendix 3-D to -- to answer the -- the questions

2   that I'm about to pose to you.

3        So -- so on August 4th, were there any

4   disclosures regarding concerns over -- well, on

12:07:37  5   August 4th, were there any disclosures regarding

6   concerns about competition that STEC would be

7   facing?

8   A    So, Counsel, my understanding is the

9   August 4th price reaction noted in Appendix 3-C is

12:07:54  10  primarily reflecting the price reaction to STEC's

11  earnings release and press conference after the

12  close of regular trading on August 3rd.

13       And it is my belief that some of the

14  relevant information that was significant to the

12:08:19  15  market on that day had to do with STEC's

16  competitive position in the SSD market.  In

17  particular, on August 3rd, the market learned, and

18  several analysts focused on the fact -- on two

19  things.

12:08:40  20       Number one.  The growth of STEC's EMC

21  volume, which had been very dramatic in terms of

22  percentage growth in Q-1 and Q-2, was forecasted to

23  be slower than last two quarters.  And people did

24  focus on the fact that the guidance for third

12:09:02  25  quarter that was announced on August 3rd forecasted

89

12:09:12  1  roughly 50 percent drop in volume that STEC

2  anticipated for its Zeus business, for non-EMC

3  customers.

4          And that is a factor that is very much a

12:09:28  5  part of what I call "competitive concerns."

6  Because over this period, it's my understanding

7  what was driving the stock price up by 800 percent

8  in the first half of 2009 was expectation that EMC

9  was the first significant customer of STEC; and

12:09:48  10  that STEC would even be able to make IBM and Sun

11  and Hitachi and other customers that are large

12  vendors in storage space -- it will be able to make

13  them significant customers.

14          So this information on August 3rd was

12:10:06  15  disappointing to the market that while EMC business

16  seemed to be slowing in growth rate, other

17  customers were not yet picking up.  And that was,

18  of course, value relevant to the market.

19      Q    Did -- did the -- did the announcement of

12:10:21  20  the secondary offering have any impact on the stock

21  price on August 4th?

22      A    It probably did in part.

23      Q    Did you make -- undertake any analysis to

24  figure out which piece of news or which piece of

12:10:35  25  information the total mix as of August 4th had the

90

```
12:10:38    1    biggest impact on the stock price that day?

            2        A    No.  I did not.

            3        Q    Okay.  Did -- can you identify any

            4    disclosure made on August 3rd that directly touched

12:10:47    5    upon the competition that STEC was facing?

            6        A    I don't know what you mean by "directly,"

            7    but --

            8        Q    I'll -- I'll explain.

            9        A    Okay.

12:10:57   10        Q    Can you point to any disclosure made on

           11    August 3rd that expressly mentioned competition

           12    that STEC was facing?

           13        A    Yes.

           14        Q    Which disclosure?

12:11:08   15        A    So when STEC offered Q-3 guidance on

           16    August 3rd, it gave total Zeus volume.  It also

           17    said that 55 million of that volume would be sold

           18    to EMC pursuant to their volume deal.

           19             And analysts did focus on the fact that

12:11:35   20    the remainder of the volume, which would account

           21    for all the other large customers that were hoped

           22    by the market would quickly follow in EMC's

           23    footsteps by ramping up their demand for Zeus

           24    drives, the market understood that the projected

12:11:59   25    volume for such non-EMC customers was not only not
```

91

12:12:03  1    projected to increase, but actually decline by

        2    50 percent from such volume in the preceding

        3    quarter.

        4        Q    So I'll ask you again.

12:12:15  5        Did you -- can you identify any disclosure

        6    made on August 3rd that explicitly -- not

        7    implicitly -- explicitly mentioned competition?

        8        A    Sir, if you're asking me whether the word

        9    "competition" was uttered by the defendant or the

12:12:35 10    CFO of STEC, I'd have to review the record of the

       11    press release and the conference call.

       12        I don't recall as I sit here.  If

       13    you're -- by "explicitly" meaning did they come out

       14    and say, hey, when you look at our guidance, the

12:12:56 15    implication is non-EMC customers are going to do

       16    half -- or expected to do half the volume in third

       17    quarter of 2009 than they did in second quarter of

       18    2009, I don't believe they explicitly said so.  But

       19    there were --

12:13:11 20        Q    Thank you.

       21        A    -- questions about this issue, and they

       22    answered those questions.  In my book that counts

       23    as an explicit disclosure, Counsel.

       24        Q    They answered questions about competition?

12:13:25 25        A    Well, to -- for analysts to interpret the

                                                          92

```
02:12:06   1        Q    Yes.
           2        A    Well, I don't buy that characterization.
           3   But as I told you, I did no analysis of technology.
           4   I'm not here as a technical expert.  My analysis
02:12:18   5   was based on mix of information in the marketplace.
           6        Q    Okay.  Right.  Your analysis restricted to
           7   only looking at what -- the information that had
           8   been disclosed or was circulating in the market;
           9   correct?
02:12:31  10        A    I would say "yes" except I won't buy into
          11   your qualifying description of "only."  I think
          12   that's sufficient analysis.
          13        Q    That's sufficient analysis to know what
          14   the market was thinking; correct?
02:12:44  15        A    Well, if the market was thinking that and
          16   there is no evidence from then or later that the
          17   market was incorrectly thinking that at the time,
          18   does it not follow that that was the reality at
          19   that time?
02:13:00  20        Q    Is that your position?
          21        A    Well, that's my conclusion.
          22        Q    Okay.
          23        MR. RAWLINSON:  I don't think you're going to
          24   be able to get John to answer your questions.  That
02:13:15  25   would be a unique trick.
```

                                                                134

02:13:18    1        THE WITNESS:  I wasn't trying to play any

            2    tricks.

            3    BY MR. BERRY:

            4        Q       Now, you also -- starting on Page 18, you

02:13:23    5    talk about the concept of "Crossing the Chasm."

            6        A       Uh-huh.

            7        Q       What are you referring to there?

            8        A       Well, I'm referring to a business dynamic

            9    that is faced by companies with innovative new

02:13:42   10    product -- that -- who are trying to capitalize on

           11    that product and trying to enlarge their market

           12    position by capitalizing on that product.

           13        Q       Now, you refer to Geoffrey Moore in

           14    reaching that conclusion; right -- in his book

02:14:10   15    "Crossing the Chasm"?

           16        A       Yes.  I do refer to him to explain that

           17    phenomenon.

           18        Q       Okay.  Well, have you ever -- this

           19    phenomenon you're talking about, you're talking

02:14:23   20    about the "Crossing the Chasm" phenomenon; is that

           21    right?

           22        A       He describes it like that, but it's really

           23    more general.

           24             It's about companies trying to take their

02:14:36   25    innovative new path making -- path-breaking product

                                                                    135

02:14:44    1    or technology and trying to become mainstream,

2    leading suppliers of that product or technology.

3        Q    Okay.  And that evolution can be called,

4    as you put it and as Mr. Moore put it, "crossing

02:15:00    5    the chasm"; is that fair?

6        A    That's how Mr. Moore characterizes.

7        Q    How would you characterize it?

8        A    Well, I think it's -- a pretty cogent

9    characterization.  That's why I describe it in his

02:15:14   10    words.

11        Q    So you would characterize it that way too?

12    I just want to be able to have some term we can

13    refer to it further on.  So can we call

14    it "crossing the chasm"?

02:15:23   15               (Simultaneous colloquy.)

16        A    I've accepted that --

17        Q    Okay.

18        A    -- I've accepted that characterization.

19        Q    Okay.  So this crossing the chasm

02:15:31   20    phenomenon, have you -- published any articles

21    regarding this phenomenon?

22        A    Not directly, no.

23        Q    Have you ever taught or given lectures on

24    this phenomenon?

02:15:46   25        A    Well, I've taught about -- taught about

136

```
02:15:51   1   financial strategy, the implication of a firm's
           2   business strategy on financial strategy.  And in
           3   that connection, I have talked about these kind of
           4   dynamics.
02:16:08   5           But if you mean by your question to ask me
           6   whether I have asked students to read his book and
           7   examined them on this book, the answer is no.
           8       Q    Okay.  And then so -- and his book refers
           9   to a technology adoption life cycle theory).  Are
02:16:27  10   you aware of that?
          11       A    Yes.
          12       Q    Okay.  And that's -- what is that?
          13       A    Well, the way I see it, Mr. Moore's
          14   insight that he's very cogently described is, when
02:16:46  15   companies are attempting to take their window of
          16   opportunity of having a disruptive technology and
          17   trying to turn it into a mainstream product, it is
          18   very customary for those companies to initially
          19   focus on one or more early adopters, gain momentum
02:17:15  20   with those early adopters, and then leverage that
          21   momentum to encourage other potential customers
          22   from -- to adopt the very same product or
          23   technology to enlarge their market presence through
          24   that mechanism.
02:17:36  25       Q    Well, this adoption life cycle theory --
```

137

02:17:43  1   have you yourself done any studies to confirm its

2   viability?

3        A    I don't know what you mean.  This is a

4   book by Mr. Moore that, through case studies, is

02:17:58  5   articulating typical business strategies of firms

6   in -- that find themselves in a similar position.

7        Q    Right.  According to you, he's done case

8   studies, as you say, in your report.

9            But have you yourself done any studies or

02:18:15  10  analysis to confirm this adoption life cycle theory

11  that you point to in your report?

12       A    I don't know what you mean by "confirm."

13  I'm not understanding your question.

14       Q    Well, you say that Mr. Moore has done --

02:18:29  15  and I think you use "extensive" -- extensive case

16  studies to develop this theory; correct?

17       A    Yes.

18       Q    Okay.  Have you yourself done extensive

19  case studies to confirm the viability of this

02:18:42  20  theory?

21       A    Mr. Moore is describing how firms in

22  similar position try to be successful.

23       Q    I know what he's describing.  I'm just

24  asking.  It's a very simple question.

02:19:02  25          Have you -- he refers and you point out --

138

02:19:04   1    what you point out, you think that he's done

2    extensive case studies.

3         A    Okay.

4         Q    Okay.  I'm just asking.  Have you done

02:19:11   5    extensive case studies or anything else to confirm

6    the viability of his theory -- ever?

7         A    Counsel, I'm not understanding the

8    "confirm the viability of this theory."  What does

9    that mean?  I'm --

02:19:22  10         Q    Do you know --

11         A    -- trying to answer your question.

12         Q    Do you know if his theory is actually

13    viable?  Is it a viable --

14         A    It is viable.  That's how it's been

02:19:28  15    applied by so many firms.  It's been successfully

16    and sometimes not too successfully been applied by

17    a lot of firms.

18         Q    Okay.  Does this theory -- well, that's my

19    question.

02:19:43  20         You're saying it's been applied by firms.

21    Have you done any study or analysis to confirm the

22    viability of this theory?

23         A    You know, I'm sorry.  I'm not

24    understanding your question.  What do you mean by

02:19:55  25    "viability of this theory"?  Mr. Moore's point

139

02:19:59  1    is -- perhaps the following will help.

          2            If somebody came to me and said, for a

          3    lawyer to really distinguish himself when they

          4    first come out of law school, they need to focus on

02:20:12  5    certain type of cases, build a lot of expertise,

          6    make a name for themselves, and then they can

          7    broaden their horizon.  That's a description.

          8            I thought Mr. Moore's description of how

          9    companies, in STEC-like position try to become

02:20:31 10    market leaders, seem to fit the observed behavior.

         11            I thought it was a helpful analogy to

         12    point out the fact that the meteoric rise of STEC

         13    over the first half of 2009 was not surprising.

         14    And most -- many firms that tried to -- bridge that

02:20:54 15    crossing, that chasm, don't end up succeeding

         16    expose the fact that STEC expose did not succeed is

         17    also not surprising relative to or in light of what

         18    Mr. Moore is describing.

         19            So I thought it was a helpful way to

02:21:14 20    explain the market dynamics.  That's all I did.

         21        Q    But how do you even know whether or not

         22    it's helpful?

         23        A    It was helpful to me to understand STEC's

         24    market dynamics in this manner.

02:21:38 25        Q    Well, the fact that you say it's -- it's

                                                              140

02:21:40   1   his theory -- and I'm looking at Paragraph 30 of

2   your report.  You say:  This theory is based on

3   extensive case studies.  Do you see that?

4       A   Yes.

02:21:53   5       Q   Is that important to you that it's based

6   on extensive case studies?

7       A   If it was just Mr. Moore's idle thinking

8   and he couldn't illustrate through case studies

9   how, in practice, this is how the world works, then

02:22:13   10   it wouldn't be as attractive a proposition for me.

11   It wouldn't -- I would not have cited it.

12       Q   If he did -- I'm trying to make sure I

13   understand.  If he didn't have corroborating

14   evidence to support the theory, you would not have

02:22:29   15   cited it?

16       A   Well, if he did not have corroborating

17   evidence saying this is how the world works, then

18   it would have been an intellectually nice thought.

19   But there would be no reason to cite to that

02:22:47   20   thought.

21       Q   Okay.  I'd like to mark as Exhibit 486

22   excerpts from the book.  And I have the book here

23   as well as just in case.

24       (Exhibit Number 486, excerpts from "Crossing the

01:59:39   25       Chasm," was marked for identification.)

141

02:23:33  1        Q    Dr. Bajaj, I'll hand you the book as well.

       2    If you could just hold it in front of the video to

       3    identify that this is the book "Crossing the

       4    Chasm."

02:23:45  5        THE VIDEOGRAPHER:  Okay.

       6    BY MR. BERRY:

       7        Q    And can you just quickly look at

       8    Exhibit 486 and confirm for me that this contains

       9    excerpts from that book.

02:23:56 10        A    It looks like it does.

      11        Q    Okay.  I'll represent to you I've copied

      12    from certain pages from this book.

      13             Did you read this book before you issued

      14    this opinion?

02:24:06 15        A    I have read this book in the past.  I did

      16    not sit down to read it to write this report.  This

      17    is a very popular book in the business schools that

      18    I have been involved with.  And I'm familiar with

      19    this book.

02:24:22 20        Q    Okay.  I'll have you turn to -- the first

      21    page, acknowledgements.  Do you see it?  It's Roman

      22    Numeral 19 that I've got in Exhibit 46.

      23        A    Yes.

      24        Q    Do you see that?

02:24:39 25             And if you could just read the paragraph

                                                            142

02:24:40  1    that starts "prior to entering the world of

2    high-tech" -- in its full.

3         A    The paragraph prior to that?

4         Q    No.  The one that starts "prior to

02:24:48  5    entering the world of high-tech."

6         A    (Reading):

7              Prior to entering the world of

8         high-tech, I was an English professor.

9         One of the things I learned during this

02:24:57  10        most scholarly period in my life was that

11        the importance of evidence and the

12        necessity to document its sources.  It

13        chagrins me to have to say, therefore,

14        that there are no documented sources of

02:25:12  15        evidence anywhere in the book that

16        follows.  Although I routinely cite

17        numerous examples, I have no studies to

18        back them up, no corroborating witnesses,

19        nothing.

02:25:26  20        Q    Were you aware that he wrote that in the

21    acknowledgment when you cited in this report?

22        A    As I've told you, I've read this book

23    before; and I presumably had read this part.

24        Q    Does it surprise you that he has -- in his

02:25:41  25    words, "no documented evidence" to support his

                                                        143

02:25:43   1      theory?

           2          A      He's not providing an empirical test of a

           3      hypothesis.  He is describing his experience in the

           4      world.  And case studies are an accepted scientific

02:25:57   5      method.

           6               Whatever he wrote, whether it's tongue in

           7      cheek or however, I don't think he means to say

           8      that he is writing a book and an acknowledgment

           9      he's saying don't believe anything in this book; I

02:26:15  10      just made it up.  I know he didn't make up because

          11      I'm familiar with the examples that he cites.

          12          Q      In Paragraph 29, you say that STEC's

          13      growth was typical of a technology company that had

          14      introduced innovative new product.  Do you see

02:26:33  15      that?

          16          A      Yes.

          17          Q      Okay.  How do you know that?

          18          A      I know that based on my experience.  I

          19      know that based on having read the market evidence.

02:26:46  20      I know that from this book.  So those are the

          21      sources I can think of right now.

          22          Q      Okay.  And you also say that STEC was an

          23      early market leader.  How do you know that?

          24          A      I think the evidence is very clear that it

02:27:00  25      was an early market leader in this space.  We

                                                                    144

02:38:14   1   is a fact that I notice and documented which is

2   relevant to my overall opinions in this case.  I'm

3   not -- here to reach an affirmative opinion on this

4   particular fact.

02:38:27   5        Q    Okay.  Well, how do you know that it's a

6   "fact" as you call it?

7        A    Based on my review of EMC's filings, based

8   on my review of market commentary from analysts,

9   based on my review of record evidence.

02:38:44  10        Q    Did you actually review the order history

11   of EMC each quarter in 2009?

12        MR. RAWLINSON:  EMC's orders?  Or EMC's orders

13   to STEC?

14        MR. BERRY:  EMC -- thank you.

02:38:56  15   BY MR. BERRY:

16        Q    Did you actually review EMC's orders to

17   STEC, the history of EMC's orders to STEC in 2009?

18        A    You're missing the point.  I'm not talking

19   about hockey stick for STEC.

02:39:08  20        Q    I'm not -- I understand that.

21        A    Counsel, I think --

22             (Simultaneous colloquy.)

23        Q    -- just stay with the question.

24        A    -- you are -- you're misreading what I was

02:39:13  25   discussing.

153

02:39:13   1        Q    I'm not; I'm not.  And I'm going to ask

           2   you the questions about that.

           3             First, did you review the order history of

           4   EMC's orders of STEC products in 2009?

02:39:27   5        A    To the extent it was available to record

           6   evidence as I read it, I'm familiar with it; but I

           7   didn't do an empirical study if that's what you

           8   mean.

           9        Q    Okay.  Did you review the order history of

02:39:46  10   orders for EMC's products that used STEC products

          11   in 2009?

          12        A    No.  But to clarify, the hockey stick I'm

          13   talking about pertains to EMC's end demand; it's

          14   not about STEC's demand.

02:40:06  15        Q    Okay.  That's what I was trying to go to.

          16             Did you do an empirical analysis -- we'll

          17   start with that.  Did you do an empirical analysis

          18   of the EMC sales for 2009?

          19        A    No.

02:40:23  20        Q    But that's the hockey stick you're talking

          21   about; correct?

          22        A    Well, EMC is a large and diversified

          23   company.  That's not necessarily the hockey stick

          24   I'm talking about.

02:40:35  25             I'm talking about what EMC witnesses have

                                                                    154

02:40:39  1    testified to; what EMC described in its 10-K

          2    filings; what is well-known phenomena in tech

          3    industry that EMC's demand had the hockey stick

          4    pattern.  And that impacted STEC in ways that are

02:40:55  5    relevant to issues in this case.

          6        Q    The hockey stick you're talking about has

          7    to do with EMC's end user demand for EMC's products

          8    that had STEC's SSD in them; correct?

          9        A    Correct.

02:41:14  10       Q    Okay.  Did you do an empirical analysis of

          11   the history of that demand for EMC's products in

          12   2009?

          13       A    No.

          14       Q    Okay.  Bear with me one second.

02:41:46  15            But you mention that you think EMC's 10-K

          16   supports your conclusion if there was a hockey

          17   stick phenomenon with respect to EMC's demand; is

          18   that right?

          19       A    Yes.  And I've given you a citation from

02:42:02  20   one on Page 24 in my report.

          21       Q    And you think that the -- the hockey stick

          22   phenomenon applied to the demand for EMC's products

          23   that used STEC's SSDs; is that right?

          24       A    Correct.

02:42:19  25       Q    Okay.  Like to mark as --

                                                              155

02:42:20  1          THE VIDEOGRAPHER:   487.

2     BY MR. BERRY:

3          Q     -- 487, the 10-K that you cite.   Wait a

4     minute.   Yes.   The 10-K that you cite in Footnote

02:42:39  5     89 that you quote on Page 24.

6          (Exhibit Number 487, EMC's 10-K for period ending

7           December 31, 2008, was marked for identification.)

8          Q     I'd also like to mark as Exhibit 488 the

9     10-Q -- just to make the record clear -- that the

02:43:10 10     10-K that's marked as 487 is EMC's 10-K for the

11     period ended December 31st, 2008.

12          And I'd like to mark as Exhibit 488 EMC's

13     10-Q for the quarterly period ended

14     September 30th, 2009 -- that is, the third

02:43:30 15     quarter of 2009.

16          (Exhibit Number 488, EMC's 10-Q for third quarter

17           2009 was marked for identification.)

18          Q     Dr. Bajaj, if you could just look at those

19     and confirm that those are the -- the filings that

02:43:43 20     you reference in Footnote 89.

21          A     I do see Footnote 89 referencing 10-K for

22     fiscal year ended December 31, 2008, dated March 2,

23     2009.   And then it's going on to talk about EMC

24     first quarter 2009 earnings call and other

02:44:16 25     references.

                                                        156

03:25:25  1    literature on that issue in that paragraph.

2         Q    Okay.  Well, besides -- well, do you

3    have -- yourself have personal experience of seeing

4    price discounts being common for bulk purchases to

03:25:45  5    key customers?

6         A    I believe the answer is yes.

7         Q    Why do you say "I believe"?

8         A    Well, I was trying to think.  I do come

9    across lot of third-party contracts.  And I often

03:26:07  10    consider them because one way you can establish

11    whether a particular intercompany price is

12    consistent with arm's length standard or not is to

13    look for similar transactions involving the company

14    and its arm's length customers or suppliers.

03:26:30  15    That's called "comparable and controlled

16    transaction" in that arena.

17              And I was just thinking back.  I think in

18    my experience I've seen oftentimes there is tiered

19    pricing that says that for a certain volume, you

03:26:51  20    get one price.  If you exceed that volume, you get

21    a break in price.  It's very common.

22         Q    Well, do you know if it was common to

23    offer price discounts for bulk purchases in this

24    SSD market?

03:27:07  25         A    Well, STEC at that time was the only

178

03:27:08  1   player in its market, so I don't know how it would

2   be quote/unquote common.  But it's not surprising.

3   It's not inconsistent with well-known and

4   well-understood business practice.  And it's

03:27:18  5   totally consistent with economic theory as I

6   explained in Paragraph --

7        Q   Have you undertaken --

8        THE REPORTER:  I'm sorry.  "As I explained

9   in --"?

03:27:26  10       THE WITNESS:  Paragraph 53.

11  BY MR. BERRY:

12       Q   Have you yourself undertaken any analysis

13  to determine whether or not price discounts for

14  bulk purchases are common in the SSD market?

03:27:36  15       A   Well, as I said, there aren't too many

16  players or, at least, weren't at that time.  So I

17  don't know how you would do that study.

18       Q   You have not; is that right?

19       A   You could say that.

03:27:48  20       Q   Okay.  And the second basis you give is --

21  is -- at least starts on Paragraph 54.  Do you see

22  that?

23       A   Yes.

24       Q   Okay.  And then -- and you refer to

03:27:59  25  Geoffrey Moore again.  Do you see that?

179

03:28:01   1        A     Yes.

           2        Q     What -- what is your -- because I'm having

           3   trouble understanding -- what is your second point

           4   here?

03:28:19   5        A     Well, the second point is that, as

           6   Mr. Moore explains, it is not at all uncommon for

           7   volume purchasers who are key for a firm to become

           8   a leading and mainstream supplier in the

           9   marketplace to get a price discount.

03:28:53  10        Q     Well, do you know if it's typical for a

          11   vendor in the SSD market to have a series of price

          12   negotiations with its customers?

          13        A     Well, the only example, the only vendor in

          14   that market is STEC, and it did.  So I don't know

03:29:12  15   what you mean by "common and customary."  There

          16   were no other transactions as we've been talking

          17   about.

          18        Q     Well, do you know if it's common for, in

          19   the storage device market, for vendors to have a

03:29:25  20   series of price negotiations with its customers?

          21        A     I don't see why that market would not be

          22   governed by the same economic phenomena that most

          23   markets are, so I would imagine it is.

          24        Q     But you don't know?

03:29:44  25        A     I can stipulate, Counsel, that I did not

                                                                    180

03:47:33  1    is about incremental price discount.  Did you mean

2    to ask me about the initial or incremental price?

3         Q    Thank you.  I meant "incremental."

4              Is it your opinion that you think that the

03:47:44  5    incremental price discount did not need to be

6    disclosed publicly?

7         A    Simply from an economic perspective.  I

8    can't speak to regulatory or legal obligations

9    perspective.

03:48:47  10        Q    Okay.  Okay.  So the second reason you --

11    you give begins on Paragraph 63; is that right?

12        A    Yes.

13        Q    Okay.  And you say that STEC obtained the

14    commitment from EMC to purchase almost half of the

03:49:06  15    120 million, two-quarter deal, and that enabled the

16    company to mitigate operational risks.  Do you see

17    that?

18        A    Yes.

19        Q    How do you know it enabled the company to

03:49:17  20    mitigate operational risks?

21        A    Well, as I was explaining, it would be

22    important for a company in STEC's position.

23        Q    I'm not asking why.  I'm asking how do you

24    know that it enabled STEC to mitigate operational

03:49:30  25    risks?

194

03:49:31  1      A      Contemporaneous documentation indicates
        2  that, indeed, it was viewed as a good bargain for
        3  STEC because it mitigated their operational risk.
        4      Q      And so it's -- it's based on your review
03:49:48  5  of the -- the record in this case?
        6      A      From the prism of an economist in light of
        7  the economic reason, yes.
        8      Q      Okay.
        9      MR. RAWLINSON:  My only objection there, John,
03:49:55 10  is you -- started to give sort of a theoretical
       11  answer, and you cut him off and directed him to
       12  the -- to the record.  I -- I don't have any
       13  problem with you doing that.  I just -- you know,
       14  there -- there may be economic theoretical
03:50:06 15  reasons --
       16                  (Simultaneous colloquy.)
       17      MR. BERRY:  Wait, look --
       18      MR. RAWLINSON:  No, no, but I'm not going to --
       19      MR. BERRY:  I don't want you speaking
03:50:09 20  objections.  You're just -- look, I asked him --
       21      MR. RAWLINSON:  No.  But --
       22      MR. BERRY:  -- what his basis was, not what his
       23  reasons were.  And that's why I cut him off,
       24  because he was about to give his reasons.  I
03:50:18 25  just --

                                                        195

03:50:18   1        MR. RAWLINSON:  Well, I think the reasons, at

2     least as I interpreted at the beginning, were going

3     to be how you come at that idea from an economist.

4        MR. BERRY:  Speaking objections --

03:50:23   5        MR. RAWLINSON:  I -- I'm not going to give

6     speaking objections, but I --

7        MR. BERRY:  That's what you're doing.

8        MR. RAWLINSON:  -- you cut him off a lot of

9     times.  If you're going to cut him off, I'll --

03:50:30  10     I'll let you meet me halfway, but then I get to

11     object when I think you've done it in a way that

12     might create a misleading record.  Okay?

13        MR. BERRY:  Okay.

14     BY MR. BERRY:

03:50:37  15        Q    So what -- what are the operational risks

16     that you believe STEC was able to mitigate?

17        A    Well, first and foremost, STEC would not

18     want to be in a position where it could not fulfill

19     customers' demand for its product.  And given how

03:50:59  20     large EMC business had grown to, if you look at the

21     experience in Q-1 and Q-2 where the confirmed

22     purchase orders, as of the end of three weeks into

23     the quarter were a small fraction of the demand had

24     repeated in the third quarter, that would be a

03:51:23  25     significant operational and reputational risk to

196

03:52:42  1    question.  How do I know -- what?  I know because

2    it's logical.  I know because that's what economic

3    theory tells you.

4         There is a phenomena that EMC has demand

03:52:59  5    uncertainty, and STEC needs lead time to produce

6    efficiently.  The two facts interact.

7         Economically efficient risk bearing

8    mechanism in this case is to transfer the risk of

9    demand uncertainty to EMC because it has greater

03:53:21  10   visibility into sources of that uncertainty.  To

11   the extent it can affect the magnitude of that

12   uncertainty through its pricing policies, marketing

13   policies, et cetera, it is in every way the party

14   that is better off bearing that risk.

03:53:39  15        Central tenet of financial economics is

16   that, when you're talking about risk sharing, there

17   is usually a party that has a comparative advantage

18   in bearing that risk.

19        The same principle applies here.  Demand

03:53:52  20   uncertainty risk.  It's more efficient from an

21   economic perspective to transfer onto EMC.  That is

22   in the aggregate beneficial for EMC and STEC put

23   together.

24        And when they can find a traction at a

03:54:09  25   price that's acceptable to both parties to make

198

03:54:12  1    that efficient arrangement, it's a good thing.

2        Q    Okay.  You mentioned concerns about the

3    Malaysian holiday.  How do you know that there were

4    concerns about the Malaysian holiday?

03:54:28  5        A    By looking at the facts that I've looked

6    at in this case.

7        Q    Okay.  You also mentioned specifications.

8    Is -- is it your position that -- that the

9    reason -- or is it your opinion that the -- one of

03:54:45  10   the reasons they -- that STEC entered into the --

11   the incremental price discount deal was to get

12   exact specifications for its Q-3 sales to EMC?

13       A    It's my understanding that that was one of

14   the motivations for STEC personnel to push

03:55:07  15   Mr. Moshayedi to get that clarification.

16       Q    It's your understanding that STEC

17   personnel actually pushed Mr. Moshayedi to get that

18   understanding?

19       A    They wanted Mr. Moshayedi to make an

03:55:20  20   arrangement that would remove that source of

21   uncertainty as to how many parts to produce of

22   which type.

23       Q    And -- and how do you know they wanted

24   that?

03:55:30  25       A    From the various materials that I've cited

199

03:55:33   1   in my report that I've seen.

2        Q    Okay.  And you know who Mr. Malani is?

3   Nader Malani?

4        A    If I recall correctly, he is one of the

03:55:50   5   production or operational guy who was managing

6   Malaysian production.  I may be remembering

7   incorrectly.

8        Q    That's -- that's correct.  Do you knowing

9   if Mr. Malani even knew about the incremental price

03:56:03  10   discount deal?

11        A    I don't know for a fact, and I don't know

12   why that matters.

13        Q    It doesn't matter that the guy running the

14   Malaysian production facilities knows about the

03:56:16  15   deal that led to these specifications that you

16   think were so important?

17        A    Well, he should know the end result that

18   the specifications came forward that made his job

19   easier.  I don't know why it's important for him to

03:56:29  20   know what insignificant economic discount had to be

21   offered to get that clarification.

22        Q    Do you know as of the day that the

23   incremental -- incremental -- I want to make sure

24   I'm using the right term.  We're using "incremental

03:56:43  25   price discount" --

                                                        200

04:10:22  1    A    I don't understand your question.  I'm

2    sure they vary.  I'm sure the lead times could be

3    as little as practically nothing when there was

4    ready inventory.

04:10:34  5         Are you averaging that at lead times when

6    they had to manufacture to demand?  I don't know

7    how much of the demand are you talking about.  I --

8         Q    Okay.  Well, I'll ask.  Did you endeavor

9    to try to find out what the average lead times were

04:10:52  10   for EMC's orders of Zeus IOPS in the first two

11   quarters of 2009 were?

12        A    No.  Nor would that be a sensible

13   analysis, Counsel.  All these type of analyses, how

14   much inventory to keep on hand to be able to meet

04:11:14  15   unforeseen demand, et cetera -- they're not about

16   averages.

17        They're about having acceptably low

18   probability of not faltering when you face an

19   outcome that is unexpected.  These are calibrated

04:11:29  20   to extreme circumstances.  They are not calibrated

21   to average circumstances.

22        Q    But did -- did you undertake any kind of

23   analysis to compare the order dates by EMC for

24   STEC's Zeus IOPS to the delivery dates of those

04:11:50  25   products to EMC in the first two quarters of 2009?

212

04:11:53   1        A    No, I did not.

2        Q    Okay.

3        A    Excuse me.

4        Q    Now, a third reason you gave, which begins

04:12:26   5   on Paragraph 55 on Page 42, do you see that?

6        A    Yes.

7        Q    Okay.  And you -- you say in the -- in the

8   first sentence that (reading):

9             It is not unusual for pricing and

04:12:39  10             quantity details to be reset in contracts

11             between OEMs and their suppliers according

12             to prior academic studies.

13        A    Yes.

14        Q    Do you see that?

04:12:48  15             And what are those -- those prior academic

16   studies you're talking about?

17        A    Well, I've given a few cites to exemplify

18   that literature.

19        Q    Okay.  Well, setting aside the prior

04:13:04  20   academic studies you cite, do you have any other

21   basis for saying it is not unusual for pricing and

22   quantity details to be reset in contracts between

23   OEMs and their suppliers?

24        A    Those studies, my general knowledge about

04:13:25  25   high-tech businesses, and economic logic.

213

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

04:13:33  1      Q      Okay.  Now, you cite in this paragraph

2  a -- a study by Crocker and Marsten.  Do you see

3  that?

4      A      Yes.

04:13:45  5      Q      Okay.  And then in Paragraph 66, you refer

6  to a study by Artz and Norman that you say

7  specifically examines contracts between OEM buyers

8  and their component suppliers.

9      A      Yes.

04:13:59  10      Q      Do you see that?

11              Do you know if these studies concerned

12  short or long-term contracts?

13      A      I don't recall, but I don't know why that

14  distinction would be that relevant.

04:14:20  15      Q      Well, the $120 million contract that we're

16  talking about, that was a short-term contract;

17  correct?

18      A      It was over a six-month period.

19      Q      How would you characterize it?  Short or

04:14:32  20  long term?

21      A      I don't know.  In the environment and the

22  rate at which conditions were evolving in the STEC

23  industry at that time, six months may be considered

24  long term, may be short term.  I don't know.  And I

04:14:48  25  don't know why that would be relevant.

214

04:14:50  1      Q      Okay.  Well, do you -- do you know if it

2  was relevant to the Crocker and Marsten or the Artz

3  and Normans studies as to whether or not the

4  contracts they were studying were short or long

04:15:00  5  term?

6      A      If I was doing an empirical study like

7  they are, I would want to look at longer contracts

8  so I could have a reasonable period of time to be

9  able to make the observations I need to do a

04:15:13  10  statistical analysis that would be reliable.

11      Q      Well, do you know if either one of

12  their -- either -- do you know if the conclusions

13  from either one of their studies are limited to

14  only long-term contracts?

04:15:26  15      A      I don't even know what that means,

16  Counsel.  Contracts are terminable.  Most contracts

17  are terminable.  I don't know what "long-term

18  contract" means.  If it doesn't suit parties'

19  needs, they would revise it; they would terminate

04:15:42  20  it.

21      Q      Contracts have terms; correct?  Typically

22  a duration?

23      A      And contracts are not word of God.

24  Contracts change all the time.

04:15:53  25      Q      I understand that.  The -- the term -- the

215

04:15:54   1    duration for the $120 million contract was two

2    quarters; correct?

3        A    Yes.

4        Q    Okay.  Do you know if the conclusions in

04:16:06   5    the Crocker and Marsten study or the Artz and

6    Norman study apply to contracts that are only two

7    months -- two quarters long?

8        A    How is it relevant?  If somebody --

9        Q    I'm not asking if it's relevant.  I'm

04:16:20  10    asking --

11        A    Counsel, let me finish, please.

12             If somebody studies the effect of using

13    some sunscreen by looking at what happens to people

14    used it for three years or five years or ten years

04:16:32  15    and find that it may be carcinogenic, does that

16    mean the study has no validity if I plan to use

17    that sunscreen for a six-month period?  No.

18             The point is the implication of that

19    study, what does that tell us?  What economic

04:16:50  20    reasoning does it tell us?  It's not whether the

21    sample was long-term or short-term.  For a

22    methodological reason, I would pick a long-term

23    sample, but that's long-term exposed.

24             A contract that is supposed to be

04:17:02  25    quote/unquote long-term may become short-term at

216

04:17:06  1   any time, and presumably that would drop out from

2   their sample.  So I don't know why this is relevant

3   for the work that I'm doing.

4       Q    Well, isn't the basic principle that, as

04:17:17  5   you -- or I think the principle you're espousing,

6   that contracts are often reset more applicable to

7   long-term contracts because they have such a

8   long-term and the uncertainties therefore are for

9   over a longer period of time?

04:17:30  10      A    Holding amount of uncertainty per unit of

11   time constant, a longer term contract, by virtue of

12   being long-term exposed, has experienced more

13   uncertainty.

14           But that does not mean that in another

04:17:46  15   situation where there is a lot of uncertainty that

16   the same phenomena may not be applicable over a

17   six-month horizon.

18      Q    Do you know what the median duration -- do

19   you know what the median of the duration of

04:18:02  20   contracts was in the Crocker and Marsten study?

21      A    I don't recall as I sit here.

22      Q    Okay.  Did you consider it when you were

23   citing it?

24      A    Well, I know the paper.  I've read the

04:18:14  25   paper.

217

04:18:14  1       Q      Did you consider the duration, the median

2    duration of contracts that they were studying in

3    citing -- in citing that paper?

4       A      No.   That wouldn't be sensible for the

04:18:26  5    reasons I explained.

6       Q      Do you have any idea what the -- the

7    duration of contracts were in the Artz and Norman

8    piece?

9       A      I don't know as I sit here.

04:18:34  10      Q      Okay.   Did you consider the duration of

11    contracts of the Artz and Norman piece when you

12    issued your opinion?

13      A      No.   Nor was it relevant.

14             Is this a good time for us to take a brief

04:18:55  15    break?

16       MR. BERRY:  Sure.   Absolutely.

17       THE WITNESS:  Thank you.

18       MR. BERRY:  Actually a very good time.

19       THE VIDEOGRAPHER:  I'm going to change media.

04:19:02  20    This is the end of Tape and Disk 4, Volume 1 of the

21    videotaped deposition of Mukesh Bajaj, Ph.D.  We're

22    going off the record, and the time is 4:19 p.m.

23                   (A recess was taken

24                    4:19 until 4:27 p.m.)

04:27:40  25       THE VIDEOGRAPHER:  This is the beginning of

218

```
04:27:41   1    Tape and Disk -- I'm sorry -- 5, Disk 5 of the

           2    videotaped deposition of Mukesh Bajaj, Ph.D.  We

           3    are back on the record, and the time is 4:27 p.m.

           4    BY MR. BERRY:

04:27:58   5         Q    Dr. Bajaj, if we could just look at

           6    Paragraph 67 in your report on Page 44.

           7         A    Yes.

           8         Q    In the middle of the -- the paragraph, do

           9    you see the sentence that starts "In turn, given

04:28:14  10    such demand uncertainty"?

          11         A    Yes.

          12         Q    And you go on and say (reading):

          13              STEC was reluctant to build an

          14              overly-large inventory of SSDs of a

04:28:20  15              particular design which may ultimately not

          16              be able to sell, especially as SSDs were

          17              built to customer speculations.

          18              Do you see that?

          19         A    Yes.

04:28:31  20         Q    How do you know that STEC was reluctant to

          21    build an overly-large inventory?

          22         A    Well, I know that from my reading of the

          23    documents cited in the report.

          24         Q    Okay.  And then you also say (reading):

04:28:48  25              As the emails cite in the complaint
```

219

05:50:18  1    a one-time deal, is not relevant?

2         A    No.  That's not what I'm saying here.

3              I'm saying whether -- what matters is

4    expected future free cash flows.  The stock price

05:50:37  5    is mostly determined by cash flows beyond 2009,

6    something like 98 or 99 percent of the value of the

7    company derives from what happens beyond 2009.

8              What matters is what are the expected cash

9    flows?  It's not particularly relevant whether you

05:51:04 10    have a commitment for six months or you have an

11    expectation of similar level of sales without there

12    being a commitment for those six months.  And

13    that's what an analyst from Pacific Crest said.

14         Q    I -- is it your opinion that whether or

05:51:24 15    not the $120 million volume agreement was just a

16    one-time deal is economically immaterial?

17         A    That's an incomplete hypothetical

18    question.  Are you asking me to compare having

19    $120 million agreement -- worth is -- a but-for

05:51:46 20    word, where you expect that there would be no sales

21    or substantially lower sales?

22         Q    I'm asking you -- the information that

23    this was a one-time deal -- is it your opinion that

24    that information is economically immaterial?

05:52:07 25         A    In light of the total mix of information

274

05:52:09  1    at the time that information was revealed, I don't

2    believe that, whether this agreement was somehow

3    set to be a one-time deal or long-term deal, is not

4    material.

05:52:32  5        For me to evaluate materiality of some

6    piece of information, I have to know relative to

7    what alternative assumptions we are talking about.

8    Q    Well, if you look at Paragraph 40 of

9    Mr. Hsueh's declaration at the end, last sentence

05:52:52  10   (reading):

11            For the reasons I explained -- for

12            the reasons explained below, I consider

13            Mr. Moshayedi's November 3rd statement

14            regarding the fact that the 120 million

05:53:03  15            supply agreement was a one-off type of

16            deal to be negative news, separate and

17            apart from the news that EMC might be

18            carrying inventory at the end of the

19            fourth quarter of 2001.

05:53:20  20        Do you see that sentence?

21   A    Okay.

22   Q    Did you consider that sentence when

23   issuing your rebuttal report?

24   A    I did.

05:53:26  25   Q    Okay.  And did it in any way -- why -- why

275

05:53:27  1    didn't that change your opinion about the economic

2    materiality of Mr. Moshayedi's comment on

3    November 3rd?

4        A    So, first of all, I was evaluating the

05:53:38  5    allegation that, as of August 3rd, Mr. Moshayedi

6    knew this was a one-off deal.  I was not evaluating

7    significance of an announcement.

8            On November 3rd, when it became known that

9    other suppliers are not stepping up -- in fact,

05:54:04  10   their sales are imploding, going -- diminishing at

11   a very rapid clip -- at the time when the market

12   knew that there was an inventory overhang, in that

13   context, knowing that EMC is refusing to commit to

14   any future deals, that's a very different piece of

05:54:28  15   information than what you need to evaluate as of

16   August 3rd to properly evaluate the allegations in

17   this case.

18           As of August 3rd, when EMC was not able

19   to -- when EMC was able to sell every STEC product

05:54:50  20   it could get its hand on, when preceding two

21   quarters they ended up buying a lot more than they

22   initially expected repeatedly, when there were

23   reasons to believe that other OEM manufacturers

24   would pick up the slack of EMC if there was any

05:55:11  25   hiccup in EMC demand.

276

05:55:14  1     The relevant question, given the

2    allegations is (A) did Mr. Moshayedi know with

3    sufficient degree of certainty that this was going

4    to be a one-time deal; (B) given the information

05:55:31  5    Mr. Moshayedi know, would it have mattered to the

6    market if he had fully disclosed what he knew about

7    the prospect of this deal?  It's that question that

8    I analyzed.

9         The question that you're asking me to --

05:55:50  10    the answer to the question that you are asking me

11    to take into account is a very different question.

12        Q    Okay.  Paragraph -- Paragraph 83 of your

13    report.

14        A    Direct report or rebuttal report?

05:56:02  15        Q    I'm sorry.  Thank you.  The -- the initial

16    report.

17        MR. RAWLINSON:  83?

18        MR. BERRY:  83, yes.

19    BY MR. BERRY:

05:56:14  20        Q    In -- in the end, you say (reading):

21             Hence, the value effect of

22             purportedly shifting Zeus IOPS revenues

23             between Q-3 and Q-4 was minimal as the

24             total value of the $120 million bulk deal

05:56:34  25             over the two quarters of the second-half

277

05:56:37  1            2009 was already disclosed.

      2            Do you see that?

      3       A    Yes.

      4       Q    Is it your opinion that revenue guidance

05:56:45  5  over a quarter is not important?

      6       A    No.

      7       Q    Then --

      8       A    What I'm saying is the following:  The

      9  market knew that EMC is going to buy $120 million

05:56:56  10  over two quarters.  Whether the breakup between

      11  quarters was 50 and 70, or 55 and 65, or some other

      12  breakup would not, by itself, be economically

      13  material unless that breakup had any signal value

      14  about implications of future long-term demand

05:57:30  15  because the way market valued STEC's stock, fully

      16  95 and a half, 95.6 percent of the value of the

      17  stock derived not from 2009 revenues, but expected

      18  revenues beyond 2009.

      19            Unless the 55/65 split or some other split

05:57:55  20  had implications about those future expected

      21  revenues, a small temporal shift in the breakup of

      22  revenue would not be economically significant.

      23       Q    You mentioned 95 to 96 percent of the

      24  stock value.  What are you talking about?

05:58:13  25       A    Well, as I say in Paragraph 83, the

278

1

2                    REPORTER'S CERTIFICATE

3

4          I, JUDITH HOLLIFIELD, C.S.R. No. 12564,

5    RPR, in and for the State of California do hereby

6    certify:

7              That prior to being examined, the witness

8    named in the foregoing deposition was by me duly

9    worn to testify the truth, the whole truth, and

10   nothing but the truth and that the witness reserved

11   the right of signature;

12             That said deposition was taken down by me

13   in shorthand at the time and place therein named,

14   and thereafter reduced to typewriting under my

15   direction, and the same is a true, correct, and

16   complete transcript of said proceedings.

17             I further certify that I am not interested

18   in the event of the action.

19             Witness my hand this 5th day of August, 2013.

20

21             _____

22             Certified Shorthand Reporter
               for the State of California

23

24

25

                                                        294

```
1    STATE OF CALIFORNIA      )
                              )  ss.
2    COUNTY OF LOS ANGELES    )

3

4          I, the undersigned, declare under penalty

5    of perjury:

6            That I have read the foregoing transcript;

7            That I have made any corrections,

8    additions, or deletions that I was desirous of

9    making;

10           That the foregoing is a true and correct

11    transcript of my testimony contained therein.

12            EXECUTED this _____ day of

13    _____, 2013, at _____,

14    _____.

15

16

17    _____
              MUKESH BAJAJ, Ph.D.
18

19

20

21

22

23

24

25
```

                                                        295

SEC v. Manouchehr Moshayedi

*Case 8:12-cv-01179 JVS-MLG*

Deposition of Mukesh Bajaj – Notice of Errata

I, the undersigned, do hereby declare that I have read the attached deposition transcript of Mukesh Bajaj (08/02/2013) and that to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Page | Line | Change | Reason for Change |
|------|------|--------|-------------------|
| 17 | 22 | Change "opinion" to "opinions" | Correct transcription error |
| 21 | 11 | Change "on" to "in" | Correct transcription error |
| 22 | 19 | Change "Febreze Toray (phonetic)" to "Fabrice Tourre" | Correct transcription error |
| 22 | 25 | Change "recall" to "recollection" | Correct word choice |
| 23 | 2 | Change "Toray" to "Tourre" | Correct transcription error |
| 27 | 13 | Change "tractions" to "transactions" | Correct transcription error |
| 43 | 18 | Change "Document" to "Documents" | Correct transcription error |
| 67 | 18 | Change "trace and" to "a trace in" | Correct transcription error |
| 71 | 10 | Change "return" to "returns" | Correct transcription error |
| 76 | 23 | Change "declined" to "decline" | Correct transcription error |
| 77 | 3 | Change "on" to "of" | Correct transcription error |
| 79 | 14 | Delete "of" | Correct transcription error |
| 90 | 12 | Change "will" to "would" | Correct transcription error |
| 110 | 17 | Change "list of" to "listing" | Correct transcription error |
| 132 | 9 | Change "report" to "reports" | Correct transcription error |
| 140 | 16 | Change "expose the fact that STEC expose" to "ex-post. The fact that STEC ex-post" | Correct transcription error |
| 144 | 10 | Insert "it" after "make" | Correct transcription error |
| 145 | 4 | Change "competitor" to "competitors" | Correct transcription error |
| 146 | 16 | Change "part" to "parts" | Correct transcription error |
| 158 | 15 | Change "will" to "would" | Clarify testimony |
| 162 | 22 | Change "piece" to "pieces" | Correct transcription error |
| 164 | 21 | Insert "in" before "analysis" | Correct transcription error |
| 165 | 13 | Insert "the" before "July" | Correct transcription error |

| 174 | 11 | Change "margin" to "margins" | Correct transcription error |
| 175 | 15 | Insert "sales" after "secondary" | Clarify testimony |
| 181 | 2 | Insert "whether" before "it" | Clarify testimony |
| 184 | 2 | Insert "on" before "business" | Correct transcription error |
| 184 | 5 | Change "friction" to "fraction" | Correct transcription error |
| 184 | 19 | Insert "a" before "bulk" | Correct transcription error |
| 190 | 19 | Insert "Would" before "you" | Correct transcription error |
| 192 | 5 | Change "has first" to "had the first" | Clarify testimony |
| 196 | 20 | Change "EMC" to "EMC's" | Correct transcription error |
| 200 | 2, 3, 9 | Change "Malani" to "Milani" | Correct transcription error |
| 200 | 5 | Change "guy" to "guys" | Correct transcription error |
| 216 | 23 | Change "exposed" to "ex-post" | Correct transcription error |
| 217 | 12 | Change "exposed" to "ex-post" | Correct transcription error |
| 220 | 13 | Change "on" to "from" | Correct transcription error |
| 227 | 25 | Insert "like a" before "reasonable" | Clarify testimony |
| 237 | 15 | Change "mark" to "marked" | Correct transcription error |
| 245 | 5 | Insert "were" after "products" | Clarify testimony |
| 250 | 11 | Change "question" to "questions" | Correct transcription error |
| 251 | 19 | Change "of a three" to "of the third" | Clarify testimony |
| 259 | 12 | Change "quarter" to "quarters" | Correct transcription error |
| 259 | 17 | Change "they're" to "their" | Correct transcription error |
| 259 | 24 | Insert "that it" before "looks" | Clarify testimony |
| 260 | 1 | Change "assume" to "assumed" | Correct transcription error |
| 261 | 14 | Change "this" to "these" | Correct transcription error |
| 262 | 20 | Delete "rather" | Clarify testimony |
| 274 | 19 | Change "worth is – a but-for word" to "in a but-for world" | Correct transcription error |
| 277 | 5 | Change "know" to "knew" | Correct transcription error |
| 278 | 9 | Change "is" to "was" | Correct transcription error |
| 289 | 16 | Change "were" to "was" | Correct transcription error |

Date:   September 4, 2013         Signature of Deponent: