1   LATHAM & WATKINS LLP
        William R. Baker, *pro hac vice*
2        william.baker@lw.com
        Sean M. Berkowitz, *pro hac vice*
3        sean.berkowitz@lw.com
        Patrick E. Gibbs, Bar No. 183174
4        patrick.gibbs@lw.com
        Matthew Rawlinson, Bar No. 231890
5        matt.rawlinson@lw.com
        Michele D. Johnson, Bar No. 198298
6        michele.johnson@lw.com
7   650 Town Center Drive, 20th Floor
    Costa Mesa, California 92626-1925
    Telephone: +1.714.540.1235
8   Facsimile: +1.714.755.8290

9   PAUL HASTINGS LLP
        Thomas P. O'Brien, Bar No. 166369
10       thomasobrien@paulhastings.com
        Thomas A. Zaccaro, Bar No. 183241
11       thomaszaccaro@paulhastings.com
12  515 South Flower Street, 25th Floor
    Los Angeles, California 90071
    Telephone: +1.213.683.6000
13  Facsimile: +1.213.627.0705

14  Attorneys for Defendant
    Manouch Moshayedi

15                  UNITED STATES DISTRICT COURT

16                  CENTRAL DISTRICT OF CALIFORNIA

17

18  SECURITIES AND EXCHANGE          CASE NO. 8:12-CV-01179-JVS-ANx
19  COMMISSION,

20              Plaintiff,            DEFENDANT'S OPPOSITION TO
                                      THE SECURITIES AND EXCHANGE
21       v.                           COMMISSION'S  MOTION TO
                                      EXCLUDE OR LIMIT EXPERT
22  MANOUCHEHR MOSHAYEDI,            TESTIMONY OF PROFESSOR
                                      ALLEN FERRELL UNDER RULES
23              Defendant.            403 AND 702 OF THE FEDERAL
                                      RULES OF EVIDENCE
24
                                      The Honorable James V. Selna
25
                                      Date:      October 21, 2013
26                                    Time:      11:00 a.m.
27                                    Place:     Courtroom 10C
28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................... 1

II.  BACKGROUND ........................................................................ 3

    A.  Dr. Bergin's Event Study and Opinions................................. 3

    B.  Professor Ferrell's Rebuttal Opinions .................................. 4

        1.  Rebuttal of Dr. Bergin's Price-Impact Calculations........................... 5

        2.  Identification of Confounding Information on Dr. Bergin's Selected Dates ................................... 6

        3.  Hypothetical "But For" Analysis Testing Dr. Bergin's Opinions .............................................. 7

III.  ARGUMENT............................................................................ 8

    A.  Professor Ferrell's Opinions Are Proper Rebuttal Opinions ........................ 8

        1.  Professor Ferrell's Opinions Are Directly Responsive to Dr. Bergin's Opinions ................................ 9

        2.  Professor Ferrell's "But For" Opinions Are Proper Rebuttal .............................................. 10

    B.  Professor Ferrell's Opinions Are Methodologically Sound and Will Assist the Trier of Fact ....................... 12

        1.  Professor Ferrell's Opinion Regarding July 16 Is Relevant to Rebut Dr. Bergin's Study of the Stock Price Impact on That Date ....................... 12

        2.  Professor Ferrell's "But-For" Analysis Is Reliable ....................... 15

        3.  Professor Ferrell's Opinions Regarding Non-Fraud-Related Factors Impacting sTec's Stock Price Between August 6, 2009, and February 24, 2010, Are Relevant and Reliable....................... 17

        4.  Professor Ferrell Does Not Offer Any Opinions Regarding the Continued Negotiation of a 2010 Volume Commitment....................... 20

        5.  Professor Ferrell's Opinions Are Not Duplicative or Cumulative ....................... 22

IV.  CONCLUSION........................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Adams v. Cooper Indus., Inc.*
No. 03-CV-476 JBC, 2006 WL 2983054 (E.D. Ky. Oct. 17, 2006) ...........................24

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*
853 F. Supp. 2d 181 (D. Mass. 2012) ........................................................................13

*Calva-Cerqueira v. United States*
281 F. Supp. 2d 279 (D.D.C. 2003) ..........................................................................16

*CDX Liquidating Trust v. Venrock Assocs.*
411 B.R. at 571 (N.D. Ill. 2009) ...............................................................................18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
509 U.S. 579 (1993) ..............................................................................................1, 17

*Durham v. Cnty. of Maui*
729 F. Supp. 2d 1188 (D. Haw. 2010) .......................................................................24

*Friedman v. Medjet Assistance, LLC*
No. 09-CV-07585-MMM (VBKx), 2010 WL 9081271 (C.D. Cal. Nov. 8, 2010)......23

*In re DVI, Inc., Sec. Litig.*
No. 03-CV-05336, 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010)................................22

*In re Imperial Credit Indus., Inc. Sec. Litig.*
252 F. Supp. 2d 1005 (C.D. Cal. 2003) .....................................................................16

*In re Oracle Sec. Litig.*
829 F. Supp. 1176 (N.D. Cal. 1993) ..........................................................................16

*In re REMEC Inc. Sec. Litig.*
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ........................................................................8

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*
04-CV-7369 LTS (HB), 2006 WL 2128785, (S.D.N.Y. July 28, 2006) .....................18

*Kirola v. City & Cnty. of San Francisco*
No. C 07-03685 SBA, 2010 WL 3476681, (N.D. Cal. Sept. 2, 2010) ........................24

*Mabrey v. United States*
No. 05-CV-00051 RLH-GWF, 2006 WL 1891127 (D. Nev. July 7, 2006)..................8

*Mesfun v. Hagos*
No. 03-CV-02182-MMM, 2005 WL 5956612 (C.D. Cal. Feb. 16, 2005)..................16

*Monsanto Co. v. E.I. Du Pont De Nemours & Co.*
No. 09-CV-00686-ERW, 2012 WL 27936 (E.D. Mo. Jan. 5, 2012)...........................23

*SEC v. Blatt*
583 F.2d 1325 (5th Cir. 1978) ...................................................................................20

*SEC v. Drucker*
 528 F. Supp. 2d 450 (S.D.N.Y. 2007) ................................................................20

*SEC v. First City Fin. Corp.*
 890 F.2d 1215 (D.C. Cir. 1989) ......................................................................20

*SEC v. First Pac. Bancorp.*
 142 F.3d 1186 (9th Cir. 1998) .......................................................................20

*SEC v. Leslie*
 No. C 07-3444, 2010 U.S. Dist. LEXIS 76826 (N.D. Cal. July 29, 2010) .................18

*SEC v. Razmilovic*
 2013 WL 3779339 (2d Cir. July 22, 2013).......................................................20

*SEC v. Roszak*
 495 F. Supp. 2d 875 (N.D. Ill. 2007) ..............................................................18

*United States v. Skillman*
 922 F.2d 1370 (9th Cir.1990) ........................................................................23

## OTHER AUTHORITIES

Esther Bruegger and Frederick C. Dunbar, "Estimating Financial Fraud Damages with Response Coefficients," The Journal of Corporation Law 35(1), 2009 ......................17

Itay Kama, "On the Market Reaction to Revenue and Earnings," Journal of Business Finance & Accounting 36 (1 and 2), January/March 2009 ..........................................17

Ray Ball and Philip Brown, "An Empirical Evaluation of Accounting Income Numbers," Journal of Accounting Research, Autumn 1968.............................................................17

# I.   INTRODUCTION

The SEC's motion to exclude or limit the expert testimony of Professor Allen Ferrell, Ph.D., should be denied.  Mr. Moshayedi designated Professor Ferrell to rebut the SEC's expert, Dr. Richard Bergin, Ph.D., who opined that certain disclosures made by sTec on three dates—July 16, 2009, November 3, 2009, and February 23, 2010—were material and had a statistically significant impact on sTec's stock price.  The SEC now seeks to prevent Professor Ferrell from testifying at trial, arguing that (1) the opinions reflected in Sections IV and VII of Professor Ferrell's expert report are not "proper" rebuttal, and (2) certain of Professor Ferrell's opinions are not sufficiently reliable or relevant to satisfy Federal Rules of Evidence 403 and 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The SEC's arguments have no merit, and instead rely on mischaracterizations of Professor Ferrell's opinions.  There is no basis to exclude any of Professor Ferrell's testimony.

First, the opinions expressed by Professor Ferrell in Sections IV and VII of his report respond directly to Dr. Bergin's analysis.  The SEC characterizes these opinions as a critique of the SEC's disgorgement calculation, not a rebuttal to Dr. Bergin's opinions, but that is false.  As he explained repeatedly in deposition, Section IV of Professor Ferrell's report opines that Dr. Bergin's analysis does not provide scientific support for the SEC's disgorgement calculation.  Although the SEC complains that Dr. Bergin does not offer a disgorgement opinion, this is a red herring.  Section IV of Professor Ferrell's opinion is directed squarely at Dr. Bergin's opinions, and this opinion could not have been offered before Professor Ferrell saw Dr. Bergin's report.  If the SEC relies on Dr. Bergin's testimony to support its disgorgement calculation, then Professor Ferrell should be allowed to offer a rebuttal.  In any event, any ambiguity about how the SEC plans to use Dr. Bergin's testimony results from SEC's failure to make its intentions clear.  But that is not a basis for excluding Dr. Ferrell from rebutting Dr. Bergin's opinions.

Section VII of Professor Ferrell's report—which he refers to as his "but-for" analysis—is also aimed squarely at Dr. Bergin's opinions.  In Section VII, Professor

1   Ferrell examined the "disclosures of interest" that Dr. Bergin studied from November 3,

2   2009, and February 23, 2010, and applied widely accepted methodologies to evaluate

3   how the disclosure of that information in July or August of 2009 would have affected

4   sTec's stock price.  In so doing, Professor Ferrell found that the disclosure of this

5   information in late July or early August would have affected the price increase observed

6   on July 16 by $3.30 at most.  This finding undermines Dr. Bergin's opinion that the

7   disclosure of this information was solely responsible for the combined $12.12 in residual

8   returns that Dr. Bergin observed on November 4, 2009, and February 24, 2010.  In other

9   words, Professor Ferrell's "but-for" analysis shows that the residual returns on those

10  dates must have been caused, in part, by confounding information that is unrelated to the

11  SEC's claims.  As such, this part of Professor Ferrell's opinion directly rebuts opinions

12  offered in Dr. Bergin's opening report.

13      The SEC's remaining attacks on Professor Ferrell's opinions are equally

14  misguided.  Although the SEC claims that Professor Ferrell incorrectly assumed that the

15  SEC is alleging a disclosure deficiency on July 16, that is false.  Professor Ferrell

16  analyzed the July 16 residual return because Dr. Bergin offered an opinion about it.  Put

17  simply, Professor Ferrell was asked to respond to Dr. Bergin's opinions, which include an

18  opinion about the reasons for the residual return on July 16, and that is what he did.

19  While the SEC has never explained why it asked Dr. Bergin to analyze the July 16 return,

20  and Dr. Bergin was unable to explain what it has to do with the SEC's case, the SEC put

21  the July 16 return at issue in Dr. Bergin's report.  If the SEC is now claiming that the

22  residual return on July 16 is totally irrelevant to this case, then Dr. Bergin's opinion is

23  irrelevant and should be excluded.  But if Dr. Bergin is going to testify about the July 16

24  residual return, then Professor Ferrell should be entitled to rebut that testimony.

25      Professor Ferrell's examination of other factors that may have impacted sTec's

26  stock price between August 6 and February 24 is also highly relevant, as it highlights a

27  crucial flaw in Dr. Bergin's analysis.  The methodologies Professor Ferrell applied in

28  doing so are well-established and do not require specialized expertise in the SSD

1   industry.  In fact, Professor Ferrell relied in part on Dr. Bergin's own event study and

2   reviewed the same analyst reports in reaching his conclusions.  Furthermore, there is no

3   basis for excluding any portion of Professor Ferrell's opinions as cumulative.  Professor

4   Ferrell's analysis not only is unique, but also cannot be deemed "cumulative" until Mr.

5   Moshayedi's other experts have been qualified and are permitted to testify.

6          Accordingly, as discussed below, the SEC's motion should be denied.

7   **II.    BACKGROUND**

8          **A.    Dr. Bergin's Event Study and Opinions**

9          Under the Court's case management order (Dkt # 33, extended by Dkt # 81),

10  opening expert reports were due on June 18, 2013.  On that date, the SEC served Mr.

11  Moshayedi with the expert report of Dr. Richard Bergin.  *See* Ex. 1 (Bergin Report).  Dr.

12  Bergin was "retained by the [SEC] to prepare certain analyses to assist the trier of fact in

13  considering both the materiality of certain disclosures … made by Moshayedi and their

14  impact on STEC's stock price on three separate dates in 2009 and 2010."  *Id.* at 6.  In

15  particular, based on an event study, Dr. Bergin opined that certain information disclosed

16  on three dates was material, and had a statistically significant impact on sTec's stock

17  price.  *Id.* at 6-7.  Dr. Bergin did not exercise any independent judgment in selecting the

18  dates and disclosures he studied.  He simply studied the dates and disclosures that the

19  SEC told him to study.  *See id.* at 16; Ex. 2 (Bergin Depo.) at 46:21-24.  However, Dr.

20  Bergin has never before offered expert testimony in a case involving alleged violations of

21  the securities laws, nor has he ever offered expert testimony based on an event study.  *Id.*

22  at 9:24-13:18.

23         Dr. Bergin studied disclosures made by sTec on July 16, 2009; November 3, 2009;

24  and February 23, 2010.  Ex. 1 (Bergin Report) at 6-7.  Following the July 16 disclosures,

25  Dr. Bergin observed a statistically significant "abnormal" return of 12.98% (an increase

26  of $3.58) in the price of sTec's stock.  *Id.* at 9.[1]  Dr. Bergin opined that this abnormal

27  ────────────────

28  [1]  The "abnormal return" is the amount by which a company's stock price moves on a
    particular day (or other event window) in excess of the "normal return," which is the

1  return was caused entirely by two "disclosures of interest" that the SEC asked him to

2  study. *Id.* at 6-7, 32-33. Dr. Bergin made no effort to link his opinions about the July 16

3  disclosures to any element of the SEC's case. In fact, at deposition, Dr. Bergin was

4  unable to explain how, if at all, his opinions about these disclosures relate to the SEC's

5  case. Ex. 2 (Bergin Depo.) at 44:2-19; *see id.* at 41:1-9, 50:19-51:15. Indeed, Dr. Bergin

6  conceded that these disclosures were true. *Id.* at 51:8-13.

7  Following the November 3, 2009, disclosures, Dr. Bergin observed an abnormal

8  return of -38.82% (a decrease of $8.99) in the price of sTec's stock. Ex. 1 (Bergin

9  Report) at 9. Dr. Bergin opined that the entire amount of this abnormal return was caused

10  by two "disclosures of interest" that the SEC asked him to study. *Id.* at 9, 40-54.

11  Following the February 23, 2010, disclosures, Dr. Bergin observed an abnormal return of

12  -23.33 % (a decrease of $3.13) in the price of sTec's stock *Id.* at 10. Dr. Bergin opined

13  that the entire amount of this abnormal return was caused by a "disclosure of interest"

14  that the SEC asked him to study. *Id.* at 10, 54-64. Again, Dr. Bergin was unable to

15  explain how, if at all, his opinions about the November 3 and February 23 disclosures

16  relate to the SEC's claims. *See* Ex. 2 (Bergin Depo.) at 251:7-17. He did not perform

17  any analysis to evaluate whether the information disclosed on November 3 or February

18  23 could have been disclosed back in July or August of 2009 (*id.* at 54:1-55:9), nor did he

19  even attempt to determine how sTec's stock price would have been affected if this

20  information had been disclosed in July or August 2009. *Id.* at 74:21-75:17, 131:12-18,

21  251:10-16.

22  **B.   Professor Ferrell's Rebuttal Opinions**

23  As rebuttal to Dr. Bergin's report, Mr. Moshayedi submitted the report of Professor

24  Allen Ferrell, PhD. Professor Ferrell, an economist, is the Greenfield Professor of

25  Securities law at Harvard Law School, where he teaches corporate finance, among other

26

27  amount the stock price would be expected to move had the event not taken place. *See*
Ex. 1 (Bergin Report) at 22; Ex. 3 (Bajaj Report) at 2. The "normal" or "expected"
28  return is calculated by reference to market or peer indices. *See id.*

subjects.  Ex. 4 (Ferrell Report) at 1.  Professor Ferrell earned a Ph.D. in economics from the Massachusetts Institute of Technology and a J.D. from Harvard Law School.  *Id.* Professor Ferrell, whose Ph.D. concerned the relationship between stock prices and financial disclosures, has testified before the United States Senate Subcommittee on Securities, Insurance and Investment, and he has presented to, among others, the Securities and Exchange Commission, the World Bank, International Monetary Fund, the Structured Products Association and the National Bureau of Economic Research.  *Id.* Professor Ferrell has published approximately thirty articles in leading journals in the general area of law and finance including papers on securities damages, loss causation and event study analysis.  *Id.*  He has served as an expert witness in a variety of securities matters involving damages and loss causation, testifying in seventeen matters (excluding the present case) during the past four years.  *Id.*

Professor Ferrell's report identifies several opinions that he is prepared to offer at trial, all of which rebut opinions disclosed in Dr. Bergin's report.

### 1.    Rebuttal of Dr. Bergin's Price-Impact Calculations

Professor Ferrell notes that Dr. Bergin's report does not purport to provide a calculation of any losses avoided or profits gained by Mr. Moshayedi due to failing to disclose any specific allegedly material information.  Ex. 4 (Ferrell Report) at 2, 5-7.  In addition, Professor Ferrell opines that Dr. Bergin's report is not consistent with the only disgorgement calculation that the SEC has disclosed in this case.  *Id.*  Specifically, Professor Ferrell opines that Dr. Bergin's conclusion that the July 16 disclosures caused a $3.58 per-share increase in sTec stock is inconsistent with the SEC's disgorgement calculation of $19.49 per share.  *Id.* at 5-6.  Professor Ferrell explains that if, as Dr. Bergin posits, the price inflation resulting from the positive disclosures made on July 16 was $3.58 per share, then the price impact caused by a correction of that information cannot exceed $3.58.  *Id.*  This analysis undermines Dr. Bergin's opinion that the full amount of the abnormal returns observed on November 4 and February 24 can be attributed to the November 3 and February 23 disclosures.  This analysis also shows that

some portion of the abnormal returns following the November 3 and February 23 disclosures must be attributable to other, non-fraud factors that Professor Ferrell documents in his report.  *Id.* at 7-12.

### 2.    Identification of Confounding Information on Dr. Bergin's Selected Dates

Professor Ferrell also identifies several methodological flaws that undermine Dr. Bergin's conclusions that the price impacts he observed on the three dates he studied are attributable to the "disclosures of interest" that the SEC asked him to study.  Ex. 4 (Ferrell Report) at 2-3, 12-26.  This undermines Dr. Bergin's conclusions that the stock price impacts he found were solely the result of the disclosures the SEC asked him to study.  To that end, Professor Ferrell examined Dr. Bergin's conclusions with respect to each date he studied, as discussed below.

**July 16, 2009:**  Professor Ferrell discusses the fact that Dr. Bergin's characterization of the July 16 disclosure regarding EMC's "continued commitment" to use sTec products was exaggerated, and not reflected in the analyst reports at the time. *Id.* at 13-14.  In addition, Professor Ferrell points out that Dr. Bergin failed to address the FY 2009 ZeusIOPS revenue guidance that sTec also disclosed on July 16.  *Id.*  Thus, Professor Ferrell rejects as unfounded Dr. Bergin's conclusion that the entire stock price increase on July 16 was attributable solely to the disclosures that sTec signed the $120 million agreement and that this reflected a "continuing commitment" by the customer. *Id.*

**November 3, 2009:**  Professor Ferrell identifies several pieces of confounding information that Dr. Bergin failed to consider, which were likely to have affected sTec's stock price on November 4.  *Id.* at 15-23.  This includes data that analysts gathered from other sources between July 16 and November 3, as well as other information disclosed on November 3, all of which affected their analysis following the November 3 disclosures. *Id.* at 15-20.  In addition, Professor Ferrell rebuts Dr. Bergin's conclusion that analysts attached a great deal of importance to the "one-off" disclosure made on November 3, and

he points out Dr. Bergin's failure to consider whether the "one-off" disclosure could have been disclosed earlier. *Id.* at 21-23.

**February 23, 2010:** Professor Ferrell opines that Dr. Bergin failed to explain how the February 23 disclosure that sTec did not expect orders from EMC during the first half of 2010 can reasonably constitute a corrective disclosure. *Id.* at 23-26. According to Professor Ferrell, the only reason Dr. Bergin gives for this conclusion is that the stock price dropped that day. *Id.* at 24. Professor Ferrell also points out that Dr. Bergin doesn't say when sTec should have disclosed this information, and fails to consider the impact of confounding information on sTec's stock price on that day. *Id.* at 23-26.

### 3.    Hypothetical "But For" Analysis Testing Dr. Bergin's Opinions

In addition, Professor Ferrell applies a "but for" analysis to evaluate how the disclosure of the information of "interest" back in July or August of 2009 would have affected sTec's stock price at the time. Ex. 4 (Ferrell Report) at 3, 26-33. Professor Ferrell conducted this analysis to rebut Dr. Bergin's attribution of the price impacts he observes to the disclosures the SEC asked him to study on dates other than August 3, 2009. Professor Ferrell's but-for analyses demonstrate that, if Dr. Bergin had taken into account confounding information that was introduced to the market on the dates he studied, his analysis would have resulted in significantly lower numbers. *Id.* at 27. But even more fundamentally, Professor Ferrell's "but for" analysis directly refutes Dr. Bergin's opinions attributing the entire residual stock price drops on November 4, 2009 and February 24, 2010 to three "disclosures of interest." *Id.* at 26-33.

The first scenario Professor Ferrell studied is the "but for impact due to different analyst interpretations of July 16 announcement." *Id.* at 26-30. Professor Ferrell examines how sTec's stock price would have been affected if sTec had disclosed on July 16 or early August that the EMC volume agreement was a "one-off type of deal," and he concludes that the price would have been reduced by an amount between $0.44 and $1.12. *Id.* This undermines Dr. Bergin's conclusion that the entire $3.58 per-share

1  increase on July 16 was attributable to the market's belief that the EMC agreement would

2  be recurring in nature.

3        Professor Ferrell also performed a "but-for impact of clairvoyance" analysis, which

4  examines how sTec's stock price would have been affected if Mr. Moshayedi had known

5  and disclosed, in advance, how long it would take for EMC to use all of the SSDs it

6  bought under the $120 million agreement. *Id.* at 30-32.  Professor Ferrell concludes that

7  even with perfect information, the stock price would have ***increased*** by $0.22 on July 16.

8  *Id.*  In other words, even if the market had known in July that the EMC agreement would

9  fulfill EMC's needs for three quarters rather than two, the disclosure of the agreement

10 still would have increased the price of sTec's stock.  This analysis demonstrates that the

11 most that sTec's price could have been affected by the information Dr. Bergin focuses on

12 was $3.30 per share, not the larger amounts Dr. Bergin provided.

13 **III.   ARGUMENT**

14     **A.   Professor Ferrell's Opinions Are Proper Rebuttal Opinions**

15       The SEC's principal argument is that some of Professor Ferrell's opinions are

16 "improper" rebuttal.  SEC's Mot. to Exclude A. Ferrell (Dkt # 255-2) ("Mot.") at 11.  In

17 particular, the SEC contends that in Sections IV and VII of his report, Professor Ferrell

18 "critiques only the SEC's disgorgement calculation," not Dr. Bergin's analysis.  *Id.*  But

19 in fact, Professor Ferrell's opinions respond directly to Dr. Bergin's opinions regarding

20 the materiality and stock price impact of the SEC-selected "disclosures of interest" on

21 July 16, 2009, November 3, 2009, and February 23, 2010.  Because Professor Ferrell's

22 opinions are in direct response to Dr. Bergin's opinions, they are manifestly proper

23 rebuttal opinions and should not be excluded.  *See, e.g.*, *In re REMEC Inc. Sec. Litig.*,

24 702 F. Supp. 2d 1202, 1220 (S.D. Cal. 2010); *Mabrey v. United States*, No. 05-CV-00051

25 RLH-GWF, 2006 WL 1891127, at *4 (D. Nev. July 7, 2006).

26

27

28

### 1. Professor Ferrell's Opinions Are Directly Responsive to Dr. Bergin's Opinions

Both sides agree that disgorgement issues are to be addressed by the Court in a separate remedial phase, and thus both sides appear to agree that no disgorgement-specific evidence should be presented to the jury.  Given that, Mr. Moshayedi believes that the SEC's focus on what testimony would or would not be admitted in a separate remedial phase is premature at this point, and need not be resolved by a motion in limine or *Daubert* motion at this time.

In any event, however, the SEC's argument is wrong.  Professor Ferrell's reference to the SEC's disgorgement calculation is in direct rebuttal to Dr. Bergin's opinion.  Specifically, Professor Ferrell opines that Dr. Bergin's opinions and analysis do not support the disgorgement calculation offered by the SEC.  Contrary to the SEC's argument, this opinion could not have been offered in an opening report, because it responds directly to the opinions that Dr. Bergin offered in his opening report.[2]

The SEC seems at great pains to avoid actually saying whether it intends to rely on Dr. Bergin's testimony to support its disgorgement calculation.  In discovery, Mr. Moshayedi served the SEC with a straightforward interrogatory calling for the SEC to identify its disgorgement calculation and to explain the basis for it.  *See* Ex. 7.[3]  The SEC refused to fully answer the interrogatory, objecting that it called for a premature expert disclosure, but promised to make appropriate expert disclosures on this issue by the expert disclosure deadline.  *Id.*[4]  The SEC then proceeded to disclose Dr. Bergin's

---

[2]  Professor Ferrell repeatedly explained all of this in his deposition (testimony the SEC ignores), stating that he was not "engaged to provide analysis about what the disgorgement amount or avoided losses should be for this case." Ex. 5 (Ferrell Depo.) at 44:3-9; *see also, e.g.*, *id.* at 103:6-13, 104:10-17, 107:2-8, 108:21-23.  Professor Ferrell provides no affirmative opinion on the calculation of disgorgement.

[3]  The Interrogatory asked the SEC to "State the amount YOU contend that DEFENDANT should be required to disgorge as ill-gotten gains and prejudgment interest, and explain how YOU calculated that amount."

[4]  The SEC also purported to reserve the right to offer a completely different disgorgement calculation at trial.  *Id.*  Apparently the SEC does not believe that Mr.

opinions, but without explaining how Dr. Bergin's opinions relate to the SEC's claims. And while Dr. Bergin testified that he is not offering an opinion about disgorgement, the SEC has never denied that it intends to rely on Dr. Bergin's opinions (and his event study regarding the causes of sTec's stock price drop between August 3, 2009, and February 23, 2010) in support of its disgorgement calculation. Thus, to the extent there is any ambiguity as to whether the SEC intends to rely on Dr. Bergin's testimony in support of its disgorgement calculation, it appears to be deliberate on the SEC's part.

In any event, for purposes of this motion, it is enough to say that Professor Ferrell's opinion is aimed squarely at Dr. Bergin's opinions. The SEC's refusal to say whether or not it intends to use Dr. Bergin's opinions for this purpose is not a proper basis for excluding any of Dr. Ferrell's testimony as "improper rebuttal."

### 2.    Professor Ferrell's "But For" Opinions Are Proper Rebuttal

There is likewise no truth to the SEC's assertion that the opinions expressed in Section VII of Professor Ferrell's report—his "but for" analysis—relate only to the SEC's disgorgement calculation and not to Dr. Bergin's opinions. *See* Mot. at 13. The SEC's assertion misrepresents this portion of Professor Ferrell's opinions, which relate directly to and critique Dr. Bergin's analysis, and ignores a host of deposition testimony by Professor Ferrell that directly contradicts the SEC's argument.

The "but for" analysis reflected in Section VII of Professor Ferrell's report directly undermines Dr. Bergin's opinions about the stock price impact of the July 16, November 3, and February 23 disclosures that Dr. Bergin analyzed in his report. With respect to July 16, Dr. Bergin opined that the entire residual stock price impact of $3.58 on that date was attributable to two "disclosures of interest." Ex. 1 (Bergin Report) at 33-34. Professor Ferrell's "but for" analysis shows that this conclusion is flawed. Through his "but for" analysis, Professor Ferrell quantifies the impact of a hypothetical disclosure on July 16 making clear the non-recurring nature of the $120 million agreement. *See id.* at

Moshayedi is entitled to know how the SEC intends to calculate a disgorgement figure until he sees the calculation at trial.

26-30.  The purpose of this analysis is to identify what portion of the stock price reaction

on July 16 can be attributed to the omission of this information and what portion must be

attributed to other, indisputably truthful disclosures—*i.e.*, the fact of the $120 million

volume agreement, or the announcement of full-year ZeusIOPS revenues.  As Professor

Ferrell explained, this analysis responds to Dr. Bergin's opinions:

> [T]here's two different effects that the volume agreement could have that
> might result in a positive price impact, the [$]3.58.  And so what I'm doing
> is I'm trying to separate those.  And I do that by looking at the variation
> across analysts in terms of their expectations . . . .

Ex. 5 (Ferrell Depo.) at 146:23-147:4.

Professor Ferrell's "but for" analysis also directly addresses (and undermines) Dr.

Bergin's conclusions about the stock price impact of disclosures made on November 3

and February 23.  In his report, Dr. Bergin opined that sTec's residual stock price drop on

November 4 ($8.99), was attributable to only two disclosures:  (1) that EMC might carry

inventory of ZeusIOPS at the end of 2009 which would be used in 2010; and (2) that

sTec's deal with EMC was "one-off" and thus non-recurring in nature.  Ex. 1 (Bergin

Report) at 46-47.  He further attributed sTec's residual stock price drop on February 24

($3.13) to the disclosure that EMC's inventory carryover would negatively affect sTec's

sales to EMC in the first half of 2010.  *Id.* at 58-59.

To test those opinions, Professor Ferrell performed a detailed, quantitative analysis

in order to estimate what the stock price impact would have been if the disclosures that

were made on November 3 and February 23 had been made back in late July or early

August of 2009.  Ex. 4 (Ferrell Report) at 26-33.  Dr. Ferrell's analysis shows that, had

that information been disclosed back in July or August of 2009, the stock price impact

would have been far less than the $8.99 and $3.13 declines that Dr. Bergin observed on

November 4, 2009, and February 24, 2009.  Thus, Professor Ferrell's "but-for" analysis

directly undermines Dr. Bergin's analysis of the stock price impact of the November 3

and February 23 disclosures, and shows that the abnormal returns following those

1   disclosures must have included the effects of other, confounding information, rather than

2   just the "disclosures of interest" that the SEC asked Dr. Bergin to study.

3       Professor Ferrell's "but for" analysis is another way of testing—and critiquing—

4   Dr. Bergin's assessment of the price impact of the disclosures he identified and analyzed

5   in his own report.  Again, Professor Ferrell made this clear repeatedly during his

6   deposition.  *See* Ex. 5 (Ferrell Depo.) at 108:16-23 ("[T]hese but-for offering prices that

7   I'm presenting under these four scenarios are from [Section VI], and that's directed at Dr.

8   Bergin."); *id.* at 139:14-18 ("So just be clear, I present but-for prices associated with

9   different pieces of information in part [VI] of my report, and they intersect with my

10  understanding of the allegations and what Dr. Bergin claims was disclosed in November

11  and February."); *id.* at 141:1-11 ("Dr. Bergin . . . claim[s] that . . . the disclosure of the

12  volume agreement [on July 16th] gave rise to market expectations that it was going to be

13  recurring.  So I think my analysis of the price impact of a hypothetical disclosure that it

14  wouldn't be recurring would speak to that and directly – now, directly addressing Dr.

15  Bergin's report, directly addresses what's causing the price decline in November.").  In

16  its Motion, the SEC inexcusably ignores all of this testimony.

17      At bottom, none of the analysis contained in Section VII of Professor Ferrell's

18  report is independent of Dr. Bergin's opinions.  Professor Ferrell's analysis serves only to

19  provide a direct rebuttal to Dr. Bergin's opinions on price impact.  As Professor Ferrell

20  explained at deposition, the starting point for his entire analysis was Dr. Bergin's report.

21  *E.g.*, Ex. 5 (Ferrell Depo.) at 32:1-15; 42:12-18; 43:24-44:9.  There is simply no basis for

22  excluding this portion of his report.

23      **B.   Professor Ferrell's Opinions Are Methodologically Sound and Will Assist the Trier of Fact**

24

25          **1.   Professor Ferrell's Opinion Regarding July 16 Is Relevant to Rebut Dr. Bergin's Study of the Stock Price Impact on That Date**

26      The SEC argues that Professor Ferrell's rebuttal opinions do not logically relate to

27  an aspect of this case because Professor Ferrell incorrectly assumed that the SEC had

28  alleged a "disclosure deficiency" on July 16, 2009.  Mot. at 15-16.  As he testified

1  repeatedly at his deposition, however, Professor Ferrell made no such assumption.

2  Instead, Professor Ferrell's opinion is that Dr. Bergin's analysis does not show that the

3  entire abnormal return on July 16 is attributable to the disclosure deficiencies asserted by

4  the SEC—whether they allegedly occurred on July 16, August 3, or any other date.

5      Dr. Bergin's event study purports to demonstrate that information disclosed on

6  three dates selected by the SEC—July 16, 2009, November 3, 2009, and February 23,

7  2010—was material, and had a statistically significant impact on sTec's stock price. *See*

8  Ex. 1 (Bergin Report) at 6-7.  A typical event study analyzes stock price movements on

9  the dates of the alleged disclosure deficiency or misrepresentation and on the dates of the

10 alleged corrective disclosure when the market learned the "truth."  The point of the event

11 study is to calculate the amount of stock price inflation caused by the alleged disclosure

12 deficiencies, and the corresponding stock price declines caused by the alleged corrective

13 disclosures. *See, e.g.*, *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1313

14 (11th Cir. 2011); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First*

15 *Boston*, 853 F. Supp. 2d 181, 187 (D. Mass. 2012).  Here, however, Dr. Bergin offered no

16 explanation for why he analyzed sTec's stock price movements on July 16, a date on

17 which the SEC does not claim there was any disclosure deficiency; instead, he examined

18 that date only because the SEC told him to (*see* Ex. 1 (Bergin Report) at 6), and opined

19 that on July 16, sTec's stock price "exhibited an abnormal return of 12.98% (an increase

20 of $3.58)" that was "attributable to" two disclosures made on that date. *Id.* at 9.

21      Professor Ferrell's opinion does nothing more than directly rebut Dr. Bergin's

22 opinion.  As he explained, because Dr. Bergin identified July 16, 2009 as one of the three

23 dates on which there were "disclosures of interest," Professor Ferrell necessarily assumed

24 that Dr. Bergin's analysis of sTec's stock price movement July 16 was (at least in the

25 SEC's estimation) somehow relevant to the SEC's case.  But contrary to the SEC's

26 assertion, Professor Ferrell did not assume that the SEC had alleged a disclosure

27 deficiency on July 16.  *See* Mot. at 16.  Professor Ferrell was indisputably clear at his

28 deposition that he did not make this assumption.  *See, e.g.*, Ex. 5 (Ferrell Depo.) at

117:22-118:3 ("Q. To say that Mr. Moshayedi was, as you say, enriched by an alleged disclosure deficiency measured by July 16th, are you assuming that he traded on material, nonpublic information, or made misrepresentations or omissions on July 16th, or did something else wrong on July 16th in order to be enriched?  A. I'm not making any of those assumptions."); *id.* at 132:19-22, 138:10-13.

The SEC's argument on this point assumes that Professor Ferrell's discussion of a "disclosure deficiency" refers to a disclosure deficiency on July 16.  But that is not what Professor Ferrell said in his report and that is not what he assumed.  Rather, as he explained, in light of Dr. Bergin's analysis of the stock price impact of disclosures made on July 16, Professor Ferrell considered the two alternative reasons why Dr. Bergin might have analyzed July 16.  First, Professor Ferrell considered the possibility that Dr. Bergin analyzed July 16, 2009, because the SEC was planning to allege that there was a disclosure deficiency on that date.  Ex. 5 (Ferrell Depo.) at 116:23-117:9, 118:18-119:7.  Alternatively, Professor Ferrell considered the possibility that the SEC (through Dr. Bergin) planned to use the price impact of the July 16 disclosures as a proxy for the stock price impact had Mr. Moshayedi disclosed the allegedly material information on August 3.  *See id.* at 123:8-15, 132:19-133:3, 134:12-16.

Professor Ferrell further explained that it made no difference to his analysis which of these were true—in either case, Dr. Bergin's report does not show (and does not provide any analytical basis to conclude) that the entire July 16 return can be attributed to the disclosure deficiencies alleged in this case.  Professor Ferrell determined that *if* the SEC was alleging that July 16 was a disclosure deficiency date or a proxy for one, then the measure of the inflated price by virtue of that fraudulent disclosure would be $3.58 per share, which would be the maximum impact caused by the alleged disclosure deficiency.  *See* Ex. 4 (Ferrell Report) at 6-7.  But Professor Ferrell acknowledged that if the SEC was not relying on July 16 as a disclosure deficiency date or as a proxy for the stock price impact of an alleged disclosure deficiency on August 3 (or some other date),

1   he would have no need to opine on the July 16 stock price impact.  As Professor Ferrell
2   explained, with respect to his analysis of Dr. Bergin's report:

3         It's assuming that Dr. Bergin's [$]3.58 and his focus on July 16th has some
4         relationship to the allegations in this case, which, at the heart, is a disclosure
5         deficiency.  So.  Again, if you're telling me – and it might well be true – that
6         July 16th and the [$]3.58 has no meaning in the context of this case, then –
7         then fine.  Then . . . there's no evidence for inflationary impact.

8   Ex. 5 (Ferrell Depo.) at 118:18-119:7; *see also id.* at 119:17-21 ("[I]f Dr. Bergin is
9   presenting a number that has no relationship to the disclosure deficiencies alleged in this
10  case, then my response would be that I'm not sure what the point is.").

11        The SEC has failed to provide any explanation for what relevance disclosures
12  made on July 16 have to this case.  If the SEC now contends that the price impact of
13  disclosures made on July 16 has no relevance to its case, then Dr. Bergin's opinion about
14  the July 16 disclosures and residual return are irrelevant and must be excluded.  If,
15  however, the SEC intends to put forward Dr. Bergin's opinions about the July 16
16  disclosures and residual return, then Mr. Moshayedi must be allowed to present an expert
17  to rebut those opinions.

18              **2.      Professor Ferrell's "But-For" Analysis Is Reliable**

19        The SEC's challenge to the reliability of Professor Ferrell's "but-for" analysis is
20  based on a misrepresentation of the record and a fundamental misunderstanding of
21  Professor Ferrell's methodology.  It does not come close to justifying the exclusion of
22  Professor Ferrell's testimony.

23        First, the SEC argues that Professor Ferrell's opinions are unreliable because he
24  did not conduct his own event study regression analysis and thus he "made no effort to
25  determine if these stock price declines were unique to sTec or not."  Mot. at 18.  This
26  misrepresents Professor Ferrell's report and distorts the record.  In fact, although
27  Professor Ferrell did not perform his own event study, he considered and relied upon the
28  two event studies already performed in this case—one prepared by Dr. Bergin and the

1   other by Mr. Moshayedi's expert, Dr. Mukesh Bajaj.  As Professor Ferrell explained, he

2   did not need to do yet another, third, event study:

3          I carefully reviewed both of the event studies that are presented in this

4          litigation, and as I point out in my report, that either event study

5          would—whether you adopt one event study or the other, it doesn't

6          change my opinions in a qualitative way.

7          * * *

8          And regardless of which event study you used, the results were the same, so

9          it was not necessary for a third expert to do a third event study.

10  Ex. 5 (Ferrell Depo.) at 56:24-57:3, 62:24-63:12.  Neither Dr. Bergin (the SEC's expert)

11  nor Dr. Bajaj (Mr. Moshayedi's expert) criticized the statistical results produced by the

12  event study of the other.  *See* Ex. 8 (Bajaj Depo.) at 75:10-76:8; Ex. 6 (Bergin Rebuttal

13  Report) at 7-9.  The SEC provides no reason why Professor Ferrell cannot rely on these

14  event studies in forming his opinions.  *See, e.g.*, *Mesfun v. Hagos*, No. 03-CV-02182-

15  MMM, 2005 WL 5956612, at *18 (C.D. Cal. Feb. 16, 2005) (experts may rely on the

16  opinions of other experts); *Calva-Cerqueira v. United States*, 281 F. Supp. 2d 279, 300

17  (D.D.C. 2003) ("[A]n expert economist may rely on the opinions of other experts").[5]

18         Second, the SEC argues that Professor Ferrell's "but for" analysis is unreliable

19  because it is "an academic exercise based on his own theories."  Mot. at 19.  But in fact,

20  the methodology Professor Ferrell applied is well-established and has been discussed in

21  numerous articles published in respected, peer-reviewed journals.  Ex. 4 (Ferrell Report)

22  Appx. B.  There is a significant body of academic literature in accounting and finance

23  that goes back to the late 1960s discussing the impact of earnings changes on stock

24

25

---

26  [5]  The cases the SEC cites (Mot. at 18-19) are not to the contrary and do not establish
    that each expert must conduct his or her *own* event study.  Rather, an expert may rely
27  on an event study "or similar analysis."  *See In re Imperial Credit Indus., Inc. Sec.
    Litig.*, 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003); *In re Oracle Sec. Litig.*, 829 F.
28  Supp. 1176, 1181 (N.D. Cal. 1993).

prices.[6]  Indeed, in the very deposition testimony the SEC cites, Professor Ferrell explained that the methodology he applied—"looking at analysts' estimates to think about price impact"—is "standard" and supported by ample accounting literature.  Ex. 5 (Ferrell Depo.) at 150:7-151:2; *see also id.* at 151:18-25 (explaining that the "relevant academic literature where this is routinely done is [the] accounting literature"); *see also id.* at 149:22-150:1 ("Dr. Bergin looks at what market actors are saying to assess importance, and so I'm doing the same thing except using … these numbers to try to do some quantification.").

The SEC suggests that this methodology has not been previously admitted by any court.  But for *Daubert* purposes, the question is not whether the proffered theory or technique has ever been admitted into evidence.  Instead, the relevant questions are whether the theory or technique "can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; and the reliability of the technique, including the potential rate of error and the general acceptance it enjoys. *Daubert*, 509 U.S. at 593-94.  Here, as discussed above, the technique that Professor Ferrell used has been tested and has been subject to peer review and publication.  The fact that Professor Ferrell has written an article on this subject—an article that was peer reviewed and published—hardly disqualifies him from offering an opinion on this basis.  Rather, his expertise makes him especially well qualified to conduct such an analysis.

### 3. Professor Ferrell's Opinions Regarding Non-Fraud-Related Factors Impacting sTec's Stock Price Between August 6, 2009, and February 24, 2010, Are Relevant and Reliable

The SEC seeks to exclude the entirety of Section V of Professor Ferrell's report, which pertains to non-fraud related factors that impacted sTec's stock price between

---

[6]  *See, e.g.*, Ray Ball and Philip Brown, "An Empirical Evaluation of Accounting Income Numbers," Journal of Accounting Research, Autumn 1968, pp. 159–178; Itay Kama, "On the Market Reaction to Revenue and Earnings," Journal of Business Finance & Accounting 36 (1 and 2), January/March 2009, pp. 31–50; Esther Bruegger and Frederick C. Dunbar, "Estimating Financial Fraud Damages with Response Coefficients," Journal of Corporation Law 35(1), 2009, pp. 11–69.

1   August 6, 2009—the date of the offering—and February 24, 2010.  Ex. 4 (Ferrell Report)

2   at 7-12.  Each of the SEC's arguments on this point fails.

3        First, Professor Ferrell's analysis does not depend on any specialized knowledge of

4   the SSD market, as the SEC contends.  Mot. at 21.  The SEC incorrectly asserts that

5   Professor Ferrell offers opinions "about competition in the SSD market and the

6   competitive strengths of sTec's drives." *Id.* (citing Ferrell Report, ¶¶19, 32, 35).  But in

7   fact, Professor Ferrell's opinion relates to the reasons for changes in sTec's stock price, a

8   topic on which he is well-qualified to opine.  Professor Ferrell has published numerous

9   articles in leading journals regarding securities damages, loss causation and event study

10  analysis, and he has served as an expert witness in a variety of securities matters

11  involving analysis of stock price movements.  *See* Ex. 4 (Ferrell Report) at 1.  The

12  relevant expertise necessary for this type of analysis (expertise that Professor Ferrell

13  unquestionably has) is in corporate finance empirical analysis and the ability to

14  disentangle different elements that affect stock prices—not experience regarding how a

15  solid state drive works or is sold.  Indeed, Dr. Bergin, too, purports to offer opinions

16  regarding the reasons for sTec's stock price movements but likewise has no expertise

17  regarding sTec's ZeusIOPS drives or specialized knowledge regarding the enterprise

18  storage or SSD market.  It is well settled that an expert with expertise in financial

19  economics may testify about stock price movements without requiring technical expertise

20  in the underlying industry.  *See, e.g.*, *SEC v. Leslie*, No. C 07-3444, 2010 WL 2991038,

21  at *11-*15 (N.D. Cal. July 29, 2010) (software licensing transactions); *CDX Liquidating*

22  *Trust v. Venrock Assocs.*, 411 B.R. 571, 580-82 (N.D. Ill. 2009) (internet infrastructure

23  and high-tech startup); *SEC v. Roszak*, 495 F. Supp. 2d 875, 880-81 (N.D. Ill. 2007)

24  (energy sector); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 04-CV-7369

25  LTS (HB), 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006) (optometry).

26       Second, the SEC contends that this portion of Professor Ferrell's report has nothing

27  to do with the SEC's claims relating to the materiality of the nonpublic information it

28  asserts Mr. Moshayedi misrepresented in August or November.  Mot. at 20-21.  But

1    Professor Ferrell's discussion of the many confounding factors that impacted sTec's

2    stock price after August 6 is highly relevant to his opinions highlighting Dr. Bergin's

3    failure to disaggregate the impact of confounding factors on sTec's stock price from the

4    impact of the "disclosures of interest."

5         Professor Ferrell expressed his opinion that to determine whether a particular

6    disclosure is likely to have caused an abnormal stock price return, "[y]ou have to look at

7    the total mix of information prior to the disclosure in question, look at the disclosure in

8    question and how that might have changed the total mix of information that preexisted

9    the disclosure at issue . . . ." Ex. 5 (Ferrell Depo.) at 61:11-18.  Dr. Bergin failed to

10   perform this analysis, ignoring entirely the total mix of information that was available to

11   the market prior to the November 3 disclosures he studied.  As Professor Ferrell

12   explained in his deposition, a "critical flaw" in Dr. Bergin's opinions regarding the

13   disclosures on November 3, 2009, is that Dr. Bergin's report was "completely lacking in

14   terms of a rich or adequate analysis of the total mix of information prior to the disclosure

15   at interest, so I think he falls short on that score." *Id.* at 70:18-25; *see also id.* at 269:18-

16   270:9 ("You have to ask the question, . . . what's the total mix of information as of

17   November 2nd because that's going to help you asses the informational content of the

18   November 3rd disclosures.  And [Dr. Bergin] doesn't do that work.").  In contrast to Dr.

19   Bergin, Professor Ferrell reviewed and considered analysts' views regarding the

20   competitive landscape in the SSD market prior to (and after) the November 3 disclosures.

21   This portion of Professor Ferrell's opinion is not only relevant, it is an essential step in

22   the methodology of determining the causes of sTec's stock price movements on

23   November 4—an essential step that Dr. Bergin failed to take.

24        Third, the SEC's contention that this information would not be relevant to a

25   disgorgement calculation (were Dr. Bergin to offer one) is both irrelevant and wrong.  It

26   is irrelevant because, for the reasons discussed above, Professor Ferrell's opinion on this

27   point is relevant for reasons that have nothing to do with disgorgement.  It is wrong

28   because this testimony clearly would be relevant to the proper measure of disgorgement.

1    Disgorgement is designed "to deprive a wrongdoer of unjust enrichment, and to

2  deter others from violating securities laws by making violations unprofitable."  *SEC v.*

3  *First Pac. Bancorp.*, 142 F.3d 1186, 1191 (9th Cir. 1998).  Thus, courts must limit the

4  disgorgement amount to the defendant's "ill-gotten gains"; anything more amounts to a

5  punitive remedy and is improper.  *See, e.g.*, *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.

6  1978).  To limit disgorgement to its remedial purpose, the SEC (1) "must distinguish

7  between legally and illegally obtained profits," *SEC v. First City Fin. Corp.*, 890 F.2d

8  1215, 1231 (D.C. Cir. 1989), "so that disgorgement is ordered only with respect to those

9  that were illegally derived," *SEC v. Razmilovic*, 2013 WL 3779339, at *13 (2d Cir. July

10  22, 2013), and (2) must demonstrate that the property it seeks to be disgorged is "causally

11  related to the wrongdoing," *First City Fin. Corp.*, 890 F.2d at 1231.

12    Consistent with these authorities, the identification of factors that impacted sTec's

13  stock price that have nothing to do with any alleged fraud would clearly be relevant to a

14  disgorgement calculation.  This is a proper method to distinguish between legally and

15  illegally obtained profits and to assure that the amount the SEC seeks to have disgorged

16  is causally related to the economic value of the information at issue.  The cases the SEC

17  cites do not establish otherwise and, in fact, support this view.  *See First City Fin. Corp.*,

18  890 F.2d at 1231 (cited Mot. at 20) (disgorgement "may not be used punitively" and thus

19  must be at least "a reasonable approximation of profits causally connected to the

20  violation"); *cf. SEC v. Drucker*, 528 F. Supp. 2d 450, 451 (S.D.N.Y. 2007) (cited Mot. at

21  21) (disgorgement could be based on the amount of the entire stock drop between date of

22  alleged disclosure deficiency and date of corrective announcement when intervening

23  stock drop was caused by rumor disclosing the very information allegedly omitted).

24          **4.    Professor Ferrell Does Not Offer Any Opinions Regarding the
25                  Continued Negotiation of a 2010 Volume Commitment**

26    The SEC further seeks to exclude portions of Professor Ferrell's opinions

27  discussing the 2010 volume commitment negotiations as unreliable and irrelevant

28  because his analysis relates to purely factual issues and is not permissible expert

1   testimony.  Mot. at 22-23.  According to the SEC, Professor Ferrell claims to have

2   reached the conclusion that the record evidence regarding sTec's and EMC's continued

3   negotiation of a potential 2010 volume agreement "'contradicts' the SEC's claim that

4   Moshayedi knew the volume agreement would not be repeated again." *Id.*; *see also id.* at

5   10.  But Professor Ferrell claims no such thing:

6       Q.  Okay.  Now, you end in paragraph 69 with, "My understanding is that

7       STEC and EMC in fact continued negotiating over a possible second volume

8       contract."  Do you see that?

9       A.  I do.

10      Q.  Are you offering an opinion as to that fact?

11      A.  No.

12  Ex. 5 (Ferrell Depo.) at 298:1-7.

13      Instead, Professor Ferrell's analysis in Section IV.B.4 of his Report pertains

14  entirely to Dr. Bergin's failure to consider whether the information disclosed on

15  November 3, 2009, was corrective of a disclosure deficiency in July or August 2009.  In

16  his report, Professor Ferrell opined that the basis for Dr. Bergin's conclusion that sTec

17  could have disclosed the non-recurring nature of the $120 million agreement as of July

18  16, 2009 (or August 2009) "is unclear and contradicted by correspondence between sTec

19  and EMC." Ex. 4 (Ferrell Report) at 22.  But Professor Ferrell is not offering the

20  independent opinion that, as a factual matter, negotiations for a potential 2010 volume

21  agreement were ongoing as of July or August 2009.  Rather, Professor Ferrell is simply

22  offering his opinion that Dr. Bergin should have—but did not—consider whether the

23  disclosures made on November 3 could have been disclosed earlier.  Professor Ferrell's

24  deposition testimony on this point could not be clearer:

25      A. . . . [I]n order for the November 3rd statement to be corrective -- a

26      corrective disclosure of a disclosure deficiency that happened in July or

27      August '09, it has to be the case that the corrective information could have

28      been disclosed in July or August; otherwise, it's not corrective.

1    Q.  Okay.  And so your premise is that this corrective information could not

2    have been disclosed back in July or August; is that right?

3    A.  *I'm not offering that opinion.*  All I'm saying is there is -- it's unclear

4    and it's questionable whether it was disclosable, *although that's ultimately*

5    *an issue for the trier of fact.*  But if [Dr. Bergin's] going to make the claim,

6    or his report's going to be used to claim that there was a corrective

7    disclosure correcting the disclosure deficiency in July or August, that's

8    going to be a necessary assumption.

9  Ex. 5 (Ferrell Depo.) at 296:13-297:5 (emphases added).  Professor Ferrell himself offers

10  no opinion one way or the other and instead merely points out that Dr. Bergin did not do

11  the work that he should have done to support his conclusions.[7]  The SEC's contention

12  that Professor Ferrell's opinion is just another way of presenting facts is simply wrong.

13          **5.        Professor Ferrell's Opinions Are Not Duplicative or Cumulative**

14          Finally, the SEC argues that Professor Ferrell's opinions regarding the factors

15  impacting sTec's stock price in the fall of 2009 and his opinions regarding continued

16  negotiations of a potential 2010 volume commitment should be excluded because those

17  opinions are cumulative of Dr. Bajaj's opinions.  Mot. at 23-24.  This assertion is based

18  on a fundamental misunderstanding of Professor Ferrell's opinions, all of which are

19  offered in direct response to Dr. Bergin.  Professor Ferrell's opinions regarding the

20  reasons for sTec's stock price movements between August 3 and November 4, 2009,

21  reveal the fundamental flaws in Dr. Bergin's analysis.  Dr. Bergin did not consider the

22  information available to the market before sTec's November 3 disclosures and did not

23  consider how that information—and the market's reaction to that information—impacted

24  and informed the market's response to sTec's November 3, 2009 disclosures.  *See supra*

25  _____

26  [7]  The SEC's own cited authority supports Professor Ferrell's criticism of Dr. Bergin's failure to consider whether the disclosures he examined were, in fact, "corrective" of the alleged misrepresentations or omissions.  *See In re DVI, Inc., Sec. Litig.*, No. 03-CV-05336, 2010 WL 3522090, at *12-*14 (E.D. Pa. Sept. 3, 2010) (cited Mot. at 20) (excluding portions of expert's opinion where expert's analysis did not establish that the "corrective disclosures" examined related to the alleged misrepresentations).

27

28

1   at 18-20.   Likewise, Professor Ferrell offers his opinion that Dr. Bergin's analysis of the

2   reasons for sTec's stock price movement on November 3, 2009, is flawed.  As Professor

3   Ferrell explained, Dr. Bergin opines that the disclosure of the "one-off" nature of the

4   agreement corrected information not previously disclosed without having conducted any

5   examination of the record evidence to assess whether that same information could have

6   been disclosed in July or August 2009.  *See supra* at 21-22.

7          These rebuttal opinions are not cumulative of Dr. Bajaj's work.  Unlike Professor

8   Ferrell, Dr. Bajaj provides an affirmative analysis of the impact on sTec's stock price of

9   disclosures made between August 4, 2009 and November 3, 2009.  Ex. 3 (Bajaj Report)

10  at 57-69.[8]  A review of Dr. Bajaj's opinions and Professor Ferrell's opinions reveals that

11  none of those opinions are the same.  Their rebuttal reports are equally distinct.  Dr. Bajaj

12  only rebuts certain portions of Dr. Bergin's opinions, while Professor Ferrell rebuts a

13  much broader range of Dr. Bergin's opinions.  *Compare* Ex. 9 (Bajaj Rebuttal Report)

14  *with* Ex. 4 ( Ferrell Report).  There is no basis to conclude that Professor Ferrell's

15  opinions are cumulative or unnecessary.  *See, e.g.*, *Friedman v. Medjet Assistance, LLC*,

16  No. 09-CV-07585-MMM (VBKx), 2010 WL 9081271, at *6 (C.D. Cal. Nov. 8, 2010)

17  ("evidence must be needless[ly] cumulative before its admission by the district court

18  amounts to an abuse of discretion") (citing *United States v. Skillman*, 922 F.2d 1370,

19  1374 (9th Cir.1990)).  Nor is there any basis to conclude now—before the Court has

20  determined which of Dr. Bajaj's opinions will be admitted, and before he has even

21  testified at trial—that anything Professor Ferrell might say at trial is cumulative of what

22  Dr. Bajaj might offer.  Thus, the decision whether to exclude expert testimony as

23  cumulative is premature at this juncture.  That determination is more properly made by

24  the Court pursuant to Rule 403 during trial.  *See, e.g.*, *Monsanto Co. v. E.I. Du Pont De

25  Nemours & Co.*, No. 09-CV-00686-ERW, 2012 WL 27936, at *3 (E.D. Mo. Jan. 5, 2012)

26  _____

27  [8]  Dr. Bajaj is withdrawing his opinions relating to sTec's and EMC's continued
    negotiation of a potential volume commitment for 2010.  Accordingly, Professor

28  Ferrell's testimony on this issue will not be cumulative of Dr. Bajaj's testimony.

1  ("striking portions of Defendants' expert reports at this time on the ground that the

2  information is cumulative is premature in part because the matter of cumulativeness is a

3  trial concern, and is not a discovery concern"); *Durham v. Cnty. of Maui*, 729 F. Supp. 2d

4  1188, 1196 (D. Haw. 2010) (motion to exclude expert report "is premature" because

5  "[e]xclusion of the [expert] Report, [the expert]'s testimony, or other related evidence is a

6  matter that is best left for the judge to make at trial"); *Kirola v. City & Cnty. of San*

7  *Francisco*, No. C 07-03685 SBA, 2010 WL 3476681, at *12-*13 (N.D. Cal. Sept. 2,

8  2010) (denying as premature motion to exclude "anticipated" cumulative expert

9  testimony because "[t]he duplicative nature of the evidence will be assessed when the

10 evidence is offered at trial").  At this point, "with nothing on which to rely besides the

11 experts' preliminary Rule 26 reports, any order entered by the court limiting the number

12 of expert witnesses the defendants may utilize will, at least, be arbitrary; at worst, it may

13 be prejudicial to their defense." *Adams v. Cooper Indus., Inc.*, No. 03-CV-476 JBC, 2006

14 WL 2983054, at *11 (E.D. Ky. Oct. 17, 2006).

15 **IV.   CONCLUSION**

16       For the foregoing reasons, Mr. Moshayedi respectfully requests that the Court deny

17 the SEC's motion to exclude or limit the expert testimony of Professor Allen Ferrell at

18 trial in this matter.

19 Dated:  September 30, 2013           Respectfully submitted,

20                                      LATHAM & WATKINS LLP

21                                      By /s Patrick E. Gibbs
                                           Patrick E. Gibbs

22                                      PAUL HASTINGS LLP

23                                      By /s Thomas A. Zaccaro
24                                         Thomas A. Zaccaro

25                                      Attorneys for Manouch Moshayedi

26

27

28