1   JOHN W. BERRY (bar admission pending, L.R. 83-2.4.1)
    Email: berryj@sec.gov
2   DONALD W. SEARLES, Cal. Bar No. 135705
    Email: searlesd@sec.gov
3   GARY Y. LEUNG (bar admission pending, L.R. 83-2.4.1)
    Email: leungg@sec.gov
4
5   Attorneys for Plaintiff
    Securities and Exchange Commission
    Michele Wein Layne, Regional Director
6   John W. Berry, Regional Trial Counsel
    5670 Wilshire Boulevard, 11th Floor
7   Los Angeles, California 90036
    Telephone: (323) 965-3998
8   Facsimile: (323) 965-3908
9
10                  UNITED STATES DISTRICT COURT
11                 CENTRAL DISTRICT OF CALIFORNIA
12
13   SECURITIES AND EXCHANGE          Case No.  12-CV-01179-JVS-ANx
     COMMISSION,
14                                    PLAINTIFF'S OPPOSITION TO
                  Plaintiff,          DEFENDANT MOSHAYEDI'S
15                                    MOTION TO EXCLUDE OPINIONS
          vs.                         AND TESTIMONY OF DR. RICHARD
16                                    BERGIN
     MANOUCHEHR MOSHAYEDI,
17
                  Defendant.          Date:    October 21, 2013
18                                    Time:    11:00 a.m.
                                      Ctrm:    10C
19                                    Judge:   Hon. James V. Selna
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................. 2

      A.    The SEC's Expert, Dr. Richard Bergin ................................................ 2

      B.    The SEC's Case And Dr. Bergin's Opinions ....................................... 3

            1.    Dr. Bergin's event study methodology ...................................... 4

            2.    Dr. Bergin's event study conclusions ........................................ 6

                  a.    July 16, 2009 ..................................................................... 6

                  b.    November 4, 2009 ............................................................ 7

                  c.    February 24, 2010 ............................................................ 8

III.  ARGUMENT ....................................................................................................... 9

      A.    Because This Is An Insider Trading And Fraudulent Omissions Case,
            It Is Not Proper To Do An Event Study For August 3rd ..................... 10

      B.    Dr. Bergin Analysis Of The July 16th, November 4th And February
            24th Price Movements Are All Relevant ............................................. 12

            1.    The July 16, November 3 and February 24 event study results
                  are relevant and "fit" the facts of this case ............................. 13

                  a.    The relevancy of the July 16, 2009 event study ..................... 13

                  b.    The relevancy of the November 4, 2009 event study .............. 14

                  c.    The relevancy of the February 23, 2010 event study .............. 15

            2.    The disclosures studied by Dr. Bergin do not have to "mirror"
                  the undisclosed information known to Moshayedi on August 3 ........ 16

      C.    Dr. Bergin's Analysis, Unlike Dr. Ferrell's, Is Not A Disgorgement
            Calculation ......................................................................................... 18

      D.    Moshayedi's Discrete Methodological Criticisms Are Not Persuasive ........ 19

            1.    Dr. Bergin disaggregated confounding factors ................................. 21

            2.    Dr. Bergin reliably used analyst declarations as confirmation
                  for his conclusions .......................................................................... 24

IV.   CONCLUSION .................................................................................................... 25

Case No.  12-CV-01179-JVS-ANx

1

## TABLE OF AUTHORITIES

2

3   *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
4       2013 WL 4779709 (9th Cir. Jun. 19, 2013) ....................................9

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*,
5       853 F.Supp.2d 181 (D. Mass. 2012).................................... 4, 12, 16

6   *Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
7       2008 WL 4737173 (N.D. Ga. 2008)...........................................22

*City of Livonia Employees' Retirement System v. Wyeth, et al.*,
8       284 F.R.D. 173 (S.D.N.Y. 2012).............................................10

9   *FindWhat Investor Group v. FindWhat.com*,
10      658 F.3d 1282 (11th Cir. 2011) .............................................18

*General Elec. Co. v. Jackson*,
11      595 F.Supp.2d 8 (D.D.C.2009)..............................................20

12  *In re Diamond Foods, Inc.*,
13      2013 U.S. Dist. LEXIS 64464 (N.D. Cal. May 6, 2013)............................25

14  *In re Heckmann*,
        2013 WL 2456104 (D. Del. Jun. 6, 2013) ......................................22

15  *In re Merck & Co., Inc. Sec. Litig.*,
16      432 F.3d 261 (3d Cir.2005) ................................................11

*In re Miller Indus. Sec. Litig.*,
17      120 F.Supp.2d 1371 (N.D. Ga. 2000).........................................25

18  *In re Novatel Wireless Sec. Litig.*,
19      910 F.Supp.2d 1209 (S.D. Cal. 2012)
        (*quoting Bazemore v. Friday*,
20      478 U.S. 385 (1986)) .....................................................21

21  *In re REMEC Inc. Sec. Litig.*,
        702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................22

22  *In re Williams Sec. Litig.*,
23      558 F.3d 1130 (10th Cir. 2009) ............................................18

*Katyle v. Penn Nat. Gaming, Inc.*,
24      637 F.3d 462 (4th Cir. 2011) ..............................................18

25  *Massachusetts Retirement Sys. v. CVS Caremark Corp.*,
26      716 F.3d 229 (1st Cir. 2013)...............................................18

*Miller v. Thane Int'l., Inc.*,
27      2005 WL 5957833 (C.D. Cal. Mar. 3, 2005)
        (*quoting Mukhtar v. California State Univ.*,
28      299 F.3d 1053 (9th Cir. 2002)) ..................................... 9, 16, 17

*Mueller v. Auker*,
    700 F.3d 1180 (9th Cir. 2012) ........................................................9

*Ryan v. Flowserve Corp.*,
    245 F.R.D. 560 (N.D. Tex. 2007)................................................25

*SEC v. Berlacher*,
    2010 WL 3566790 (E.D. Pa. Sept. 13, 2010)..............................20

*SEC v. Blavin*,
    760 F.2d 706 (6th Cir.1985) .......................................................17

*SEC v. Constantin*,
    2013 WL 1453792 (S.D.N.Y. Apr. 2, 2013) ...............................17

*SEC v. Pirate Investor LLC*,
    580 F.3d 233 (4th Cir. 1999) ......................................................17

*SEC v. Sabhlok*,
    2010 WL 2944255 (N.D. Cal. Jul. 23, 2010) ....................... 21, 22

*SEC v. Tambone*,
    597 F.3d 436 (1st Cir. 2010).......................................................17

*U.S. v. Grabske*,
    260 F.Supp.2d 866 (N.D. Cal. 2002)...........................................11

*U.S. v. Ferguson*,
    584 F.Supp.2d 447 (D. Conn. 2008) ...........................................11

*U.S. v. Schiff*,
    602 F.3d 152 (3d Cir. 2010) ........................................................19

*Walker v. Woodford*,
    593 F.Supp.2d 1140 (S.D. Cal. 2008) .........................................25

Case No.  12-CV-01179-JVS-ANx

1

## I.     <u>INTRODUCTION</u>

2        Defendant Moshayedi asks this Court to exclude the expert testimony of the

3   SEC's expert, Dr. Richard Bergin, the only expert to have completed a full event

4   study of the corrective disclosures in this case.  *See* Dkt. No. 259-1 (Def. Mot.).

5        Dr. Bergin's opinions in this matter are beyond reproach.  To support the

6   SEC's burden to prove materiality, he conducted event studies regarding sTec's stock

7   price changes on July 16, 2009, November 4, 2009 and February 24, 2010.  Based on

8   this rigorous analysis, he determined that the "statistically significant abnormal

9   returns" in sTec's stock price on those dates were attributable to the following

10  disclosures:  (1) the July announcement of sTec's $120 million volume agreement

11  with EMC, (2) the revelation in November that, based on "preliminary indications,"

12  EMC "might" be carrying inventory of sTec's ZeusIOPS drives, and (3) the

13  confirmation in February that EMC, in fact, had built up such a large inventory that

14  EMC would no longer need to purchase drives from sTec for the first half of 2010.

15        Dr. Bergin's event study methodology is undisputedly reliable.  Neither of

16  Moshayedi's experts—Dr. Mukesh Bajaj and Prof. Allen Ferrell—have any criticism

17  of Dr. Bergin's methodology.  And both agree that Dr. Bergin's use of an

18  econometric regression analysis and his review of analyst expectations during the

19  relevant period are an appropriate methodology.

20        Moshayedi nonetheless argues that Dr. Bergin's event study dates are

21  "irrelevant" to the SEC's claims.  Moshayedi asserts that instead of July 16,

22  November 4 and February 24, Dr. Bergin should have conducted an event study on

23  August 3—the date of Moshayedi's insider trading and fraudulent omissions.

24        Both points fail to withstand any degree of scrutiny.  First, Dr. Bergin's event

25  study dates are unquestionably relevant.  The disclosures on these dates and what

26  Moshayedi knew are all of the same cloth—they all concern weakened, forecasted

27  demand for ZeusIOPS, which was inconsistent with the two-quarter, $120 million

28  volume agreement announced to the market on July 16.

Second, it is well-settled that event studies are intended to analyze the stock price movements on dates when undisclosed information was revealed to the market. They are not meant to, and cannot, study price movements on a date when a fraudulent omission was made or when insider trading on non-public information took place. In those situations, by definition, the market has nothing to react to since the information withheld or traded on was not public. Therefore, an event study of the stock movement on August 3, 2009 would be utterly meaningless here. That day, Moshayedi traded on and failed to disclose *non-public* information regarding the risk of inventory buildup at EMC and EMC's unwillingness to enter into another volume commitment contract. Dr. Bergin thus correctly studied the stock price reaction to the days in November and February when this information was ultimately disclosed.

Finally, Moshayedi's contention that Dr. Bergin made no effort to disaggregate confounding factors is belied by the record. As reflected in his report, and then made clear in his deposition, Dr. Bergin painstakingly examined and identified all of the disclosures which potentially drove sTec's abnormal price returns on July 16, November 4 and February 24. In any event, Moshayedi's disagreement with the conclusions that Dr. Bergin reached, rather than the methodology that he employed, is a matter for cross-examination at trial, and is not a basis for exclusion.

Therefore, Moshayedi's motion to exclude Dr. Bergin from testifying should be denied.

## II.   STATEMENT OF FACTS

### A.   The SEC's Expert, Dr. Richard Bergin

The SEC has offered one expert to testify at trial in its case-in-chief, Dr. Richard Bergin. The other two SEC expert witnesses—Mr. Stuart Harden, CPA, and Mr. Matthew Behan—are offered only to rebut the opinions of Moshayedi's experts, to the extent these experts are even allowed to testify.

Moshayedi does not challenge Dr. Bergin's expert qualifications, and for good reason. Dr. Bergin is a Principal in KPMG's Forensic practice, and is the co-lead of

KPMG's Economics & Regulation practice in the United States. *See* Bergin Report at Ex. 1.[1]  He has taught courses in economics and valuation at New York University and Harvard Business School.  Dr. Bergin earned his doctorate in business administration with highest distinction from Harvard Business School, and he also holds a M.B.A. from Harvard Business School.  In his practice, Dr. Bergin has directed many engagements, including representing clients involved in investigations and enforcement activity by the SEC, CFTC, DOJ, and state attorneys general.

## B.    The SEC's Case And Dr. Bergin's Opinions

The SEC has the burden of proving the materiality of the non-public information that Moshayedi was aware of when he insider traded and that he failed to disclose in August and November 2009.  As to Moshayedi's August insider trading and omissions, the SEC must prove, among other things, that it was material for investors to know that (1) there was a risk that EMC would be holding a substantial amount of inventory as a result of the $55 million side deal between EMC and sTec, and (2) EMC had told Moshayedi that the $120 million supply agreement, which he had touted as an indication of sTec's future growth, was just a "one-off" contract and would not be repeated again.  This non-public information was partially disclosed on November 3, when Moshayedi disclosed that EMC "might" have an inventory build-up and that sTec's contract with EMC was just a "one-off" contract.

For Moshayedi's November 3rd fraud, the SEC must prove that Moshayedi's statement that he and sTec had received "preliminary indications" that EMC "might" be holding inventory of ZeusIOPS drives heading into 2010 was materially

---

[1] The June 18, 2013 Expert Report of Dr. Richard J. Bergin ("Bergin Report") and the July 12, 2013 Expert Rebuttal Report of Dr. Richard J. Bergin ("Bergin Rebuttal Report") cited in this motion are attached as Exhibits 5 and 6, respectively, to the Declaration of Gary Leung (Dkt. No. 258).  Excerpts of Dr. Bergin's July 24th deposition testimony are cited in this motion as "Bergin Depo. Tr." and are attached as Exhibit 20 to the Declaration of Gary Y. Leung In Support Of The SEC's Oppositions To Defendant's Motions *In Limine* Nos. 1-4 and To Exclude Plaintiff's Expert Witnesses ("Leung MIL Decl.").

misleading because he knew at the time that EMC was holding a substantial amount of inventory.  On February 23, 2010, Moshayedi finally disclosed that EMC's inventory balance was significant, and thus EMC would not be buying any more sTec product during the first half of 2010.

To help the SEC prove the materiality of the non-public information, the SEC has proffered Dr. Bergin, who undertook a thorough event study analysis of sTec's stock price movement and disclosures on three dates:  July 16, 2009, November 3, 2009 and February 24, 2010.  *See* Bergin Report at 9-10.

### 1.    Dr. Bergin's event study methodology

The event study method employed by Dr. Bergin "is an accepted method for the evaluation of materiality [and] damages to a class of stockholders in a defendant corporation."  *In re Imperial Credit Indus. Sec. Litig*., 252 F.Supp.2d 1005, 1014 (C.D.Cal. 2003).  An event study is a two-step process.  First, the study uses a statistical analysis to determine whether changes in stock price are due to factors unique to the company.  Second, the study analyzes whether the isolated price change is attributable to the disclosures at issue.  *See id*.; *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F.Supp.2d 181 (D. Mass. 2012) (cited by Def. Mot. at 5, 7, 10-11, 17).

This was the exact methodology employed by Dr. Bergin.  As a first step, he constructed an econometric regression of sTec's daily stock price performance from July 16, 2009 to February 24, 2010.  *See* Bergin Report at 22-23.  He selected this time period because it contained the three days he studied (July 16, 2009, November 4, 2009 and February 24, 2010).  Dr. Bergin's model utilized a market factor and an industry factor to control for, isolate and remove general market and industry-specific influences on sTec's stock price.  *Id.*  By doing so, Dr. Bergin segregated company-specific influences on sTec's stock price.  After running his econometric regression, Dr. Bergin calculated the abnormal return of sTec's stock price attributable to company-specific disclosures on the three dates.  *Id.* at 33, 44, 56.

Dr. Bergin also performed the second, important step in an event study analysis—namely, determining whether the change in sTec's stock price was attributable to the disclosures in question.  To accomplish this, Dr. Bergin considered every new disclosure to the market on his event study dates and examined whether those disclosures would have warranted a material change to sTec's current and future financial performance.  *Id.* at 27.  Dr. Bergin then assessed whether any part of the abnormal return was attributable to company-specific information disclosed on the same day other than the "disclosures of interest."  *Id.* at 26.

To analyze the significance of company-specific disclosures, Dr. Bergin also examined the extent to which equity analysts commented on these disclosures in their research reports, and how analysts changed their forecasts for sTec's earnings and revenues in light of the disclosures.  *Id.*  Dr. Bergin reviewed all 105 equity research reports on sTec issued by investment banks and brokerage firms covering sTec from June 16, 2009 to February 24, 2010.  *Id.* at 29.

To confirm that a disclosure was not previously known by market participants and was disclosed to the market on the day under evaluation, Dr. Bergin considered every analyst's expectations prior to sTec's disclosures on July 16, November 3 and February 23.  He also analyzed any change in analyst expectations and commentary immediately following the three disclosure dates.  *Id.* at 30.  He paid particular attention to the emphasis placed by analysts on the disclosed news, and the extent of their discussion on the new information.  *Id.*  Dr. Bergin took this approach in order to ascertain the importance of each piece of new information to analyst coverage.  *Id.*

Dr. Bergin then reviewed the equity analysts' published forecast models on sTec's financial performance both before and after the disclosures occurring on July 16th, November 3rd and February 23rd.  *Id.* at 30-31.  For each analyst, Dr. Bergin analyzed how his or her revenue and earnings forecasts for 2009 and 2010 changed over time and in specific response to sTec disclosures.  He also examined these models in the aggregate, calculating maximum, minimum, mean, and median figures

for the universe of analyst models.  He used this aggregate data as a consensus proxy of market expectations.  *Id*. at 31, Schedules 2a-3d.  By assessing the sTec analysts' earnings and revenue models, Dr. Bergin obtained quantitative validation of his conclusions regarding the significance of sTec-specific disclosures.

To further corroborate his opinions, Dr. Bergin also considered declarations submitted by eight sTec analysts in this litigation.  Those declarations summarized the analysts' contemporaneous research reports, highlighted the basis of the analysts' opinions regarding the drivers of sTec's growth in 2009, and detailed how their coverage of sTec would have changed had they known about EMC's weak 3Q09 demand forecast and the circumstances surrounding the $55 million deal, in which Moshayedi paid EMC $2 million to take $55 million in drives in the third quarter. The analyst declarations corroborated  the conclusions Dr. Bergin reached when reviewing their contemporaneous reports on sTec from 2009.  *Id.*[2]

## 2.   Dr. Bergin's event study conclusions

Dr. Bergin performed an event study for each of the three dates (July 16, 2009, November 4, 2009 and February 24, 2010) that he analyzed.  For all three dates, Dr. Bergin concluded that sTec's stock price experienced a statistically significant abnormal return, and he attributed the returns to disclosures made on each day.

### a.   July 16, 2009

Dr. Bergin concluded that sTec's stock price experienced a statistically significant positive return of 12.98%  on July 16, 2009.  He concluded that this return

---

[2] As a final step, if a disclosure's impact was directionally opposite to sTec's observed price movement (*e.g.*, if a disclosure was positive but sTec's stock price nonetheless declined), then Dr. Bergin treated that disclosure as having no price impact.  *Id.* at 27-28.  This approach was conservative because removing the positive impact of encouraging news only served to understate the negative impact of the disclosure of interest.  *Id.* at 28 n.85.  Also, if a disclosure instead influenced sTec's stock price in the same direction as the observed price movement (*e.g.*, if a disclosure was negative  and sTec's stock price decreased), then Dr. Bergin assessed whether the disclosure overlapped with a disclosure of interest.  If overlapping, Dr. Bergin concluded it would not have exerted a unique impact on sTec's stock price.  *Id*. at 28.

was attributable to the announcement on that day that sTec had entered into the $120 million supply contract, and the market's understanding that the execution of this agreement portended a sustainable and increased level of demand consistent with the two-quarter $120 million contract amount. *See id.* at 9, 32-33. He reached this conclusion by studying stock analyst commentaries before and after the July 16th announcement. *See id.* at 34-38. Dr. Bergin found that the market was unaware of this information before July 16th, that analysts' expectations changed following July 16 as reflected in their reports, and that analysts' earnings and revenue models were revised upward following July 16th. *See id.* at 34-39, Schedule 2a (analysts' median revenue estimates for 2009 and 2010 moved from $331 million/$417 million to $346 million/$497 million after July 16th announcement).

### b.      November 4, 2009

Dr. Begin also concluded that sTec's stock price experienced a statistically significant negative return of 38.82% on November 4, 2009. *See id.* at 9. Dr. Bergin identified five disclosures that were considered significant by sTec equities analysts: (1) sTec's 3Q09 financial results; (2) Moshayedi's statement that he had received "preliminary indications" that EMC "might" carry inventory into 2010; (3) Moshayedi's statement that he had just learned about the inventory problem "a week ago" and the initiation of a joint marketing program with EMC to address the issue; (4) sTec's 4Q09 guidance; and (5) Moshayedi's statement that the $120 million EMC volume agreement was a "one-off" contract. *Id.* at 40-43. For each disclosure, Dr. Bergin confirmed that they reflected new information, that they were a focus of analyst commentary (*see*, *e.g.*, "the big announcement on the call was that EMC may not be able to sell the entire $120M it has committed to purchasing in F2H09"), and that the disclosures coincided with a downward revision of analysts' revenue and earnings models (*see*, *e.g.*, median analysts estimates for 2010 revenue dropped from $491 million to $420 million).

Dr. Bergin removed the positive disclosure that sTec exceeded its 3Q09

1  guidance, because he concluded, consistent with his approach, that that positive

2  disclosure would not explain sTec's stock price drop on that date.  This resulted in a

3  conservative and likely understated measure of the negative impact of the remaining

4  disclosures of interest.  Dr. Bergin also removed offsetting and overlapping negative

5  disclosures (*i.e.*, sTec's announcement of a joint marketing program with EMC and

6  its downwardly revised 4Q09 guidance both of which overlapped with the negative

7  disclosures on EMC's expected demand).  *Id.* at 44-54.

8       As a result of this analysis, he concluded that the negative abnormal return on

9  November 4th was attributable to Moshayedi's disclosures the day before that EMC

10  "might" have "preliminary indications" of an inventory buildup of sTec's products,

11  and that the EMC supply agreement was just a "one-off" contract (that is, the second

12  and fifth disclosures listed above).  *See id*.

13                  **c.      February 24, 2010**

14       Finally, Dr. Bergin concluded that sTec's stock price exhibited a statistically

15  significant abnormal negative return of 23.33% on February 24, 2010.  *See id*. at 10.

16  Dr. Bergin identified four disclosures that were considered significant by sTec

17  equities analysts:  (1) sTec's 4Q09 financial results; (2) the announcement of a stock

18  repurchase program; (3) Moshayedi's statement that because EMC's inventory

19  carryover from the $120 million volume agreement continued to negatively impact

20  sales, sTec did not expect any meaningful production orders from EMC in 1H 2010;

21  and (4) sTec's 1Q10 guidance.  *Id*. at 54-55.  As before, Dr. Bergin determined that

22  the disclosures concerned information previously unknown to the market, confirmed

23  that they were of significance to analysts given their discussion in reports issued

24  following the disclosures (*see*, *e.g.*, "STEC delivered an in-line F4Q-09, but guidance

25  for F1Q-10 was worse than even our worst-case expectations, as mgmt. sees no sales

26  to EMC in F1H-10 due to the inventory overhang"), and examined the downgrade in

27  analysts' earnings and revenue models following the November 23 disclosures (*see*,

28  *e.g.*, median revenue estimates for 2010 dropped from $415 million to $209 million

1  after February 23).

2  Because sTec's 4Q09 results and its announced stock repurchase program were

3  positive news that otherwise would have resulted in an increase in sTec's share price,

4  these disclosures were conservatively treated as having no price effect (thus resulting

5  in an understated measure of the negative news' impact) and were removed from Dr.

6  Bergin's inquiry.

7  As a result of this analysis, Dr. Begin concluded that the negative abnormal

8  return on February 24th was attributable to the news disclosed the previous day that

9  EMC had a huge inventory balance of sTec drives and so would not be purchasing

10  any more drives in the first part of the year (that is, the third and fourth disclosures

11  listed above).  *See id*. at 54-64.

12  **III.   <u>ARGUMENT</u>**

13  Rule 702 of the Federal Rules of Evidence governs the admission of expert

14  testimony; in this area, the district court retains "broad latitude."  *Miller v. Thane*

15  *Int'l.*, *Inc.*, No. SACV 03-1031-JVS (SGLx), 2005 WL 5957833, *1 (C.D. Cal. Mar.

16  3, 2005) (Selna, J.) (*quoting Mukhtar v. California State Univ.*, *Hayward*, 299 F.3d

17  1053, 1064 (9th Cir. 2002)).  A "district court is not tasked with deciding whether the

18  expert is right or wrong, just whether his testimony has substance such that it would

19  be helpful to the jury."  *Alaska Rent-A-Car*, *Inc. v. Avis Budget Group*, *Inc.*, Nos. 10-

20  35137, 10-35615, 2013 WL 4779709 (9th Cir. Jun. 19, 2013); *Mueller v. Auker*, 700

21  F.3d 1180, 1191 (9th Cir. 2012) (finding expert opinion "relevant with respect not

22  only to the substantive issues before the jury" and holding that "[o]nce admissible,

23  the weight to be given to [expert's] testimony was for the jury to determine").  Rule

24  702 permits expert testimony when it is based on sufficient facts or data and is the

25  product of reliable principles and methods, and the expert has applied his or her

26  methodology reliably to the facts of the case.  FED. R. EVID. 702.

27

28

A.   **Because This Is An Insider Trading And Fraudulent Omissions Case, It Is Not Proper To Do An Event Study For August 3rd**

Moshayedi's criticism of Dr. Bergin is primarily focused on the fact that Dr. Bergin did not do an event study of sTec's stock price movement on August 3, 2009. *See* Def. Mot. at 7-8.  He claims Dr. Bergin's opinions should be cast aside solely because Dr. Bergin "did not analyze any of the statements that Moshayedi made on August 3." *Id*. at 8.

Moshayedi completely misses the point.  This is an insider trading and omissions case.  On August 3, 2009, Moshayedi traded on *non-public* information regarding the risk of EMC's inventory buildup and EMC's unwillingness to do another volume commitment contract like the $120 million 2H 2009 deal.  None of that information was presented to the market on August 3—it was non-public, after all—so the market, by definition could not react to it.  As for the few affirmative misstatements Moshayedi made on August 3rd, they were false and misleading because of the non-public, undisclosed information Moshayedi knew that day.

Moshayedi's criticism that Dr. Bergin did not conduct a full event-study analysis of August 3rd is therefore baffling.  In an omissions case, event studies necessarily look not to the date of the "alleged disclosure deficiency," but instead to the dates that the undisclosed information was revealed to the market.  For example, in *City of Livonia*, the Southern District of New York addressed this exact issue in examining the related question of market efficiency.  *City of Livonia Employees' Retirement System v. Wyeth*, *et al.*, 284 F.R.D. 173 (S.D.N.Y. 2012).  There, the defendants focused on the dates of the alleged misrepresentations and omissions— *i.e.*, August 3rd for purposes here.  Having found no statistically significant price impact, the defendants argued that the market for the securities in question was not efficient.  *See id*. at 181-82.  The court was not persuaded given the nature of plaintiffs' claims:

> In this case—which is primarily about omissions—Defendants'

Case No.  12-CV-01179-JVS-ANx

> evidence that there was no statistically significant price impact on the dates of the alleged omissions is inapposite.  As Defendant's own expert explains, in "a case about *omissions*, … conducting event study analysis on the dates of the alleged omissions would not be probative [of price impact] and therefore, one would only look at the alleged corrective disclosure date.

*Id.* at 182 (emphasis in original).

In an omissions or insider trading case, the information at issue remains *undisclosed* on the day of the fraud or insider trading.  Thus, event studies which focus on that day are structurally ill-suited for determining the materiality of the omitted information.  This makes eminent sense, and is confirmed by leading academic commentary:

> Many of the disclosures in a complaint identify dates in which defendants omitted material information.  But, an event study is designed to quantify the effect of disclosed information, not undisclosed information.  Such use of an event study is completely improper.

Frank Torchio, *Proper Event Study Analysis In Securities Litigation*, 35 J. Corp. L. 159, 159-160 (2009) (emphasis added).

When, as here, an expert must reliably assess the materiality of omitted information, the operative inquiry is directed to when the market learned the truth, rather than the date of the fraud or insider trading.  *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 274 (3d Cir.2005) (explaining that where the "efficient market hypothesis" is invoked, "'the materiality of disclosed information may be measured *post hoc* by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock'") (emphasis added); *U.S. v. Grabske*, 260 F.Supp.2d 866, 867 (N.D. Cal. 2002) ("An event study looks to how the price of the stock changed *after* the fraud was disclosed as evidence of the amount by which it was inflated *prior* to disclosure.") (emphasis added); *U.S. v. Ferguson*, 584 F.Supp.2d 447, 449 n.3 (D. Conn. 2008) ("Typically, event studies *work backward* from what is ultimately determined to be a fair price, after dissipation of inflation, to determine how much inflation was contained in the price due to fraud during the relevant time

11

frame all the way back to the beginning.") (emphasis added) (quotations omitted).

Consequently, Dr. Bergin's selection of November 4 and February 24 as dates for examination, rather than August 3, was appropriate because this is an insider trading case involving non-public information and fraudulent omissions.  It was on the November and February dates that the undisclosed information Moshayedi knew in August was finally (but partially)[3] disclosed to the market.[4]

**B.    Dr. Bergin Analysis Of The July 16th, November 4th And February 24th Price Movements Are All Relevant**

Moshayedi also argues that Dr. Bergin's event study analysis of sTec's stock price changes on July 16, November 4 and February 24 are irrelevant.  *See* Def. Mot. at 9-14.  He claims that Dr. Bergin did not even consider the non-public facts known to Moshayedi on August 3.  *Id*. at 7-8.  And he goes so far as to argue that Dr. Bergin needed to establish that the disclosures he identified must be mirror images of Moshayedi's fraud.

As a threshold matter, however, Moshayedi's complaint that Dr. Bergin failed to show how his event study is relevant to the SEC's claims (*see*, *e.g.*, Def. Mot. at 9-10, 12) is not an appropriate criticism of an expert.  It is not the expert who is tasked

---

[3] One piece of material information that Moshayedi knew in August, and traded on but did not disclose, was that he had sought and secured the secret $55 million side deal with EMC to make sure sTec's 3Q09 revenue guidance could meet analysts' expectations.  That deal was not disclosed to the market until this case was filed.

[4] Moshayedi's principal case on this point, *Bricklayers*, does not lead to a contrary result.  *See* Def. Mot. at 5 (citing *Bricklayers*, 853 F. Supp. 2d 181).  Moshayedi implies that *Bricklayers* proscribed a bright-line "requirement" that an event study *must* analyze both "the days the allegedly fraudulent misrepresentations were made and the days the market learned the truth."  Def. Mot. at 5:22-25.  *Bricklayers* does no such thing.  The court expressly found that the expert's failure to consider 22 of 34 days in which fraud allegedly occurred to be "unconventional," but ultimately determined that the expert's decision not to study all of the days did "not necessarily subvert his study."  853 F. Supp. 2d at 187.  Instead, the expert's opinions were excluded because of his pervasive cherry-picking of days, and most egregiously, his use of corrective disclosure dates in which the only news released to the market was *positive*, and not negative.  *Id*.

with arguing his client's case, rather, it is up to the party—the SEC—to explain why an expert's opinions are relevant to the issues in the case.  Therefore, that Dr. Bergin did not articulate the SEC's arguments for why his opinions are relevant to the SEC's case is completely irrelevant to the admissibility of his opinions.  In any event, as discussed below, his opinions are directly relevant to the SEC's claims.

### 1.  The July 16, November 3 and February 24 event study results are relevant and "fit" the facts of this case

Moshayedi also argues that "none" of the dates Dr. Bergin studied "is relevant to the SEC's claims."  Def. Mot. at 9.  Moshayedi asserts that Dr. Bergin performed no analysis of the non-public information possessed by Moshayedi on August 3rd. *See id*. at 8.  But there is no disconnect between the alleged inside information and the disclosures that Dr. Bergin identified on July 16, November 3 and February 23. The disclosures identified by Dr. Bergin on those dates are directed to the very same subject matter as Moshayedi's insider trading—they all revolve around EMC's demand for ZeusIOPS, and whether the run-rate implied by the $120 million volume agreement announced by Moshayedi in July accurately provided a baseline for growth in in the second half of 2009 and in future quarters.  *See SEC v. Leslie*, 2010 WL 2991038, *13-14 (N.D. Cal. Jul. 29, 2010) (rejecting defense argument that expert's materiality opinion was unreliable because disclosure did not reveal alleged misrepresentation where "logical inference" could be drawn between the two).

### a.  The relevancy of the July 16, 2009 event study

Although no fraud is alleged to have occurred on July 16, 2009, Dr. Bergin's event study regarding sTec's stock price reaction to the news disclosed that day is still relevant to this case.  On that day, sTec announced the $120 million volume agreement with EMC.  Dr. Bergin determined that market participants garnered, from that announcement, two pieces of information: (1) that sTec's quarterly run rate with EMC had significantly increased and (2) that the execution of a volume commitment of that magnitude augured a sustainable and increased level of demand in future

Case No.  12-CV-01179-JVS-ANx

periods.  *See* Bergin Report at 32-33.

The market's positive and statistically significant reaction to this information supports the SEC's case in three ways.  First, it establishes the significance to investors of the supply agreement itself—the key contract in this case.  Second, it shows the importance of EMC's August 3rd communication to Moshayedi that, to a "high degree of confidence," it would not be entering into any more volume commitments with sTec.  After all, as Dr. Bergin's analysis shows, the mere announcement of the deal had moved the market to conclude that the growth in EMC's ZeusIOPS demand would continue.  And third, Dr. Bergin's July 16 event study establishes the materiality of EMC's late-July negative demand forecast. sTec's 2Q09 EMC revenue was in the range of $33 million.  The late-July EMC 3Q09 forecast of $33.4 million showed no quarter-to-quarter growth in sTec's EMC business.  This information, known to Moshayedi by late July, was directly at odds with the news previously disclosed by sTec on July 16—that the execution of the $120 million two-quarter supply agreement indicated EMC's actual level of demand for the second half of 2009 and portended the sustainability of an increased level of demand into future periods.[5]

<b>b.     The relevancy of the November 4, 2009 event study</b>

The relevancy of Dr. Bergin's event study of the November 3rd disclosures (and the price reaction to those disclosures the following day) should not even be in dispute.  On November 3, sTec announced that it had received "preliminary indications" that EMC "might" have inventory going into 2010, and that the $120 million EMC volume agreement was a "one-off."  The market's negative and statistically significant reaction to those disclosures supports the SEC's case because sTec's November 3 disclosure of a potential inventory problem at EMC and the non-

---

[5] To be clear, the SEC has not alleged that, on July 16, Moshayedi knew or was reckless in not knowing that EMC's demand for sTec's products would be lower than contemplated under the $120 million contract.

recurring nature of the EMC volume commitment paralleled what Moshayedi knew on August 3rd:  (1) that there was risk that EMC would accumulate significant inventory of sTec's products as a result of the $120 million supply agreement, given EMC's forecasted demand for 3Q09 was just $33-34 million; and (2) that EMC had told Moshayedi, with a "high degree of confidence," that the $120 million volume agreement would not be repeated.

Remarkably, Moshayedi argues that none of the non-public information Moshayedi knew in August was disclosed on November 3.  *See* Def. Mot. at 11-12. That is simply not true.  In August, Moshayedi learned of a risk of inventory, and that risk was finally disclosed in November when he told the markets there "might" be an inventory buildup.  In August, he learned that EMC would not do another volume commitment, and in November, he finally told the market that the 2H09 volume deal with EMC was just a "one-off" contract.  Clearly, these two pieces of non-public information were known in August and then disclosed in November.  To argue otherwise, Moshayedi gives a bullet-point list of the disclosures he claims were made on November 3, and then argues that this list shows that "[n[either of these two facts was disclosed" that day.  *See id*.  But that is disingenuous, at best.  Moshayedi conspicuously leaves off this "list" the very two disclosures that form the basis of the SEC's claim—his disclosure that there "might" be inventory, and his disclosure that the volume commitment was just a "one-off type of deal."

    c.  **The relevancy of the February 23, 2010 event study**

Finally, Dr. Bergin's event study of the February 23, 2010 disclosures and the stock price reaction on February 24 is relevant to the SEC's claims.  Specifically, on February 23, sTec confirmed that inventory carryover had occurred at EMC because its actual demand in 2H09 was well below the $120 million in ZeusIOPS that EMC was obligated to buy under the volume agreement.  Rather than reflecting EMC's true two-quarter demand, the $120 million volume commitment would likely meet EMC's requirements for a full four quarters (*i.e.*, approximately $30 million in EMC revenue

per quarter).  Once again, this disclosure tracks the non-public information in Moshayedi's possession on August 3rd, when he knew that there was a significant risk of inventory build-up at EMC given EMC's 3Q09 forecast of only $33-34 million.  Accordingly, the market's negative and statistically significant reaction to sTec's February 23 disclosures is also supportive of the SEC's materiality case.  Just as importantly, Dr. Bergin's analysis of February 23 also supports the materiality of Moshayedi's misrepresentations and omissions on November 3.  On that day, he disclosed that he had "recently" received "preliminary indications" that "might" have inventory, but he, in fact, knew that EMC exited the third quarter with $30 million in inventory, and expected to accumulate an additional $60 million in inventory in the fourth quarter.

Therefore, Moshayedi's claim that Dr. Bergin's July 16, November 3 and February 23 event studies do not "fit" the facts of the case is unfounded.  The information that Dr. Bergin identified for these three dates undoubtedly bears an "actual relationship to defendant's alleged fraud." *Bricklayers*, 853 F.Supp.2d at 187. Regardless, even if Moshayedi's criticism of Dr. Bergin's lack of analysis regarding August 3rd was valid, that criticism goes only to the weight of Dr. Bergin's testimony, not its admissibility. *See*, *e.g.*, *Miller*, 2005 WL 5957833, *3 (admitting event study that did not incorporate standard regression analysis).

## 2. The disclosures studied by Dr. Bergin do not have to "mirror" the undisclosed information known to Moshayedi on August 3

Finally, in order to frame Dr. Bergin's event disclosure dates as irrelevant, Moshayedi urges that Dr. Bergin's disclosures of interest must be a "mirror image" of the facts that Moshayedi knew but failed to disclose in August.  Def. Mot. at 11, 14.

However, Moshayedi's authority for this proposition is inapposite because the cases he cites largely concern loss causation in private shareholder actions.  Dr. Bergin's opinions have nothing to do with loss causation; instead, they are supportive of the SEC's theory of materiality. *See* Bergin Report at 6-7.  More importantly, the

loss causation cases cited by Moshayedi have no bearing here because the SEC does not have to prove loss causation in SEC enforcement actions. *See SEC v. Pirate Investor LLC*, 580 F.3d 233, 239 n.10 (4th Cir. 1999) ("Unlike private litigants, the SEC need not prove the additional elements of reliance or loss causation."); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985); *SEC v. Tambone*, 597 F.3d 436, 464 (1st Cir. 2010); *SEC v. Constantin*, No. 11 Cv. 4642 (MHD), 2013 WL 1453792, *11 (S.D.N.Y. Apr. 2, 2013).

Thus, even though materiality and loss causation are often intertwined, the two concepts are not coextensive for purposes of this Court's *Daubert* inquiry. This Court's *Miller* decision is instructive on this key point. In that case, an expert opined on the materiality of misrepresentations made in a proxy statement and prospectus, and further opined on class damages. 2005 WL 5957833, *5-6. The opposing party challenged both opinions on the ground that the other party's expert "did not even attempt to factor out the effect of other events that could have accounted for a portion of the [stock's price] decline." *Id.* at *6. Although the Court agreed with this "disaggregation" criticism, it did not exclude the expert's opinion that the purported misrepresentation was material; instead, the expert's methodological error only went to her conclusion on damages, *i.e.*, "loss causation." *Id.* That was because the expert's opinion on materiality was not dependent on a precise calculation of the portion of the stock drop attributable to non-fraud events. In the Court's estimation, it was sufficient for the expert to demonstrate materiality by demonstrating "some degree" of price reaction to the alleged fraud. *Id.*.

Here, Dr. Bergin expresses no opinion on loss causation—he only draws conclusions as to the abnormal stock price returns that, through his event study methodology, he was able to attribute to the disclosures of interest. *See* Bergin Report at 6-7. These opinions support the SEC's case for materiality. So, consistent with *Miller*, Moshayedi's criticisms that Dr. Bergin "failed to disaggregate" and ignored "confounding information" have less import in this context—where the

1   opinions are being used to help establish materiality—than they would had they been

2   offered to prove loss causation.  Moreover, even if these criticisms were valid (and

3   they are not), those arguments do not mandate exclusion.[6]

4         In sum, because all of Dr. Bergin's disclosures of interest "relate" to "the same

5   subject matter" of Moshayedi's alleged fraud, his opinions are helpful to the jury, are

6   based on an unmistakably reliable event study methodology, and should be admitted

7   under Rule 702.  *See Massachusetts Retirement Sys.*, 716 F.3d at 240; *In re Williams*

8   *Sec. Litig.*, 558 F.3d at 1140; *FindWhat Investor Group*, 658 F.3d at 1312 n.28.

9       **C.**    **Dr. Bergin's Analysis, Unlike Dr. Ferrell's, Is Not A Disgorgement**

10            **Calculation**

11         Moshayedi also complains that Dr. Bergin's opinions are disgorgement

12   calculations that should be reserved for the remedy phase of this case.  *See* Mot. at

13   15-16.  That is a remarkable position to take, given what Dr. Bergin actually did and

14   what Moshayedi's own expert, Prof. Allen Ferrell did.

15         Dr. Bergin did not do a disgorgement calculation or attempt to measure

16   Moshayedi's unjust enrichment.  He did an event study, which is a standard, well-

17   accepted method for determining whether a change in a company's stock price can be

18   attributed to what was disclosed to the market on a particular day.  In SEC

19   enforcement actions, where loss causation or damages are not at issue, event studies

20   are used for one primary purpose—to assist in establishing (or disproving)

21   materiality.  And that is all that Dr. Bergin has done here for the SEC.  For example,

22   

23   [6] Even if the opinions were being offered to establish loss causation, a corrective
disclosure must only "relate" back to "the same subject matter" as the alleged fraud.
24   *Massachusetts Retirement Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir.
2013); *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009); *FindWhat*
25   *Investor Group v. FindWhat.com*, 658 F.3d 1282, 1312 n.28 (11th Cir. 2011).  For
loss causation, there is no requirement that the corrective disclosure "precisely
26   mirror" the alleged misrepresentation, or that the corrective disclosure correlate "fact-
for-fact" with the earlier fraud.  *Id.*; *see also Massachusetts Retirement Sys.*, 716 F.3d
27   at 240; *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011); *In re*
*Oracle Corp. Sec. Litig.*, 2009 WL 1709050, *12 (N.D. Cal. Jun. 19, 2009).
28

he concludes that the almost 40% price drop on November 4th was due to the disclosure that EMC "might" have an inventory buildup and EMC's $120 million supply contract with sTec was just a "one-off" contract.  That is probative and helpful for the jury to assess the materiality of the same  two pieces of information, which Moshayedi knew when he sold his stock on August 3rd.

On the other hand, it is Moshayedi's expert, Prof. Ferrell, who has done a disgorgement analysis.  And the SEC agrees with Moshayedi—that analysis should not be presented to the jury.  *See* Def. Mot. at 15.  As the SEC made clear in its motion to exclude Prof. Ferrell, Prof. Ferrell hopes to offer his "but-for" price impact analyses, which, as he puts it, "measure the per share price impact attributable to the alleged omissions."  Dkt. No. 258, Ex. 1 (Ferrell Report) ¶ 9.  And it was Prof. Ferrell who criticized the SEC's disgorgement calculation, and offered an alternative "maximum amount by which Mr. Moshayedi could have been enriched by any alleged disclosure deficiency."  *Id*. ¶ 18; *see also* Dkt. No. 255-2 (SEC motion to exclude Ferrell) at 6.  Therefore, if anyone's opinions regarding disgorgement should be excluded, it should be the expert who actually tried to calculate the amount of disgorgement or "avoided losses."  And that was Moshayedi's expert, not Dr. Bergin.

### D.     Moshayedi's Discrete Methodological Criticisms Are Not Persuasive

Finally, Moshayedi attempts to discredit Dr. Bergin's event study methodology.  *See* Def. Mot. at 16-24.  However, no one disputes that the event study method "is an accepted method for the evaluation of materiality [and] damages to a class of stockholders in a defendant corporation."  *In re Imperial Credit Indus. Sec. Litig*., 252 F.Supp.2d 1005, 1014 (C.D.Cal.2003); *see also U.S. v. Schiff*, 602 F.3d 152, 174 n.31 (3d Cir. 2010) (acknowledging that an event study is a reliable methodology for establishing materiality).  Because litigants must "distinguish between the fraud-related and non-fraud related influences of the stock's price behavior," *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993), event study analyses have taken a central role in determining materiality and damages in

securities litigation.  *See General Elec. Co. v. Jackson*, 595 F.Supp.2d 8, 23–24
(D.D.C.2009) (stating that an event study is an acceptable method of determining the
effect of an event on stock price); *SEC v. Berlacher*, 2010 WL 3566790, *8 (E.D. Pa.
Sept. 13, 2010) (accepting expert-conducted event study "as reliable and the best
measure of materiality"); *SEC v. Leslie*, 2010 WL 2991038, *11-14 (N.D. Cal. Jul.
29, 2010) ) (rejecting *Daubert* challenge to event study used to prove materiality).

In fact, Moshayedi's own experts—Prof. Ferrell and Dr. Bajaj—do not criticize
Dr. Bergin's methodology at all.  Prof. Ferrell and Dr. Bajaj have no criticism of the
time period selected by Dr. Bergin for use in his regression model.  *See* Leung MIL
Decl., Ex. 18 (Bajaj Depo. Tr.) at 75:17-22; Ex. 21 (Ferrell Depo. Tr.) at 56:10-18.
Nor do they take issue with Dr. Bergin's market and industry factors.  *Id.*  Prof.
Ferrell did not conduct an event study of his own and instead chose to adopt Dr.
Bergin's for use in forming his opinions.  *Id.*, Ex. 21 (Ferrell Depo. Tr.) at 56:22-
57:3.  Dr. Bajaj only conducted a regression analysis without performing the
disaggregation step necessary to the conclusions he reached.  Dkt. No. 255,
Attachment No. 1 at 21-22.

Moreover, as for Dr. Bergin's examination of analyst commentary, both Prof.
Ferrell and Dr. Bajaj concurred in this approach.  *See* Leung MIL Decl., Ex. 21
(Ferrell Depo. Tr.) at 64:10-25 ("One of the things you can do—and I do in my
rebuttal report—is to do an analysis based on … what market actors, such as analysts,
are saying about why they think the information is important or how they are using
the information."); *id.*, Ex. 18 (Bajaj Depo. Tr.) at 57:7-59:14 ("I would look at,
under most circumstances I can imagine right now, what other analysts thought and
said and did as part of the consideration").  From their respective reports, it is
abundantly clear that Prof. Ferrell and Dr. Bajaj—like Dr. Bergin himself—relied
heavily on analyst commentary when forming their opinions in the case.  *See* Dkt.
No. 258, Leung Decl., Ex. 3 (Bajaj Report), Appx. 2; Ex. 1 (Ferrell Report), Appx. B.

Therefore, Moshayedi and his defense experts criticize only the conclusions

reached by Dr. Bergin, not his methodology.  But that is not a basis to exclude Dr. Bergin's report.  *See*, *e.g.*, *SEC v. Sabhlok*, No. C-08-4238 EMC, 2010 WL 2944255, *7 (N.D. Cal. Jul. 23, 2010) ("Ultimately, the parties confuse reliability with correctness ….  The general methodologies employed by the experts (*e.g.* events analysis) are generally reliable and accepted.").  In any event, Moshayedi's claims that Dr. Bergin did not reliably disaggregate confounding information and that his opinions are based on "unreliable" analyst declarations are meritless.

### 1.    Dr. Bergin disaggregated confounding factors

As described *supra*, under his methodology, Dr. Bergin accounted for the influence of informational disclosures other than the disclosures of interest by analyzing analyst reports, revenue and earnings models, and declarations to assess their significance to market participants; if overlapping, these disclosures were removed, and if directionally opposite to the movement of sTec's stock price on that day, these disclosures were removed for the sake of conservatism.  Prof. Ferrell and Dr. Bajaj did the exact same thing—they looked to analyst commentary to gauge materiality.  Thus, what Moshayedi takes issue with are the conclusions that Dr. Bergin reached after applying the very same methodological tool brought to bear by Moshayedi's two rebuttal experts.  This is no basis for exclusion.

In the *In re Novatel* case, the district court confronted the very same criticism at bar—that an event study failed to consider "multiple pieces of information that are entirely separate and distinct" from the alleged fraud—and found no grounds to exclude.  As the court explained:

> Defendants are correct that Steinholt's event study could have included an analysis of non-fraud-related company-specific news. However, the failure to consider one of the relevant variables does not dictate exclusion of the report as unreliable.  Generally, the failure to include a variable in a regression analysis affects the probative value of the analysis and not necessarily its admissibility.

*In re Novatel Wireless Sec. Litig.*, 910 F.Supp.2d 1209, 1215 (S.D. Cal. 2012) (*quoting Bazemore v. Friday*, 478 U.S. 385, 400 (1986)), *vacated on other grounds*

1   *by* 2013 WL 494361; *see also In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202,

2   1273 (S.D. Cal. 2010) ("Where a study accounts for the 'major factors' but not 'all

3   measurable variables,'" it is admissible); *Carpenters Health & Welfare Fund v.*

4   *Coca-Cola Co.*, 2008 WL 4737173 (N.D. Ga. 2008) (economist's choice of variable

5   for event study went to weight and not admissibility); *see also SEC v. Leslie*, No. C

6   07-3444, 2010 WL 2991038, *14-15 (N.D. Cal. Jul. 29, 2010) (where expert did not

7   read entire Form 10-Q and accordingly failed to filter out the effect of other negative

8   information contained therein that was not referenced in any of the newspaper

9   sources actually reviewed by the expert, criticism went to weight rather than

10  admissibility—"While each of these arguments appropriately may be made on cross-

11  examination, they do not show that Davis's opinion should be excluded entirely.");

12  *Sabhlok*, 2010 WL 2944255, *7 ("Ultimately, the parties confuse reliability with

13  correctness."); *In re Heckmann*, No. 10-378-LPS-MPT, 2013 WL 2456104, *8 (D.

14  Del. Jun. 6, 2013) (criticism of event study dates went to weight not admissibility).

15         In any event, each of the criticisms lodged by Moshayedi has no merit:

16         ***July 16, 2009***.  Moshayedi argues that Dr. Bergin failed to account for two

17  other disclosures on July 16:  (1) sTec's announcement of a $28 million contract for

18  its Mach8 product, and (2) sTec's announcement of full-year guidance for ZeusIOPS

19  sales in the amount of $220 million.  Def. Mot. at 17-18.  At deposition, Dr. Bergin

20  explained that sTec's full-year guidance was already baked into its robust revenue

21  guidance on June 16, one month earlier.  As a result, the full-year guidance was not

22  picked up by the market as new information.  Leung MIL Decl., Ex. 20 (Bergin

23  Depo. Tr.) at 133:1-136:25.  As for the Mach8 announcement, that information was

24  disclosed on July 13th.  Thus, according to the efficient markets hypothesis that Dr.

25  Bergin, Dr. Bajaj, and Prof. Ferrell all assumed, any price influence of the Mach8

26  contract would have already been incorporated into sTec's stock price prior to July

27  16.  Dkt No. 258, Leung Decl., Ex. 2 (Bajaj Report) at Appendix 3a ("in an efficient

28  market prices react very quickly to value-relevant news, often within a few

minutes"); *see also* Leung MIL Decl., Ex. 18 (Bajaj Depo. Tr.) at 60:7-15 (assuming sTec stock traded in semi-strong form efficient market); Dkt. No. 258, Leung Decl., Ex. 1 (Ferrell Report) at ¶ 82 (assuming market efficiency); Leung MIL Decl., Ex. 21 (Ferrell Depo. Tr.) at 83:23-84:14 ("If the market is semi-strong, efficient, then, by definition, the publicly available information will be reflected in the price, or quickly reflected in the price.").

*November 3, 2009*.  Moshayedi further contends that Dr. Bergin failed to account for two other disclosures on November 3:  (1) inferential information that, based on its announced 3Q09 figures, sTec had only sold $60.7 million in ZeusIOPS drives, and (2) 4Q09 guidance that "impliedly" demonstrated that sTec expected only $2-3 million in 4Q09 sales to non-EMC customers.  Def. Mot. at 19.  Dr. Bergin addressed both of these points at his deposition and in his report, explaining that these disclosures regarding weak non-EMC demand were stale and had already been incorporated into sTec's stock price, and that sTec's 3Q09 results—which exceeded its guidance from August 3—was on balance, positive news.  *See* Leung MIL Decl., Ex. 20 (Bergin Depo. Tr.) at 203:25-205:10.[7]

*February 23, 2010*.  Finally, Moshayedi asserts that Dr. Bergin did not disaggregate the effect of two other disclosures on February 23, (1) that Mach8 revenues would not grow until a successor product hit the market in 2H 2010, and (2) that sTec's operating expenses would increase by $10 million per quarter.  Def. Mot. at 20.  Analysts, however, were divided over the meaning of the Mach8 news.  *See* Leung MIL Decl., Ex 22 (2/24/10 B. Riley report) (believing focus of 2/23 earnings

---

[7] Moshayedi also argues that Dr. Bergin ignored the materialization of competitive risks from August 3 to November 3.  This is the exact subject of Dr. Bergin's Rebuttal Report, where he explained that competition and slower than expected adoption of solid state drives cannot explain with any statistical significance sTec's stock price decline from August 4 to November 3.  Dkt. No. 258, Leung Decl., Ex. 6 (Bergin Rebuttal Report).  In any event, as further explained in the SEC's motion *in limine* to exclude Dr. Bajaj, the cause of sTec's stock price drop from August 3 to November 3, 2009, is irrelevant to any issue in this case.  *See* Dkt. No. 255-1.

1    call was almost entirely on EMC and expecting total Mach sales to resume growth

2    upon shipment of Mach18 product); Ex. 23 (2/24/10 Thomas Wiesel report) (no

3    mention of Mach as driver of analysts' investment thesis); Ex. 24 (2/24/10 Stifel

4    Nicolaus report) (referencing Mach product line but not ascribing any negative

5    developments to it); Ex. 25 (2/24/10 Pacific Crest report) (noting nothing negative

6    about Mach product line in investment thesis and showing total Mach sales increasing

7    from 4Q09 to 4Q10); Ex. 26 (2/24/10 Needham report) (noting only increased sales

8    of Mach in 4Q09); Ex. 27 (2/24/10 Wedbush report) (no mention of Mach product

9    line at all).  As for sTec's alleged disclosure of increased operating expenses on

10   February 23rd, this disclosure was stale news.  During the August 3rd earnings call,

11   Moshayedi stated that sTec would continue to keep on spending on R&D, that it

12   would continue to try to add positions, and that any increases in operating expenses

13   would be attributable to R&D.  Leung MIL Decl., Ex. 28 (8/3/09 earnings transcript)

14   at 11.  Because this information was previously disclosed and already known as of

15   August 3, 2009, it was not confounding news on February 23, 2010.

16            **2.    Dr. Bergin reliably used analyst declarations as confirmation**

17                    **for his conclusions**

18            Moshayedi's contention that Dr. Bergin's opinions rely "almost exclusively"

19   on the sworn declarations of eight sTec analysts is just wrong.  Def. Mot. at 21.  But

20   under any fair reading of his report, Dr. Bergin utilized a vast amount of information

21   on analyst commentary and expectations in 2009—indeed, he reviewed and

22   considered every single sTec analyst report issued from June 2009 to February 2010.

23   Dr. Bergin also constructed consensus views on sTec's future earnings and revenue

24   by compiling all of the available data on analysts' forecasting models in that same

25   timeframe.  As to the declarations, Dr. Bergin employed those only to "confirm the

26   materiality of the disclosures of interest[.]"  Bergin Report at 30.

27            More to the point, there is nothing unreliable about considering the sworn

28   statements of percipient witnesses to Moshayedi's alleged fraud.  *See Walker v.*

*Woodford*, 593 F.Supp.2d 1140, 1148 n.3 (S.D. Cal. 2008) ("As an expert witness, Dr. Poceta may properly consider Plaintiff's medical records and the declarations of percipient witnesses in forming and expressing his opinions.").  The bulk of each analysts' declaration is comprised of their factual account of events, rather than the putative "hypothetical conclusions" that Moshayedi characterizes those affidavits to be.  Proof of this reliability need come no further than Dr. Bajaj himself.  Like Dr. Bergin, Dr. Bajaj considered the sworn testimony of sTec stock analysts—both deposition testimony and the affidavits submitted in this case—when rendering his opinions.  Dkt. No. 258, Leung Decl., Ex. 2 (Bajaj Report) at Appendix 2.  *See In re Diamond Foods, Inc.*, No. C-11-05386 WHA, Fed. Sec. L. Rptr. (CCH) P. 97,414, 2013 U.S. Dist. LEXIS 64464, * 37 (N.D. Cal. may 6, 2013)  (finding that information selected by expert in conducting event study, including reliance on analyst reports, reasonably objective ); *Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 579 n. 32 (N.D. Tex. 2007) (expert's review of analyst reports proper, as "[r]eports of market analysts serve as a good indication of the knowledge of the market as a whole."); *In re Miller Indus. Sec. Litig*, 120 F.Supp.2d 1371, 1381 (N.D. Ga. 2000) (expert properly relied on analyst reports to determine materiality of information at issue).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the SEC respectfully requests that the Court deny Moshayedi's motion to exclude opinions and testimony of Dr. Richard Bergin in its entirety.

Dated:  September 30, 2013               Respectfully submitted,


                                         /s/ *Gary Y. Leung*
                                         John W. Berry
                                         Donald W. Searles
                                         Gary Y. Leung
                                         Attorney for Plaintiff
                                         Securities and Exchange Commission

## <u>PROOF OF SERVICE</u>

I am over the age of 18 years and not a party to this action.  My business address is:

     U.S. SECURITIES AND EXCHANGE COMMISSION,
     5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648
     Telephone No.  (323) 965-3213; Facsimile No.  (323) 965-3908.

On September 30, 2013, I caused to be served the document entitled **PLAINTIFF'S OPPOSITION TO DEFENDANT MOSHAYEDI'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DR. RICHARD BERGIN** on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

      ☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

      ☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

    I declare under penalty of perjury that the foregoing is true and correct.

Date: _September 30, 2013         /s/ Gary Y. Leung_____
                             GARY Y. LEUNG

1

## SEC v. MANOUCHEHR MOSHAYEDI
### United States District Court—Central District of California
### Case No. 12-CV-01179 (JVS) (ANx)

## SERVICE LIST

Sean M.  Berkowitz
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Direct Dial: 312-777-7016
sean.berkowitz@lw.com

Matthew Rawlinson
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: 650-463-3076
matt.rawlinson@lw.com

Colleen Smith
LATHAM & WATKINS LLP
600 W.  Broadway, Suite 1800
San Diego, CA 92101
Direct Dial: 619-238-2950
colleen.smith@lw.com

Everett Bulthuis (Paralegal)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925
Direct Dial: 714-755-8247
Cell: 714-747-1814
everett.bulthuis@lw.com

Thomas A.  Zaccaro
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomaszaccaro@paulhastings.com

*Attorneys for Defendant*

Patrick Gibbs
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-4696
patrick.gibbs@lw.com

William R.  Baker, III
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.  20004-1304
Direct Dial:  202-637-1007
william.baker@lw.com

Jennifer S.  Duckworth (Paralegal)
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-3012
jennifer.duckworth@lw.com

Thomas P.  O'Brien
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomasobrien@paulhastings.com

*Attorneys for Defendant*

2