LATHAM & WATKINS LLP
  William R. Baker, *pro hac vice*
  william.baker@lw.com
  Sean M. Berkowitz, *pro hac vice*
  sean.berkowitz@lw.com
  Patrick E. Gibbs, Bar No. 183174
  patrick.gibbs@lw.com
  Matthew Rawlinson, Bar No. 231890
  matt.rawlinson@lw.com
  Michele D. Johnson, Bar No. 198298
  michele.johnson@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

PAUL HASTINGS LLP
  Thomas P. O'Brien, Bar No. 166369
  thomasobrien@paulhastings.com
  Thomas A. Zaccaro, Bar No. 183241
  thomaszaccaro@paulhastings.com
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: +1.213.683.6000
Facsimile: +1.213.627.0705

Attorneys for Defendant
Manouch Moshayedi

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. 8:12-CV-01179-JVS-ANx |
| Plaintiff, | DEFENDANT'S REPLY IN SUPPORT OF MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DR. RICHARD BERGIN PURSUANT TO FEDERAL RULE OF EVIDENCE 702 |
| v. | |
| MANOUCHEHR MOSHAYEDI, | |
| Defendant. | The Honorable James V. Selna |
| | Date:    October 21, 2013<br>Time:    11:00 a.m.<br>Place:   Courtroom 10C |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................... 1

II.  ARGUMENT ......................................................................................... 2

A.   The SEC Has Failed to Show That Dr. Bergin's Opinions Comply With The *Daubert* "Fit" Requirement ............................ 2

1.   Analyzing Disclosures That Merely "Relate to" the "Same Subject Matter" Does Not Satisfy *Daubert*'s Stringent "Fit" Requirement ............................................. 2

2.   Dr. Bergin's Opinions Do Not Meet *Daubert*'s "Fit" Requirement, Properly Understood ................................... 6

a.   Dr. Bergin Cannot Tie His Own Event Study to Any Issue in the Case ................................................. 6

b.   The SEC Admits That Dr. Bergin Did Not Actually Analyze the Materiality of the Information That Mr. Moshayedi Allegedly Knew on August 3 ........................................................... 8

3.   The SEC Fails to Show How Dr. Bergin's Analysis of Stock Price Movements Speaks Directly to Whether the Facts Allegedly Known to Mr. Moshayedi on August 3 Were Material ............................................................. 9

a.   The SEC Concedes That Dr. Bergin's Opinion Regarding July 16, 2009 Relates Only to a Question Not in Dispute Here ................................ 10

b.   The SEC's Attempt to Link Dr. Bergin's Analysis of November 3, 2009 Disclosures to the SEC's Theory of the Case Depends on a Mischaracterization of the "Facts" ......................... 11

c.   The SEC Fails to Demonstrate How the February 23, 2010 Disclosure Dr. Bergin Analyzed Relates to the Fraud Alleged in this Case ............................ 13

B.   The Methodological Flaws in Dr. Bergin's Analysis Are Severe Enough to Warrant Exclusion ....................................... 14

1.   Dr. Bergin's Failure to Disaggregate Confounding Factors Undermines His Opinions ................................... 15

2.   Dr. Bergin Failed to Disaggregate Critical Confounding Disclosures ........................................................ 18

3.     Dr. Bergin Used Unreliable Analyst Declarations to Form His Opinions, Not Merely to "Confirm" Them ....................... 20

III.    CONCLUSION ......................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*Amadio v. Glenn*
  2011 WL 336721 (E.D. Pa. Feb. 1, 2011) .................................................... 11

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*
  853 F. Supp. 2d 181 (D. Mass. 2012) .......................................................... 16

*Daubert v. Merrell Dow Pharms., Inc.*
  43 F.3d 1311 (9th Cir. 1995) ............................................................... passim

*Daubert v. Merrell Dow Pharms, Inc.*
  509 U.S. 579 (1993) ................................................................... 2, 11, 13

*Democratic Party of Wash. State v. Reed*
  No. C00-5419FDB, 2002 WL 32925223 (W.D. Wash. Mar. 27, 2002) .................. 20

*FindWhat Investor Grp. v. FindWhat.com*
  658 F.3d 1282 (11th Cir. 2011) ................................................................... 4

*In re Daou Sys.*
  411 F.3d 1006 (9th Cir. 2005) ..................................................................... 4

*In re Diamond Foods, Inc.*
  No. C-11-05386 WHA, 2013 WL 1891382 (N.D. Cal. May 6, 2013) ................... 21

*In re Miller Industries Secs. Litig.*
  120 F. Supp. 2d 1371 (N.D. Ga. 2000) ......................................................... 21

*In re Novatel Wireless Secs. Litig.*
  910 F. Supp. 2d 1209 (S.D. Cal. 2012), *vacated by* 2013 WL 494361 ............... 17

*In re Paoli R.R. Yard PCB Litig.*
  35 F.3d 717 (3d Cir. 1994) ........................................................................... 6

*In re REMEC Inc. Sec. Litig.*
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................................... 17

*In re Verifone Sec. Litig.*
  784 F.Supp. 1471 (N.D. Cal. 1992) ............................................................. 10

*In re Williams Secs. Litig.*
  558 F.3d 1130 (10th Cir. 2009) ......................................................... 4, 7, 9, 17

*In re Xcelera.com Sec. Litig.*
  2008 WL 7084626 (D. Mass. Apr. 25, 2008) ................................................... 7

*Jones v. United States*
  933 F. Supp. 894 (N.D. Cal. 1996), *aff'd* 127 F.3d 1154 (9th Cir. 1997) ............ 20

*Katyle v. Penn Nat'l Gaming, Inc.*
  637 F.3d 462 (4th Cir. 2011) ......................................................................... 4

*Lauzon v. Senco Prods.*
   270 F.3d 681 (8th Cir. 2001) ..................................................................... 7

*Metzler v. GMBH Corinthian Colleges, Inc.*
   540 F.3d 1049 (9th Cir. 2008) .................................................................. 4

*Miller v. Thane International Inc.,*
   2005 WL 5957833 (C.D. Cal. Mar. 3, 2005) ..................................... 15, 17

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*
   487 F.3d 261 (5th Cir. 2007) ..................................................................... 9

*SEC v. Leslie*
   2010 WL 2991038 (N.D. Cal. July 29, 2010) ................................. 4, 5, 17

*Stoebner Holdings, Inc. v. Automobili Lamborghini S.P.A.*
   2007 WL 4230878 (D. Hawaii Nov. 30, 2007) ...................................... 11

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*
   546 F.3d 196 (2d Cir. 2008) ................................................................... 15

*United States v. Schiff*
   538 F. Supp. 2d 818 (D.N.J. 2008) ............................................... 6, 9, 16

*Vaughn v. Teledyne, Inc.*
   628 F.2d 1214 (9th Cir. 1981) ................................................................ 10

*Walker v. Woodford*
   593 F. Supp. 2d 1140 (S.D. Cal. 2008) .................................................. 21

**OTHER AUTHORITIES**

Frank Torchio, *Proper Event Study Analysis In Securities Litigation*
   35 J. Corp. L. 159, 167 (2009) .................................................................. 9

1    **I.      INTRODUCTION**

2           The SEC's opposition to Mr. Moshayedi's motion to exclude Dr. Bergin under

3    Rule 702 reflects its fundamental misunderstanding of that Rule and the corresponding

4    requirement that an expert's opinions must "speak[] clearly and directly to an issue in

5    dispute in the case." *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17

6    (9th Cir. 1995) ("*Daubert II*").  The SEC ignores this test, and does not even cite

7    *Daubert*.  Instead, the SEC argues repeatedly that Dr. Bergin's opinions are admissible

8    because he analyzed, through an event study, sTec's stock price movements on three

9    dates—July 16, 2009, November 4, 2009, and February 24, 2010—that the SEC claims

10   are "relevant" to or based on the "same subject matter" as the SEC's claims.  But this is

11   not what the law requires.  Instead, an expert opinion purporting to show the materiality

12   of information disclosed on a particular day must also show that the disclosures relate to

13   *the same fact* (or set of facts) in the case as to which materiality is at issue.

14          Here, the SEC does not connect what Dr. Bergin did with any issue that is actually

15   in dispute in this case.  It offers no argument showing that the materiality of the

16   "disclosures of interest" studied by Dr. Bergin is probative of the materiality of the facts

17   the SEC claims Mr. Moshayedi knew as of August 3, 2009.  And Dr. Bergin himself

18   admits that he did no work whatsoever to show that what was disclosed on July 16,

19   November 3, or February 23 is the same information Mr. Moshayedi allegedly possessed

20   on August 3.  The SEC tries to justify its failure to show that Dr. Bergin's opinions fit its

21   case by arguing that Dr. Bergin could not consider the materiality of the "facts" Mr.

22   Moshayedi knew on August 3 and that the only possible way for him to analyze the

23   materiality of this information was to look at other disclosure dates.  This is wrong.  Even

24   in an omissions case, an expert must make a showing that the dates and facts the expert

25   studied are probative of the materiality of the alleged omission or misstatement.  To meet

26   that requirement, the expert must demonstrate that the facts disclosed on the corrective

27   disclosure date were actually the same as the charged conduct.  But the disclosures Dr.

28   Bergin examined here are not probative of what the SEC alleges Mr. Moshayedi knew

1  and did not disclose on August 3.  Dr. Bergin's analysis shows only that the market

2  reacted to some news on July 16, November 3, and February 23.  It does not demonstrate

3  anything about the facts Mr. Moshayedi allegedly possessed but did not disclose on

4  August 3, as *Daubert* requires.

5       The SEC's attempt to excuse the methodological flaws in Dr. Bergin's opinions

6  fares no better.  The SEC falsely contends that Mr. Moshayedi's objection to Dr. Bergin's

7  methodology is really just a criticism of Dr. Bergin's conclusions.  Dr. Bergin offered

8  opinions not just on the materiality of the disclosures he studied, but as to the precise

9  price impact of those disclosures.  Under Rule 702 and *Daubert*, to be admissible, those

10 conclusions must account for non-fraud related factors before attributing the entirety of

11 the price impact to the disclosures that Dr. Bergin deems material.  Dr. Bergin's failure to

12 disaggregate confounding information on the dates he analyzed is a fundamental

13 methodological failure that undermines the entirety of his opinion.  Nor has the SEC

14 succeeded in excusing Dr. Bergin's reliance on unreliable analyst declarations.  Dr.

15 Bergin's extensive citation to those declarations—which were created solely for purposes

16 of this litigation and are unreliable, improper lay opinion testimony—undermines the

17 reliability of his opinion.

18      Dr. Bergin's opinions suffer from fundamental methodological flaws and do not

19 prove the materiality of any "facts" that are relevant to the SEC's claims.  His opinions

20 do not meet the "fit" and reliability requirements of *Daubert*, and must be excluded.

21 **II.   ARGUMENT**

22      **A.   The SEC Has Failed to Show That Dr. Bergin's Opinions Comply With**
23           **The *Daubert* "Fit" Requirement**

24           **1.   Analyzing Disclosures That Merely "Relate to" the "Same Subject**
                  **Matter" Does Not Satisfy *Daubert*'s Stringent "Fit" Requirement**

25      As Mr. Moshayedi explained in his opening brief, a party offering expert testimony

26 must show more than mere relevance.  Instead, the expert's opinion must meet the far

27 more demanding "fit" requirement set forth by the Supreme Court in *Daubert v. Merrell*

28 *Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) ("*Daubert I*").  *See* Def.'s Mot. to

1   Exclude Dr. Bergin (Dkt # 259) at 7 ("Mot.").  To meet that requirement, the proposed

2   testimony must "logically advance[] a material aspect of the proposing party's case."

3   *Daubert II*, 43 F.3d at 1315.  Under this standard, an expert's analysis must be excluded

4   unless the Court determines that "it speaks clearly and directly to an issue in dispute in

5   the case, and that it will not mislead the jury."  *Id.* at 1321 n.17.

6       Tellingly, the SEC does not even try to show that Dr. Bergin's opinions meet the

7   *Daubert* "fit" standard.  In fact, the SEC's opposition does not discuss this standard at all

8   and does not even cite or discuss the Supreme Court's *Daubert* opinion.  Instead, the SEC

9   argues that Dr. Bergin's opinions should be admitted because the disclosures that he

10  studied involve the "same subject matter as Moshayedi's insider trading."  Pl.'s Opp. to

11  Def.'s Mot. to Exclude Dr. Bergin (Dkt # 279) at 13 ("Opp.").  The SEC cites no

12  authority suggesting that an expert's analysis of the same "subject matter" as an alleged

13  omission is enough to satisfy *Daubert*'s rigorous "fit" requirement.  Rather, the SEC's

14  "subject matter" test appears to be drawn from a handful of opinions (all but one of which

15  are from outside the Ninth Circuit) addressing the question of what a private plaintiff has

16  to prove to establish loss causation.  *Id.* at 18 & n.6.  But as the SEC itself points out, loss

17  causation is not an element of the SEC's case, and so it is not at issue here.  *Id.* at 16-17.

18      More importantly, none of the SEC's authorities have anything to do with the "fit"

19  requirement under *Daubert*, and none of them suggests that Dr. Bergin can meet that

20  requirement by studying disclosures that merely "relate to" the same "subject matter" as

21  an alleged omission.  Under *Daubert*, the question is not whether the disclosures that Dr.

22  Bergin studied "related" to the same "subject matter" as the information the SEC claims

23  he concealed.  The question is whether Dr. Bergin's opinion "speaks clearly and directly

24  to an issue in dispute in the case."  *Daubert II*, 43 F.3d at 1321 n.17.

25      In any event, having invoked the wrong legal standard, the SEC has badly

26  misstated it, presumably because they know Dr. Bergin cannot meet this standard either.

27  Indeed, the SEC's own authorities (Opp. at 18 & n.6) make clear that a disclosure is not

28  "corrective" (and therefore does not prove loss causation) unless it reveals the facts that

were concealed by a prior misstatement or omission.  *See, e.g.*, *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1312 n.28 (11th Cir. 2011) ("same subject matter" test requires proof that the corrective disclosure "reveal[s] to the market the falsity of the prior misstatements") (citation and quotation marks omitted); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (corrective disclosures "must reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains"); *In re Williams Secs. Litig.*, 558 F.3d 1130, 1139–40 (10th Cir. 2009) (rejecting expert's conclusions because he "could not tie these four particular disclosures to any of the alleged misrepresentations or describe why they should be considered 'corrective'").  Ninth Circuit law likewise holds that a corrective disclosure is one that reveals to the market the "facts" that were concealed by a prior misstatement or omission. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005).  Thus, the test for loss causation, as the courts actually apply it, bears no resemblance to the test the SEC proposes in its opposition.

The SEC's citation to *SEC v. Leslie*, No. 07-CV-3444, 2010 WL 2991038 (N.D. Cal. Jul. 29, 2010) (Opp. at 13), does not change this analysis.  *Leslie* does not adopt or apply anything like the "same subject matter" test that the SEC proposes here.  On its facts, moreover, *Leslie* actually highlights one of the key flaws in Dr. Bergin's analysis.  In *Leslie*, the SEC claimed that several Veritas executives violated the securities laws by causing Veritas to incorrectly recognize $20 million in revenue from a "swap" transaction with AOL.  *Id.* at *2.[1]  The SEC offered an expert to testify about the materiality of a disclosure by Veritas that the SEC had subpoenaed records relating to the AOL agreement, and Veritas was "reviewing [its] accounting treatment" with respect to the $20 million at issue.  *Id.* at *11–*13.  The defendants argued that the expert's opinion

---

[1]  In this swap transaction, AOL agreed to increase the price it would pay to license Veritas's software products from $30 million to $50 million, and in exchange, Veritas agreed to purchase $20 million of AOL's online-advertising services.  *Id.*

1    was "unreliable" because the disclosure "did not reveal the alleged misrepresentations of

2    the named defendants."  *Id.* at *12–*14.  Without addressing the *Daubert* "fit"

3    requirement, the court in *Leslie* held that the expert's opinion was admissible because,

4    among other things, the market was already aware that AOL was under scrutiny for

5    similar "swap" transactions with other customers, and had previously restated revenues

6    on such transactions.  *Id.* at *14.

7            More importantly, the expert in *Leslie* supplied precisely the analytical link that

8    Dr. Bergin failed to supply here:  the expert opined that, due to the extensive publicity

9    surrounding AOL's problems with similar "swap" transactions, the disclosure at issue

10   was enough for market participants to conclude that Veritas would end up having to

11   restate $20 million in revenue.  *Id.*  In fact, when Veritas formally announced a

12   restatement, the market did not react, which suggested that the market already expected

13   it.  *Id.*  Thus, far from suggesting that an expert meets the fit requirement by analyzing

14   disclosures that "relate to" the "same subject matter" as an omission, *Leslie* held that the

15   expert's opinion was reliable because the expert was able to show that the disclosure

16   effectively revealed the very fact that the prior misstatements and/or omissions had

17   concealed—namely, Veritas had improperly recognized $20 million in revenue on the

18   AOL agreement.  *Id.* at *13–*14.

19           The SEC also argues that Dr. Bergin need not meet the standards that courts have

20   uniformly imposed on similar economic testimony because Dr. Bergin's opinion relates

21   only to "materiality" and not to damages or loss causation.  Opp. at 16-17.  But this is a

22   red herring:  regardless of which element the SEC intends to prove through Dr. Bergin's

23   testimony, for purposes of the "fit" requirement, the relevant question is whether Dr.

24   Bergin's analysis of disclosures on June 16, November 3, and February 23 speaks

25   "clearly and directly" to the relevant disputed issue—*i.e.*, whether different information

26   known to Mr. Moshayedi on August 3 was material.  And in any event, Dr. Bergin does

27   not just opine about "materiality."  He purports to link specific stock price movements to

28   specific disclosures on those dates.  Regardless of how the SEC intends to use his

testimony, Dr. Bergin cannot be allowed to testify that specific stock movements can be
attributed "solely" to specific disclosures without meeting the strict standards courts have
imposed for similar testimony in other cases.  Simply put, having chosen to use a stock
price drop as evidence of materiality, the SEC and its expert have to meet the same
scientific standards that courts have imposed on other experts offering opinions about the
causes of specific stock price movements.  *See, e.g.*, *United States v. Schiff*, 538 F. Supp.
2d 818, 835 (D.N.J. 2008).  As set forth in Mr. Moshayedi's motion, those standards
require far more than an analysis of disclosures that "relate to" the "same subject matter."
Mot. at 6-7.

### 2.   Dr. Bergin's Opinions Do Not Meet *Daubert*'s "Fit" Requirement, Properly Understood

With the question properly framed, it is clear that Dr. Bergin's analysis of
disclosures on July 16, November 3, and February 23 does not meet the "fit" requirement
because Dr. Bergin's opinions do not speak "clearly and directly" to a disputed issue in
this case.  *See Daubert II*, 43 F.3d at 1321 n.17.

### a.   Dr. Bergin Cannot Tie His Own Event Study to Any Issue in the Case

As noted in Mr. Moshayedi's opening brief, Dr. Bergin himself has no idea how, if
at all, his analysis of the disclosures on these dates relates to the SEC's case.  *See* Mot. at
9-14.  In response, the SEC argues that its lawyers, rather than Dr. Bergin, will draw the
link between the materiality of the disclosures that Dr. Bergin studied and the allegedly
material facts that the SEC claims Mr. Moshayedi possessed on August 3, 2009.  Opp. at
13.  But this suggestion reflects, at best, a fundamental misunderstanding of Rule 702.  In
order to be admissible, the expert's opinion itself must have "a valid *scientific*
connection" to "particular disputed factual issues in the case."  *In re Paoli R.R. Yard PCB
Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (emphasis added) (citations and quotation marks
omitted).  Accordingly, one critical question for determining admissibility under *Daubert*
is "whether *the proposed expert* sufficiently connected the proposed testimony with the

1   facts of the case." *Lauzon v. Senco Prods, Inc.*, 270 F.3d 681, 687 (8th Cir. 2001)

2   (emphasis added).  Where the expert cannot tie his study to the disputed issues in the

3   case, the expert's testimony is properly excluded.  *In re Williams Secs. Litig.*, 558 F.3d at

4   1139–40 (rejecting opinion of expert Dr. Nye where "*Dr. Nye* had not shown why [the

5   disclosures he studied] should be considered 'corrective' such that corresponding losses

6   could be reliably attributed to the revelation of fraud rather than other factors"; "*Dr. Nye*

7   himself … could not tie these four particular disclosures to any of the alleged

8   misrepresentations or describe why they should be considered 'corrective'") (emphases

9   added).

10          The SEC's suggestion that it can fill this analytical gap with a lawyer's argument is

11   completely inconsistent with Rule 702 and *Daubert*.  The Supreme Court has directed

12   courts to exclude expert opinions that are tied to the existing data only by the expert's

13   *ipse dixit*. *See, e.g.*, *In re Xcelera.com Sec. Litig.*, No. Civ. A. 00-11649-RWZ, 2008 WL

14   7084626, at *1–*2 (D. Mass. Apr. 25, 2008) (citation omitted) (holding that the expert's

15   "theory does not match the facts," and observing that courts need not admit "opinion

16   evidence which is connected to existing data only by the *ipse dixit* of the expert").  Here,

17   the SEC does not even have *ipse dixit* from the expert, and instead intends to have its

18   lawyers make the link between Dr. Bergin's opinion and the facts of the case.  But this is

19   precisely the kind of link that the expert, not the lawyers, should draw.  The SEC claims

20   that Mr. Moshayedi was aware of material nonpublic information as of August 3, 2009.

21   Although the SEC intends to offer Dr. Bergin's testimony to show that this information

22   was material, Dr. Bergin did not analyze that information.  Instead, he analyzed a series

23   of other disclosures.  To the extent that the SEC wants to use those other disclosures as

24   proxies to prove the materiality of information allegedly known to Mr. Moshayedi as of

25   August 3, 2009, the SEC needs to present scientifically sound economic evidence that

26   establishes the necessary connection between the disclosures Dr. Bergin studied and the

27   information that the SEC claims Mr. Moshayedi knew.  Absent such evidence, Dr.

28   Bergin's analysis creates precisely the risks that *Daubert* cautions trial courts to avoid.

### b. The SEC Admits That Dr. Bergin Did Not Actually Analyze the Materiality of the Information That Mr. Moshayedi Allegedly Knew on August 3

Dr. Bergin also freely admits that he did no work at all to analyze the issue on which the SEC apparently intends to offer his testimony—that is, the materiality of the information that the SEC alleges Mr. Moshayedi knew but failed to disclose on August 3.[2]  The SEC's opposition concedes this point, which should be the end of the analysis under *Daubert*.  If Dr. Bergin admits that he did no work to assess the materiality of any facts allegedly known to Mr. Moshayedi on August 3, the SEC cannot seriously argue that Dr. Bergin's opinion nevertheless speaks "clearly and directly" to that issue.

The SEC's only response is to argue that "[t]his is an insider trading and omissions case."  Opp. at 10.  But there is no "omissions" exception to the "fit" requirement.  If the SEC wants to offer Dr. Bergin's opinion in support of its claim that facts known to Mr. Moshayedi on August 3 were material, the SEC needs to show that Dr. Bergin's opinion speaks "clearly and directly" to that issue.  *Daubert II*, 43 F.3d at 1321 n.17.  The SEC goes on to complain that, by its nature, an event study can only measure the stock price impact of information that is disclosed to the market.  Opp. at 10-11.  But just as there is no "omissions" exception to the "fit" requirement, there is no such exception for event studies, either.  Having chosen to use an event study for this purpose, Dr. Bergin must show that his event study speaks "clearly and directly" to the question of whether information known to Mr. Moshayedi on August 3 was material.

In that regard, courts have recognized that event studies examining the impact of a corrective disclosure (or other proxy disclosure) are useful to show the materiality of an allegedly omitted fact *only if* that fact is the same as what is disclosed on the corrective

---

[2]  At deposition, Dr. Bergin admitted: (a) that "[he] didn't look at August 3"; (b) that he did not even read the entire conference call on August 3, 2009 (he delegated that to his staff); (c) that he does not even know why he was not asked by the SEC to analyze that date ("I could not speculate why that was not part of my scope, but it was not"); and (d) that he did not exercise any judgment about whether it was appropriate to not analyze August 3.  Dkt # 263, Ex. 2 (Bergin Depo.) at 46:9-10, 16-17, 21-24.

1  disclosure date. *See, e.g.*, *Schiff*, 538 F. Supp. 2d at 838, 841.  Thus, an event study must

2  show more than that the stock "'reacted to the entire bundle of negative information ...

3  [because that showing] suggests only market efficiency, not loss causation, [absent]

4  evidence linking the culpable disclosure to the stock-price movement.'"  *In re Williams*

5  *Sec. Litig.*, 496 F. Supp. 2d 1195, 1264 (N.D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th

6  Cir. 2009) (citing *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261,

7  270 (5th Cir. 2007)).[3]  Put another way, "[w]ithout a causal link to the curative disclosure

8  of the misstatement charged in the indictment, evidence of a stock price drop is not

9  probative of the materiality of that alleged misstatement, and instead is more prejudicial

10  or confusing than probative."  *Schiff*, 538 F. Supp. 2d at 838.

11      As discussed in more detail below, neither Dr. Bergin nor the SEC has come close

12  to showing that Dr. Bergin's analysis of disclosures on July 16, November 3, and

13  February 23 is probative of whether an entirely different set of facts known to Mr.

14  Moshayedi as of August 3, 2009, was material.

15                  **3.      The SEC Fails to Show How Dr. Bergin's Analysis of Stock Price**
                           **Movements Speaks Directly to Whether the Facts Allegedly**
16                         **Known to Mr. Moshayedi on August 3 Were Material**

17      The SEC argues that Dr. Bergin's analysis of the July 16, November 3, and

18  February 23 disclosures is relevant because the information disclosed on those dates

19  "relate to" the same "subject matter" as the information that Mr. Moshayedi allegedly

20  knew but failed to disclose on August 3.  Opp. at 13.  Analyzed correctly under

21  *Daubert*'s "fit" requirement, however, it is clear that Dr. Bergin's analysis of the

22

23

24  _____

   [3]  The SEC's citation to "leading academic commentary" (Opp. at 11) for the
25  proposition that event studies need not consider the materiality of omitted information
   is misleading.  Indeed, the same "leading academic" noted in the same publication that
26  "it is inadequate to justify such lack of intellectual rigor by merely invoking the
   mantra that … these are the dates in the complaint.  It is still incumbent upon the
27  economist to understand and consider in event study analyses why these dates are in
   the complaint or face risk of a Daubert challenge."  Frank Torchio, *Proper Event*
28  *Study Analysis In Securities Litigation*, 35 J. Corp. L. 159, 167 (2009)

disclosures on those dates does not speak "clearly and directly" to any issue that the jury has to decide, and therefore does not come close to satisfying Rule 702 and *Daubert*.

**a.    The SEC Concedes That Dr. Bergin's Opinion Regarding July 16, 2009 Relates Only to a Question Not in Dispute Here**

The SEC concedes that "no fraud is alleged to have occurred on July 16, 2009." Opp. at 13.  The SEC claims that Dr. Bergin's event study regarding disclosures made on that date "is still relevant to this case," however, because it shows the materiality of the $120 million volume agreement with EMC for the second half of 2009.  *Id.*; Dkt # 263, Ex. 1 (Bergin Report) at 32-33.  But the materiality of the 2009 volume agreement is not in dispute.  Indeed, that is why sTec announced it.  Rather, with regard to materiality, the disputed issue is whether, as of August 3, 2009, Mr. Moshayedi had information about EMC's future demand (*i.e.*, 2010 forward) that was reasonably certain enough to be "material" under the relevant standard for forecasts and other forward-looking information.  *See, e.g.*, *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir. 1981); *In re Verifone Sec. Litig.*, 784 F.Supp. 1471, 1482 (N.D. Cal. 1992).

Dr. Bergin's opinion—that the market understood the July 16 announcement to mean a run rate of around $60 million per quarter in 2010 and that this understanding was material to investors—is not remotely relevant to this issue.  It does not speak to the question of whether information known to Mr. Moshayedi as of August 3, 2009, was sufficiently certain to qualify as "material" under the relevant standard.  Put differently, nothing in Dr. Bergin's analysis of the "disclosures of interest" on July 16 would help the jury determine whether the July 21, 2009 forecast or any other information Mr. Moshayedi had regarding EMC's expected purchases in 3Q09 or 4Q09 was "material"— *i.e.*, reasonably certain with respect to EMC's likely run rate for the periods following the completion of the $120 million agreement.

Indeed, far from helping the jury, Dr. Bergin's analysis of the July 16 disclosures and residual price return on that date could only serve to confuse it.  As the Supreme Court emphasized in *Daubert*, "scientific expert testimony carries special dangers to the

fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Daubert II*, 43 F.3d at 1321 n.17 (quoting *Daubert I*, 509 U.S. at 595). That risk is one reason why "judges must … exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Id.* Here, the SEC wants to offer Dr. Bergin's opinion about the materiality of three sets of disclosures, in order to show that a totally different bundle of information (the information known to Mr. Moshayedi on August 3) was material, but without any testimony from Dr. Bergin directly about the materiality of the information that Mr. Moshayedi knew on August 3, and without any testimony from him to connect the disclosures he studied to the information that the SEC claims Mr. Moshayedi possessed. The risk of confusing the jury is obvious, and it is precisely the kind of risk that the *Daubert* standard is designed to avoid. *See, e.g.*, *Amadio v. Glenn*, 2011 WL 336721, at *9 (E.D. Pa. Feb. 1, 2011) (without a "'valid scientific connection to the pertinent inquiry,'" expert's opinion "will not help the trier of fact, and it may unfairly prejudice defendants") (quoting *Daubert I*, 509 U.S. at 591-92); *Stoebner Holdings, Inc. v. Automobili Lamborghini S.P.A.*, 2007 WL 4230878, at *5 (D. Hawaii Nov. 30, 2007) (excluding expert testimony that "addresses problems with the vehicle that are not at issue in this action" on the ground that it "would likely mislead the jury concerning what damages are actually at issue in this action").

> **b.    The SEC's Attempt to Link Dr. Bergin's Analysis of November 3, 2009 Disclosures to the SEC's Theory of the Case Depends on a Mischaracterization of the "Facts"**

Dr. Bergin's analysis of the November 3 disclosures also does not speak "clearly and directly" to any issue in dispute in this case. The SEC argues that this analysis is relevant because the November 3 disclosures "paralleled" what the SEC claims Mr. Moshayedi "knew on August 3rd." Opp. at 14-15. The SEC never says what "paralleled" means in this context, but to the extent that the SEC seeks to use the

1    November 3 disclosures as a proxy for what it claims Mr. Moshayedi should have

2    disclosed back in August of 2009, the argument fails. *See* Mot. at 11-13.

3         Indeed, to make this point the SEC's completely mischaracterizes the "facts" that

4    were disclosed on November 3, referring to a disclosure that sTec had received

5    "preliminary indications" that EMC "might" carry inventory into 2010. Opp. at 14. But

6    in fact, sTec's November 3 disclosures were far more detailed than that. Among other

7    things, sTec disclosed that: EMC "had inventory" that it had informed sTec about; EMC

8    and sTec initiated a joint marketing program designed to try to increase sales and to

9    promote EMC's consumption of this inventory; and EMC would not know the full extent

10   of the inventory carry over until mid-to end of December, but if EMC's demand for SSDs

11   did not improve, sTec's orders from EMC in 1Q 2010 would be negatively affected. *See*

12   Dkt # 263, Ex. 8 at 5-14, Ex. 9.

13        None of these facts matches the material nonpublic information Mr. Moshayedi

14   allegedly knew but did not disclose on August 3. As framed in its opposition brief, the

15   SEC seems to be claiming that, based on a purported 3Q09 "forecast" of $33-34 million,

16   Mr. Moshayedi knew in August that there was some unspecified degree of risk that EMC

17   would accumulate "significant" inventory, at some unspecified point in time, as a result

18   of the $120 million agreement. Opp. at 15.[4] This latest formulation differs substantially

19   from other formulations used by the SEC to describe the allegedly material nonpublic

20   "facts" that Mr. Moshayedi allegedly knew as of August 3, 2009, but none of the SEC's

21   various permutations actually matches the facts that sTec disclosed on November 3,

22   _____

23   [4]   Obviously, as disclosed in sTec's public filings, there is always some underlying risk
     that sTec's customers (including, of course, its biggest customer) would end up with
     inventory. *See, e.g.*, Def.'s Statement of Facts in Support of MSJ (Dkt # 149), ¶ 93

24   (Ex. 22) (disclosing that sTec faced a risk of "[o]rder cancellations, product returns,
     inventory buildups by customers and inventory write downs"); *see also id.* ¶ 94 (Ex.

25   119) (disclosing difficulty of predicting, in the "relatively new and evolving market"
     for flash-based SSDs, "end user adoption rates or customer demand for our products

26   or the future growth rate"). Given that underlying risk, the key question in defining
     the "materiality" of information related to a heightened "risk of inventory" (a question

27   that Bergin never acknowledges, much less addresses) is precisely what the difference
     is between that ever-present risk and the risk the SEC now claims was "material" (that

28   is, what makes it significantly larger and more certain, justifying disclosure).

1    2009.  Simply put, there is no way that Mr. Moshayedi could have been disclosed in

2    August that EMC had already accumulated inventory, or that EMC and sTec had put in

3    place a joint marketing program.  Moreover, whatever inventory "risk" that could have

4    disclosed back in August would not have been—and could not have been—the same risk

5    that was disclosed in November, because the information known as of November was

6    fundamentally different than the information known back in August.

7         As important, Dr. Bergin did no work at all to determine whether this information

8    disclosed on November 3 should have or could have been disclosed on August 3.  *See*

9    Dkt # 263, Ex. 2 (Bergin Depo.) at 74:21-75:17.  The SEC makes no attempt to explain

10   how Dr. Bergin's conclusion that the information disclosed on November 3 was material

11   can serve as a proxy for the materiality of information omitted on August 3 when he has

12   made no attempt to consider the similarity of that information.  It is simply not enough

13   for the SEC to say the disclosures are the same when it has not asserted (and cannot

14   prove, in any event) that Mr. Moshayedi knew on August 3 the same facts that sTec

15   disclosed on November 3.  Dr. Bergin's opinion therefore is not "relevant to the task at

16   hand" and should be excluded on this basis.  *See Daubert I*, 509 U.S. at 597.

17         c.    **The SEC Fails to Demonstrate How the February 23,
18               2010 Disclosure Dr. Bergin Analyzed Relates to the
               Fraud Alleged in this Case**

19         Dr. Bergin's analysis of the February 23 disclosures fares even worse.  The SEC

20   argues that Dr. Bergin's event study of the February 23 disclosure is relevant because it

21   "tracks" information that Mr. Moshayedi allegedly knew back on August 3, 2009.  Opp.

22   at 16.  As with November 3, the SEC never says what it means when it says the

23   information "tracks" the information Mr. Moshayedi knew back in August.  But if the

24   SEC's claim is that sTec's February 23, 2010 disclosure revealed facts that Mr.

25   Moshayedi actually knew back in August of 2009, that claim fails miserably.  On

26   February 23, sTec disclosed that it did not expect "any meaningful production orders"

27   from EMC during the entire first half of 2010.  Dkt # 263, Ex. 13 at 5-14.  There is

28   absolutely no evidence (and there can be no plausible inference from the evidence) that

1   Mr. Moshayedi knew on August 3, 2009, that EMC would not place any meaningful

2   production orders from sTec during the first half of 2010.  Thus, to say that sTec's

3   February 23, 2010 disclosure "tracks" information known to Mr. Moshayedi back in

4   August of 2009 is simply absurd.

5          In any event, Dr. Bergin's analysis of the price impact of the one "disclosure of

6   interest" on February 23 is entirely irrelevant to the claims pled in the operative

7   complaint.  In his report, Dr. Bergin opines that, with this disclosure, "[t]he ambiguous

8   inventory problem described on November 3, 2009 gave way to the revelation that [sTec]

9   was expecting no production orders from EMC during the entire first half of the year."

10  Dkt # 263, Ex. 1 (Bergin Report) at 55.  But because the SEC's claims related to what

11  Mr. Moshayedi purportedly knew and failed to disclose on November 3 are not a part of

12  the case, Dr. Bergin's analysis of the February 23, 2010 disclosure is completely

13  irrelevant.  Remarkably, the SEC refuses to acknowledge that the Court has repeatedly

14  prohibited it from relying on those November 3 statements.  *See* May 23, 2013 Order

15  Denying Leave to Amend (Dkt # 78).  Instead, the SEC unapologetically asserts in its

16  opposition brief that Dr. Bergin's February 23 analysis "also supports the materiality of

17  Moshayedi's misrepresentations and omissions on November 3," arguing that Mr.

18  Moshayedi knew but did not disclose on that day that "EMC exited the third quarter with

19  $30 million in inventory, and expected to accumulate an additional $60 million in

20  inventory in the fourth quarter."  Opp. at 16.  The SEC's repeated flouting of the Court's

21  order denying the SEC's motion for leave to amend should not be permitted.

22          **B.     The Methodological  Flaws in Dr. Bergin's Analysis Are Severe Enough
23                  to Warrant Exclusion**

24          The fact that event studies are an accepted method for determining materiality and

25  damages in securities litigation (Opp. at 19-21) does not suffice to show that Dr. Bergin's

26  methodology is reliable.  Indeed, there is no question that "[a]n event study may be

27  rejected . . . if it is methodologically unsound or unreliable."  *Teamsters Local 445*

28

*Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 208 n.15 (2d Cir. 2008). Here, Dr. Bergin's event study is unsound and unreliable in several key respects.[5]

### 1. Dr. Bergin's Failure to Disaggregate Confounding Factors Undermines His Opinions

The SEC argues that, because it offers Dr. Bergin's opinion to show materiality rather than loss causation or damages, disaggregation of confounding information is not required. Opp. at 16-18. But the case the SEC cites for this proposition, *Miller v. Thane International Inc.*, No. SACV031031JVSSGLX, 2005 WL 5957833 (C.D. Cal. Mar. 3, 2005) (Selna, J.), establishes no such thing. In that case, this Court actually prohibited the party from relying on an expert opinion "as evidence of damages" because the expert "did not even attempt to factor out the effect of other events that could have accounted for a portion of the decline." *Id.* at *6. While this Court did permit the expert to "use[] her experience as a financial analyst" to opine on the importance of certain disclosures to investors, *id.*, the Court also noted that the expert's failure to determine what portion of the alleged price decline was connected to the alleged fraud "represents a fundamental flaw" invalidating the expert's damage calculation. *Id.* at *7. Dr. Bergin, unlike the expert in *Miller*, did not purport to use relevant experience to opine on materiality; rather, his entire opinion on materiality depends on the ability of his event study to mathematically tie certain disclosures to particular price movements. Indeed, the SEC admits as much in its motion, stating that Dr. Bergin's conclusions include attribution of particular abnormal stock price returns to the "disclosures of interest." Opp. at 17. And in his report, Dr. Bergin expressly states that he was "retained by the Commission to prepare certain analyses to assist the trier of fact in considering *both* the materiality of

---

[5]  It is also untrue that neither of Mr. Moshayedi's experts criticized Dr. Bergin's methodology. Opp. 20-21. Professor Ferrell's entire rebuttal report is devoted to critiquing Dr. Bergin's methodology as unreliable (*see* Dkt # 298, Ex. at 2-3, 12-26), and Dr. Bajaj concludes that Dr. Bergin contains serious "methodological flaws [that] lead to faulty conclusions" (Dkt # 298, Ex. 9 at 4).

certain disclosures . . . *and* their impact on [sTec]'s stock price on three separate dates in 2009 and 2010." Dkt # 263, Ex. 1 (Bergin Report) at 6 (emphasis added).

In essence, the SEC is urging the Court to adopt a special rule for SEC enforcement actions. Opp. at 16-18. But there is no basis for such a rule. So long as the SEC seeks to rely on Dr. Bergin's opinions regarding the precise price impact of the "disclosures of interest," disaggregation of confounding information is critical to the reliability of an event study. *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) ("To establish a causal link between stock price movement and misrepresentations or corrective disclosures, an economist must control for confounding factors, i.e., other industry- or company-specific information released to the market unrelated to the alleged fraud."). Accordingly, an observed stock price drop can only be probative of materiality of alleged misstatements and omissions when it includes "an analysis of whether the stock price drop is attributable to the public disclosures that relate to the charged conduct, rather than to disclosures that relate to other events at the company or in the market as a whole." *Schiff*, 538 F. Supp. 2d at 836. Thus, in *Schiff*, for example, the court excluded an expert's event study where the expert attempted to introduce evidence of a stock price drop without establishing "a causal link to the curative disclosure of the misstatement charged in the indictment." *Id.* at 838. As Mr. Moshayedi explained in his motion to exclude Dr. Bergin, Dr. Bergin failed to disaggregate the July 16, November 3, and February 23 "disclosures of interest" from confounding information revealed to the market on those same dates. Mot. at 16-21.

The SEC contends that Mr. Moshayedi's objection to Dr. Bergin's methodology is really just a criticism of Dr. Bergin's conclusions. Opp. at 20-21. This is false. It is true that there are cases like those cited in the SEC's opposition (at 21-22) in which courts have found that an expert's methodology is sound even though the expert's event study fails "to consider one of the relevant variables" in assessing the impact of a disclosure on a company's stock price. *See In re Novatel Wireless Secs. Litig.*, 910 F. Supp. 2d 1209,

1215 (S.D. Cal. 2012), *vacated by* 2013 WL 494361.  But these cases also recognize that
where the expert fails to disaggregate significant confounding information, the court
properly exercises its gatekeeping role in excluding the opinion altogether.  *See, e.g.*, *In
re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–75 (S.D. Cal. 2010) (cited Opp.
at 22) (finding that expert's failure to disaggregate in addition to other deficiencies
rendered the expert's study so incomplete that it was inadmissible as irrelevant and
unreliable); *SEC v. Leslie*, 2010 WL 2991038, at *15 (N.D. Cal. July 29, 2010) (cited
Opp. at 22) (noting cases that excluded experts who "failed to consider information that
other sources clearly had identified as relevant"); *In re Williams Secs. Litig.*, 558 F.3d at
1142 (cited Opp. at 18) (finding expert's methodology "unreliable" because expert
"fail[ed] to show why [certain studied] losses should be attributed to the revelation of
fraud and not other non-fraud related news").

      Indeed, in *In re Novatel* itself, the court on reconsideration excluded the very
expert opinion that is discussed in the block quote in the SEC's opposition brief (at 21).
Although the court on first look admitted the expert's opinion despite the expert's failure
to consider and disaggregate certain "non-fraud-related company-specific news," 910 F.
Supp. at 1215, on reconsideration the court held that the expert's failure to disaggregate
certain disclosures that the court later deemed to be non-fraudulent rendered the expert's
opinion inadmissible altogether, 2013 WL 494361, at *3-*4.  The same is true in *Miller*,
a case that the SEC discusses elsewhere its opposition (at 17).  There, the court held that
an expert's "failure to factor out the effect of known events is not merely one of degree to
be brought out on cross-examination, but represents a fundamental flaw which invalidates
[the expert's] damage calculation."  2005 WL 5957833, at *7.  Thus, the SEC's
suggestion that Dr. Bergin's to disaggregate confounding information "is no basis for
exclusion" (Opp. at 21) is unfounded.

### 2.   Dr. Bergin Failed to Disaggregate Critical Confounding Disclosures

Having argued, incorrectly, that Dr. Bergin was not required to disaggregate confounding disclosures, the SEC goes on to suggest that he did so in any event.  Opp. at 21-24.  But in fact, the record is clear that Dr. Bergin's failure to consider several significant confounding disclosures on the dates he studied.

July 16.  The SEC and Dr. Bergin are incorrect that sTec's full-year guidance for ZeusIOPS sales announced on July 16 was "already baked into" sTec's revenue guidance issued on June 16.  Opp. at 22; Dkt # 263, Ex. 2 (Bergin Depo.) at 133:2-136:25.  On June 16, sTec updated its second quarter guidance only, and did not provide any guidance at all for full-year ZeusIOPS sales.  *See* Ex. 32.[6]  Thus, July 16, 2009, was the first time sTec had announced full-year guidance of $220 million for ZeusIOPS sales—accurate guidance that was likely to have affected sTec's price on July 16.  The record is clear, moreover, that analysts reacted to the full-year guidance that sTec announced on July 16.  *See* Dkt # 263, Ex. 14 ("Raised Zeus IOPS Forecast.  Due to the agreement, STEC now expects its 2009 Zeus revenues to exceed $220M."); Ex. 33 ("STEC also indicated that its 2009 ZeusIOPS sales target would 'exceed' $220 million."); Ex. 34 ("STEC further increased estimates for FY09 ZeusIOPS shipments.  Based on updated forecast ZeusIOPs revenues likely exceed S220m during FY09.").  Nor is it necessarily true that because the Mach8IOPS announcement came on July 13, analysts incorporated that information into sTec's price prior to July 16.  Opp. at 22.  Dr. Bergin fails to account for the possibility that at least some analysts' revenue estimates could be partly attributable to that announcement.  For example, at least one analyst indicated *on July 16* that the announcement resulted in raising FY 2010 estimates from $50 million to $63 million.  Dkt # 263, Ex. 14.  Dr. Bergin's mechanical dismissal of these two pieces of confounding information undermines the reliability of his opinion.

---

[6] Exhibits 32-34 are attached to the Declaration of Matthew Rawlinson, filed herewith.

November 3.  Although Dr. Bergin stated in his deposition that he considered the confounding disclosures on November 3 that (1) sTec's total ZeusIOPS sales for 3Q09 had been only $60.7 million, and (2) sTec's 4Q09 revenue guidance which implied that there would be only $2-$3 million in sales in 4Q09 to sTec's non-EMC customers, his report provides no explanation for why he disregarded those disclosures as "stale."  Dr. Bergin fails to account for analysts' contemporaneous reports which clearly consider those disclosures relevant in demonstrating that expected ZeusIOPS sales to non-EMC customers was slower than expected.  *See* Mot. at 19 (citing analyst reports noting that this guidance implied slower than expected adoption by non-EMC customers).[7]

February 23.  The SEC again defends Dr. Bergin's failure to consider confounding information on February 23 by arguing that analysts were divided over the negative news regarding Mach8IOPS products and by contending that the increase in sTec's operating expenses was "stale news."  Opp. at 23-24.  The fact that analysts had mixed reactions to the Mach8 news is insufficient to justify Dr. Bergin's failure to even consider the possibility that it affected the stock price.  And the August 3 disclosure that the SEC claims renders "stale" the announcement that sTec's operating expenses would increase by $10 million per quarter is insufficiently similar to substitute for the February 23 disclosure.  Analysts were unlikely to view that information—that sTec would continue to spend on R&D—as significantly as the quantification of those increased expenses that sTec provided on February 23.  The SEC has no justification for Dr. Bergin's failure to consider this information in his February 23 analysis.

Even if it were true, as the SEC contends, that Dr. Bergin considered all of this confounding information, the SEC fails to explain the basis for Dr. Bergin's

---

[7]   The SEC explains away Dr. Bergin's failure to consider the reasons for sTec's stock price drop during the period from August 4 to November 3, asserting that competition and slower than expected SSD adoption cannot explain this price decline.  Even if that were correct (and it is not), it does not cure Dr. Bergin's failure to review the "total mix" of information available before November 3 or to disaggregate disclosures on that day reflecting a materialization of these competitive risks.  *See* Dkt # 263, Ex. 2 (Bergin Depo.) at 237:24-238:10; *id.* at 264:23-269:15.

1   disaggregation or to articulate how he performed that analysis.  Dr. Bergin merely asserts

2   that the disclosures had no independent significance to the market, without providing any

3   means by which his analysis could be recreated.  The SEC has no response to Mr.

4   Moshayedi's argument that Dr. Bergin's "methodology" consists of precisely the sort of

5   "unadorned assertions that the methodology … employed comports with standard

6   [specialized] procedures" that the Ninth Circuit has rejected as sufficient to support an

7   expert opinion.  *Daubert II*, 43 F.3d at 1319.

### 3.    Dr. Bergin Used Unreliable Analyst Declarations to Form His Opinions, Not Merely to "Confirm" Them

10      Contrary to the SEC's assertion that Dr. Bergin "reliably used analyst declarations

11   as *confirmation for* his conclusions" (Opp. at 24 (emphasis added)), a comparison of his

12   report with the analyst declarations makes plain that, in fact, Dr. Bergin relied almost

13   entirely on those declarations in forming his opinions.

14      As discussed in depth in Mr. Moshayedi's Evidentiary Objections to the SEC's

15   Statement of Facts (Dkt #182) and in his Motion *in Limine* to exclude them (Dkt # 252),

16   these analyst declarations are unreliable, improper lay opinion testimony.  They provide

17   anecdotal speculation about how the analysts hypothetically might have reacted in certain

18   circumstances, using facts cherry picked by the SEC.  The SEC's assertion that the

19   analysts' declarations are a "factual account of events, rather than [a] putative

20   'hypothetical conclusion'" is entirely contradicted by the declarations themselves.  *See,

21   e.g.*, Dkt # 263, Ex. 27 (Decl. of Kevin Cassidy) ¶ 35 ("I have been advised by the SEC

22   of several facts that, had I known on or before November 3, 2009…"); Dkt # 263, Ex. 28

23   (Decl. of Betsy Van Hees) ¶¶ 23-24 ("I understand that the Commission's complaint

24   against Manouch Moshayedi alleges… Assuming the truth of the Commission's

25   allegations, had I known those facts at the time…").  Experts may not rely on anecdotal

26   reports.  *See, e.g.*, *Jones v. United States*, 933 F. Supp. 894, 898–900 (N.D. Cal. 1996),

27   *aff'd* 127 F.3d 1154 (9th Cir. 1997); *Democratic Party of Wash. State v. Reed*, No. C00-

28   5419FDB, 2002 WL 32925223, at *15 (W.D. Wash. Mar. 27, 2002).  Dr. Bergin's

1  substantial reliance on the analyst declarations, even if it were simply for "confirmation,"

2  as the SEC claims, undermines the reliability of his opinion.  Moreover, the striking

3  similarity between the two makes plain that the analyst declarations were used not merely

4  to confirm Dr. Bergin's independent opinions, but rather, to substantially influence the

5  conclusions he reached.  *See, e.g.*, Dkt # 263, Ex. 1 (Bergin Report) at 36-38, 45-46, 50-

6  51, 59-60; *see also* Dkt # 263, Ex. 2 (Bergin Depo.) at 141:11-142:24, 146, 148.  If Dr.

7  Bergin had "reviewed and considered" every analyst report issued from June 2009 to

8  February 2010 (Opp. at 24), then he would have addressed the significant inconsistencies

9  between the analysts' declarations to which he cites and their earlier reports and

10  deposition testimony.  *See* Dkt # 263, Ex. 2 (Bergin Depo.) at 28:20-29:15, 34:19-35:8.

11  He did not.

12       The cases cited by the SEC further undermine its position.  In those cases, the

13  analyst's report upon which the expert relied was based on events and facts that actually

14  occurred, and the reports themselves were created independently, not at the behest of a

15  party, years after the events in question.  For example, in *In re Miller Industries*

16  *Securities Litigation*, 120 F. Supp. 2d 1371, 1380–81 (N.D. Ga. 2000), the court noted it

17  was appropriate for defendants' expert to have considered "analyst reports published

18  *during the relevant time* as evidence of what the market considered relevant information

19  and . . . provided . . . numerous statements that analysts made *before and during* the class

20  period." (emphasis added).[8]  In stark contrast, Dr. Bergin repeatedly relied upon

21  anecdotal evidence created at the behest of the SEC, years after the events in question, in

22

23

24  ───────────
    [8]  *See also Walker v. Woodford,* 593 F. Supp. 2d 1140, 1147–48 (S.D. Cal. 2008) (expert

25  considered information from a log actually maintained at the time of the events in
    question); *In re Diamond Foods, Inc.*, No. C-11-05386 WHA, 2013 WL 1891382, at

26  *8 (N.D. Cal. May 6, 2013) (noting that expert did not "rely on the analyst reports of the
    actual post-announcement stock-price reactions to establish the predicted direction

27  for the stock price change"); *Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 579 (N.D.
    Tex. 2007) (expert "reviewed public press … as well as all market analyst reports"

28  made well prior to the litigation).

forming his opinions.  His report is thus entirely unreliable, and his opinions should not be permitted.[9]

## III.   CONCLUSION

For the foregoing reasons, Mr. Moshayedi respectfully requests that the Court exclude the reports and testimony of Dr. Richard Bergin at trial in this matter.

Dated: October 7, 2013

Respectfully submitted,

LATHAM & WATKINS LLP

By /s Patrick E. Gibbs
Patrick E. Gibbs

PAUL HASTINGS LLP

By /s Thomas A. Zaccaro
Thomas A. Zaccaro

Attorneys for Manouch Moshayedi

---

[9] The SEC's claim that Dr. Bajaj, Defendant's expert, also relied on the analysts' declarations is incorrect.  While it is true that, in forming his opinions, Dr. Bajaj considered the analysts' previous deposition testimony and their contemporaneous reports, he did not consider the analysts' declarations created for the purposes of this litigation.  Dkt # 298, Ex. 3 (Bajaj Report) at App'x 2.