1  JOHN W. BERRY (bar admission pending, L.R. 83-2.4.1)
   Email: berryj@sec.gov
2  DONALD W. SEARLES, Cal. Bar No. 135705
   Email: searlesd@sec.gov
3  GARY Y. LEUNG (bar admission pending, L.R. 83-2.4.1)
   Email:  leungg@sec.gov
4
   Attorneys for Plaintiff
5  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
6  John W. Berry, Regional Trial Counsel
   5670 Wilshire Boulevard, 11th Floor
7  Los Angeles, California 90036
   Telephone: (323) 965-3998
8  Facsimile: (323) 965-3908

9

10                   **UNITED STATES DISTRICT COURT**

11                  **CENTRAL DISTRICT OF CALIFORNIA**

12

13  SECURITIES AND EXCHANGE        Case No.  12-CV-01179-JVS-ANx
    COMMISSION,
14                                 **PLAINTIFF SECURITIES AND**
                Plaintiff,         **EXCHANGE COMMISSION'S**
15                                 **REPLY MEMORANDUM IN**
          vs.                      **FURTHER SUPPORT OF ITS**
16                                 **MOTION TO EXCLUDE OR LIMIT**
    MANOUCHEHR MOSHAYEDI,          **EXPERT TESTIMONY OF**
17                                 **PROFESSOR ALLEN FERRELL**
                Defendant.         **UNDER RULES 403 AND 702 OF THE**
18                                 **FEDERAL RULES OF EVIDENCE**

19

20                                 Date:    October 21, 2013
                                   Time:    1:30 p.m.
21                                 Ctrm:    10C
                                   Judge:   Hon. James V. Selna
22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 1

II.   ARGUMENT ........................................................................................ 2

    A.    Prof. Ferrell's Disgorgement Opinions Are Irrelevant ................................. 2

        1.    Moshayedi admits that Section IV of Prof. Ferrell's report is a disgorgement opinion ........................................................................... 2

        2.    Prof. Ferrell's Section V opinions about sTec's stock price from August to November is about disgorgement ............................... 3

        3.    Prof. Ferrell's "but-for" analysis in Section VII of his report is also a disgorgement opinion ............................................................. 8

        4.    Whether or not Dr. Bergin's opinion is admissible in the remedial phase has no bearing on the admissibility of Prof. Ferrell's disgorgement opinions at the liability phase ....................... 11

    B.    Prof. Ferrell's Opinions Regarding The SEC's Preliminary Disgorgement Calculation Were Improper Rebuttal Opinions .................... 13

    C.    Prof. Ferrell's Opinions Are Unreliable Because They Assume Fraud On July 16 ................................................................................. 15

    D.    Prof. Ferrell's "But-For" Analysis Is Untested And Unreliable .................. 18

    E.    Prof. Ferrell's Opinions About Why sTec's Stock Price Fell From August 2009 To February 2010 Are Unreliable ............................................ 19

        1.    Moshayedi does not deny that Prof. Ferrell's opinions regarding specific price drops lack any kind of methodology ........... 19

        2.    Moshayedi does not deny Prof. Ferrell's lack of qualifications ......... 20

    F.    Prof. Ferrell's Views Regarding Factual Record Is Inadmissible ................ 21

    G.    Prof. Ferrell's Opinions Are Duplicative Of Dr. Bajaj's ............................ 23

III.  CONCLUSION .................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

3   <u>Cases</u>

4   *A.D. v. Cal. Highway Patrol*,
        2009 WL 733872 (N.D. Cal. March 17, 2009) ................................3
5
    *Bourjaily v. United States*,
6        483 U.S. 171 (1987).................................................................1

7   *Daubert v. Merrell Dow Pharms., Inc.*,
        509 U.S. 579 (1993)..............................................................3, 20
8
    *Donell v. Fidelity Nat'l Title Agency of Nevada*,
9        2012 WL 170990 (D. Nev. Jan. 20, 2012) .................................15

10  *Green v. Chicago Bd. of Educ.*,
        2010 WL 2681176 (N.D. Ill. July 6, 2010) ................................3
11
    *Highland Capital Mgmt., L.P. v. Schneider*,
12       379 F.Supp.2d 461 (S.D.N.Y. 2005) ..................................... 21, 22

13  *In re Oracle Sec. Litig.*,
        829 F.Supp. 1176 (N.D.Cal.1993)..........................................12
14
    *In re Rezulin Products Liability Litig.*,
15       309 F.Supp.2d 531 (S.D.N.Y. 2004) ........................................22

16  *Monsanto Co. v. E.I. Du Pont De Nemours & Co.*,
        2012 WL 27936 (E.D. Mo. Jan. 5, 2012) ..................................25
17
    *SEC v. Clark*, 915 F.2d 439 (9th Cir. 1990) ...................................5
18
    *SEC v. Drucker*, 528 F.Supp.2d 450 (S.D.N.Y. 2007) ....................5
19
    *SEC v. First City Financial Corp., Ltd.*,
20       890 F.2d 1215 (D.C. Cir. 1989)................................................4

21  SEC v. Henke,
        130 Fed.Appx. 173 (9th Cir. 2005) ...........................................2
22
    *SEC v. Henke*,
23       275 F.Supp.2d 1075 (N.D. Cal. 2003)........................................2

24  *SEC v. Patel*,
        61 F.3d 137 (2d Cir. 1995) ............................................... 2, 4, 5
25
    *SEC v. Platform Wireless Int'l Corp.*,
26       617 F.3d 1072 (9th Cir. 2010)............................................4, 12

27  *SEC v. Yuen*,
        272 Fed. Appx. 615 (9th Cir. 2008) .........................................12
28

Case No.  12-CV-01179-JVS-ANx

*Vinh Nguyen v. Radient Pharm. Corp.*,
      287 F.R.D. 563 ................................................................................................20

**<u>Other Authorities</u>**

*Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell, and Jeffrey M. Netter,
      Lessons from Financial Economics: Materiality, Reliance, and Extending the
      Reach of Basic v. Levinson*,
      77  Va. L. Rev. 1017 (1991) ...........................................................................6

Case No.  12-CV-01179-JVS-ANx

1    **I.     <u>INTRODUCTION</u>**

2         As the party offering Prof. Ferrell as an expert, Moshayedi has "the burden of

3    establishing that the pertinent admissibility requirements are met by a preponderance of

4    the evidence."  FED. R. EVID. 702, Notes of Advisory Committee on 2000 amendments

5    (*citing Bourjaily v. United States*, 483 U.S. 171 (1987).  He has failed considerably in

6    that regard.

7         Moshayedi agrees that disgorgement-related opinions should not be presented to

8    the jury, and instead should be reserved for the remedial phase of the case.  Yet several

9    of Prof. Ferrell's opinions are strictly about disgorgement.  Prof. Ferrell's opinions in

10   Section IV (calculating Moshayedi's "avoided losses") and Section VII (calculating the

11   "per-share" price impact of the alleged fraud) of his report are only disgorgement

12   opinions.  In fact, Moshayedi concedes that Section IV report is concerned solely with

13   disgorgement.  And Prof. Ferrell's opinions in Section V about the sTec stock price

14   drop from August 2009 to February 2010 can only have one purpose:  to help

15   Moshayedi argue that the SEC's proposed disgorgement calculation is too large, since it

16   uses the $19.49 per share difference between the August 2009 secondary offering price

17   and the February 24, 210 closing price to measure Moshayedi's disgorgement.  The

18   causes of sTec's stock price drop on dates other than November 4, 2009 and February

19   24, 2010 have absolutely nothing to do with Moshayedi's liability for insider trading

20   and fraud.

21        Moreover, all of these opinions are improper rebuttal, because they could and

22   should have been disclosed with the initial expert reports.  For that reason, they should

23   all be excluded, both at the liability phase, as well as at the remedial phase.

24        Moshayedi also cannot refute the fact that Prof. Ferrell assumed that the SEC

25   alleged there was a "disclosure deficiency" on July 16th.  As Moshayedi concedes in his

26   opposition, all of Prof. Ferrell's opinions relying on this assumption are irrelevant.  We

27   agree, and so his opinions in Sections IV, VI.A and VII should be excluded.

28        Finally, Moshayedi does not dispute that Prof. Ferrell has no expertise in the SSD

market or that Prof. Ferrell should not be giving opinions about the factual record in this case.  Therefore, his opinions in Sections V and VI.B.4 about the "competitive landscape" of the SSD market and about his view of the record regarding sTec-EMC contract negotiations are inadmissible.

## II.   ARGUMENT[1]

### A.   Prof. Ferrell's Disgorgement Opinions Are Irrelevant

As Moshayedi acknowledges in his opposition, "disgorgement issues are to be addressed by the Court in a separate remedial phase," after the jury has found Moshayedi liable.  Def. Opp. at 9; *see* Dkt. No. 255-2 (SEC Mot. to Exclude Ferrell) at 16-17.  Since this is primarily an insider trading case, Moshayedi's disgorgement for that claim will be the "losses avoided" by his sale of stock.  *E.g.*, *SEC v. Patel*, 61 F.3d 137, 139-140 (2d Cir. 1995) (affirming disgorgement of losses defendant avoided after selling before announcement of negative news); *SEC v. Henke*, 275 F.Supp.2d 1075, 1081 (N.D. Cal. 2003), *aff'd*, 130 Fed.Appx. 173 (9th Cir. 2005) (ordering disgorgement of losses avoided while committing insider trading).[2]  Moshayedi either admits or fails to refute the fact that Prof. Ferrell offers three opinions only addressing the calculation of this disgorgement amount in Sections IV, V and VII of his report.

### 1.   Moshayedi admits that Section IV of Prof. Ferrell's report is a disgorgement opinion

Moshayedi admits that Prof. Ferrell's opinion in Section IV of his report is only about disgorgement.  *See* Def. Opp. at 9.  As the title of that section in his report makes clear, it is about "Avoided Losses."  Ferrell Report at 5.  And in that section, Prof.

---

[1] The expert reports of Prof. Ferrell, Dr. Bergin and Dr. Bajaj are attached as Exhibits 1, 2 and 5 of the Declaration of Gary Y. Leung (Dkt. No. 258).  Also excerpts from Prof. Ferrell's deposition are attached as Exhibit 7 to that declaration or as Exhibit 43 to the Supplemental Declaration of Mr. Leung.

[2] Moshayedi's disgorgement amount for his fraudulent misrepresentations would be calculated differently.  *See infra* at 13.

Ferrell gives the opinion that "the maximum amount by which Mr. Moshayedi could have been enriched by any alleged disclosure deficiency … is $3.58." Ferrell Report ¶ 18; *see also id*, Section IV, ¶¶ 15-20. So it is not surprising that Moshayedi concedes this is a disgorgement opinion. *See id*. at 9 (this opinion is "that Dr. Bergin's opinions and analysis do not support the disgorgement analysis offered by the SEC"). Therefore, this opinion should not permitted in the liability phase of the case that is before the jury. *See Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 591 (1993) ("[e]xpert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful") (quotations omitted); *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993); *A.D. v. Cal. Highway Patrol*, No. C 07-5483 SI, 2009 WL 733872, *10 (N.D. Cal. March 17, 2009) (excluding expert testimony regarding damages in liability phase of case).

Moshayedi's sole response to this seemingly irrefutable point is an off-hand remark that it is "premature" to address what should or should not be "admitted in a separate remedial phase" of the case. Def. Opp. at 9. But it is  not "premature" to decide now what testimony should be admitted in front of the jury. That is the "whole point" of pre-trial *in limine* motion practice. *E.g.*, *Green v. Chicago Bd. of Educ.*, No. 05 C 7115, 2010 WL 2681176, *1 (N.D. Ill. July 6, 2010) (rejecting argument that motion to exclude evidence on damages was premature "because the whole point of a motion *in limine* is to allow the parties to prepare in advance of trial, so that the substantive question deserves an early answer").

### 2.     Prof. Ferrell's Section V opinions about sTec's stock price from August to November are about disgorgement

Prof. Ferrell's opinions in Section V of his report are also only relevant to a disgorgement calculation. In that section, he opines that so-called "non-fraud" factors caused sTec's stock price to decrease in the fall of 2009. *See* Ferrell Report ¶¶ 19, 21-36. There is only one reason to offer those opinions, and that is to help Moshayedi reduce the disgorgement amount he would have to pay.

The SEC's burden is low for establishing the disgorgement amount, and for an

insider trading case, the calculation is simple.  When seeking disgorgement, the SEC only needs to present evidence of a "reasonable approximation" of the defendants' ill-gotten gains.  *SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010).  The burden of refuting this approximation rightfully belongs to the wrongdoer because, as the Ninth Circuit has explained, "'the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  *Id.* (*quoting SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989).  And for insider trading cases, disgorgement is typically calculated as the difference between the stock price when the defendant sold his shares and the price when the non-public information was finally disclosed.  *See Patel*, 61 F.3d at 139-140; *First City Financial*, 890 F.2d at 1232.

Under that standard, Moshayedi's disgorgement amount should be $87.7 million.  *See* Dkt. No. 298-7 (SEC Interrog. Resp. No. 20) at 50-52.  This is because Moshayedi sold about 4.5 million shares in August 2009 at a price of $29.76 per share (after the underwriting discount).  *See* Dkt. No. 146 (SEC Facts) ¶¶ 268-270.  The non-public information he knew when he sold was not disclosed, at least in part, until November 2009 and then, finally in February 2010.[3]  When it was disclosed on November 3rd that there were "preliminary indications" that EMC "might" have an inventory balance and that the $120 million volume commitment with EMC was just a "one-off" contract, sTec's stock price fell almost 40%, and closed at $14.14 per share the next day.  *See id.* ¶ 324-328, 339-340.  Then, when it was finally disclosed in February that EMC did, in fact, have a substantial inventory balance of sTec drives, sTec's share again dropped precipitously to $10.27 per share.  *See id.* ¶ 341-342.  Therefore, Moshayedi's "avoid

---

[3] Not all of the material information Moshayedi knew in August and traded on was full disclosed in November 2009 or February 2010.  The fact that he had sought and secured the secret $55 million side deal with EMC to make sure sTec's 3Q09 revenue guidance could meet analysts' expectations was never disclosed to the market until this case was filed.

losses" or ill-gotten gains equal the 4.5 million shares he sold times the $19.49 price differential between the offering price of $29.76 and the February 24th closing price of $10.27—or, $87.7 million.[4]

Moshayedi does not agree with the SEC's calculation, and he relies on Prof. Ferrell to challenge it. In fact, this is the very calculation that Prof. Ferrell criticizes in Section IV of his report. *See supra* at 2-3; Ferrell Report ¶¶ 16-18 (quoting and challenging SEC's use of the $19.49 price differential). And, as defendants often do in this context, Moshayedi argues that his ill-gotten gains should not include the full difference between his August offering price and the November or February disclosure prices because he claims sTec's stock price decreased during that period for reasons unrelated to his fraud. *See* Def. Opp. 19-20 (making that very argument). That is exactly what Prof. Ferrell has argued in Section V of his report. In that part of his report, he opines that "non-fraud related factors ... played a significant role in driving down the price of STEC stock between August 6, 2009 and February 24, 2010." Ferrell Report ¶ 7. There is no other purpose for Prof. Ferrell's opinion regarding sTec's stock price decrease in the fall of 2009 and what he calls "non-fraud" factors.[5]

---

[4] This calculation does not include the SEC's claim to have Moshayedi disgorge the secondary offering profits conferred upon his brother, Mark Moshayedi, as a result of Moshayedi's illegal insider trading. *See* Dkt. No. 1 (Compl.) at 33; *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990). Also, if only the November 3rd date was used as the corrective disclosure in this case (which the SEC contends would not be the proper measuring point for Moshayedi's ill-gotten gains), then his disgorgement would be $70.3 million (4.5 million shares times the difference between $29.76 and the November 4th price of $14.14).

[5] This argument is incorrect as a matter of law. For insider trading claims, courts have routinely rejected arguments by defendant that disgorgement amounts should not include price decreases between the defendant's illegal insider sale and the public disclosure of the non-public information he traded on. *See Patel*, 61 F.3d at 139-140 (affirming district court's rejection of defense argument that disgorgement should be reduced because stock price decrease between sale and disclosure "was not entirely due to" non-public information); *SEC v. Drucker*, 528 F.Supp.2d 450, 451 (S.D.N.Y. 2007) (similar). Regardless, this issue does not have to be decided at this juncture.

Moshayedi, however, now claims Prof. Ferrell offered his opinion in Section V, not to challenge the SEC's disgorgement calculation, but to critique Dr. Bergin's event study of the November 3rd disclosure. *See* Def. Opp. at 19.  He argues that Prof. Ferrell examined the events in the fall of 2009 because an "analysis of the total mix of information" "is an essential step in … determining the causes of sTec's stock price movements on November 4." *Id.*  That is pure fiction.  As Prof. Ferrell acknowledged in his deposition, event study analysis is premised on the theory that the market is efficient and quickly absorbs public information about a company, so that its stock price will immediately reflect all of the publicly disclosed information about the company at the time. *See* Ferrell Depo. Tr. at 83:12-84:7.  Event studies therefore look for the new information that is disclosed to the market about a particular company to see if that new information led to a stock price movement that is unique—or, "statistically significant"—to the company. *See id*. at 59:22-62:16.  The key is that the disclosed information linked to the stock price change on the event day is *new*. *See*, *e.g.*, *id*. at 78:20-24 (Prof. Ferrell:  "If you think the market is efficient and you can identify the disclosure, *and that disclosure is new information*, you could look at the price reaction on that day as one test of whether it's having a price impact.") (emphasis added); *see also* Jonathan R. Macey et al., *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson*, 77  Va. L. Rev. 1017, 1028 (1991) ("Event studies are an empirical technique for determining how securities returns react to *new* information.") (emphasis added).

Therefore, with respect to, for example, Dr. Bergin's event study of the disclosures on November 3rd, the only reason to look at events before that day in the fall of 2009 is to confirm that the information disclosed on November 3 and attributable to the statistically significant abnormal stock price return the next day was actually new information. *See id*.  For this basic proposition, Prof. Ferrell agrees.  As he explained in his deposition, the reason he was looking at the August to November time frame was because "what you have to do is look at the total mix of information immediately prior

Case No.  12-CV-01179-JVS-ANx

to November 3rd because that's the baseline against which the market's going to assess the new disclosures." *Id*. at 269:23-270:1.

So Moshayedi's claim that Prof. Ferrell was looking at the fall 2009 events in order to assess Dr. Bergin's November 3rd event study is just an after-the-fact attempt to recast Prof. Ferrell's disgorgement opinion. *Nowhere* does Prof. Ferrell say anything like that in his report. He does not even mention Dr. Bergin or his event study analysis in Section V. *See* Ferrell Report ¶¶ 21-36. As set forth clearly in that section, Prof. Ferrell only opines that "non-fraud factors" caused the stock price to fall over the course of the seven-month period from August 2009 to February 2010. He *never* attempts to link those so-called "non-fraud factors" to the specific—and important—price drops on November 4th or February 24th. *See id*.

In any event, as Prof. Ferrell conceded in his deposition, the "non-fraud factors" he identifies in Section V have *nothing* to do with the severe price drop on November 4th. His opinion—which he makes without any relevant experience (*see infra* at 20)— is that the these "non-fraud factors" were "the rapidly changing competitive landscape" in the SSD market in the fall of 2009. Ferrell Report ¶ 19; *see also id*. ¶¶ 21-36. Yet the disclosures that Dr. Bergin identified as causing sTec's stock price to drop on November 4th—namely, the "preliminary indications" of a possible EMC inventory buildup and the concession that the EMC contract was just a "one-off"—have absolutely nothing to do with the competitive landscape in the SSD market. And Prof. Ferrell admitted this in his deposition:

> Question:  But it's fair to say that the stock price movement from November 3rd to November 4th has nothing to do with the commentary about increased competition that you're citing that pre-dated that, correct?
>
> THE WITNESS:  I would agree with that. The reason why I'm agreeing is in a semi-efficient market, publicly available information, if it has a price impact, will be reflected quickly.

Ferrell Depo. Tr. at 228:7-15.

Thus, while both Moshayedi and Prof. Ferrell claim that Prof. Ferrell was

examining pre-November 3rd events to assess the disclosures on that day (*see* Def. Opp. at 19), they cannot deny, and have conceded, that these factors had "nothing" to do with those disclosures.  Rather, as is apparent from his written report, Prof. Ferrell's opinions in Section V regarding sTec's stock price movement from August 2009 to February 2010 had only one goal, and that was to help Moshayedi argue that the SEC's disgorgement amount was over-stated.  But that analysis has nothing to with the threshold issue of liability.

> **3.**   **Prof. Ferrell's "but-for" analysis in Section VII of his report is also a disgorgement opinion**

Try as he must, Moshayedi also cannot deny that Prof. Ferrell's "but-for" analysis in Section VII of his report is also only about how to calculate disgorgement.  This is plain from Prof. Ferrell's written conclusions in that part of his report.  As Prof. Ferrell summarizes, this analysis is meant to calculate the dollar-per share value of the fraud:

> [I]n Section VII, I present some potential but-for prices assuming different disclosures had been made at the time of the secondary offering.  These but-for prices *measure the per share price impact attributable to the alleged omissions*.

Ferrell Report ¶ 9 (emphasis added).  And in his final paragraph of the section, he clearly explains his goal in making this calculation—to compare his "but-for" dollar-per-share price impacts of the fraud to the SEC's dollar-per share disgorgement figure of $19.49 per share.  *See id.* ¶ 103.  This comparison is provided in a chart he attaches as Exhibit 5 to his report:

> As can be seen in Exhibit 5, all of my estimates of the per share impact of additional disclosures are significantly lower than the SEC's estimate of $19.49 per STEC share.

*Id.*  There is no reason to compare his "but-for" price impacts to the SEC's disgorgement number unless Prof. Ferrell's "but-for" figures are his proposed disgorgement measurements, which they clearly are.

In his opposition, however, Moshayedi does not even address Prof. Ferrell's express conclusions in his report, his chart in Exhibit 5, or the clearly stated purpose of

his "but-for" analysis. Instead, Moshayedi tries, again, to recast Prof. Ferrell's analysis as a rebuttal of Dr. Bergin's event study analysis. *See* Def. Opp. at 10-11. He is wrong for two fundamental reasons.

<blockquote>

a.   **The "but-for" analysis was aimed at showing which part of the July 16th stock price increase was due to fraud**
</blockquote>

First, Prof. Ferrell's "but-for" analysis does not rebut Dr. Bergin's analysis of the July 16th event day. Instead, both experts *agree* about what caused the price to increase on that day. Dr. Bergin opined that the statistically significant positive return of 12.98% on that day was attributable to sTec's announcement that it had entered into the $120 million supply contract and the market's understanding that this agreement portended a sustainable and increased level of future demand. *See* Bergin Report at 9, 32-33. Prof. Ferrell reached the *exact same* conclusion. He opined that the stock price increase on July 16th was "attributable" to (1) the announcement that sTec would sell $120 million of its drives to EMC in 2H09 (*see* Ferrell Report ¶ 83) and (2) the "increased expectations regarding future demand for ZeusIOPS products in 2010 and beyond." *Id*. ¶ 84.

Prof. Ferrell then uses his "but-for" analysis not to refute Dr. Bergin's opinions about what caused the price to increase on July 16th, but instead, as Moshayedi explains in his opposition, "to identify what portions of the stock price reaction on July 16 can be attributed to the *omission* of this information and what portion must be attributed to other, indisputably *truthful* disclosures." Def. Opp. at 11 (emphasis added). That is, Prof. Ferrell's but-for analysis was aimed at ferreting out which part of the stock price increase was due to a fraudulent omission, and which part was due to truthful disclosures. As he makes clear in paragraph 85 of his report, he "assume[d] that STEC announced in its July 16, 2009 press release that the volume agreement with EMC was non-recurring in nature." Ferrell Report ¶ 85. He then explains that he used his "but-for" analysis to calculate the "impact of the putative deliberate withholding of the one-off nature of the agreement." *Id*. In the end, he concludes that $3.30 of the price

increase on July 16th would be the maximum amount of that increase that could be due to some kind of fraudulent omission that day:

> The remaining $3.30 can be considered the absolute upper bound of the stock price impact of any information regarding the volume agreement or demand that, *ex post*, *turned out to be untrue*.

*Id*. ¶ 102 (emphasis added).

But, as discussed below, neither the SEC nor Dr. Bergin have claimed that there was a fraudulent omission on July 16.  Therefore, Prof. Ferrell's "but-for" analysis cannot have been aimed at Dr. Bergin's July 16th event study because both experts agree as to the causes of the price increase that day.  Rather, Prof. Ferrell makes clear that this "but-for" analysis was directed at calculating a number that is wholly irrelevant to this case—the amount of the July 16th price increase that could be attributed to fraud.

### b.    The "but-for" analysis has nothing to do with the November and February corrective disclosures

Second, as is clear from his report, Prof. Ferrell's "but-for" analysis does not attempt to rebut any of Dr. Bergin's event study analysis of the corrective disclosures on November 3, 2009 and February 23, 2010.  Moshayedi contends that his "but-for" analysis "directly addresses" Dr. Bergin's opinions regarding those two sets of corrective disclosures.  Def. Opp. at 11.  This is a remarkable claim given what Prof. Ferrell really did, which is clearly laid out in his report.

Moshayedi does not deny, because he cannot, that Prof. Ferrell's analysis starts with the July 16th disclosure.  *See* Ferrell Report ¶ 80 ("STEC's residual return on July 16, 2009 is a logical starting point.").  And as discussed above, the purpose was to figure out what part of that increase was due to a piece of information regarding the sTec-EMC $120 million contract was "deliberately withheld."  *See id*. ¶ 85.  Therefore, on its face, this "but-for" analysis was not even trying to address the corrective disclosures in November and February.

Moreover, the key corrective disclosure on November 3rd and the entire disclosure on February 23rd do not even mention the $120 million contract.  Rather,

Case No.  12-CV-01179-JVS-ANx

these corrective disclosures were Moshayedi's (false) statement in November that there were "preliminary indications" that EMC "might" have an inventory buildup, and his concession in February that EMC actually did have a huge inventory balance. Moshayedi's opposition carefully avoids these irrefutable facts.  In addition, Prof. Ferrell's "but-for" analysis really only concerns whether the $120 million was recurring or not.  *See* Ferrell Report ¶ 81.  Thus, at most, it could be argued that his analysis addresses Moshayedi's true disclosure on November 3rd that the contract was just a "one-off type of deal."  *Id*.  However, as discussed above, that is not what Prof. Ferrell did.  Instead, he only analyzed what impact that the disclosure of the "one-off" nature of the contract would have had on the *July 16th* price increase, and then used that analysis to measure the dollar-per-share amount of the fraud's impact and to contrast that with the SEC's proposed disgorgement figure.  *See id*. ("In this group of scenarios, I analyze the effect of disclosing that the volume agreement with EMC was a 'one-off type of deal' as of July 16 or early August 2009 on STEC's stock price.").

> **4.      Whether or not Dr. Bergin's opinion is admissible in the remedial phase has no bearing on the admissibility of Prof. Ferrell's disgorgement opinions at the liability phase**

Finally, having painted himself into a corner by offering Prof. Ferrell to opine about disgorgement, Moshayedi tries to shift the playing field and focus on what he claims is the "SEC's refusal to say whether or not it intends to use Dr. Bergin's opinions" in support of the SEC's disgorgement calculations.  Def. Opp. at 10-11.  This is a red herring.  Whether or not the SEC intends to rely on Dr. Bergin's opinions to support its disgorgement calculation has nothing to do with the inadmissibility of Prof. Ferrell's disgorgement opinions in Sections IV, V and VII of his report.  Nor does it address the fact that these opinions have nothing to do with liability.  And since Moshayedi agrees that disgorgement-related expert opinions should be offered only at the remedial phase of this case, that is all that matters when assessing whether Prof. Ferrell's opinions are admissible at the jury trial.

In any event, event studies are regularly used in securities fraud cases both to help establish materiality, *see*, e.g., *In re Oracle Sec. Litig.*, 829 F.Supp. 1176, 1181 (N.D.Cal.1993), and to help calculate disgorgement.  *See*, *e.g.*, *SEC v. Yuen*, 272 Fed. Appx. 615, 618 (9th Cir. 2008).  And that is exactly how the SEC can and should be allowed to use Dr. Bergin's event study opinions.  That is to say, while Dr. Bergin's event study has properly been offered to help establish the materiality of the non-public information that Moshayedi was aware of in August 2009 and that was ultimately disclosed in November and February, the results of his analysis can be used to help the SEC approximate the disgorgement amount.  For example, for the SEC's misrepresentation claim, one approximation of Moshayedi's unjust enrichment would be the amount of his ill-gotten gains that can be attributed to his fraud—that is, his total sale proceeds (about $133 million) times the 38.2% stock price return on November 4th that Dr. Bergin determined was attributable to Moshayedi's fraud in August—or about $50.8 million.  *See*, *e.g.*, *Platform Wireless*, 617 F.3d at 1096.

Prof. Ferrell's opinions, however, do not and cannot have this dual purpose.  As discussed above, Moshayedi admits Prof. Ferrell's Section IV "avoided loss" opinion critiquing the SEC's disgorgement calculation has nothing to do with liability, and his opinions in Sections V and VII, which Moshayedi strains to couch as non-disgorgement opinions, are only relevant to the issue of disgorgement (and  wrongly based on an assumed fraud on July 16th).  Therefore, the jury should not be subjected to any one of these three opinions from Prof. Ferrell.[6]

---

[6] Moshayedi also claims, in a footnote, that Prof. Ferrell "provides no affirmative opinion on the calculation of disgorgement."  Def. Opp. at 9 n.2.  But, as discussed above, that is simply not true.  And Moshayedi has good reason to spin this.  If he were to expressly admit that Prof. Ferrell "affirmatively" offers disgorgement opinions, then those opinions are either irrelevant to the liability phase of this case or, as discussed below, are improper rebuttal opinions.  On the other hand, if he were to claim that Prof. Ferrell's opinions have nothing to do with disgorgement (which he cannot do), then he would effectively be denying himself the chance of calling Prof. Ferrell during the remedy phase of the case.

Case No.  12-CV-01179-JVS-ANx

**B.     Prof. Ferrell's Opinions Regarding The SEC's Preliminary Disgorgement Calculation Were Improper Rebuttal Opinions**

Not only are Prof. Ferrell's disgorgement opinions in Sections IV, V and VII of his report irrelevant to the liability issues facing the jury, they are also not proper rebuttal opinions because they could and should have been disclosed with initial expert reports.  *See* FED. R. CIV. P. 26(a)(2)(D)(ii); *see also* Dkt. No. 255-2 (SEC Mot. to Exclude Ferrell) at 11-12 (cased cited therein).

First of all, Prof. Ferrell did not rebut any disgorgement calculation by Dr. Bergin because Dr. Bergin did not do any.  Moshayedi ignores this in his opposition.  But Prof. Ferrell openly conceded this in his deposition:

> Q.     And Dr. Bergin didn't calculate disgorgement, correct?
> A.     That's right.

Ferrell Depo. Tr. at 104:2-4.  Indeed, Section IV of his report was entitled "Dr. Bergin's Report Does Not Calculate 'Avoided Losses.'"  Ferrell Report at 5.

Moshayedi, however, argues that Prof. Ferrell was simply arguing that "Dr. Bergin's opinions and analysis do not support the calculation offered by the SEC."  Def. Opp. at 9.  Well, for one, this is a concession that Prof. Ferrell's opinions are about disgorgement and, as discussed above, should thus wait until the remedial phase of the case.  But it is also just an effort to spin the truth about Prof. Ferrell's report.  There is nothing in Dr. Bergin's report that Prof. Ferrell needed to know in order to issue his opinions in Sections IV, V and VII of his report.

Notably, the SEC disclosed all of its preliminary disgorgement calculations to defense counsel before the close of fact discovery.  *See* Dkt. No. 255-2 (SEC Mot. to Exclude Ferrell) at 14.  Moshayedi ignores this in his opposition.  But the fact that Moshayedi had this calculation before initial expert disclosures were due on June 12, 2013, only underscores how strategic and inexcusable it was for Moshayedi to advance, a month later, Prof. Ferrell as a "rebuttal" witness to challenge that calculation, particularly since Dr. Bergin offered no opinions on the subject of disgorgement.

1    That Prof. Ferrell is not rebutting Dr. Bergin is perhaps best demonstrated by the

2    fact that Prof. Ferrell does not mention Dr. Bergin once in either Section V or Section

3    VII of his report.  In Section V, he opines about the "non-fraud" factors that he said

4    caused sTec's stock price to fall between August 2009 and February 2010.  *See* Ferrell

5    Report ¶¶ 21-36.  There is nothing he needed to see in Dr. Bergin's report to opine that

6    the "changing competitive landscape" caused that price decline.  *Id*. ¶ 7.  As discussed

7    above, that opinion is made strictly to argue that the price declines in November and

8    February cannot measure the true ill-gotten gains of Moshayedi from his fraud.  And so

9    it is not surprising that Prof. Ferrell never even cites to or speaks of Dr. Bergin and his

10    analysis in Section V.

11    Likewise, in Section VII of his report regarding his "but-for" analysis, Prof.

12    Ferrell makes no mention of Dr. Bergin.  Instead, the only reason he said he did this

13    analysis was because Moshayedi's defense counsel "asked me."  *Id*. ¶ 80.  And, as

14    discussed above, the sole purpose of this analysis was to calculate dollar-per-share

15    impact figures that he contrasted with the SEC's $19.49 per share figure.  As he readily

16    acknowledges in his report, that $19.49 figure was obtained not from Dr. Bergin's

17    report, but from the SEC's responses to Moshayedi's interrogatories, which were

18    provided well in advance of the initial expert report due dates.

19    Finally, Prof. Ferrell's only mention of Dr. Bergin in his Section IV analysis of

20    "avoid losses" is his use of the $3.58 stock price increase that Dr. Bergin calculated as

21    the abnormal return on July 16th.  But, in Section VII of his report, he instead relied on

22    the $3.52 per share increase presented by his co-expert, Dr. Mukesh Bajaj, in Dr. Bajaj's

23    initial expert report.  *See* Ferrell Report ¶ 17 (referring to Dr. Bergin's $3.58 per share

24    figure), ¶ 82, p. 26 n.94 (referring to Dr. Baja's $3.52 per share figure).  This only

25    further demonstrates how his "but-for" analysis in Section VII has nothing to do with

26    Dr. Bergin's analysis.  Also, as Prof. Ferrell concedes in both his report and in his

27    deposition, whether or not he used Dr. Bajaj's figure "wouldn't change anything."

28    Ferrell Depo. Tr. at 156:21-157:25; Ferrell Report, p. 26 n.94 ("[m]y analysis would not

be substantially different if I were to adopt Dr. Bergin's July 16, 2009 residual price change of $3.58."). In other words, Prof. Ferrell did not need Dr. Bergin's analysis to challenge the SEC's $19.49 per-share figure that he criticizes in Section IV. Instead, he could have used the figure Dr. Bajaj disclosed in his initial expert report to make the exact same critique.

Therefore, not only are Prof. Ferrell's disgorgement opinions in Sections IV, V and VII inadmissible at the jury trial, they also should be excluded from the remedial stage because they violated this Court's scheduling order and Rule 26(a)(2). *See*, *e.g.*, *Donell v. Fidelity Nat'l Title Agency of Nevada*, No. 2:07-cv-00001-KJD-PAL, 2012 WL 170990, *3 (D. Nev. Jan. 20, 2012) (excluding plaintiff's rebuttal expert because it was offered to "contradict" defendant's case and not rebut defendant's expert). However, if the Court does accept Prof. Ferrell's report at the remedial phase for purposes of determining disgorgement, the SEC respectfully requests the opportunity for Dr. Bergin to submit a report to rebut Prof. Ferrell's analysis.

## C.    Prof. Ferrell's Opinions Are Unreliable Because They Assume Fraud On July 16

Also, Moshayedi cannot deny that Prof. Ferrell's opinions in Section IV, VI and VIII of his report are all based on the assumption that there was an "alleged disclosure deficiency" on July 16th. Ferrell Report ¶ 5. Remarkably, Moshayedi claims that "that is not what Professor Ferrell said in his report." Def. Opp. at 14. But that is *exactly what* Prof. Ferrell said in his report:

> The first date of July 16, 2009 is *allegedly when* there was an alleged disclosure deficiency.

Ferrell Report ¶ 5 (emphasis added). No one disputes that the SEC has *not* alleged that there was a fraud on that day. Indeed, much of the key evidence establishing Moshayedi's fraud in this case happened *after* July 16th. *See*, *e.g.*, Dkt. No. 146 (SEC Facts) ¶¶ 185-212 (Moshayedi learning after July 16 that EMC's 3Q09 forecast was too low to support increased analysts' Q309 consensus estimates).

15

This is a fatal flaw to the opinions that Prof. Ferrell offers in Sections IV, VI.A
and VII of his report.  On page 14 of his opposition, Moshayedi all but concedes this is
a mistake.  He agrees that Prof. Ferrell's opinions regarding the July 16th price
reaction—which, as discussed above, pervade his report—are wholly irrelevant as long
as the SEC is not alleging that there was a fraud on that day or is not using the $3.58
stock price increase on that day to measure the per-share stock price impact of the fraud
that is actually alleged:

> But Professor Ferrell acknowledged that if the SEC was not relying on July
> 16 as a disclosure deficiency date or as a proxy for the stock price impact
> of an alleged disclosure deficiency on August 3 (or some other date), he
> would have no need to opine on the July 16 stock price impact.

Def. Opp. at 14.  We also agree.  The SEC has never alleged that Moshayedi committed
fraud on July 16, and the SEC does not contend that the $3.58 per share increase on that
day should be used as a "proxy" to measure the true impact of the Moshayedi's fraud on
August 3rd or November 3rd.  This should end the discussion.  Based on Moshayedi's
own framing of the issue, Prof. Ferrell's challenged opinions are irrelevant to this case.

In any event, Moshayedi has no basis to contend that Prof. Ferrell's opinions
which assume an alleged fraud on July 16 have any bearing in this case.  The plain
language of Prof. Ferrell's report makes clear that in Sections IV, VI.A and VII of his
report, he assumes that Moshayedi is alleged to have engaged in some kind of fraud on
July 16, and then proceeds to offer opinions attempting to refute evidence of this fraud:

*Section IV*.  In this section, Prof. Ferrell opines that the $19.49 per-share
amount used by the SEC for its preliminary disgorgement calculation is too large
because the "maximum" that this per-share amount can be is the $3.58 per-share
increase on July 16th:

> [T]he maximum amount by which Mr. Moshayedi could have been
> enriched by any alleged disclosure deficiency … is $3.58, not the $19.49
> per share that the SEC calculates as avoided losses.

*Id*. ¶ 18.  He then goes on to say that this $3.58 stock price increase on July 16th has
nothing to do with this phantom "alleged disclosure deficiency" on that day:

Case No.  12-CV-01179-JVS-ANx

> [T]he $3.58 cannot be attributed to the impact of the *alleged disclosure deficiency* nor is there any scientific basis provided by Dr. Bergin for attributing any portion of the $3.58 to the impact of the *alleged disclosure deficiency*.

*Id*. (emphasis added).

    ***Section VI.A***.  In Section VI (*see id*. ¶¶ 37-79), Prof. Ferrell claims that Dr. Bergin's analysis is "flawed" because he ignores "confounding information"—that is, "non-fraud related information" (*id*. ¶ 20) that "might be responsible, in part, for the stock price reaction."  Ferrell Depo. Tr. at 68:12-16 .  But in sub-section A, where he focuses on Dr. Bergin's event study of the July 16th disclosures, Prof. Ferrell again invokes his assumption that there was an alleged "deliberate withholding" of information on that day.  *See* Ferrell Report ¶¶ 39-49.  Specifically, he opines that the alleged "disclosure deficiency" on July 16 had to be confounded because, unlike this presumed fraudulent disclosure, one of the disclosures that day—the report of the $120 million contract—was "truthful."  *Id*. ¶ 40.  He then concludes:

> Given these failures, Dr. Bergin has not established a reasonable basis for linking STEC's residual price change of $3.58 on July 16, 2009 to the market impact of the alleged disclosure deficiency.

*Id*. ¶ 49.[7]

    ***Section VII***.  Finally, as discussed above, Prof. Ferrell specifically explains that his "but-for" analysis starts with the July 16th price increase and attempts to calculate how much of that increase is attributable to the fraud that is supposedly alleged on July 16th.  *See supra*.  In each of his "but-for" scenarios in this section, Prof. Ferrell attempts to quantify the price impact on sTec's stock if fraudulently omitted information had been disclosed "as of July 16th."  Ferrell Report ¶¶ 81, 85, 96, 97.  In all cases, Prof. Ferrell assumes there was a "putative deliberate withholding" of this

---

[7] The SEC does not seek to exclude all of Section VI of Prof. Ferrell's report.  Rather, the SEC has sought to exclude only Section VI.A of his report because it assumes a fraud has been alleged on July 16th, and Section IV.B.4 because, as discussed below, it relies only on a factual interpretation of the record.

Case No.  12-CV-01179-JVS-ANx

1   information on July 16th.  *Id*.[8]

2        Moshayedi completely ignores the fact that these aspects of Prof. Ferrell's

3   opinions are expressly linked to an assumption that the SEC has alleged a July 16th

4   fraud.  Because that underlying assumption is not true, his opinions are inherently

5   unreliable.

6        **D.    Prof. Ferrell's "But-For" Analysis Is Untested And Unreliable**

7        It is also critical to recognize that Prof. Ferrell's so-called "but-for" analysis has

8   never been tested or approved by any court.  Moshayedi, however, claims there is a

9   "significant body of academic literature" that supports this analysis.  Def. Opp. at 16.

10  But none of the articles he cites review or assess, much less discuss, the "but-for"

11  analysis Prof. Ferrell used.  Rather, as Moshayedi points out, they merely offer general

12  principles about "the impact of earnings changes on stock prices."  *Id*.  And Moshayedi

13  does not deny that the "but-for" analysis was invented by Prof. Ferrell himself, that it

14  has never been used by anybody else and that no court has ever accepted it.

15       Prof. Ferrell used this untested approach rather than doing his own event study

16  analysis.  Moshayedi argues, however, that Prof. Ferrell did not need to do an event

17  study because he could instead rely on the event studies conducted by Dr. Bajaj, or by

18  the SEC's expert, Dr. Bergin.  *See id*. at 15-16.  But Dr. Bergin, in his expert report, did

19  not conduct an event study for the period August 3 to November 3, 2009, in an attempt

20  to determine the cause of sTec's stock price decline prior to November 4.  Thus, the

21  only event study that Prof. Ferrell could have relied upon for the opinions he gives in his

22  report (although he did not claim to do so) is the event study performed by Dr. Bajaj.

23

24  _____

[8]In an effort to explain this away, Prof. Ferrell and Moshayedi both try to lessen the

25  impact of the flaw by vaguely referring to the "disclosure deficiency" as one to have

    allegedly occurred in "July or August."  *See* Def. Opp. at 2:3, 4:18, 4:20, 7:12, 11:24,

26  21:15, 21:17-18, 21-22, 23:6; Ferrell Report ¶¶ 69, 76, 78, 81; Ferrell Depo. Tr. at

    270:15-16, 296:15-16, 297:1-4.  This does not solve the problem for them, and only

27  underscores the fact that Prof. Ferrell assumed a July fraud is alleged.

28

However, Dr. Bajaj's event study is meaningless and unreliable since he failed to disaggregate distinct influences on sTec's stock price during that period.  In his report, Dr. Bajaj concluded that sTec's stock price declined in the fall of 2009  "was attributable to growing investor concerns about the intensifying competition that STEC faced in the enterprise-class market and the slow adoption rate of the ZeusIOPS drives, *i.e.,* the materialization of known risks unrelated to the alleged fraud."  Bajaj Report ¶ 88.  But those risks are entirely distinct—the first implies a robust SSD market, filled with new entrants; the second implies a dying market and a failed technology. Accordingly, because Dr. Bajaj failed to disaggregate the potential influences of each of these purported market concerns, his event study is meaningless.  *See*, *e.g.*, Dkt. No. 259-1 (Def. Mot. to Exclude Dr. Bergin) at 16-17 (event study that fails to disaggregate confounding factors must be excluded) (collecting cases).

E.    **Prof. Ferrell's Opinions About Why sTec's Stock Price Fell From August 2009 To February 2010 Are Unreliable**

As discussed above, in Section V of his report, Prof. Ferrell opines that the "non-fraud" factors relating to the "changing competitive landscape" caused sTec's stock price to decrease between August 2009 and February 2010.  *See* Ferrell Report ¶¶ 21-36.  Not only is that wholly irrelevant to Moshayedi's liability (*see supra*), it is inherently unreliable.  He is also not qualified to present them in the way he does in his report.

1.    **Moshayedi does not deny that Prof. Ferrell's opinions regarding specific price drops lack any kind of methodology**

Prof. Ferrell's opinions in Section V of his report are not reliable because he did not do any kind of analysis, much less an event study, to assess the four stock price drops in September and October 2009 that he identifies in that part of his report.  *See* Ferrell Report ¶¶ 26, 28, 29, 31.  For each, Prof. Ferrell notes a drop in sTec's stock price, and then seems to suggest that reports expressing concerns about competition had something to do with the decrease in price.  *See id*.  Yet it is undisputed that Prof.

Ferrell undertook no analysis to determine whether these disclosures had anything to do with the stock price changes. *See id*.; *see also* Ferrell Depo. Tr. at 230:24-231:7, 232:4-13 (conceding he did not even try to figure out if other disclosures made have led to the price drop). This wholesale lack of any kind of testable methodology makes his opinions on these price changes inadmissible under Rule 702 and *Daubert*. *See* Dkt. No. 255-2 (SEC Mot. to Exclude Ferrell) at 14-15.

Moshayedi does not address at all the fact that there are no event studies for these September and October dates. For this reason alone, the Court should grant the SEC's motion to exclude these opinions and conclusions. *See*, *e.g.*, *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 569 (C.D. Cal. 2012) (resolving issue in favor of movants where opposing parties' briefing failed to respond to movants' contentions). Moreover, to the extent Moshayedi is arguing that Prof. Ferrell could have relied on Dr. Bajaj's event study to formulate his opinions about the stock price drop in the fall of 2009, he would be wrong. As discussed above, Dr. Bajaj's analysis of the fall of 2009 focused on two distinct causes for the stock price drop during that period. Yet he made no attempt to determine which of these influences impacted sTec's stock price. As a result, not only is Dr. Bajaj's event study flawed, it provides no support for Prof. Ferrell's opinion that sTec's stock price dropped in the fall of 2009 *solely* as result of market concerns over increasing competition

### 2. Moshayedi does not deny Prof. Ferrell's lack of qualifications

Moshayedi also does not deny that Prof. Ferrell is not qualified to opine about the competitive forces in the SSD market, as he clearly does in Section V of his report. *See* Def. Opp. at 18. Instead, Moshayedi argues that Prof. Ferrell opinion "only relates to the reasons for the changes in sTec's stock price." *Id*.

That may be what Moshayedi says now, and it is similar to what Prof. Ferrell said in his deposition. But that is not at all what Prof. Ferrell's states in his report. Rather, Prof. Ferrell gave the following four opinions about the SSD market:

- "STEC's competitive advantage related to its use of single level cell or

'SLC'-based enterprise SSDs such as ZeusIOPS was under pressure"
(Ferrell Report ¶ 32);

- "multi-level cell or 'MLC'-based SSDs … were not yet competitive in terms of some aspects of their performance" (*id*.);

- "MLC-based SSDs had a noteworthy advantage—they were significantly less expensive than SLC-based drives" (*id*.); and

- "broad economic conditions, among other things, impeded the speed of adoption thus lowering the overall demand for STEC's products" (*id*. ¶ 35).

The record going into trial should be clear.  Prof. Ferrell, admittedly, has no expertise to offer these four opinions on these subjects.  *See* Ferrell Depo. Tr. at 18:21-19:2, 19:11-16, 19:17-21, 19:22-20:3.  Therefore, he should not be allowed to offer these opinions, as they are stated in his report, at trial.  Moshayedi does not seem to dispute this in his opposition.

### F.    Prof. Ferrell's Views Regarding Factual Record Is Inadmissible

There is a similar problem with Prof. Ferrell's opinion in Section VI.B.4 of his report.  *See* Ferrell Report ¶¶ 69-71.  In that part of his report, Prof. Ferrell opines that it was his "understanding that STEC and EMC in fact continued negotiating over a possible second volume contract through at least September 10, 2009."  *Id*. ¶ 69.  As Moshayedi acknowledges in his opposition, this opinion is based on Prof. Ferrell's conclusion that any claim that Moshayedi failed to disclose the "one-off" nature of the contract is "'contradicted by correspondence between STEC and EMC.'"  Def. Opp. at 21 (quoting Prof. Ferrell).

This is clearly inadmissible expert testimony.  Both Moshayedi and Prof. Ferrell recognize that an expert witness, with no personal knowledge of the facts at issue, is not allowed to give his interpretation of the factual record.  *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y. 2005) ("no expert may supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting

the evidence") (quotations omitted); *In re Rezulin Products Liability Litig.*, 309 F.Supp.2d 531, 539 (S.D.N.Y. 2004); *see also* Ferrell Depo. Tr. at 38:5-7 (Prof. Ferrell: "it's inappropriate for an expert to opine on purely factual issues").

However, Moshayedi argues that Prof. Ferrell should be allowed to give this factual opinion because it is only intended to challenge "Dr. Bergin's conclusion that sTec could have disclosed the non-recurring nature of the $120 million agreement as of July 16, 2009 (or August 2009)." *Id.* at 21. This argument only reveals the flaw in Moshayedi's reasoning. Dr. Bergin has never opined as to what could or should have been disclosed in August 2009. That is not the role of an event study expert. Rather, that is what SEC counsel is charged with doing. That Moshayedi is contending that Prof. Ferrell's opinion is intended to rebut this point only shows Moshayedi's true intention in offering this so-called "expert" opinion—that is, to argue, as Moshayedi's counsel has done throughout this case, that Moshayedi could not have known, much less disclosed, that EMC would not enter into another volume agreement with sTec again. Putting aside the fact that the record evidence proves otherwise, it is not up to experts to argue that defense. *See Highland Capital*, 379 F.Supp.2d at 469 ("no expert may supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence") (quotations omitted); *In re Rezulin Products Liability Litig.*, 309 F.Supp.2d at 539 (an expert cannot "argue the client's cause from the witness stand").

Therefore, there is no reason that Prof. Ferrell should be allowed to testify to the jury about what he thinks the evidence shows about the supposed "continued negotiations" of a volume commitment between sTec and EMC, or about whether Moshayedi could have disclosed in early August EMC's unwillingness to enter into another commitment. Indeed, Dr. Bajaj, has rightly decided to withdraw this very same opinion from the palette of opinions he plans to offer at trial. *See* Def. Opp. at 23 n.8. Since Moshayedi persists in having Prof. Ferrell make this fact-based argument, masked as an expert opinion, the Court should exclude this testimony.

### G.     Prof. Ferrell's Opinions Are Duplicative Of Dr. Bajaj

Finally, Moshayedi argues that Prof. Ferrell's opinions are not cumulative of Dr. Bajaj's. *See* Def. Opp. at 22-24.  In making this argument, he offers only vague and general descriptions of these experts' respective sets of opinions, and fails to address the specific opinions that, in fact, overlap. *See id.*  Indeed, Moshayedi's withdrawal of Dr. Bajaj's opinion about the volume commitment negotiations is, at least, a tacit concession that the opinions of his two experts on this subject were identical. *See id.* at 23 n.8.

What is left of the cumulative opinions of Prof. Ferrell and Dr. Bajaj are their opinions about the causes of sTec's stock price drop from August to November 2009 (all of which are irrelevant).  When their specific opinions on this topic are compared, the duplication is obvious.  They both opine about the "non-fraud" factors (as Prof. Ferrell puts it) or the "risks unrelated to the fraud" (as Dr. Bajaj puts it) that they say influenced sTec's stock price in the fall of 2009:

> Dr. Bajaj:     sTec's stock price decline "was attributable to growing investor concerns about the intensifying competition that STEC faced in the enterprise-class SSD market and the slow adoption rate of ZeusIOPS drives, i.e., the materialization of known risks unrelated to the fraud" (Bajaj Report ¶ 87)

> Prof. Ferrell:  sTec's stock price decline was attributable to "considerable pressure as a result of developments in th[e] competitive landscape" facing sTec (Ferrell Report ¶ 2[.]

Even the bases for their opinions were the same.  In support of this opinion, both experts identified the same disclosures and quoted the same language (*compare* Bajaj Report ¶¶ 88, 91, 94 *with* Ferrell Report ¶¶ 26-27, 29-31, 33):

- Prof. Ferrell and Dr. Bajaj quote the same September report in *The Channel Register* about Plaint Technology, and the same Stifel Nicolaus and Wedbush analyst reports about Pliant.

- Both also quote Oppenheimer's September analyst report about "intensified competition."
- Each also quotes Sun Microsystem's October announcement "unveil[ing] a solid-state flash-based storage array," and Stifel Nicolaus's follow-up analyst report about Sun.
- Prof. Ferrell and Dr. Bajaj also have the same word-for-word description of Fusion-io's October report "that MySpace was adopting its flash memory cards across its data center," and cite Hapoalim Securities's analyst report about Fusion-io.
- They also had the exact same descriptions of announcements by Silicon Motion Technology, Micron and sTec.

Moshayedi ignores all of this in his opposition, as if this duplication does not even exist.  Instead, he contends that Prof. Ferrell's opinions are "broader" than Dr. Bajaj's.  Def. Opp. at 23.  Moshayedi is apparently referring to the fact that Prof. Ferrell attempts to opine about the price movement of sTec's stock from August 2009 to February 2010, while Dr. Bajaj only focuses on the period from August to November 2009.  *Compare* Bajaj Report ¶¶ 86-95 *with* Ferrell Report ¶¶ 21-36.  But that does not diminish the fact that Prof. Ferrell's opinions about the August to November 2009 period are the exact same as Dr. Bajaj's opinions for the same period.  Moreover, to say that Prof. Ferrell is opining about more than this fall 2009 period is a stretch.  In his report, he only cites one disclosure outside the August-November period—a December 8th report by Seagate Technologies—and he does not even explain why he cites that report or quotes the analyst report discussing the disclosure.  *See* Ferrell Report ¶ 36.

Finally, perhaps recognizing the duplication here, Moshayedi urges the Court not to decide whether his two experts offer duplicative opinions at this stage because he claims it would be "premature."  Def. Opp. at 23-24.   But, as one of the cases Moshayedi cites points out, whether or not experts are offering duplicate opinions *is* "a trial concern" and should be addressed in pre-trial motion practice.  *Monsanto Co. v.*

24                        Case No.  12-CV-01179-JVS-ANx

*E.I. Du Pont De Nemours & Co.*, No. 09-CV-00686-ERW, 2012 WL 27936, at *3 (E.D. Mo. Jan. 5, 2012) (holding that determination of whether experts' opinions were cumulative should not be addressed during expert discovery, and instead should be assessed "at a time closer to trial").  Indeed, not one of the cases Moshayedi cites for pushing off this determination involves a situation, like we have here, where the expert's opinions are exactly the same and have the same, word-for-word, bases.  That is more than sufficient for this Court to reach the obvious conclusion that Dr. Bajaj and Prof. Ferrell are opining about the same thing.

## III.   **CONCLUSION**

For the foregoing reasons and for the reasons set forth in the SEC's moving papers (*see* Dkt. No. 255-2), the SEC respectfully requests that the Court exclude Prof. Ferrell's proposed opinion testimony.


Dated:  October 7, 2013                    Respectfully submitted,

                                              */s/  John W. Berry*
                                              John W. Berry
                                              Donald W. Searles
                                              Gary Y. Leung
                                              Attorney for Plaintiff
                                              Securities and Exchange Commission

Case No.  12-CV-01179-JVS-ANx

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

   U.S. SECURITIES AND EXCHANGE COMMISSION,
   5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648
   Telephone No.  (323) 965-3213; Facsimile No.  (323) 965-3908.

On October 7, 2013, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF PROFSSOR ALLEN FERRELL UNDER RULES 403 AND 702 OF THE FEDERAL RULES OF EVIDENCE** on all the parties to this action addressed as stated on the attached service list:

☐     **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

        ☐     **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

        ☐     **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐     **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐     **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐     **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒     **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐     **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

        I declare under penalty of perjury that the foregoing is true and correct.

Date:  October 7, 2013                    */s/ John W. Berry*
                                           JOHN W. BERRY

1

**SEC v. MANOUCHEHR MOSHAYEDI**
**United States District Court—Central District of California**
**Case No. 12-CV-01179 (JVS) (ANx)**

**SERVICE LIST**

Sean M.  Berkowitz
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Direct Dial: 312-777-7016
sean.berkowitz@lw.com

Matthew Rawlinson
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: 650-463-3076
matt.rawlinson@lw.com

Colleen Smith
LATHAM & WATKINS LLP
600 W.  Broadway, Suite 1800
San Diego, CA 92101
Direct Dial:  619-238-2950
colleen.smith@lw.com

Everett Bulthuis (Paralegal)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925
Direct Dial:  714-755-8247
Cell:  714-747-1814
everett.bulthuis@lw.com

Thomas A.  Zaccaro
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomaszaccaro@paulhastings.com

*Attorneys for Defendant*

Patrick Gibbs
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-4696
patrick.gibbs@lw.com

William R.  Baker, III
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.  20004-1304
Direct Dial:  202-637-1007
william.baker@lw.com

Jennifer S.  Duckworth (Paralegal)
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Direct Dial:  650-463-3012
jennifer.duckworth@lw.com

Thomas P.  O'Brien
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: 213-683-6000
thomasobrien@paulhastings.com

*Attorneys for Defendant*